UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-------------------------------------------------------------------X

**CHAIM KAPLAN**, individually and as natural guardian of
plaintiffs M.K.(1), A.L.K., M.K.(2), C.K. and E.K.;

**RIVKA KAPLAN**, individually and as natural guardian of
plaintiffs M.K.(1), A.L.K., M.K.(2), C.K. and E.K;

Civ. No.

**M.K.(1)**, a minor, by her father and natural guardian, Chaim
Kaplan, and by her mother and natural guardian, Rivka Kaplan;

**A.L.K.**, a minor, by his father and natural guardian, Chaim
Kaplan, and by his mother and natural guardian, Rivka Kaplan;

**M.K.(2)**, a minor, by his father and natural guardian, Chaim
Kaplan, and by his mother and natural guardian, Rivka Kaplan;

**C.K.**, a minor, by her father and natural guardian, Chaim
Kaplan, and by her mother and natural guardian, Rivka Kaplan;

**E.K.**, a minor, by his father and natural guardian, Chaim
Kaplan, and by his mother and natural guardian, Rivka Kaplan;

**MICHAEL FUCHS**;

**AVISHAI REUVANE**;

**ELISHEVA ARON**;

**CHAYIM KUMER**;

**NECHAMA KUMER**;

**KEREN ARDSTEIN**, individually and as natural guardian
of plaintiffs M.A., N.A., A.C.A. and N.Y.A.;

**BRIAN ARDSTEIN**, individually and as natural guardian of
plaintiffs M.A., N.A., A.C.A. and N.Y.A.;

**M.A.**, a minor, by her father and natural guardian, Brian
Ardstein, and by her mother and natural guardian, Keren
Ardstein;

1

**N.A.,** a minor, by her father and natural guardian, Brian Ardstein, and by her mother and natural guardian, Keren Ardstein;

**A.C.A,** a minor, by his father and natural guardian, Brian Ardstein, and by his mother and natural guardian, Keren Ardstein;

**N.Y.A.,** a minor, by his father and natural guardian, Brian Ardstein, and by his mother and natural guardian, Keren Ardstein;

**LAURIE RAPPEPORT**, individually and as natural guardian of plaintiff M.R.;

**M.R.,** a minor, by her mother and natural guardian, Laurie Rappeport;

**YAIR MOR**;

**THEODORE GREENBERG**;

**MAURINE GREENBERG**;

**JACOB KATZMACHER**;

**DEBORAH CHANA KATZMACHER**;

**CHAYA KATZMACHER**;

**MIKIMI STEINBERG**;

**JARED SAUTER**;

**DANIELLE SAUTER**;

**MYRA MANDEL**;

**Y.L.,** a minor, by his father and natural guardian Elihav Licci and by his mother and natural guardian Yehudit Licci;

**ELIHAV LICCI**, individually and as natural guardian of plaintiff Y.L.;

**YEHUDIT LICCI**, individually and as natural guardian of plaintiff Y.L.;

**TZVI HIRSH**;

**ARKADY GRAIPEL**;

**TATIANA KREMER**;

**YOSEF ZARONA**;

**TAL SHANI**;

**SHLOMO COHEN**;

**NITZAN GOLDENBERG**;

**RINA DAHAN**;

**RAPHAEL WEISS**;

**AGAT KLEIN**;

**TATIANA KOVLEYOV**;

**VALENTINA DEMESH**;

**RIVKA EPON**;

**JOSEPH MARIA**;

**IMMANUEL PENKER**;

**ESTHER PINTO**;

**SARAH YEFET**;

**SHOSHANA SAPPIR**;

**R.G.G.**, a minor, by his father and natural guardian Fuad Shchiv Ghanam and by his mother and natural guardian Suha Shchiv Ghanam;

**FUAD SHCHIV GHANAM**, individually and as natural guardian of plaintiff R.G.G.;

**SUHA SHCHIV GHANAM**, individually and as natural guardian of plaintiff R.G.G.;

**ORNA MOR**;

**ROCHELLE SHALMONI**;

**OZ SHALMONI**;

**DAVID OCHAYON**;

**YAAKOV MAIMON**;

**MIMI BITON**;

**MIRIAM JUMA'A**, individually and as Personal Representative of the Estate of Fadya Juma'a;

**SALAH JUMA'A**, individually and as Personal Representative of the Estate of Samira Juma'a;

**SAID JUMA'A**, individually and as Personal Representative of the Estate of Samira Juma'a;

**ABD EL-RAHMAN JUMA'A**, individually and as Personal Representative of the Estate of Samira Juma'a;

**RAHMA ABU-SHAHIN**;

**ABDEL GAHNI ABDEL GAHNI**, individually and as Personal Representative of the Estate of Soltana Juma'a;

**SHADI SALMAN AZZAM**, individually, as the Personal Representative of the Estate of Manal Camal Azam and as natural guardian of plaintiffs K.S.A. and A.S.A.;

**K.S.A.**, a minor, by his father and natural guardian, Shadi Salman Azzam;

**A.S.A.**, a minor, by his father and natural guardian, Shadi Salman Azzam;

**ADINA MACHASAN DAGESH**;

**ARKADY SPEKTOR**;

**YORI ZOVREV**;

**YAAKOV ABUTBUL**;

**A.N.M.**, a minor, by his father and natural guardian, Zion Mor, and by his mother and natural guardian, Revital Mor;

**B.Z.M.**, a minor, by her father and natural guardian, Zion Mor, and by her mother and natural guardian, Revital Mor;

**M.M.**, a minor, by her father and natural guardian, Zion Mor, and by her mother and natural guardian, Revital Mor;

**C.I.M.**, a minor, by her father and natural guardian, Zion Mor, and by her mother and natural guardian, Revital Mor;

**ZION MOR**, individually and as natural guardian of plaintiffs A.N.M., B.Z.M., M.M. and C.I.M.;

**REVITAL MOR**, individually and as natural guardian of plaintiffs A.N.M., B.Z.M., M.M. and C.I.M.;

**ADHAM MAHANE TARRABASHI**;

**EMILLIA SALMAN ASLAN**;

**JIHAN KAMUD ASLAN**;

**ZOHARA LOUIE SA'AD**;

**I.Z.G.**, a minor, by his father and natural guardian Ziad Shchiv Ghanam, and by his mother and natural guardian, Gourov Tisir Ghanam;

**ZIAD SHCHIV GHANAM**, individually and as natural guardian of plaintiff I.Z.G.;

-and-

**GOUROV TISIR GHANAM**, individually and as natural
guardian of plaintiff I.Z.G.,

Plaintiffs,

-against-

**THE CENTRAL BANK OF THE ISLAMIC
REPUBLIC OF IRAN** (a/k/a Bank Markazi Jomhouri
Islami Iran)
Mirdamad Blvd., No.144
Teheran, Islamic Republic of Iran;

**BANK SADERAT IRAN**
Bank Saderat Tower
43 Somayeh Avenue,
Teheran, Islamic Republic of Iran;

**BANK SADERAT, PLC**
5 Lothbury
London EC2R 7HD
United Kingdom;

**THE ISLAMIC REPUBLIC OF IRAN**
Ministry of Foreign Affairs
Khomeini Ave. United Nations St.
Teheran, Iran;

**CBI DOES 1-10**
c/o The Central Bank of the Islamic Republic of Iran
(a/k/a Bank Markazi Jomhouri Islami Iran)
Mirdamad Blvd., No.144
Teheran, Islamic Republic of Iran;

**BSI DOES 1-10**
c/o Bank Saderat Iran
Bank Saderat Tower
43 Somayeh Avenue,
Teheran, Islamic Republic of Iran;

**BSPLC DOES 1-10**
c/o Bank Saderat PLC
5 Lothbury
London EC2R 7HD
United Kingdom,

-and-

**IRANIAN DOES 1-10**
c/o The Islamic Republic of Iran Ministry of Foreign Affairs
Khomeini Ave. United Nations St.
Teheran, Iran,

Defendants.

-------------------------------------------------------------------------- X


## COMPLAINT

Plaintiffs, by their counsel, complain of the Defendants, and hereby allege for their Complaint as follows:


## INTRODUCTION

1.      This is a civil action brought pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333(a), the Alien Tort Claims Act ("ATCA") 28 U.S.C. § 1350 and supplemental causes of action, arising from a series of terrorist rocket and missile attacks on civilians in Israel carried out by the Hezbollah terrorist organization between July 12 and August 14, 2006 ("Hezbollah Rocket Barrage").

2.     The plaintiffs are American, Israeli and Canadian civilians who were injured in the Hezbollah Rocket Barrage, and the family members and personal representatives of the estates of four Israeli civilians who were murdered by the Hezbollah Rocket Barrage.

3.     The defendants provided extensive material support and resources to Hezbollah, that caused, enabled and facilitated the Hezbollah Rocket Barrage.

## THE PARTIES

4.     Plaintiffs Chaim Kaplan, Rivka Kaplan, M.K.(1), A.L.K., M.K.(2), C.K. E.K, Michael Fuchs, Avishai Reuvane, Elisheva Aron, Chayim Kumer, Nechama Kumer, Keren Ardstein, Brian Ardstein, M.A., N.A., A.C.A., N.Y.A., Laurie Rappeport, M.R., Yair Mor, Theodore Greenberg, Maurine Greenberg, Jacob Katzmacher, Deborah Chana Katzmacher, Chaya Katzmacher, Mikimi Steinberg, Jared Sauter, Danielle Saute and Myra Mandel (sometimes referred to hereinafter collectively as the "American Plaintiffs") are American citizens who were injured by the Hezbollah Rocket Barrage. The details of the attacks and the nature of these plaintiffs' injuries are set forth below.

5.     Plaintiffs Chaim Kaplan, Rivka Kaplan, Brian Ardstein, Keren Ardstein and Laurie Rappeport bring this action individually and on behalf of their respective minor children (as set forth in the caption and below) plaintiffs M.K.(1), A.L.K., M.K.(2), C.K., E.K., M.A., N.A., A.C.A., N.Y.A., and M.R..

6.     The remaining plaintiffs (sometimes referred to hereinafter collectively as the "Non-American Plaintiffs") are Israeli and Canadian citizens who were injured, or whose family members were murdered, by the Hezbollah Rocket Barrage. The details of the attacks and the nature of these plaintiffs' injuries are set forth below.

7.      Plaintiffs Elihav Licci, Yehudit Licci, Fuad Shchiv Ghanam, Suha Shchiv Ghanam, Shadi Salman Azzam, Ziad Shchiv Ghanam, Gourov Tisir Ghanam, Zion and Revital Mor bring this action individually and on behalf of their respective minor children (as set forth in the caption and below) plaintiffs Y.L., R.G.G., K.S.A., A.S.A, A.N.M., B.Z.M., M.M., C.I.M. and I.Z.G..

8.      Plaintiff Abdel Gahni Abdel Gahni is the heir of Soltana Juma'a, who was murdered by the Hezbollah Rocket Barrage, and is authorized under Israeli law to bring this action on behalf of the Estate of Soltana Juma'a, and he brings this action both individually and on behalf of the Estate of Soltana Juma'a.

9.      Plaintiff Miriam Juma'a is the heir of Fadya Juma'a, who was murdered by the Hezbollah Rocket Barrage, and is authorized under Israeli law to bring this action on behalf of the Estate of Fadya Juma'a, and she brings this action both individually and on behalf of the Estate of Fadya Juma'a.

10.     Plaintiffs Salah Juma'a, Said Juma'a and Abd El-Rahman Juma'a are the heirs of Samira Juma'a, who was murdered by the Hezbollah Rocket Barrage, and are authorized under Israeli law to bring this action on behalf of the Estate of Samira Juma'a, and they bring this action both individually and on behalf of the Estate of Samira Juma'a.

11.     Plaintiff Shadi Salman Azzam is the heir of Manal Camal Azzam, who was murdered by the Hezbollah Rocket Barrage, and is authorized under Israeli law to bring this action on behalf of the Estate of Manal Camal Azzam, and brings this action both individually and on behalf of the Estate of Manal Camal Azzam.

12.     Defendant The Islamic Republic of Iran ("Iran"), through its political subdivisions, agencies, instrumentalities, officials, employees and agents, including the other

defendants herein, provided Hezbollah with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated and caused the Hezbollah Rocket Barrage and thereby caused plaintiffs' injuries and the murder of the decedents.

13.     Defendant Iran is a foreign state within the meaning of 28 U.S.C. § 1603, and has been continuously designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)) since 1984.

14.     Defendant The Central Bank of the Islamic Republic of Iran (a/k/a Bank Markazi Jomhouri Islami Iran) ("CBI") is a political subdivision of defendant Iran. As its name suggests CBI is Iran's central bank. The CBI's capital is wholly owned by defendant Iran. The CBI holds the funds belonging to Iran's ministries and government agencies, as well as Iran's foreign currency and gold reserves. Defendant CBI, acting within the scope of its office and agency, along with the other defendants herein, provided Hezbollah with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated and caused the Hezbollah Rocket Barrage and thereby caused plaintiffs' injuries and the murder of the decedents.

15.     Defendant Bank Saderat Iran ("BSI") is a bank incorporated in Iran. Defendant Iran owns over 90% of the shares of defendant BSI, and BSI is therefore an agency and instrumentality of defendant Iran. Defendant BSI, acting within the scope of its office and agency, along with the other defendants herein, provided Hezbollah with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated and caused the Hezbollah Rocket Barrage and thereby caused plaintiffs' injuries and the murder of the decedents.

16.     Defendant Bank Saderat PLC ("BSPLC") is a bank incorporated in the United Kingdom that is wholly-owned by defendant BSI. Defendant BSPLC, along with the other defendants herein, provided Hezbollah with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated and caused the Hezbollah Rocket Barrage and thereby caused plaintiffs' injuries and the murder of the decedents.

17.     Defendants CBI Does 1-10 are, and at all times relevant hereto were, officials, employees and agents of defendant CBI who, within the scope of their office, employment and agency, along with the other defendants herein, provided defendant Hezbollah with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated and caused the Hezbollah Rocket Barrage and thereby caused plaintiffs' injuries and the murder of the decedents.

18.     Defendants BSI Does 1-10 are, and at all times relevant hereto were, officials, employees and agents of defendant BSI who, within the scope of their office, employment and agency, along with the other defendants herein, provided defendant Hezbollah with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated and caused the Hezbollah Rocket Barrage and thereby caused plaintiffs' injuries and the murder of the decedents.

19.     Defendants BSPLC Does 1-10 are, and at all times relevant hereto were, officials, employees and agents of defendant BSPLC who, within the scope of their office, employment and agency, along with the other defendants herein, provided defendant Hezbollah with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated and caused the Hezbollah Rocket Barrage and thereby caused plaintiffs' injuries and the murder of the decedents.

20.     Defendants Iranian Does 1-10 are, and at all times relevant hereto were, officials, employees and agents of defendant Iran who, within the scope of their office, employment and agency, provided defendant Hezbollah with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated and thereby caused the Hezbollah Rocket Barrage and thereby caused plaintiffs' injuries and the murder of the decedents.

## JURISDICTION

21.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330(a), 1331, 1350, 1367 and 1605A(a) and pursuant to 18 U.S.C § 2333(a).

22.     This Court also has subject-matter jurisdiction over the action against defendant BSI by the joint operation of 28 U.S.C. § 1330(a) and Article XI(4) of the *United States – Iran Treaty of Amity, Economic Relations, and Consular Rights*, Aug. 15, 1955, 8 U.S.T. 899 ("Treaty of Amity"), because defendant BSI "engage[d] in commercial [and] other business activities within the territories" of the United States during the period in which the conduct complained of here occurred (2001-2006) and is therefore not immune from this action. *Id.*

## UNDERLYING FACTS

### A.      The Islamic Republic of Iran

23.     Since 1979 and until the present time, defendant Iran has continuously been governed by a militant Islamic regime which believes that Islam should be the sole world religion, that all non-Islamic nations and peoples should become Islamic and be destroyed if they refuse to do so, and that the Islamic nations, led by Iran, should rule the world exclusively.

24.     Since 1979 and until the present time Iran has been and remains, as a matter of official policy, extremely hostile to the United States (which Iran terms "the Great Satan") and to the State of Israel (which Iran terms "the Little Satan").

25.     Since 1979 and until the present time it has been the continuous and official policy and goal of Iran:

    a.  To weaken, harm and undermine the United States militarily, economically and politically;

    b.  To bring about and cause the eradication of the State of Israel and its replacement with an Islamic state; and

    c.  To bring about and cause the murder and/or expulsion of the Jewish residents of the State of Israel.

26.     The policy and goals described in the previous paragraph are referred to collectively hereinafter as "Iran's Policy and Goals."

27.     Iran is a highly ideological and authoritarian state that does not tolerate dissent and all political subdivisions of the Iranian government, all agencies and instrumentalities of Iran and all corporations controlled or directly or indirectly owned by Iran therefore support, and seek to advance the policies and goals of Iran, including Iran's Policy and Goals. Accordingly, CBI (which is a political subdivision of Iran) BSI (which is an agency and instrumentality of Iran and is controlled and directly owned by Iran) and BSPLC (which is controlled and indirectly owned by Iran) support and seek to advance Iran's Policy and Goals.

28.     Since 1979 and until the present time, it has been the continuous and official policy of Iran to use terrorism to achieve Iran's Policy and Goals. Specifically, since 1979 and until the present time, it has been the continuous and official policy of Iran to use terrorism (a) to

intimidate and influence the United States government and public and thereby to weaken, harm and undermine the United States militarily, economically and politically and (b) to intimidate and influence the Israeli government and public and thereby to bring about the eventual eradication of the State of Israel and its replacement with an Islamic state and the murder and/or expulsion of the Jewish residents of the State of Israel.

29.     In order to carry out and achieve Iran's Policy and Goals using terrorism, Iran established the Hezbollah terrorist organization in 1982. Since 1982 and until the present day, Hezbollah has been controlled, funded and operated by Iran. Since 1982 and until the present day, Iran has used Hezbollah to carry out thousands of terrorist attacks against American and Israeli targets, in which hundreds of innocent victims have been murdered and thousands more maimed.

30.     In 1982 Iran and Hezbollah entered into an agreement, that remains in force until today, pursuant to which Hezbollah undertook to carry out acts of terrorism against American and Israeli targets, and in return Iran undertook to provide Hezbollah with financial and other material support to carry out such terrorist attacks ("Hezbollah Agreement"). The purpose of the Hezbollah Agreement was and is to achieve Iran's Policy and Goals.

31.     The terrorist attacks committed by Hezbollah between 1982 and July 12, 2006, using material support and resources provided by Iran, included, *inter alia*, the following:

    a.  The July 19, 1982, kidnapping of American University president David S. Dodge in Beirut.

    b.  The April 18, 1983, car bomb attack on the United States Embassy in Beirut in which 63 people were killed.

c.  The October 23, 1983, truck bomb attack on the U.S. Marine barracks in Beirut in which 241 American military personnel were killed.

d.  The September 20, 1984, car bomb attack on the U.S. Embassy annex in Beirut in which two Americans and 22 others were killed.

e.  The March 16, 1984, kidnapping and murder of William Buckley, a CIA operative working at the U.S. Embassy in Beirut.

f.  The April 12, 1984, attack on a restaurant near the U.S. Air Force Base in Torrejon, Spain in which eighteen U.S. servicemen were killed and 83 people injured.

g.  The December 4, 1984, terrorist hijacking of a Kuwait Airlines plane in which four passengers were murdered, including two Americans.

h.  The June 14, 1985, hijacking of TWA Flight 847 in which Robert Stethem, a U.S. Navy diver, was murdered. Other American passengers were held hostage before being released on June 30, 1985.

i.  The February 17, 1988, kidnapping and subsequent murder of U.S. Marine Col. William Higgins.

j.  The March 17, 1992, bombing of the Israeli Embassy in Buenos Aires that killed 29 people and injured over 200.

k.  The July 18, 1994, bombing of the Jewish community center in Buenos Aires that killed 86 people and injured over 200.

l.  The November 28, 1995, bombardment of towns in northern Israel with missiles aimed at Jewish civilians.

m. The March 30, 1996, bombardment of northern Israeli towns with 28 missiles. A week later, Hezbollah fired 16 additional missiles, injuring 36 Israelis.

n. The August 19, 1997, bombardment of northern Israel with dozens of missiles aimed at Jewish civilians.

o. The December 28, 1998, bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

p. The May 17, 1999 bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

q. The June 24, 1999, bombardment on northern Israel, killing 2 people.

r. The April 9, 2002, launching of missiles into northern Israeli towns.

s. The August 10, 2003, firing of shells that killed a 16-year-old Israeli boy and wounded other Israelis.

32. The courts of the United States have issued many decisions finding Iran civilly liable for terrorist attacks carried out by Hezbollah in which U.S. citizens were murdered or harmed. This Court has found that "Hezbollah is an Iranian proxy organization, controlled, funded and operated by Iran … Iran's control over Hezbollah is so far-reaching that [the federal courts have] repeatedly held Iran vicariously liable, under the doctrine of respondeat superior, for actions of Hezbollah." *Stern v. Islamic Republic of Iran*, 271 F.Supp.2d 286, 292 (D.D.C. 2003).

33. Hezbollah has been designated by the United States Government as a Specially Designated Terrorist ("SDT") continuously since 1995, as a Foreign Terrorist Organization ("FTO") continuously since 1997, and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001.

**B.** **The Defendants' Provision of Funding to Hezbollah Between 2001 and 2006**

34.     Hezbollah requires financial support: (a) in order to build and maintain its operational infrastructure for the planning and execution of terrorist attacks; (b) in order to purchase and store weapons, explosives and other materiel used by it to carry out terrorist attacks; (c) in order to pay, train, transport and shelter its terrorist operatives; and (d) in order to carry out specific terrorist attacks.

35.     Between 2001 and 2006, the defendants herein provided Hezbollah with over $50 million in financial support (hereinafter: "Defendants' Transfer of Funds to Hezbollah") with the specific intent and purpose of facilitating, enabling and causing Hezbollah to carry out terrorist attacks against American and Israeli targets in order to advance Iran's Policy and Goals. Defendants' Transfer of Funds to Hezbollah was carried out by defendants with the specific intent and purpose of (a) intimidating and influencing the United States government and public and thereby weakening, harming and undermining the United States militarily, economically and politically and (b) intimidating and influencing the Israeli government and public and thereby bringing about the eventual eradication of the State of Israel and its replacement with an Islamic state and the murder and/or expulsion of the Jewish residents of the State of Israel.

36.     Defendants' Transfer of Funds to Hezbollah was carried out by defendants in the following manner: defendant CBI transferred funds belonging defendant Iran to defendant BSI; defendant BSI then transferred these funds to defendant BSPLC in London; defendant BSPLC then transferred these funds to accounts controlled by Hezbollah in branches of defendant BSI in Beirut, from which Hezbollah then withdrew these funds.

37.     Defendants' Transfer of Funds to Hezbollah has been confirmed by the United States government. *See* Exhibit A (published at www.ustreas.gov/press/releases/hp644.htm).

38.     But for Defendants' Transfer of Funds to Hezbollah, Hezbollah's ability (a) to build and maintain its operational infrastructure for the planning and execution of terrorist attacks; (b) to purchase and store weapons, explosives and other materiel used by it to carry out terrorist attacks; (c) to pay, train, transport and shelter its terrorist operatives; and (d) to carry out specific terrorist attacks, including the Hezbollah Rocket Barrage, would have been severely crippled and limited.

39.     Defendants' Transfer of Funds to Hezbollah substantially increased Hezbollah's ability to plan and carry out terrorist attacks, and facilitated and caused the execution of terrorist attacks by Hezbollah, including the Hezbollah Rocket Barrage.

40.     The defendants gave substantial aid, assistance and encouragement to one another and to Hezbollah and provided massive financial support to Hezbollah, and thereby aided and abetted Hezbollah, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism by Hezbollah, including the Hezbollah Rocket Barrage. The defendants did so with actual knowledge that Hezbollah had killed and injured numerous U.S. and other civilians in terrorist attacks and with the knowledge and specific intent that additional U.S. and other innocent civilians would be killed and/or injured as a result of their aiding, abetting and provision of material support and resources to the Hezbollah.

41.     The defendants knowingly and willingly conspired, agreed and acted in concert with one another and with Hezbollah, in order to advance Iran's Policy and Goals and pursuant to the Hezbollah Agreement, to cause and facilitate the commission of acts of extrajudicial killing and international terrorism including Hezbollah Rocket Barrage. The defendants did so with actual knowledge that Hezbollah had killed and injured numerous U.S. and other civilians

in terrorist attacks and with the knowledge and specific intent that additional U.S. and other innocent civilians would be killed and/or injured as a result of their conspiracy with Hezbollah.

42. At all relevant times, CBI was a political subdivision of Iran, and performed acts on behalf and at the direction of Iran, in order to advance Iran's Policy and Goals, pursuant to the Hezbollah Agreement and within the scope of its agency and office (within the meaning of 28 U.S.C. §§ 1605A(a)(1) and 1605A(c)), that caused the Hezbollah Rocket Barrage and the harm to the plaintiffs herein, in that CBI implemented and acted as a conduit and instrumentality for Iran's provision of funds to Hezbollah for the commission of acts of extrajudicial killing and international terrorism including the Hezbollah Rocket Barrage, as described herein.

43. Iran ordered, directed, authorized, ratified and approved the acts of CBI. Accordingly, Iran is vicariously liable for the acts of CBI.

44. At all relevant times, CBI Does 1-10 were agents, officers and employees of CBI and Iran and performed acts on behalf and at the direction of defendants CBI and Iran, in order to advance Iran's Policy and Goals, pursuant to the Hezbollah Agreement and within the scope of their agency and office (within the meaning of 28 U.S.C. §§ 1605A(a)(1) and § 1605A(c)), that caused the Hezbollah Rocket Barrage and the harm to the plaintiffs herein, in that CBI Does 1-10 authorized, planned and caused the provision of funds by CBI and Iran to Hezbollah for the commission of acts of extrajudicial killing and international terrorism including the Hezbollah Rocket Barrage, as described herein.

45. CBI and Iran ordered, directed, authorized, ratified and approved the acts of CBI Does 1-10. Accordingly, CBI and Iran are vicariously liable for the acts of CBI Does 1-10.

46. At all relevant times, BSI was an agency and instrumentality of Iran, and performed acts on behalf and at the direction of Iran, in order to advance Iran's Policy and Goals,

pursuant to the Hezbollah Agreement and within the scope of its agency and office, (within the meaning of 28 U.S.C. §§ 1605A(a)(1) and 1605A(c)), that caused the Hezbollah Rocket Barrage and the harm to the plaintiffs herein, in that BSI implemented and acted as a conduit and instrumentality for Iran's provision of funds to Hezbollah for the commission of acts of extrajudicial killing and international terrorism including the Hezbollah Rocket Barrage, as described herein.

47.     Iran ordered, directed, authorized, ratified and approved the acts of BSI. Accordingly, defendant Iran is vicariously liable for the acts of BSI.

48.     At all relevant times, BSI Does 1-10 were agents, officers and employees of BSI and Iran and performed acts on behalf and at the direction of BSI and Iran, in order to advance Iran's Policy and Goals, pursuant to the Hezbollah Agreement and within the scope of their agency and office (within the meaning of 28 U.S.C. §§ 1605A(a)(1) and 1605A(c)), that caused the Hezbollah Rocket Barrage and the harm to the plaintiffs herein, in that BSI Does 1-10 authorized, planned and caused the provision of funds by BSI and Iran to Hezbollah for the commission of acts of extrajudicial killing and international terrorism including the Hezbollah Rocket Barrage, as described herein.

49.     BSI and Iran ordered, directed, authorized, ratified and approved the acts of BSI Does 1-10. Accordingly, BSI and Iran are vicariously liable for the acts of BSI Does 1-10.

50.     At all relevant times, BSPLC was an agent of Iran, and performed acts on behalf and at the direction of Iran, in order to advance Iran's Policy and Goals, pursuant to the Hezbollah Agreement and within the scope of its agency, that caused the Hezbollah Rocket Barrage and the harm to the plaintiffs herein, in that BSI implemented and acted as a conduit and instrumentality for Iran's provision of funds to Hezbollah for the commission of acts of

extrajudicial killing and international terrorism including the Hezbollah Rocket Barrage, as described herein.

51.     Iran ordered, directed, authorized, ratified and approved the acts of BSPLC. Accordingly, Iran is vicariously liable for the acts of BSPLC.

52.     At all relevant times, BSPLC Does 1-10 were agents, officers and employees of BSPLC and Iran and performed acts on behalf and at the direction of BSPLC and Iran, in order to advance Iran's Policy and Goals, pursuant to the Hezbollah Agreement and within the scope of their agency and office, that caused the Hezbollah Rocket Barrage and the harm to the plaintiffs herein, in that BSPLC Does 1-10 authorized, planned and caused the provision of funds by BSPLC and Iran to Hezbollah for the commission of acts of extrajudicial killing and international terrorism including the Hezbollah Rocket Barrage, as described herein.

53.     BSPLC and Iran ordered, directed, authorized, ratified and approved the acts of BSPLC Does 1-10. Accordingly, BSPLC and Iran are vicariously liable for the acts of BSPLC Does 1-10.

54.     At all relevant times, Iranian Does 1-10 were agents, officers and employees of Iran and performed acts on behalf and at the direction of Iran, in order to advance Iran's Policy and Goals, pursuant to the Hezbollah Agreement and within the scope of their agency and office, that caused the Hezbollah Rocket Barrage and harm to the plaintiffs herein, in that Iranian Does 1-10 authorized, planned and caused the provision of funds by Iran to Hezbollah for the commission of acts of extrajudicial killing and international terrorism including the Hezbollah Rocket Barrage, as described herein.

55.     Iran ordered, directed, authorized, ratified and approved the acts of Iranian Does 1-10. Accordingly, Iran is vicariously liable for the acts of Iranian Does 1-10.

**C.** **The Hezbollah Rocket Barrage**

56.     Between July 12, 2006 and August 14, 2006, Hezbollah fired thousands of rockets and missiles (hereinafter "rocket" or "rockets") at civilians in northern Israel.

57.     Over 43 civilians were murdered by the Hezbollah Rocket Barrage, which constituted "extrajudicial killings" within the meaning of 28 U.S.C. § 1605A.

58.     The plaintiffs were injured and their decedents were murdered by the Hezbollah Rocket Barrage, as detailed below.

59.     On July 13, 2006, plaintiff Chaim Kaplan was severely injured by two rockets fired by Hezbollah at the northern Israeli town of Safed. The first rocket landed next to Chaim's car and severly injured him. The second rocket struck the Kaplan family's home, and also injured Chaim's wife, plaintiff Rivka Kaplan, as well as the couple's minor children plaintiffs M.K.(1), A.L.K., M.K.(2), C.K. and E.K.. As a result of these rocket attacks plaintiffs Chaim Kaplan, Rivka Kaplan, M.K.(1), A.L.K., M.K.(2), C.K. and E.K. suffered severe physical, psychological, emotional and financial injuries.

60.     Plaintiffs Avishai Reuvane and Elisheva Aron were injured on July 13, 2006, by a rocket fired by Hezbollah at Safed. As a result of this rocket attack Avishai Reuvane and Elisheva Aron suffered severe physical, psychological, emotional and financial injuries.

61.     Plaintiff Chayim Kumer, a resident of Safed, suffered a nervous breakdown and was hospitalized as a result of the Hezbollah Rocket Barrage, which in turn caused severe harm to his wife, Plaintiff Nechama Kumer. As a result of the Hezbollah Rocket Barrage plaintiffs Chayim Kumer and Nechama Kumer suffered severe psychological, emotional and financial injuries.

62.     On July 13, 2006, at approximately 14:30, plaintiff Michael Fuchs was driving his car in Safed when a rocket filed by Hezbollah at Safed struck nearby. Massive amounts of shrapnel penetrated Fuchs' car and caused him severe injuries. Fuchs lost large quantities of blood, lost consciousness and was rushed to the intensive care unit of Rebecca Ziv Hospital. Fuchs' throat was slashed as a result of the explosion and his right hand remains completely paralyzed. Fuchs has been permanently disabled. He is unable to work and relies on intensive and expensive medical treatments on an on-going basis. As a result of this rocket attack Michael Fuchs suffered severe physical, psychological, emotional and financial injuries.

63.     Plaintiffs Karen and Brian Ardstein resided in Safed at the time of the Hezbollah Rocket Barrage. Numerous rockets filed by Hezbollah at Safed landed near the family's home. Karen was pregnant at the time the attacks began and due to the ongoing strain, stress and anxiety, and the rocket explosions near the Ardstein home she suffered a miscarriage and lost the baby. In the wake of the miscarriage, Karen suffered from post-partum depression, damage to her immune system and has developed other medical complications. Brian was greatly traumatized by the rocket attacks and the loss of the baby. In addition, as a result of the rocket attacks and the collapse of tourism in Israel, Brian, a licensed tour guide, lost all of his work and had extreme difficulties supporting his family. The Ardsteins' minor children, plaintiffs M.A., N.A., A.C.A. and N.Y.A. all suffered emotional and psychological trauma from the Hezbollah Rocket Barrage. All of the children have been diagnosed with permanent and severe emotional disorders and are receiving on-going psychiatric treatment and therapy. As a result of the Hezbollah Rocket Barrage, plaintiffs Brian Ardstein, Keren Ardstein, M.A., N.A., A.C.A. and N.Y.A. suffered severe physical, psychological, emotional and financial injuries.

64.     On July 13, 2006, at approximately 7:00 p.m. a rocket fired by Hezbollah at Safed landed outside the home of plaintiffs Laurie Rappeport and her minor daughter M.R. in Safed. The powerful explosion blew M.R., who was playing outside on a wall, into the air. M.R. was hospitalized as a result of the explosion and suffered severe psychological trauma. Laurie was emotionally distraught over the injury sustained by her young daughter. As a result of this rocket attack plaintiffs Laurie Rappeport and M.R. suffered severe physical, psychological, emotional and financial injuries.

65.     On July 19, 2006, the art gallery owned by plaintiffs Yair and Orna Mor in Safed was directly hit by a rocket fired by Hezbollah at Safed. The business was completely destroyed in the blast. The couple was extremely traumatized by the destruction of their family's business. As a result of this rocket attack plaintiffs Yair and Orna Mor suffered severe psychological, emotional and financial injuries.

66.     In the summer of 2006, plaintiffs Theodore (Ted) Greenberg and Maurine Greenberg were the proprietors of a tourism business in Safed. The Hezbollah Rocket Barrage caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the Greenbergs severe financial damage. As a result of the Hezbollah Rocket Barrage, plaintiffs Theodore (Ted) Greenberg and Maurine Greenberg suffered severe financial damages.

67.     In the summer of 2006, plaintiffs Jacob Katzmacher and Deborah Chana Katzmacher were the proprietors of an art gallery in Safed (a business that caters almost exclusively to tourists). The Hezbollah Rocket Barrage caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the

Katzmachers severe financial damage. As a result of the Hezbollah Rocket Barrage, plaintiffs Jacob Katzmacher and Deborah Chana Katzmacher suffered severe financial damages.

68. On July 13, 2008, a rocket fired by Hezbollah at Safed landed a few meters away from plaintiff Chaya Katzmacher causing her psychological and emotional damage. As a result of this rocket attack, Chaya Katzmacher suffered severe psychological, emotional and financial damage.

69. On August 11, 2006, at approximately 1:15 p.m., a rocket fired by Hezbollah at Safed landed directly on plaintiff Mikimi Steinberg's house in Safed, severely damaging the house and the possessions therein. As a result of this rocket attack, Mikimi Steinberg suffered severe financial damages.

70. In the summer of 2006, plaintiffs Jared Sauter and Danielle Sauter were the owners of a tourism business in the town of Rosh Pina in the Galilee. The Hezbollah Rocket Barrage caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the Sauters severe financial damage. The Sauters' business collapsed and they was forced to relocate to a different city. As a result of the Hezbollah Rocket Barrage, Jared Sauter and Danielle Sauter suffered severe financial damages.

71. In the summer of 2006 plaintiff Myra Mandel was the owner of an art gallery in Safed. Rockets launched by Hezbollah damaged her art gallery. Additionally, the Hezbollah Rocket Barrage caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused Mandel severe financial damage. As a result of the Hezbollah Rocket Barrage, Myra Mandel suffered severe financial damages.

72. On July 13, 2006 a rocket fired by Hezbollah at Safed directly struck the home of plaintiffs Zion Mor and Revital Mor and injured their entire family. After the explosion, while

fighting the smoke, fire and destruction, Zion hysterically rushed to save his family who were in the center of the house at the time. The family home was completely destroyed by the rocket's explosion. Due to the emotional trauma Zion has been severely impaired psychologically and emotionally and remains disabled. Zion is largely unable to work as he must spend his time caring for his wife and children. Zion's wife, plaintiff Revital Mor, was sprayed with rocket shrapnel and glass in her legs and she suffered deep tissue injuries and major scars. Revital has been diagnosed with severe psychological and emotional damage and has been declared mentally debilitated and must rely on anxiety medicines for her day-to-day existence. The couple's minor son, plaintiff A.N.M., was also hit with shrapnel throughout his body, most acutely in his head and back. One of the shrapnel fragments pierced A.N.M.'s appendix which required surgery to remove. A.N.M. remains scarred throughout his body as a result of the injuries he sustained in the rocket attack. Another child, plaintiff B.Z.M., was also sprayed with shrapnel throughout her body. The large and visible scars that riddle her body as a result of the injuries she sustained in the rocket attack will never be healed – most notably the significant scars near her nose, near her eyes, on her torso and on her lower back. Another child, plaintiff M.M., suffered severe head trauma caused by large shrapnel fragments that pierced her head. M.M. was also severely injured in the belly area. The young girl was rushed to the hospital while on life support and was administered life-saving emergency surgery. M.M. remains scarred throughout her body as a result of the injuries she sustained in the rocket attack and suffers from severe headaches and severe psychological and emotional trauma that manifest themselves in acute restlessness, inability to concentrate, scattered thoughts and activities, severe attention deficit, and non-stop tics in her hands. The Mors' youngest child, plaintiff C.I.M. was also sprayed with shrapnel, most acutely in her head and legs. As a result of this rocket attack Zion Mor, Revital Mor,

A.N.M., B.Z.M., M.M. and C.I.M. suffered severe physical, psychological, emotional and financial injuries.

73.     On July 13, 2006 at approximately 7:30 am, a rocket fired by Hezbollah at the Israeli city of Nahariya directly struck plaintiff David Ochayon's apartment building. Ochayon was in his home at the time of the powerful explosion and was struck with shrapnel and debris. In addition, he was badly traumatized from the blast and is still being treated for emotional disorders. As a result of this rocket attack David Ochayon suffered severe physical, psychological, emotional and financial injuries.

74.     On July 13, 2006 at approximately 2:00 p.m. a rocket fired by Hezbollah at Safed directly hit the business owned by plaintiff Yaakov Maimon and collapsed the building on him. The force of the blast seriously physically injured and traumatized Yaakov Maimon. His business was badly damaged as well. As a result of this rocket attack Yaakov Maimon suffered severe physical, psychological, emotional and financial injuries.

75.     On July 12, 2006 at approximately 2:30 p.m. a rocket a rocket fired by Hezbollah at Safed struck the workplace of plaintiff Mimi Biton and collapsed the building on her. Biton was struck by shrapnel from the explosion and was badly traumatized by the blast and she experiences long-term psychological disorders. As a result of this rocket attack Mimi Biton suffered severe physical, psychological, emotional and financial injuries.

76.     On July 29, 2006 a rocket a rocket fired by Hezbollah at the Israeli town of Kiryat Motzkin near Haifa landed next to plaintiff Tzvi Hirsh as he was making his way to a bomb shelter near his home. Hirsh was hit with shrapnel from the explosion and was badly injured. In addition, he experienced severe trauma. The injuries Hirsh sustained caused him to be

permanently confined to a wheelchair. As a result of this rocket attack Tzvi Hirsh suffered severe physical, psychological, emotional and financial injuries.

77.    On July 26, 2006 at approximately 9:30 am a rocket fired by Hezbollah at the Israeli town of Kiryat Yam near Haifa landed next to plaintiff Arkady Graipel as he traveled to work. Arkadi was struck by shrapnel from the explosion. In addition he was badly traumatized from the blast. As a result of this rocket attack Arkady Graipel suffered severe physical, psychological, emotional and financial injuries.

78.    On July 13, 2006 at approximately 3:45 p.m. a rocket fired by Hezbollah at Safed landed outside the home of plaintiff Tatiana Kremer. Kremer was struck by shrapnel from the explosion. In addition, she was badly traumatized from the blast and is still being treated for psychological disorders. As a result of this rocket attack Taitana Kremer suffered severe physical, psychological, emotional and financial injuries.

79.    On August 3, 2006 a rocket fired by Hezbollah at the Israeli city of Acre, north of Haifa, slammed into the work place of plaintiff Yosef Zarona. Zarona was struck by shrapnel from the explosion which left him unable to walk without painful effort. In addition, he was badly traumatized from the blast and is still being treated with medication. He has had to stop working on account of his numerous injuries. As a result of this rocket attack Yosef Zarona suffered severe physical, psychological, emotional and financial injuries.

80.    On July 28, 2006 a rocket fired by Hezbollah at Kibbutz Amir in Israel's Hula Valley struck the home of plaintiff Tal Shani. Shani was struck with shrapnel and debris from the powerful blast and suffered severe head wounds. In addition, she was badly traumatized from the blast and she sustained long term psychological disorders. As a result of this rocket attack Tal Shani suffered severe physical, psychological, emotional and financial injuries.

81.     On August 13, 2006 a rocket fired by Hezbollah at Haifa directly struck the home of Shlomo Cohen, as well as his car. The powerful blast severely injured his ears and badly traumatized him. Medical experts are unable to provide treatment for his hearing difficulties. As a result of this rocket attack Shlomo Cohen suffered severe physical, psychological, emotional and financial injuries.

82.     On August 11, 2006 a rocket fired by Hezbollah at Kiryat Bialik, near Haifa, directly struck the home of a business associate of Nitzan Goldenberg, while Goldenberg was visiting. Goldenberg was injured by shrapnel and permanently handicapped. One of his hands is paralyzed and does not function. Goldenberg had trained as a chef and was preparing to open his own restaurant at the time of the rocket attack. Because of the serious damage to his hand he is today unable to work in his chosen profession as a chef. As a result of this rocket attack Nitzan Goldenberg suffered severe physical, psychological, emotional and financial injuries.

83.     On August 4, 2006 a rocket fired by Hezbollah at M'rar village in the Upper Galilee struck the house of plaintiff Shadi Salman Azzam. Shrapnel from the rocket flew into his house and killed his wife, Manal Camal Azzam, who was 28 at the time of her death, and severely wounded the couple's minor children, plaintiffs K.S.A. and A.S.A.. The murder of Manal Camal Azzam caused decedent and her estate severe harm, including conscious pain and suffering and pecuniary loss.

84.     Plaintiff Shadi Salman Azzam saw his wife torn to pieces and his children maimed by the rocket blast, and as a result he has suffered severe psychological harm and has been forced to seek professional mental health care. Before his wife's death plaintiff Shadi Salman Azzam worked as a builder and made a good salary on which he was able to support his family, but after the attack he stopped working for 4 months and to this day is unable to work the

same hours he used to – a fact that has hurt his family's income. In addition, plaintiff Shadi Salman Azzam is now responsible for assuming the duties that his wife previously fulfilled as a mother. As a result of this rocket attack decedent Manal Camal Azzam was murdered and plaintiff Shadi Salman Azzam suffered severe psychological, emotional and financial injuries.

85.     Plaintiff K.S.A., minor, is the daughter of plaintiff Shadi Salman Azzam and decedent Manal Camal Azzam. Plaintiff K.S.A.suffered severe physical injuries in the same rocket attack that killed her mother. As a result of her own injuries and watching the gruesome death of her mother in their family home, and seeing the maiming of her brother, she suffers from severe psychological and emotional trauma and is undergoing continuous psychological treatment. As a result of this rocket attack plaintiff K.S.A. suffered severe physical, psychological and emotional injuries.

86.     Plaintiff A.S.A., minor, is the four year-old son of plaintiff Shadi Salman Azzam and decedent Manal Camal Azzam. Plaintiff A.S.A. suffered physical shrapnel wounds in the same attack that severely injured his sister and killed his mother. As a result of his own injuries and watching the gruesome death of his mother in their family home, and seeing the maiming of his sister, he suffers from severe psychological and emotional trauma and is undergoing continuous psychological treatment. As a result of this rocket attack plaintiff A.S.A. suffered severe physical, psychological and emotional injuries.

87.     Plaintiff Adina Machasan Dagesh, 53, is a relative of the Azzam family, and was present in their home at the time of the August 4, 2006 rocket attack. Due to the shock, fear and trauma that she suffered, she is now undergoing continuous psychological treatment to deal with the manifestations of severe psychological and emotional trauma. As a result of this rocket attack, Adina Dagesh suffered severe psychological and emotional injuries.

88. On August 5, 2006 a rocket fired by Hezbollah at the village of Arb El-Aramshe, near the Israeli-Lebanese border, landed near the home of the Juma'a family. The rocket killed Fadya Juma'a, along with her daughters Samira Juma'a and Sultana Juma'a. The murder of Fadya Juma'a, Samira Juma'a and Sultana Juma'a caused decedents and their estates severe harm, including conscious pain and suffering and pecuniary loss.

89. Plaintiff Miriam Juma'a, aged 88, is the mother of decedent Fadya Juma'a and the grandmother of decedents Samira Juma'a and Sultana Juma'a. Miriam Jum'a suffered severe emotional harm as a result of the death of her daughter and granddaughters, as well as a substantial loss of support. Miriam was very much attached to her daughter, and dependent on her for care. This rocket attack caused Miriam Juma'a severe psychological and emotional injuries.

90. Plaintiffs Salah Juma'a, Said Juma'a, Abdel Rahman Juma'a and Rahma Abu-Shahin are the siblings of decedent Fadya Juma'a. The death of their beloved sister caused them severe emotional harm and distress. As a result of this rocket attack and the death of their sister, Salah Juma'a, Said Juma'a, Abdel Rahman Juma'a and Rahma Abu-Shahin suffered severe psychological and emotional injuries.

91. Plaintiff Abedel Gahni Abedel Gahni is the husband of decedent Soltana Juma'a. As a result of the death of his wife and the mother of his children, plaintiff Abedel Gahni Abedel Gahni has suffered terrible psychological and emotional trauma and distress, and financial loss. As a result of this rocket attack and the death of his wife Abedel Gahni Abedel Gahni suffered severe psychological, emotional and financial injuries.

92. On July 25, 2006 and August 4, 2006, rockets fired by Hezbollah at Kfar Maghar in the Galilee landed near plaintiffs Adham Mahane Tarrabashi, Emillia Salman Aslan and Jihan

Kamud Aslan. They experienced extreme trauma from the explosions and are undergoing treatment for psychological disorders. As a result of this rocket attack Adham Mahane Tarrabashi, Emillia Salman Aslan and Jihan Kamud Aslan suffered severe psychological and emotional injuries.

93.    On July 25, 2006 a rocket fired by Hezbollah at Kfar Maghar struck the workplace of plaintiff Zohara Louie Sa'ad. She was psychologically and emotionally traumatized by the blast. As a result of this rocket attack Zohara Louie Sa'ad suffered severe psychological, emotional and financial injuries.

94.    On July 25, 2006 a rocket fired by Hezbollah at Kfar Maghar hit the home of plaintiff Ziad Shchiv Ghanam and his wife plaintiff Gourov Tisir Ghanam. The blast caused Ziad severe physical injuries. Plaintiff Gourov Tisir Ghanam and the couple's minor son, plaintiff I.Z.G., who were also in the home, suffered severe psychological trauma as a result of the attack. As a result of this rocket attack Ziad Shchiv Ghanam suffered severe physical, psychological, emotional and financial injuries and plaintiffs Gourov Tisir Ghanam and I.Z.G. suffered severe psychological and emotional injuries.

95.    On August 8, 2006 a rocket fired by Hezbollah at Haifa landed next to plaintiff Rina Dahan as she was making her way to a bomb shelter. Rina was injured in both her legs and she is still in need of medical treatments, including pain-relieving shots. Rina's ability to walk is limited, especially climbing stairs. Rina Dahan's quality of life was severely damaged by her injuries and she is now disabled and dependent on medical care and third party assistance. In addition she was badly emotionally traumatized by the blast. As a result of this rocket attack Rina Dahan suffered severe physical, psychological, emotional and financial injuries.

96.     On August 3, 2006 at approximately 16:15 p.m., a rocket fired by Hezbollah at Acre struck outside the car of plaintiff Raphael Weiss. Weiss sustained shrapnel injury in his head and was rushed to the operating room. As a result of his injury, Weiss has been turned from a healthy active man to a disabled patient confined to a wheelchair, requiring regular medical treatments and a permanent assistance. As a result of this injury, Weiss suffered a CVA on the left part of his brain, and became epileptic. In addition to his physical injuries Weiss was badly emotionally traumatized by the blast. As a result of this rocket attack Raphael Weiss suffered severe physical, psychological, emotional and financial injuries.

97.     On July 16, 2006, in the morning hours, a rocket fired by Hezbollah at Kiryat Yam struck next to the bomb shelter where plaintiff Agat Klein was seeking refuge. As a result of the powerful blast, Agat Klein suffered serious psychological and emotional damage. She was evacuated to Carmel Hospital in Haifa. Agat Klein continues to suffer from psychological disorders and anxiety attacks. She still has not regained her ability function properly to this day, has trouble functioning and has had to resign from her job. As a result of this rocket attack Agat Klein suffered severe psychological, emotional and financial injuries.

98.     On July 25, 2006, at approximately 1:55 a.m., a rocket fired by Hezbollah at Haifa landed near plaintiff Tatiana Kovleyov. As a result of the blast, Kovleyov was sprayed with shrapnel in all parts of her body. Her ability to walk has been severely impaired, her left hand does not work, her body is still riddled with shrapnel and she requires ongoing physiotherapeutic care. In addition, Kovleyov has been severely impaired psychologically and emotionally. She suffers depression and sleep impairment among other ailments, for which she requires ongoing psychiatric care. Kovleyov is unable to work, due to the heavy physical and

psychological injuries she maintains. As a result of this rocket attack Tatiana Kovleyov suffered severe physical, psychological, emotional and financial injuries.

99.     On July 25, 2006, a rocket filed by Hezbollah at Haifa landed next to plaintiff Valentina Demesh as she was walking down the street. Demesh was sprayed with shrapnel and is suffering from functional disability in her hands and legs. In addition, Valentina has suffered psychological and emotional damage. She suffers from nightmares and other emotional disorders for which she requires ongoing psychiatric care. Damesh has been unable to return to work as a result of her medical condition. As a result of this rocket attack Valentina Demesh suffered severe physical, psychological, emotional and financial injuries.

100.     On August 11, 2006, at approximately 4:00 p.m., a rocket fired by Hezbollah at the town of Kiryat Shemona in the Galilee Panhandle directly struck the home of plaintiff Rivka Epon. Epon was in the house at the time of the explosion and she was hit in the face with shrapnel. The blast broke her nose and jaw and knocked three of her teeth from her mouth. She continues to suffer from dizziness, an inability to concentrate, headaches, severe ringing in her ears and significant pain in the spot where a two centimeter piece of rocket shrapnel is still lodged in her body. Rivka suffers from severe psychological and emotional damage and is unable to be alone. She requires continuous psychiatric care. As a result of this rocket attack Rivka Epon suffered severe physical, psychological, emotional and financial injuries.

101.     In the afternoon hours of July 28, 2006, a rocket fired by Hezbollah at Acre landed outside the home of plaintiff Joseph Maria. As a result of the powerful explosion Maria suffered a severe stroke and half his body remains paralyzed. His speech is confused and unintelligible, he requires continuous medical and nursing care 24 hours a day. Maria was also badly traumatized by the blast and suffers from psychological and emotional damage. As a result

of this rocket attack Joseph Maria suffered severe physical, psychological, emotional and financial injuries.

102.    On August 13, 2006, at approximately 10 p.m., a rocket fired by Hezbollah at Nahariya exploded outside a bus being operated by plaintiff Immanuel Penker. The powerful blast wounded Penker throughout his body including his right hand. Since the attack Penker has undergone surgery several times on his hand, left leg and left eye. In addition he has required skin grafts and restructuring. Penker needs medical care as well as occupational therapy due to his injuries and the extensive series of operations he has endured. In addition, he has been badly traumatized by the rocket blast. Since the attack Penker has been unable to work. As a result of this rocket attack Immanuel Penker suffered severe physical, psychological, emotional and financial injuries.

103.    On July 17, 2006, at approximately 1:10 p.m., a rocket fired by Hezbollah at Safed directly struck the home of Esther Pinto. Pinto was in her home at the time. The powerful explosion injured Pinto in both legs, and she was required to undergo surgery. Her walking remains impaired and she requires regular medical care. Pinto was badly traumatized from the blast and suffers from psychological and emotional damage. As a result of the rocket attack Esther Pinto suffered severe physical, psychological, emotional and financial injuries.

104.    On July 25, 2006 a rocket fired by Hezbollah at the Israeli village of Ma'ar exploded in the yard of the home of plaintiffs Fuad and Suha Shchiv Ghanam. Fuad suffered severe rocket shrapnel injuries throughout his body. He was also badly traumatized by the blast. Fuad's wife, Suha, suffered rocket shrapnel injuries throughout her body and suffers from severe psychological and emotional trauma. She requires continuous psychiatric care since the attack. The couple's young son plaintiff R.G.G. was also injured in the explosion. R.G.G. suffered

rocket shrapnel wounds throughout his body. In addition, R.G.G. suffers from psychological and emotional trauma due to the attack. As a result of this rocket attack Fuad and Suha Shchiv Ghanam and R.G.G. suffered severe physical, psychological, emotional and financial injuries.

105. On July 14, 2006, a rocket fired by Hezbollah at Safed landed next to plaintiff Yaakov Abutbul as he was leaving his shift at the hospital where he was employed. Abutbul was wounded with shrapnel in his legs, his back and his chest. He subsequently required surgery three times. In addition, he was traumatized by the explosion. As a result of this rocket attack Yaakov Abutbul suffered severe physical, psychological, emotional and financial injuries.

106. On July 22, 2006, a rocket fired by Hezbollah at Nahariya landed in close proximity to plaintiff Arkady Spektor. Spektor was sprayed with shrapnel in his right thigh, left shoulder and left lung, and was hospitalized. As a result of this rocket attack, Arkady Spektor suffered severe physical, psychological and emotional injuries.

107. On July 28, 2006, a rocket fired by Hezbollah at Nahariya landed about forty meters from plaintiff Yori Zovrev as he was running to a bomb shelter near his home. As a result, he broke his left ankle (compound fracture) and was hospitalized. As a result of this injury, he has suffered severe, constant pain through the present. In addition, he suffers from severe anxiety, manifesting itself in the form of insomnia and inability to rest. As a result of this rocket attack, Zovrev has suffered severe physical and psychological and emotional injuries.

108. On July 13, 2006, alarms sounded in response to rockets fired by Hezbollah at Safed, and, while running to the bomb shelter, plaintiff Y.L. stumbled and fell on his stomach and suffered an injury requiring that his spleen be immediately removed. On July 20, 2006 while still hospitalized in Safed from the spleen operation, another rocket fired by Hezbollah at Safed landed directly on the hospital in which Y.L. was being treated, very close to the room in which

he was hospitalized. Y.L. received shrapnel and glass shard wounds to his entire body, especially to his left foot and hand, his head, his back and his eyes. Y.L. suffered a fracture in his skull that cannot heal, and bulging scars in his limbs, back, and head. In addition, Y.L. suffered severe emotional injuries. While previously a healthy and active boy, Y.L. is now dependant on psychiatric treatment and medications. Y.L.'s condition has not improved. Even today, as a teenager, he sleeps in his parents' bed. As a result of these rocket attacks, Y.L. suffered severe physical, psychological, emotional and financial injuries.

109.    On July 21, 2006, a rocket fired by Hezbollah at Safed landed on the hospital where plaintiff Elihav Licci was attending to his son Y.L.. Elihav Licci was injured by the rocket, and suffered shrapnel wounds and glass shards embedded in his right hand and in his left foot. Some of these shards could not be removed and are still in Elihav's body. Elihav Licci also experienced psychological injuries (severe PTSD) as a result of the rocket attack. As a result of this rocket attack, Elihav Licci suffered severe physical, psychological, emotional and financial injuries.

110.    On July 13 2006, a rocket fired by Hezbollah landed on a dairy owned by plaintiffs Elihav and Yehudit Licci near Safed, paralyzing the dairy's activity. On July 20, 2006, another rocket fired by Hezbollah landed on the Licci's dairy and destroyed it. The dairy had until that time generated approximately $90,000 in monthly revenue. As a result of these rocket attacks, plaintiffs Elihav and Yehudit Licci suffered severe financial damages.

111.    On July 19, 2006 a rocket fired by Hezbollah at the town of Carmiel in the Northern Galilee struck the home of plaintiffs Rochelle Shalmani and Oz Shalmani, partly destroying it. The family could not live in the house in Carmiel due to the damage and the danger of ongoing rocket attacks, and spent several weeks crowded into a small Tel Aviv apartment with

twelve other people. The Shalmanis lost significant work time due to the attack. As result of this rocket attack Rochelle Shalmani and Oz Shalmani suffered severe financial injuries.

### D.     Plaintiffs' Injuries Are the Result of Defendants' Conduct

112.    Hezbollah carried out the Hezbollah Rocket Barrage, thereby causing the injuries and harm suffered by the plaintiffs herein.

113.    Defendants' Transfer of Funds to Hezbollah substantially increased and facilitated Hezbollah's ability to plan, to prepare for and to carry out the Hezbollah Rocket Barrage.

114.    But for Defendants' Transfer of Funds to Hezbollah, Hezbollah's ability (a) to build and maintain its operational infrastructure for the planning and execution of the Hezbollah Rocket Barrage; (b) to pay, train, transport and shelter the terrorist operatives who carried out the Hezbollah Rocket Barrage; and (c) to carry out the Hezbollah Rocket Barrage, would have been severely crippled and limited.

115.    The Hezbollah Rocket Barrage was thereby enabled, facilitated and proximately caused by the conduct of defendants described herein.

116.    Plaintiffs' injuries and harm are therefore the direct and proximate result of defendants' conduct.

### FIRST CLAIM FOR RELIEF AGAINST IRAN, CBI, BSI, IRANIAN DOES 1-10, CBI DOES 1-10 AND BSI DOES 1-10 ON BEHALF OF THE AMERICAN PLAINTIFFS ACTION FOR DAMAGES UNDER 28 U.S.C. §1605A(c)

117.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

118.    Defendants Iran, CBI, BSI, Iranian Does 1-10, CBI Does 1-10 and BSI Does 1-10 provided material support and resources to Hezbollah, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Hezbollah Rocket Barrage.

119.    Defendants CBI, BSI, Iranian Does 1-10, CBI Does 1-10 and BSI Does 1-10 are officials, employees, and/or agents of Iran who, within the scope of their office, employment and/or or agency, provided Hezbollah with the material support and resources that caused and facilitated the Hezbollah Rocket Barrage.

120.    The American Plaintiffs suffered severe physical, psychological, emotional and other personal injuries as a result of the Hezbollah Rocket Barrage, including: disfigurement; loss of physical and mental functions; extreme pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish and loss of solatium.

121.    As a direct and proximate result of the conduct of defendants Iran, CBI, BSI, Iranian Does 1-10, CBI Does 1-10 and BSI Does 1-10 the American Plaintiffs suffered the injuries and harm described herein

122.    Defendants Iran, CBI, BSI, Iranian Does 1-10, CBI Does 1-10 and BSI Does 1-10 are therefore jointly and severally liable under 28 U.S.C. § 1605A(c) for the full amount of the American Plaintiffs' damages.

123.    The conduct of defendants Iran, CBI, BSI, Iranian Does 1-10, CBI Does 1-10 and BSI Does 1-10 was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## SECOND CLAIM FOR RELIEF AGAINST IRAN, CBI, BSI, IRANIAN DOES 1-10, CBI DOES 1-10 AND BSI DOES 1-10 ON BEHALF OF THE AMERICAN PLAINTIFFS ACTION FOR DAMAGES UNDER 28 U.S.C. §1605A(d)

124.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

125.    The conduct of defendants Iran, CBI, BSI, Iranian Does 1-10, CBI Does 1-10 and BSI Does 1-10 caused the American Plaintiffs loss of property and financial loss as set forth above.

126.    Defendants Iran, CBI, BSI, Iranian Does 1-10, CBI Does 1-10 and BSI Does 1-10 are therefore jointly and severally liable under 28 U.S.C. § 1605A(d) for the full amount of the American Plaintiffs' financial damages.

## THIRD CLAIM FOR RELIEF AGAINST BSPLC AND BSPLC DOES 1-10 ON BEHALF OF THE AMERICAN PLAINTIFFS ACTION FOR INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a)

127.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

128.    The actions of defendants BSPLC and BSPLC Does 1-10 described herein constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

129.    As required by § 2331, the actions of defendants BSPLC and BSPLC Does 1-10 described herein constituted a violation of the criminal laws of the United States including, without limitation, the provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C, which criminalize the provision of funding to terrorist organizations and/or for terrorist activities.

130.     As required by § 2331, the actions of defendants BSPLC and BSPLC Does 1-10 were dangerous to human life by their nature and as evidenced by their consequences. At least 43 civilians were murdered by the Hezbollah Rocket Barrage, which was caused and facilitated by the actions of defendants BSPLC and BSPLC Does 1-10.

131.     As required by § 2331(1)(B) the actions of defendants BSPLC and BSPLC Does 1-10 were "intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion," in that between 2001 and 2006, BSPLC and BSPLC Does 1-10 provided Hezbollah with over $50 million in financial support with the specific intent and purpose of facilitating, enabling and causing Hezbollah to carry out acts of violence against American and Israeli targets in order to (a) intimidate and influence the United States government and public and thereby weaken, harm and undermine the United States militarily, economically and politically and (b) intimidate and influence the Israeli government and public and thereby bring about the eventual eradication of the State of Israel and its replacement with an Islamic state and the murder and/or expulsion of the Jewish residents of the State of Israel.

132.     As required by § 2331, the actions of defendants BSPLC and BSPLC Does 1-10 transcended national boundaries in terms of the means by which they were accomplished and the persons they appeared intended to intimidate or coerce.

133.     The actions of defendants BSPLC and BSPLC Does 1-10 described herein therefore constitute "acts of international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333(a).

134.     As a direct and proximate result of the actions of defendants BSPLC and BSPLC Does 1-10 the American Plaintiffs suffered the injuries and harm described herein.

135. Defendants BSPLC and BSPLC Does 1-10 are therefore liable for all of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

**FOURTH CLAIM FOR RELIEF AGAINST BSPLC AND BSPLC DOES 1-10 ON BEHALF OF THE AMERICAN PLAINTIFFS AIDING AND ABETTING INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a)**

136. The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

137. Since its founding and until July 12, 2006 (and until the present day) Hezbollah is and was a radical Islamic terrorist organization that views the State of Israel, the United States and other Western countries as its enemies.

138. Since its founding and until July 12, 2006 (and until the present day), Hezbollah has used terrorism against American and Israeli targets in an effort to coerce, intimidate and influence the American and Israeli government and public, and thereby weaken and undermine the United States and bring about the ultimate destruction of the State of Israel and the murder or expulsion of the Jews in Israel.

139. Hezbollah's actions described herein are and were dangerous to human life and constituted a violation of the criminal laws of the United States, since Hizbollah is a violent terrorist organization that, since its establishment has murdered hundreds of innocent civilians, and openly proclaims its intention to murder other such innocent civilians.

140. Hezbollah's actions described herein transcended national boundaries in terms of the means by which they were accomplished, the persons they appeared intended to intimidate or coerce, and the locales in which Hezbollah operates.

141.    The actions of Hezbollah described herein therefore constituted "acts of international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333(a).

142.    BSPLC and BSPLC Does 1-10 knowingly and intentionally transferred $50 million to Hezbollah between 2001-2006, with the specific purpose and intention of enabling and assisting Hezbollah to carry out violent attacks against American and Israeli targets.

143.    The actions of BSPLC and BSPLC Does 1-10 therefore constituted aiding and abetting Hizbollah's "acts of international terrorism" within the meaning of 18 U.S.C. §§ 2331 and 2333(a).

144.    As a direct and proximate result of the actions of defendants BSPLC and BSPLC Does 1-10 the American Plaintiffs suffered the injuries and harm described herein.

145.    Defendants BSPLC and BSPLC Does 1-10 are therefore liable for all of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

**FIFTH CLAIM FOR RELIEF AGAINST BSI, BSPLC, BSI
DOES 1-10 AND BSPLC DOES 1-10 ON BEHALF OF
PLAINTIFFS SHADI SALMAN AZZAM, K.S.A., A.S.A,
ADINA MACHASAN DAGESH, MIRIAM JUMA'A, SALAH
JUMA'A, SAID JUMA'A, ABDEL RAHMAN JUMA'A,
RAHMA ABU-SHAHIN AND ABEDEL GAHNI ABEDEL
GAHNI AIDING AND ABETTING VIOLATIONS OF
INTERNATIONAL LAW**

146.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

147.    Defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 knowingly and intentionally transferred some $50 million to Hezbollah between 2001-2006, on behalf and at the direction of Iran, and in coordination with Iran, in order to advance Iran's Policy and

Goals, with the specific purpose and intention of enabling and assisting Iran and Hezbollah to carry out extrajudicial killings against American and Israeli targets.

148.    As a result of the conduct of defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10, which was carried out on behalf and at the direction of Iran, and in coordination with Iran, in order to advance Iran's Policy and Goals, Manal Camal Azzam, Fadya Juma'a, Samira Juma'a and Sultana Juma'a were murdered.

149.    The murders of Manal Camal Azzam, Fadya Juma'a, Samira Juma'a and Sultana Juma'a were extrajudicial killings carried out on behalf and at the direction of Iran, and in coordination with Iran, in order to advance Iran's Policy and Goals, and therefore constituted violations of "the law of nations" within the meaning of 28 U.S.C. § 1350.

150.    Defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 aided and abetted the extrajudicial killings of Manal Camal Azzam, Fadya Juma'a, Samira Juma'a and Sultana Juma'a on behalf and at the direction of Iran, and in coordination with Iran, in order to advance Iran's Policy and Goals.

151.    As a direct and proximate result of the actions of defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10, decedents Manal Camal Azzam, Fadya Juma'a, Samira Juma'a and Sultana Juma'a and plaintiffs Shadi Salman Azzam, K.S.A., A.S.A, Adina Machasan Dagesh, Miriam Juma'a, Salah Juma'a, Said Juma'a, Abdel Rahman Juma'a, Rahma Abu-Shahin and Abedel Gahni Abedel Gahni, none of whom were or are American citizens, suffered severe injuries and harm including: death; severe physical injuries, pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

152.     Defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 are therefore liable for all of the damages suffered by Manal Camal Azzam, Fadya Juma'a, Samira Juma'a and Sultana Juma'a and plaintiffs Shadi Salman Azzam, K.S.A., A.S.A, Adina Machasan Dagesh, Miriam Juma'a, Salah Juma'a, Said Juma'a, Abdel Rahman Juma'a, Rahma Abu-Shahin and Abedel Gahni Abedel Gahni in such sums as may hereinafter be determined.

153.     The conduct of defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 was criminal, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

### SIXTH CLAIM FOR RELIEF AGAINST BSI, BSPLC, BSI DOES 1-10 AND BSPLC DOES 1-10 ON BEHALF OF ALL PLAINTIFFS
### NEGLIGENCE
### (Under the Law of the State of Israel)

154.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

155.     Pursuant to Fed.R.Civ.P. 44.1 plaintiffs hereby give notice of their intention to rely on the law of the State of Israel.

156.     Causes of action in tort in Israeli law are codified in the *Civil Wrongs Ordinance (New Version) - 1968*, (hereinafter "CWO").

157.     The CWO provides that any person injured or harmed by the civil wrongs (i.e. torts) enumerated in the CWO is entitled to relief from the person liable or responsible for the wrong.

158.     CWO § 35 creates a tort of Negligence.

159.     Under binding precedent of the Israeli Supreme Court, the tort of Negligence also includes intentional and/or reckless conduct.

160.    CWO § 35 provides that a person is liable for the tort of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances he is obligated not to act as he did.

161.    CWO § 36 provides that the obligation stated in the last sentence of § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

162.    By providing and transferring funds to Hezbollah defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 performed acts which a reasonable and prudent person would not have committed under the same circumstances, within the meaning of the CWO.

163.    Defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 did not, in the performance of their occupations, use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, within the meaning of the CWO, in that, *inter alia*, BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 provided and transferred funds to Hezbollah.

164.    Defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 acted negligently in connection with the decedents and the plaintiffs, toward whom, in the circumstances described herein, defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-

10 had an obligation not to act as they did. Defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 were obligated not to act as they did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, persons such as the decedents and the plaintiffs were liable to be harmed by the acts of defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 described herein.

165.    The behavior of defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 constitutes Negligence under the CWO, and that negligent behavior was the proximate cause of the decedents' and the plaintiffs' harm, which includes: death; severe physical injuries, pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

166.    Defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 are therefore liable for the full amount of plaintiffs' compensatory damages.

167.    Under Israeli case law a plaintiff harmed by an act of Negligence caused by intentional conduct is entitled to punitive damages.

168.    The conduct of defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 was intentional and malicious, and so warrants an award of punitive damages under Israeli law.

### SEVENTH CLAIM FOR RELIEF AGAINST BSI, BSPLC, BSI DOES 1-10 AND BSPLC DOES 1-10 ON BEHALF OF ALL PLAINTIFFS
### VICARIOUS LIABILITY
#### (Under the Law of the State of Israel)

169.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

170. Defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 knowingly and intentionally provided Hezbollah with funds which enabled, facilitated, supported and assisted Hezbollah to carry out the Hezbollah Rocket Barrage.

171. Vicarious liability principles are recognized in § 12 of the CWO, which provides that a person who participates in, assists, advises or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

172. Defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 knowingly and intentionally assisted Hezbollah to carry out the Hezbollah Rocket Barrage and are therefore liable for the full amount of plaintiffs' damages under CWO § 12.

173. The conduct of defendants BSI, BSPLC, BSI DOES 1-10 and BSPLC DOES 1-10 was intentional and malicious, and so warrants an award of punitive damages under Israeli law.

## JURY DEMAND

Plaintiff demands trial by jury of all issues legally triable to a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray that this Court:

(a) Enter judgment against the defendants, jointly and severally, in favor of the plaintiffs, for compensatory damages in an amount to be determined at trial, but for no less than $1,000,000,000.00 (one billion dollars);

(b) Enter judgment against the defendants, jointly and severally, in favor of the plaintiffs for punitive damages in amounts to be determined at trial;

(c)    Enter judgment against defendants BSPLC and BSPLC DOES 1-10, jointly and severally, in favor of the American Plaintiffs for treble damages;

(d)    Enter judgment against the defendants in favor of the plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees; and

(e)    Grant such other and further relief as justice requires.

Dated: February 15, 2010
      Brooklyn, New York

                  Respectfully submitted,

                  THE BERKMAN LAW OFFICE, LLC
                  *Counsel for Plaintiffs*

                  By:

                    Robert J. Tolchin
                    (D.C. Bar #NY0088)

                  111 Livingston Street, Suite 1928
                  Brooklyn, New York 11201
                  (718) 855-3627
                  Fax: (718) 504-4943

                  NITSANA DARSHAN-LEITNER & CO.
                  Nitsana Darshan-Leitner
                  *Israeli counsel for the plaintiffs*
                  10 Hata'as Street
                  Ramat Gan, 52512 Israel
                  Israeli #: 011-972-523-837-020
                  U.S. #: 212-591-0073

# EXHIBIT A

*To view or print the PDF content on this page, download the free Adobe® Acrobat® Reader®.*

October 25, 2007
hp-644

**Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism**

The U.S. Government is taking several major actions today to counter Iran's bid for nuclear capabilities and support for terrorism by exposing Iranian banks, companies and individuals that have been involved in these dangerous activities and by cutting them off from the U.S. financial system.

Today, the Department of State designated under Executive Order 13382 two key Iranian entities of proliferation concern: the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps) and the Ministry of Defense and Armed Forces Logistics (MODAFL). Additionally, the Department of the Treasury designated for proliferation activities under E.O. 13382 nine IRGC-affiliated entities and five IRGC-affiliated individuals as derivatives of the IRGC, Iran's state-owned Banks Melli and Mellat, and three individuals affiliated with Iran's Aerospace Industries Organization (AIO).

The Treasury Department also designated the IRGC-Qods Force (IRGC-QF) under E.O. 13224 for providing material support to the Taliban and other terrorist organizations, and Iran's state-owned Bank Saderat as a terrorist financier.

Elements of the IRGC and MODAFL were listed in the Annexes to UN Security Council Resolutions 1737 and 1747. All UN Member States are required to freeze the assets of entities and individuals listed in the Annexes of those resolutions, as well as assets of entities owned or controlled by them, and to prevent funds or economic resources from being made available to them.

The Financial Action Task Force, the world's premier standard-setting body for countering terrorist financing and money laundering, recently highlighted the threat posed by Iran to the international financial system. FATF called on its members to advise institutions dealing with Iran to seriously weigh the risks resulting from Iran's failure to comply with international standards. Last week, the Treasury Department issued a warning to U.S. banks setting forth the risks posed by Iran. (For the text of the Treasury Department statement see: http://www.fincen.gov/guidance_fi_increasing_mlt_iranian.pdf.) Today's actions are consistent with this warning, and provide additional information to help financial institutions protect themselves from deceptive financial practices by Iranian entities and individuals engaged in or supporting proliferation and terrorism.

**Effect of Today's Actions**

As a result of our actions today, all transactions involving any of the designees and any U.S. person will be prohibited and any assets the designees may have under U.S. jurisdiction will be frozen. Noting the UN Security Council's grave concern over Iran's nuclear and ballistic missile program activities, the United States also encourages all jurisdictions to take similar actions to ensure full and effective implementation of UN Security Council Resolutions 1737 and 1747.

Today's designations also notify the international private sector of the dangers of doing business with three of Iran's largest banks, as well as the many IRGC- affiliated companies that pervade several basic Iranian industries.

**Proliferation Finance – Executive Order 13382 Designations**

E.O. 13382, signed by the President on June 29, 2005, is an authority aimed at freezing the assets of proliferators of weapons of mass destruction and their supporters, and at isolating them from the U.S. financial and commercial systems. Designations under the Order prohibit all transactions between the designees and any U.S. person, and freeze any assets the designees may have under U.S. jurisdiction.

The Islamic Revolutionary Guard Corps (IRGC): Considered the military vanguard of Iran, the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps) is composed of five branches (Ground Forces, Air Force, Navy, Basij militia, and Qods Force special operations) in addition to a counterintelligence directorate and representatives of the Supreme Leader. It runs prisons, and has numerous economic interests involving defense production, construction, and the oil industry. Several of the IRGC's leaders have been sanctioned under UN Security Council Resolution 1747.

The IRGC has been outspoken about its willingness to proliferate ballistic missiles capable of carrying WMD. The IRGC's ballistic missile inventory includes missiles, which could be modified to deliver WMD.

The IRGC is one of the primary regime organizations tied to developing and testing the Shahab-3. The IRGC attempted, as recently as 2006, to procure sophisticated and costly equipment that could be used to support Iran's ballistic missile and nuclear programs.

Ministry of Defense and Armed Forces Logistics (MODAFL): The Ministry of Defense and Armed Forces Logistics (MODAFL) controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007. MODAFL also was sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000 for its involvement in missile technology proliferation activities.

MODAFL has ultimate authority over Iran's Aerospace Industries Organization (AIO), which was designated under E.O. 13382 on June 28, 2005. The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group (SHIG) and the Shahid Bakeri Industries Group (SBIG), which were both listed under UN Security Council Resolution 1737 and designated under E.O. 13382. The head of MODAFL has publicly indicated Iran's willingness to continue to work on ballistic missiles. Defense Minister Brigadier General Mostafa Mohammad Najjar said that one of MODAFL's major projects is the manufacturing of Shahab-3 missiles and that it will not be halted. MODAFL representatives have acted as facilitators for Iranian assistance to an E.O. 13382- designated entity and, over the past two years, have brokered a number of transactions involving materials and technologies with ballistic missile applications.

Bank Melli, its branches, and subsidiaries: Bank Melli is Iran's largest bank. Bank Melli provides banking services to entities involved in Iran's nuclear and ballistic missile programs, including entities listed by the U.N. for their involvement in those programs. This includes handling transactions in recent months for Bank Sepah, Defense Industries Organization, and Shahid Hemmat Industrial Group. Following the designation of Bank Sepah under UNSCR 1747, Bank Melli took precautions not to identify Sepah in transactions. Through its role as a financial conduit, Bank Melli has facilitated numerous purchases of sensitive materials for Iran's nuclear and missile programs. In doing so, Bank Melli has provided a range of financial services on behalf of Iran's nuclear and missile industries, including opening letters of credit and maintaining accounts.

Bank Melli also provides banking services to the IRGC and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

Bank Mellat, its branches, and subsidiaries: Bank Mellat provides banking services in support of Iran's nuclear entities, namely the Atomic Energy Organization of Iran (AEOI) and Novin Energy Company. Both AEOI and Novin Energy have been designated by the United States under E.O. 13382 and by the UN Security Council under UNSCRs 1737 and 1747. Bank Mellat services and maintains AEOI accounts, mainly through AEOI's financial conduit, Novin Energy. Bank Mellat has facilitated the movement of millions of dollars for Iran's nuclear program since at least 2003. Transfers from Bank Mellat to Iranian nuclear-related companies have occurred as recently as this year.

IRGC-owned or -controlled companies: Treasury is designating the companies listed below under E.O. 13382 on the basis of their relationship to the IRGC. These entities are owned or controlled by the IRGC and its leaders. The IRGC has significant political and economic power in Iran, with ties to companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial sectors. Through its companies, the IRGC is involved in a diverse array of activities, including petroleum production and major construction projects across the country. In 2006, Khatam al-Anbiya secured deals worth at least $7 billion in the oil, gas, and transportation sectors, among others.

- Khatam al-Anbya Construction Headquarters
- Oriental Oil Kish
- Ghorb Nooh
- Sahel Consultant Engineering
- Ghorb-e Karbala
- Sepasad Engineering Co
- Omran Sahel
- Hara Company
- Gharargahe Sazandegi Ghaem

IRGC Individuals: Treasury is designating the individuals below under E.O 13382 on the basis of their relationship to the IRGC. One of the five is listed on the Annex of UNSCR 1737 and the other four are listed on the Annex of UNSCR 1747 as key IRGC individuals.

- General Hosein Salimi, Commander of the Air Force, IRGC
- Brigadier General Morteza Rezaie, Deputy Commander of the IRGC
- Vice Admiral Ali Akhbar Ahmadian, Most recently former Chief of the IRGC Joint Staff
- Brigadier Gen. Mohammad Hejazi, Most recently former Commander of Bassij resistance force
- Brigadier General Qasem Soleimani, Commander of the Qods Force

Other Individuals involved in Iran's ballistic missile programs: E.O. 13382 derivative proliferation designation by Treasury of each of the individuals listed below for their relationship to the Aerospace Industries Organization, an entity previously designated under E.O. 13382. Each individual is listed on

the Annex of UNSCR 1737 for being involved in Iran's ballistic missile program.

- Ahmad Vahid Dastjerdi, Head of the Aerospace Industry Organization (AIO)
- Reza-Gholi Esmaeli, Head of Trade & International Affairs Dept., AIO
- Bahmanyar Morteza Bahmanyar, Head of Finance & Budget Department, AIO

**Support for Terrorism -- Executive Order 13224 Designations**

E.O. 13224 is an authority aimed at freezing the assets of terrorists and their supporters, and at isolating them from the U.S. financial and commercial systems. Designations under the E.O. prohibit all transactions between the designees and any U.S. person, and freeze any assets the designees may have under U.S. jurisdiction.

IRGC-Qods Force (IRGC-QF): The Qods Force, a branch of the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps), provides material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC).

The Qods Force is the Iranian regime's primary instrument for providing lethal support to the Taliban. The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. Since at least 2006, Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and probably man-portable defense systems to the Taliban. This support contravenes Chapter VII UN Security Council obligations. UN Security Council resolution 1267 established sanctions against the Taliban and UN Security Council resolutions 1333 and 1735 imposed arms embargoes against the Taliban. Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and NATO forces.

The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.

In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hizballah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence. Hizballah has used Bank Saderat to send money to other terrorist organizations, including millions of dollars on occasion, to support the activities of Hamas. As of early 2005, Hamas had substantial assets deposited in Bank Saderat, and, in the past year, Bank Saderat has transferred several million dollars to Hamas.

**REPORTS**

- Treasury and State Department Iran Designations Identifier