Case 1:10-cv-00483-RCL   Document 25-1   Filed 08/15/11   Page 1 of 102



C

[1999] 2 W.L.R. 827

**\*147 Regina v Bow Street Metropolitan Stipendiary Magistrate And Others, Ex Parte Pinochet Ugarte (No. 3)**

House of Lords

Lord Browne Wilkinson, Lord Goff of Chieveley, Lord Hope of Craighead, Lord Hutton, Lord Saville of Newdigate, Lord Millett,  and Lord Phillips of Worth Matravers

1999 Jan. 18, 19, 20, 21, 25, 26, 27, 28; Feb. 1, 2, 3, 4; March 24

Extradition—Extradition crime—Double criminality—Torture committed outside jurisdiction of both requesting state and England—Alleged offences committed before extraterritorial torture punishable in England—Extradition requested after offence made punishable under English law—Whether relevant time for consideration of criminality date of offence or date of request—Whether offence extraditable— Extradition Act 1989 (c. 33), s. 2

International Law—State immunity—Former head of state—Request for extradition in respect of crimes of torture and conspiracy to torture relating to period when applicant head of state—Whether immunity in respect of acts performed in exercise of functions as head of state—Whether governmental acts of torture attributable to functions of head of state—Whether former head of state entitled to immunity ratione materiae in relation to acts of torture— Diplomatic Privileges Act 1964 (c. 81), s. 2(1), Sch. 1, arts. 29, 31, 39 — State Immunity Act 1978 (c. 33), s. 20(1) — Criminal Justice Act 1988 (c. 33), s. 134(1)

The applicant, a former head of state of Chile who was on a visit to London, was arrested under a provisional warrant issued by a metropolitan stipendiary magistrate pursuant to section 8(1) of the Extradition Act 1989 1 following the issue of an international warrant of arrest issued by the Central Court of Criminal Proceedings No. 5, Madrid. Six days later a

second section 8(1) warrant was issued by a magistrate upon receipt of a second international warrant of arrest issued by the Spanish court alleging, inter alia, that the applicant, during his period of office between 1973 and 1990, had ordered his officials to commit acts of torture falling within section 134(1) of the Criminal Justice Act 1988 2 and acts of hostage-taking within section 1 of the Taking of Hostages Act 1982. 3 The applicant issued proceedings in the Divisional Court for orders of certiorari to quash the first provisional warrant as disclosing no act amounting to an extradition crime, as defined by section 2 of the Act of 1989, and both warrants as relating to acts performed by the applicant in exercise of his functions as head of state and in respect of which he was entitled to immunity under customary international law and the provisions of section 20(1) of Part III of the State Immunity Act 1978, 4 read with section 2 of, and articles 29, 31, and 39 of Schedule 1 to, the Diplomatic Privileges Act 1964. 5 The Divisional Court, having found that the first warrant was bad as falling outside section 2 of the Act of 1989, held with respect to both warrants that the applicant, as a former head of state, was **\*148** entitled to immunity from civil and criminal process in the English courts in respect of acts committed in the exercise of sovereign power. The court quashed both warrants. On appeal the Commissioner of Police of the Metropolis and the Government of Spain the House of Lords allowed the appeal by a majority of three to two. The applicant challenged that decision on the ground that the Appellate Committee was improperly constituted. The House of Lords set aside the decision and ordered that the appeal be reheard before a differently constituted committee. By the time the case came on for rehearing the Spanish authorities had particularised further charges against the applicant, including charges of torture and conspiracy to torture, conspiracy to murder, attempted murder and murder. Most offences were alleged to have occurred in Chile but some were said to have occurred variously in Spain, Italy, France and Portugal and some offences were said to have taken place as early as 1 January 1972. As a result of the widening of the case against the applicant he took the additional point that he could not be extradited to face most of the charges as they did not amount to "extradition crimes" within the meaning of section 2 of the Act of 1989.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

On the rehearing of the appeal:-

 (1) that the requirement in section 2 of the Act of 1989 that the alleged conduct which was the subject of the extradition request be a crime under United Kingdom law as well as the law of the requesting state was a requirement that the conduct be a crime in the United Kingdom at the time when the alleged offence was committed; that (Lord Millett dissenting) extraterritorial torture did not become a crime in the United Kingdom until section 134 of the Criminal Justice Act 1988 came into effect on 29 September 1988; and that, accordingly, all the alleged offences of torture and conspiracy to torture before that date and all the alleged offences of murder and conspiracy to murder which did not occur in Spain were crimes for which the applicant could not be extradited (post, pp. 195B-196B, 196C-197B, 208D-F, 229H-230C, 237E-F, 249C-E, 265C-D, 268A-B, 279E-F).(2) Allowing the appeal in part (Lord Goff dissenting), that, a former head of state had immunity from the criminal jurisdiction of the United Kingdom for acts done in his official capacity as head of state pursuant to section 20 of the State Immunity Act 1978 when read with article 39(2) of Schedule 1 to the Diplomatic Privileges Act 1964 ; but that torture was an international crime against humanity and jus cogens and after the coming into effect of the International Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment 1984 there had been a universal jurisdiction in all the Convention state parties to either extradite or punish a public official who committed torture; that in the light of that universal jurisdiction the state parties could not have intended that an immunity for ex-heads of state for official acts of torture ( *per* Lord Hope of Craighead, for systematic and widespread acts of official torture) would survive their ratification of the Convention;

that ( *per* Lord Browne-Wilkinson, Lord Hope of Craighead and Lord Saville of Newdigate) since Chile, Spain and the United Kingdom had all ratified the Convention by 8 December 1988 the applicant could have no immunity for crimes of torture or conspiracy to torture after that date; that ( *per* Lord Hutton) the relevant date when the immunity was lost was 29 September 1988 when section 134 of the Act of 1988 came into effect; that ( *per* Lord Browne-Wilkinson, Lord Hope of Craighead, Lord Hutton and Lord Saville of Newdigate) there was nothing to show that states had agreed to remove the immunity for charges of murder which immunity **\*149** accordingly remained effective; that, on the facts alleged, no offence of hostage-taking within the meaning of section 1(1) of the Act of 1982 arose; and that, accordingly, the applicant had no immunity from extradition for offences of torture or conspiracy to torture which were said to have occurred after 8 December 1988 and the extradition could proceed on those charges (post, pp. 198E-H, 200F-201A, 203C-F, 204F-205B, 205F-H, 231A-B, 234E-H, 240G-241C, 241E-F, 242B-C, 247E-248H, 261A-B, 262B-C, 263D-F, 265A-B, 266G-267E, 270A-D, 277C-F, 287E-288A, 289E-290C, 292E-F).*Per* Lord Millett and Lord Phillips of Worth Matravers. The systematic use of torture was an international crime for which there could be no immunity even before the Convention came into effect and consequently there is no immunity under customary international law for the offences relating to torture alleged against the applicant. Nor is there immunity for the offence of conspiracy to murder in Spain (post, pp. 275C-F, 276D-E, 277B, 279B-C, 290A-C, 292E-F).Decision of the Divisional Court of the Queen's Bench Division reversed in part.

The following cases are referred to in their Lordships' opinions:

- Al-Adsani v. Government of Kuwait (1996) 107 I.L.R. 536, C.A..

- Alcom Ltd. v. Republic of Colombia [1984] A.C. 580; [1984] 2 W.L.R. 750; [1984] 2 All E.R. 6, H.L.(E.).

- Argentine Republic v. Amerada Hess Shipping Corporation (1989) 109 S.Ct. 683

- Brunswick (Duke of) v. King of Hanover (1848) 2 H.L.Cas. 1, H.L.(E.).

- Buck v. Attorney-General [1965] Ch. 745; [1965] 2 W.L.R. 1033; [1965] 1 All E.R. 882, C.A..

- Congreso del Partido, I [1983] 1 A.C. 244; [1981] 3 W.L.R. 328; [1981] 2 All E.R. 1064, H.L.(E.).

- Demjanjuk v. Petrovsky (1985) 603 F.Supp. 1468; 776 F.2d 571

- Farouk of Egypt (Ex-King) v. Christian Dior (1957) 24 I.L.R. 228

- Hatch v. Baez (1876) 7 Hun 596

- Ireland v. United Kingdom (1978) 2 E.H.R.R. 25

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999

**(Cite as: [2000] 1 A.C. 147)**

- Israel (Attorney-General of) v. Eichmann (1962) 36 I.L.R. 5
- Jaffe v. Miller (1993) 13 O.R.(3d) 745
- Jean Dessès (Société) v. Prince Farouk (1963) 65 I.L.R. 37
- Jimenez v. Aristeguieta (1962) 311 F.2d 547
- Lafontant v. Aristide (1994) 844 F.Supp. 128
- Liangsiriprasert (Somchai) v. Government of the United States of America [1991] 1 A.C. 225; [1990] 3 W.L.R. 606; [1990] 2 All E.R. 866, P.C..
- Lotus S.S., The Case of, Judgment No. 9 of 7 September 1927, P.C.I.J., Series A, No. 10
- Marcos and Marcos v. Federal Department of Police (1989) 102 I.L.R. 198
- Persinger v. Islamic Republic of Iran (1984) 729 F.2d 835
- Piracy Jure Gentium, In re [1934] A.C. 586, P.C..
- Princz v. Federal Republic of Germany (1994) 26 F.3d 1166
- Prosecutor v. Furundzija (unreported), 10 December 1998, International Criminal Tribunal for the Former Yugoslavia, Case No. IT-95-17/1-T 10
- Reg. v. Bow Street Metropolitan Stipendiary Magistrate, Ex parte Pinochet Ugarte [2000] 1 A.C. 61; [1998] 3 W.L.R. 1456; [1998] 4 All E.R. 897, H.L.(E.).
- Reg. v. Bow Street Metropolitan Stipendiary Magistrate, Ex parte Pinochet Ugarte (No. 2) [2000] 1 A.C. 119; [1999] 2 W.L.R. 272; [1999] 1 All E.R. 577, H.L.(E.).

**\*150**
- Reg. v. Sansom [1991] 2 Q.B. 130; [1991] 2 W.L.R. 366; [1991] 2 All E.R. 145, C.A..
- Saltany v. Reagan (1988) 702 F.Supp. 319
- Sampson v. Federal Republic of Germany (1997) 975 F.Supp. 1108
- Schooner Exchange v. M'Faddon (1812) 11 U.S. (7 Cranch) 116
- Siderman de Blake v. Republic of Argentina (1992) 965 F.2d 699
- Smith v. Socialist People's Libyan Arab Jamahiriya (1995) 886 F.Supp. 306; (1996) 101 F.3d 239
- Syrian Ambassador (Former) to the German Democratic Republic, In re (unreported), 10 June 1997, Federal Constitutional Court, Case No. 2 BvR 1516/96
- Trendtex Trading Corporation v. Central Bank of Nigeria [1977] Q.B. 529; [1977] 2 W.L.R. 356; [1977] 1 All E.R. 881, C.A..
- Underhill v. Hernandez (1897) 168 U.S. 250
- United States of America v. Noriega (1990) 746 F.Supp. 1506; (1997) 117 F.3d 1206

ment:

The following additional cases were cited in argu-
- Aksionairnoye Obschestvo A. M. Luther v. James Sagor & Co. [1921] 3 K.B. 532, C.A..
- Arantzazu Mendi, The [1939] A.C. 256; [1939] 1 All E.R. 719, H.L.(E.).
- Azanian Peoples Organisation (A.Z.A.P.O.) v. President of the Republic of South Africa (1996) 8 B.C.L.R. 1015
- Banco Nacional de Cuba v. Sabbatino (1964) 376 U.S. 398
- Barcelona Traction, Light and Power Co. Ltd., In re [1970] I.C.J. Rep. 3
- Buttes Gas and Oil Co. v. Hammer [1982] A.C. 888; [1981] 3 W.L.R. 787; [1981] 3 All E.R. 616, H.L.(E.).
- Caire, Jean-Baptiste (Estate of) (France) v. United Mexican States (1929) 5 U.N.R.I.A.A. 516
- Canada (Government of) v. Aronson [1990] 1 A.C. 579; [1989] 3 W.L.R. 436; [1989] 2 All E.R. 1025, H.L.(E.).
- Carl Marks & Co. Inc. v. Union of Soviet Socialist Republics (1987) 665 F.Supp. 323; (1988) 841 F.2d 26

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999

**(Cite as: [2000] 1 A.C. 147)**

- Castioni, In re [1891] 1 Q.B. 149, D.C..
- Chung Chi Cheung v. The King [1939] A.C. 160; [1938] 4 All E.R. 786, P.C..
- Church of Scientology Case (1978) 65 I.L.R. 193
- Compania Naviera Vascongado v. S.S. Cristina [1938] A.C. 485; [1938] 1 All E.R. 719, H.L.(E.)
- Duff Development Co. Ltd. v. Government of Kelantan [1924] A.C. 797, H.L.(E.).
- East Timor (Portugal v. Australia), In re [1995] I.C.J. Rep. 90
- Empresa Exportadora de Azucar v. Industria Azucarera Nacional S.A. [1983] 2 Lloyd's Rep. 171, C.A..
- Empson v. Smith [1966] 1 Q.B. 426; [1965] 3 W.L.R. 380; [1965] 2 All E.R. 881, C.A..
- Filartiga v. Pena-Irala (1980) 630 F.2d 876; (1984) 577 F.Supp. 860
- Frolova v. Union of Soviet Socialist Republics (1985) 761 F.2d 370
- Goering, In re (1946) 13 I.L.R. 203
- Grand Jury Proceedings, John Doe 700, In re (1987) 817 F.2d 1108
- Harrison v. Tew [1990] 2 A.C. 523; [1990] 2 W.L.R. 210; [1990] 1 All E.R. 321, H.L.(E.).
- Herbage v. Meese (1990) 747 F.Supp. 60
- Hilao v. Estate of Marcos (1994) 25 F.3d 1467
- Holland v. Lampen-Wolfe [1999] 1 W.L.R. 188, C.A..

**\*151**

- Honecker, In re (1984) 80 I.L.R. 365
- Iran (Empire of), Claim against (1963) 45 I.L.R. 57
- Jacobus v. Colgate (1916) 217 N.Y. 235
- Kadic v. Karadzic (1995) 70 F.3d 232
- Kendall v. Kingdom of Saudi Arabia (1965) 65 Adm. 885
- Kirkpatrick & Co. Inc. v. Environmental Tectonics Corporation International (1990) 110 S.Ct. 701
- Kuwait Airways Corporation v. Iraqi Airways Co. [1995] 1 W.L.R. 1147; [1995] 3 All E.R. 694, H.L.(E.).
- Kuwait Airways Corporation v. Iraqi Airways Co. (unreported), 29 July 1998, Mance J.
- Letelier v. Republic of Chile (1980) 63 I.L.R. 378; 488 F.Supp. 665
- Littrell v. United States of America (No. 2) [1995] 1 W.L.R. 82; [1994] 4 All E.R. 203, C.A..
- Liu v. Republic of China (1989) 892 F.2d 1419
- L'Office Cherifien des Phosphates v. Yamashita-Shinnihon Steamship Co. Ltd. [1994] 1 A.C. 486; [1994] 2 W.L.R. 39; [1994] 1 All E.R. 20, H.L.(E)
- Maal Case, The (1903) 10 U.N.R.I.A.A. 730
- Monetary Gold, The [1954] I.C.J. Rep. 19
- Naghdi, In re [1990] 1 W.L.R. 317; [1990] 1 All E.R. 257, D.C..
- Nelson v. Saudi Arabia (1991) 88 I.L.R. 189
- Nielsen, In re [1984] A.C. 606; [1984] 2 W.L.R. 737; [1984] 2 All E.R. 81; 79 Cr.App.R. 1, H.L.(E.).
- North Sea Continental Shelf, [1969] I.C.J. Rep. 3
- Oetjen v. Central Leather Co. (1918) 246 U.S. 297
- Oppenheimer v. Cattermole [1976] A.C. 249; [1975] 2 W.L.R. 347; [1975] 1 All E.R. 538, H.L.(E.).
- Paul v. Avril (1993) 812 F.Supp. 207
- Philippines (Republic of) v. Marcos (1986) 806 F.2d 344
- Polyukhovich v. Commonwealth of Australia (1991) 91 I.L.R. 1
- Propend Finance Pty. Ltd. v. Sing, The Times, 2 May 1997; Court of Appeal (Civil Division) Transcript No.

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

      572 of 1997, C.A..

- Prosecutor v. Blaskic (Subpoenae) (1997) 110 I.L.R. 607
- Prosecutor v. Tadic (unreported), 7 May 1997, International Criminal Tribunal for the Former Yugoslavia, Case No. IT-94-1-T
- Reg. v. Doot [1973] A.C. 807; [1973] 2 W.L.R. 532; [1973] 1 All E.R. 940, H.L.(E.).
- Reg. v. Governor of Brixton Prison, Ex parte Schtraks [1964] A.C. 556; [1962] 3 W.L.R. 1013; [1962] 3 All E.R. 529, H.L.(E.).
- Reg. v. Governor of Pentonville Prison, Ex parte Cheng [1973] A.C. 931; [1973] 2 W.L.R. 746; [1973] 2 All E.R. 204, H.L.(E.).
- Reg. v. Governor of Pentonville Prison, Ex parte Osman (No. 3) [1990] 1 W.L.R. 878; [1990] 1 All E.R. 999, D.C..
- Reg. v. Governor of Pentonville Prison, Ex parte Sotiriadis [1975] A.C. 1; [1974] 2 W.L.R. 253 ; [1974] 1 All E.R. 504 ; [1974] 1 All E.R. 692, D.C. and H.L.(E.).
- Reg. v. Secretary of State for the Home Department, Ex parte Hill [1999] Q.B. 886; [1998] 3 W.L.R. 1011; [1997] 2 All E.R. 638, D.C..
- Roncarelli v. Duplessis [1959] S.C.R. 121
- Société Levant Express Transport v. Chemins de fer du gouvernement iranien (1969) in Grands Arrê ts 3rd ed. (1988), p. 372
- United Kingdom v. France Permanent Court of International Justice,Advisory Opinion No. 4 of 7 February 1923
- United States Diplomatic and Consular Staff in Tehran, In re [1980] I.C.J. Rep. 3; 61 I.L.R. 504

**\*152**
- United States of America v. Allard [1991] 1 S.C.R. 861
- United States of America and Republic of France v. Dollfus Mieg et Cie. S.A. and Bank of England [1949] Ch. 369; [1949] 1 All E.R. 946 ; [1950] Ch. 333; [1950] 1 All E.R. 747, C.A. .; [1952] A.C. 582; [1952] 1 All E.R. 572, H.L.(E.).
- Vel squez Rodríguez Case (1989) 95 I.L.R. 232
- Youmans (Thomas H.) (U.S.A.) v. United Mexican States (1926) 4 U.N.R.I.A.A. 110
- Zoernsch v. Waldock [1964] 1 W.L.R. 675; [1964] 2 All E.R. 256, C.A..

    Appeal from the Divisional Court of the Queen's Bench Division.

    This was the rehearing of an appeal by the Commissioner of Police of the Metropolis and the Government of Spain from a decision of the Divisional Court of the Queen's Bench Division (Lord Bingham of Cornhill C.J., Collins and Richards JJ.) of 28 October 1998 granting orders of certiorari to quash warrants issued pursuant to section 8(1) of the Extradition Act 1989 , at the request of the Central Court of Criminal Proceedings No. 5, Madrid, for the provisional arrest of the applicant, Senator Augusto Pinochet Ugarte, a former head of state of the Republic of Chile, (i) dated 16 October 1998, by Nicholas Evans, Bow Street Metropolitan Stipendiary Magistrate, and (ii) dated 22 October 1998, by Ronald Bartle, Bow Street Metropolitan Stipendiary Magistrate.

    Leave to appeal was granted by the Divisional Court which, in accordance with section 1(2) of the Administration of Justice Act 1960 , certified that a point of law of general public importance was involved in its decision, namely, "the proper interpretation and scope of the immunity enjoyed by a former head of state from arrest and extradition proceedings in the United Kingdom in respect of acts committed while he was head of state."

    The appeal was originally heard by the House in November 1998 and allowed by a majority (Lord Nicholls of Birkenhead, Lord Steyn and Lord Hoffmann; Lord Slynn of Hadley and Lord Lloyd of Berwick dissenting). That decision was set aside by the House (Lord Browne-Wilkinson, Lord Goff of

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

Chieveley, Lord Nolan, Lord Hope of Craighead and Lord Hutton) on 15 January 1999 and a rehearing ordered before a differently constituted committee.

 Leave to intervene was given to Amnesty International, the Medical Foundation for the Care of Victims of Torture, the Redress Trust, Mary Ann Beausire, Juana Francisca Beausire and Sheila Cassidy and the Association of the Relatives of the Disappeared Detainees. Additionally, an order was made permitting Human Rights Watch to intervene to the extent of presenting written submissions.

 The facts are stated in the opinions of Lord Browne-Wilkinson and Lord Hope of Craighead.

 *Alun Jones Q.C., Christopher Greenwood, James Lewis* and *Campaspe Lloyd-Jacob* for the appellants. Criminal liability is personal. A state does not commit crimes. The crimes alleged are crimes against international law and three Conventions underlie the relevant English statutes: the European Convention on the Suppression of Terrorism of 27 January 1977 (1977) (Cmnd. 7031), the International Convention against the Taking of Hostages of 18 December 1979*153 (1983) (Cmnd. 9100) and the International Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment 1984 (1990) (Cm. 1775). The Conventions provide machinery for extradition for crimes which have been recognised for decades as crimes by international law and which are recognised as crimes by the United Kingdom, Spain and Chile.

The provisional warrant, in respect of which the appeal was brought, no longer has life or effect and has been superseded by the Secretary of State's authority to proceed. The applicant is now remanded under section 9(2) of the Extradition Act 1989 . Provisional arrest terminated on the issue by the Secretary of State of the authority to proceed: see Reg. v. Governor of Pentonville Prison, Ex parte Sotiriadis [1975] A.C. 1, 25 and Reg. v. Governor of Pentonville Prison, Ex parte Osman (No. 3) [1990] 1 W.L.R. 878 . The certified question can nonetheless be answered properly and finally, although the case is now more developed and complex.

If the appeal were to be decided on the basis of the limited facts alleged in the provisional warrant the result would be wholly artificial and the matter would

be open to further argument. It is now alleged that complete conspiracies to commit crimes of torture, hostage taking and murder were formed before the earliest date on which the applicant became head of state. The overt acts committed in foreign countries are not merely evidence of the primary conspiracies but amount to sub-conspiracies, or, in some cases, substantive crimes, within those states. The provisional warrant did not disclose this.

 It is common in extradition cases for crimes which are generally and broadly described in Civil Code countries to be represented in authorities to proceed in English proceedings as individual charges. Consequently, it is necessary to look at the conduct in the request and not at the terminology of the charge. The details of what amounts to a crime in Spain do not have to be considered. The issue is whether the acts amount to an offence under English law. The conduct alleged is a concluded agreement and acts done in furtherance of it. Such conduct is a conspiracy under English law, although Spain calls the alleged acts terrorism. In English law a conspiracy remains a continuing offence until it is completed. Overt acts are not part of the conspiracy, merely evidence of it: see Somchai Liangsiriprasert v. Government of the United States of America [1991] 1 A.C. 225 . The dates of the alleged acts are not normally included in the authority to proceed: see In re Naghdi [1990] 1 W.L.R. 317 .

Substantive acts of torture are particularised for August 1973 and, therefore, the conspiracy was complete before the coup on 11 September 1973. However, the applicant did not become head of state at the time of the coup but merely the head of a military junta. He did not become head of state until 17 June 1974. Consequently, the issue of immunity does not arise for acts committed before that date. If there was a pre-existing plan to commit these offences before the applicant became head of state then there is an extraditable offence and he can have no immunity.

 The State Immunity Act 1978 and the Diplomatic Privileges Act 1964 determine the immunity issue.

Section 20 of the Act of 1978 equates the position of a head of state to that of an ambassador and applies only to acts committed in the *154 performance of the functions of a head of state, not to acts committed previously. A former head of state only has immunity

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

with regard to his acts as a head of state but not with regard to acts which fall outside his role as head of state. If he also had the role of head of government he enjoys no immunity for his actions in that capacity.

A former head of state cannot have immunity for acts of murder committed outside his own territory. International law recognises crimes against humanity and the Torture Convention says that no circumstances can be invoked as justification for torture. Therefore it cannot be a part of the function of a head of state under international law to commit those crimes.

 A head of state's functions in a foreign country are of a diplomatic nature. The essential nature of the protection afforded by section 20 relates to the carrying out of a diplomatic function in the United Kingdom: see, Hansard (H.L. Debates, 17 January 1978, col. 58; 16 March 1978, col. 1537).

 If, however, section 20 has no application to acts performed outside the United Kingdom then the matter is determined by Conventions. Parliament cannot have intended that there should be immunity outside the elaborate statutory scheme and the Conventions and there can be no fallback on the common law. The policy of Acts and Conventions of recent years is that people should take individual and personal responsibility for certain crimes, without any protection for acts done in the name of the state.

 The prohibition under the Hostage Taking Convention applies to everyone regardless of his position and the duty to prosecute those who commit such offences applies to the United Kingdom. Hostage-taking is not specifically charged in the Spanish indictment but the offence is made out on the facts alleged.

 The Torture Convention applies to all "public officials" irrespective of position. It is inconceivable that it was intended to exclude those who gave orders while including those who followed them. The Convention gives a state a right and an obligation to establish jurisdiction where the victim is a national of that state. Article 8(4) combined with article 5 amounts to an acknowledgment that offences of torture committed in one state can be regarded as having taken place in the state of which the victim is a national. The United Kingdom has an obligation to extradite the applicant to Spain if no prosecution is

brought in the United Kingdom. Chile has not requested extradition so the applicant cannot be extradited there. Section 26(2) of the Act of 1989, deeming the torture to have taken place in Spain, prevents Chile claiming a priority of jurisdiction as the place where the acts took place. Chile, like Spain and the United Kingdom, has ratified the Torture Convention and torture has been outlawed by the Constitution of Chile since 1925. Consequently, Chilean law reflects and embodies the same principles as the Convention and Chile cannot claim exclusive jurisdiction.

Older presumptions as to territoriality of crimes such as these have been replaced. Section 6(1) of the Act of 1989 prohibits extradition for offences of a "political character" but section 24 provides that no act to which section 1 of the Suppression of Terrorism Act 1978 applies shall be *155 regarded as of a political character. For an analysis of "political offence" and "political character" see In re Castioni [1891] 1 Q.B. 49 ; Reg. v. Governor of Pentonville Prison, Ex parte Cheng [1973] A.C. 931 and Reg. v. Governor of Brixton Prison, Ex parte Schtraks [1964] A.C. 556 . Certain crimes are deemed so odious that no reticence in involving the United Kingdom in the internal disputes of foreign states would be shown in relation to them.

*Greenwood* following. International law does not require the United Kingdom to accord immunity to a former head of state for acts which international law not only prohibits but for which it imposes individual criminal responsibility. Indeed, there is a positive duty under international law not to grant immunity in such circumstances.

No international agreement specifically provides for the immunities of a head of state or former head of state. However, under customary international law a state is entitled to expect that the head of state will enjoy a measure of immunity from the jurisdiction of the courts of other states. That immunity reflects the respect due to the dignity of the head of state but the extent of the immunity is uncertain: see Sir Arthur Watts Q.C., Hague Lectures, "The Legal Position in International Law of Heads of States, Heads of Governments and Foreign Ministers" (1994-III) 247 Recueil des cours, pp. 32, 36-37, 52-68 and *Oppenheim's International Law,* vol. I, 9th ed. (1992) (ed. Sir Robert Jennings Q.C. and Sir Arthur Watts Q.C.), pp. 1037-1038.

[2000] 1 A.C. 147                                                                                     Page 8
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

A head of state may be treated as the state itself and entitled to the same immunities. That is the rationale behind section 14 of the State Immunity Act 1978. In so far as proceedings are brought against the head of state in his personal capacity he enjoys the same immunities as an ambassador, immunity ratione personae, attaching to the individual on account of his office.

Of the four possible rationales advanced for former head of state immunity, the first, the dignity of the state, applies only to an existing head of state. The second, that courts will not sit in judgment on the acts of another state, is one of the principal grounds for the act of state and non-justiciability doctrines. The third, that acts of an official character performed by a head of state engage the responsibility of the state itself and not the individual, can be answered by pointing out that the state's responsibility does not automatically do away with personal responsibility. The fact that the acts of which the applicant is accused might be attributable to Chile does not mean that the United Kingdom has to grant him immunity. The conviction of Nazi war criminals after the Second World War shows that. The fourth, that a former head of state needs immunity so that he is not hindered in the exercise of his public functions while he holds office, is a functional rationale. The last three of these could apply equally to proceedings against any official or former official.

A former head of state no longer represents the grandeur of his nation. He does not enjoy immunity for personal acts performed while he was head of state. Any requirement to accord immunity applies only in respect of acts of an official character performed in the exercise of the functions of head of state, immunity ratione materiae and does not extend to conduct criminal under international law. The absence of any authority establishing **156** the right to prosecute former heads of state in common law jurisdictions arises from the lack of extraterritorial jurisdiction until recently.

In showing an international intention to prohibit an express practice, such as torture, it is not necessary that each country prohibits it in the same way, nor is it necessary that each state's law prohibits torture wherever it occurs. The various laws of states considered in the light of the fact that every recent human rights treaty has prohibited torture provide evidence that customary international law prohibited torture before the Torture Convention and that, under customary international law, torture was an international crime if committed by a public official. There was no head of state exception and states other than the state where the offence took place were entitled to exercise jurisdiction.

The Torture Convention codified existing customary law norms prohibiting torture, but added a duty to exercise the jurisdiction which existed under customary international law. No signatory to that Convention can object to the exercise of the jurisdiction by another state as being an interference with the signatory's internal affairs. Accordingly, either the Torture Convention establishes that the applicant can have no immunity from prosecution for acts of torture or alternatively the prohibition against torture has the status of jus cogens and he can be prosecuted under customary international law. The applicable law is the present law as evidenced by the Torture Convention. If it is necessary to show that torture was a crime under international law in 1973 when the acts occurred that requirement is satisfied because it was a crime under customary international law at that time. Even if torture itself was not a crime under international law then the widespread and systematic torture practised in Chile was a crime against humanity, as that concept has developed over the century.

International law recognises international crimes. The oldest is piracy: see In re Piracy Jure Gentium [1934] A.C. 586 . It has long been recognised that individuals may be prosecuted for war crimes and crimes against humanity under international law. The development since the First World War of the concept of "war crimes" illuminates the point that for some international crimes there can be no immunity.

The attempt to put the Kaiser on trial before an international tribunal after the war shows that at that time there was no immunity for a head of state. The United States objected on the grounds that there should be an immunity for a head of state but no concern was expressed about a former head of state. The failure of the attempt led to a different approach to the question of immunity at the end of the Second World War: see the London Declaration 1942 ; the Moscow Declaration 1943 ; the Charter of the International Military Tribunal, Nuremberg, adopted by

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                                    Page 9

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

the Big Four Powers (1945) and the Charter of the International Military Tribunal for the trial of major war criminals in the Far East (1946).

Under the Nuremberg Charter the vast majority of defendants were tried in the territories where the crimes occurred. Only the leaders whose crimes were not confined to a specific location were tried before the international tribunal at Nuremberg. While only one former head of state (Admiral Donitz) was tried before the international tribunal, there was no suggestion that this was necessary to overcome any immunity or that he **\*157** could not have been tried before a national court. The Big Four Powers were exercising jointly a right which each could have exercised separately: see *Oppenheim's International Law*, vol. II, 7th ed. (1952) (ed. Sir Hersch Lauterpacht), pp. 580-581. If ever there was a clear immunity for heads of state or former heads of state it has been eroded during the course of this century.

The definition of an international crime is a substantive question. Whether the trial should be before an international tribunal or a national court is a procedural question. Crimes against humanity are crimes not against a state but against individuals and are triable anywhere. Until recently there were almost no international tribunals so international crimes could be tried only before a national court.

Even in 1946 the concept of territoriality of jurisdiction for crimes against humanity was not really in issue. The Nuremberg Tribunal certainly felt restricted to regarding crimes against humanity as linked to war crimes or crimes against the peace but that has been broadened over the years.

The significance of the Nuremberg Charter and the approach of the tribunal is that it provided the bedrock upon which the United Nations' and the international approach to human rights has developed. The United Nations adopted the Nuremberg declaration: see the Affirmation of the Principles of International Law Recognised in the Charter of the Nuremberg Tribunal adopted by the United Nations General Assembly on 11 December 1946 (G.A. Res. 95, 1st Sess., 1144; U.N. Doc. A/236 (1946)). The absence of immunity for international crimes tried before national courts has been reaffirmed on a number of occasions: see *The British Manual of Military Law* , (1958) (ed. Sir Hersch Lauterpacht), paras. 632, 637;

the International Law Commission's Draft Code of Crimes Against the Peace and Security of Mankind 1954; the four Geneva Conventions on the Law of Armed Conflict of 1949 (implemented in the United Kingdom by the Geneva Conventions Act 1957 ); U.N.General Assembly Resolution No. 3074 on the Principles of International Co-operation on Persons Guilty of War Crimes and Crimes Against Humanity adopted in 1973; the Statute of the War Crimes Tribunal for former Yugoslavia (1993 ); the Statute of the War Crimes Tribunal for Rwanda (1994); the International Law Commission's Draft Code of Crimes Against the Peace and Security of Mankind 1996

The Draft Code of 1996 is the International Law Commission's view of existing international law. Article 8envisages the establishment of an international court but in its absence the jurisdiction must be exercisable by national courts. The Code shows that crimes against humanity are crimes in international law which need not be connected with armed conflict and that state officials have no immunity.

The Appeals Tribunal for the former Yugoslavia has held that, while the tribunal's statute restricts the definition of crimes against humanity, that restriction is not a requirement of substantive law: see Prosecutor v. Tadic (unreported), 7 May 1997; International Criminal Tribunal for the former Yugoslavia, Case No. IT-94-1-T . In Prosecutor v. Furundzija (unreported), 10 December 1998, International Criminal Tribunal for theFormer Yugoslavia, Case No. IT-95-17/1-T 10 **\*158** the tribunal dealt with torture as a crime against humanity.

Attorney-General of Israel v. Eichman (1962) 36 I.L.R. 5 is a particularly striking example of the universality of jurisdiction for crimes against humanity as Israel did not exist at the times when the crimes were committed.

The failure of the United States to sign the Rome Statute of the International Criminal Court (adopted by the United Nations Diplomatic Conference on Plenipotentiaries on the Establishment of an International Criminal Court on 17 July 1998) is based on an objection to some parts of the statute rather than to the validity of international tribunals as such, or to the concept of trials for international crimes.

[2000] 1 A.C. 147                                                                                          Page 10
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

The idea that individuals benefit from the immunity of the state is based on civil cases where to make the individual liable would directly implicate the state: see Argentine Republic v. Amerada Hess Shipping Corporation (1989) 109 S.Ct. 683 and Siderman de Blake v. Republic of Argentina (1992) 965 F.2d 699 . That idea cannot apply to criminal proceedings as the criminal law cannot impleaded the state: see Princz v. Federal Republic of Germany (1994) 26F.3d 1166 .

Hatch v. Baez (1876) 7Hun 596 concerned civil, not criminal, proceedings and is therefore distinguishable. The rationale for the decision is the same as is given in many act of state cases. If that doctrine were to be applied here the provisions of the Torture Convention would be meaningless. Al-Adsani v. Government of Kuwait (1996) 107 I.L.R. 536 is also distinguishable as it concerned a statutory immunity from civil proceedings granted by section 1 of the State Immunity Act 1978 . In any event the present case does not involve a statutory scheme from which the Spanish Government are trying to carve out an exception. It is highly unlikely that Parliament intended to lay down an immunity which is not recognised in international law. The Act of 1978 and other statutes should be construed in the light of the relevant rules of international law: see Alcom Ltd. v. Republic of Colombia [1984] A.C. 580 , 597, 600 and Trendtex Trading Corporation v. Central Bank of Nigeria [1977] Q.B. 529 .

The applicant's amnesty under Chilean law is ambiguous and, in any event, does not touch on the question of immunity. The Spanish court has held that the amnesty is not relevant to their law. The issue is one for the Home Secretary to consider.

The provisions of the Torture Convention combined with section 134 of the Criminal Justice Act 1988 are incompatible with any notion of immunity for a foreign official for acts of torture. Although under the Vienna Convention diplomat in office has total immunity, there can be no immunity after he has left office.

"Public official" naturally includes the head of state. Past agreements in international law have dealt with the head of state with a specific provision but "public official" in the Torture Convention and section 134 appears to be a general term. The lack of a specific mention of heads of state cannot mean they were excluded from the description and have immunity. The provisions are clear: there is no immunity for anyone who commits torture. *159

As a matter of United Kingdom law a serving head of state has immunity, but there is no such immunity for torture under international law. Ahead of state is an "official" like any other within the terms of the Convention and of section 134.

The relevant time for assessing the criminality of an act in the United Kingdom is the time of the extradition request. Immunity is a procedural issue and has to be determined at that time, not when the acts occurred. There is no doubt that the alleged conduct was prohibited under international law throughout the period when it occurred: see Filartiga v. Pena-Irala (1980) 630 F.2d 876 , 880, 888; Demjanjuk v. Petrovsky (1985) 603 F.Supp. 1468 ; 776 F.2d 571.

Act of state and non-justiciability have developed as two distinct doctrines in English law. Under the doctrine of act of state English courts will not sit in judgment on the act of a foreign sovereign performed within the territories of that sovereign: see Duke of Brunswick v. King of Hanover (1848) 2 H.L.Cas. 1 . The doctrine of non-justiciability (see Buttes Gas and Oil Co. v. Hammer [1982] A.C. 888 , 931-932, per Lord Wilberforce) prevents English courts from adjudicating upon certain transactions of foreign states in the international sphere. Neither doctrine is applicable. Under the Extradition Act 1989 it is not for the court to examine the weight of the evidence, the situation in Chile in 1973 or current relations with Chile. In the United States, where the two doctrines have not always been treated as separate (see Kirkpatrick & Co. Inc. v. Environmental Tectonics Corporation International (1990) 110 S.Ct. 701 ; 493 U.S. 400, 405), all cases, applying the Restatement of the Law 3rd: The Foreign Relations Law of the United States, vol. 1, (1986), p. 370, reject the notion that the act of state doctrine bars proceedings against an individual for acts of torture: see Filartiga v. Pena-Irala (1984) 577 F.Supp. 860 ; Hilao v. Estate of Marcos (1994) 25 F.3d 1467 and Liu v. Republic of China (1989) 892 F.2d 1419 .

It has frequently been held that neither doctrine bars judicial inquiry into conduct which involves a violation of fundamental human rights: see Kuwait Airways Corporation v. Iraqi Airways Co. (unreported),

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

29 July 1998 ; Empresa Exportadora de Azucar v. Industria Azucarera Nacional S.A. [1983] 2 Lloyd's Rep. 171 and Letelier v. Republic of Chile (1980) 488 F.Supp. 665 . Nor does the act of state doctrine apply to acts performed by one state in the territory of another.

Section 20 of the State Immunity Act and the Vienna Convention are the basis of the immunity for a former head of state. The role of head of state has to be analogous to that of a diplomat as defined in article 3 of the Convention. The acts alleged against the applicant were outside his functions as head of state. Chilean law expressly prohibits torture. This is not a case of one state foisting its standards on another but of behaviour which is universally accepted as being abhorrent and criminal.

*Jones* Q.C. resuming. Conspiracy is a crime in Spain, as is a conspiracy which is not carried out. The Spanish approach is to roll conspiracy up in the offence charged as a continuing or schematic offence. Pursuance of the plan is an element of the charge rather than the charge itself. That is the whole tone of the Spanish indictment. **\*160**

The allegations of pre-coup conspiracy formed in Chile to commit acts in Chile and abroad amount to an offence under English law: see Reg. v. Doot [1973] A.C. 807 . Conspiracy to torture is caught by one or other part of section 2(1) of the Extradition Act 1989 . Even if the acts are not deemed to have taken place in Spain, torture is an extraterritorial offence under English law by virtue of section 2(2).

The conspirators were serving military officers and therefore public officials for the purposes of section 134 of the Criminal Justice Act 1988 . It was not necessary that they were acting on behalf of the state. It would be absurd if two factions during a civil disturbance committed acts of torture but only those acting under government orders could be liable under section 134.

If the applicant was not acting as a public official in plotting to take over the state and organising torture then the acts of torture after the coup make him liable under section 134 on the basis of a continuing action. As the basic conspiracy was hatched before 11 September 1973 and before the applicant was in control of the country he can claim no immunity based on his status as head of state.

*Ian Brownlie Q.C., Peter Duffy Q.C., Michael Fordham, Owen Davies, Frances Webber* and *David Scorey* for Amnesty International and others. Given the clear incorporation of the Torture Convention into English statute law, almost all the relevant international law has been brought into United Kingdom law and domesticated. That is a sufficient basis to determine the appeal. However, it is unrealistic to leave the matter at that and it is necessary to consider the wider issues.

The amnesty granted to the applicant in Chile is an issue for the Home Secretary to consider. If, however, it is unlikely that justice will be done in Chile the only matters to consider are the extradition proceedings and trial before the Spanish courts.

No immunity is provided by Part I of the State Immunity Act 1978 as it does not apply to criminal proceedings. No immunity is provided by Part III of the Act because the alleged acts cannot constitute official acts done in the exercise of the functions of a head of state. The relevant principles of international law do not recognise any immunity in respect of crimes of torture and hostage-taking, which are crimes against international law. In the absence of any basis for immunity in domestic law, as construed in the context of international law, the applicant cannot derive any benefit from the act of state doctrine.

Neither a former head of state nor a current head of state can have immunity from criminal proceedings in respect of acts which constitute crimes under international law. There is no distinction between a head of state and a former head of state.

The immunity granted to a head of state by section 20 of the Act of 1978 is the same as the immunity accorded by the Diplomatic Privileges Act 1964 (incorporating the Vienna Convention) to an ambassador. The references to "sending state" and "receiving state" (see articles 1, 23 and 31 of the Convention) show that geographical focus is on immunity for acts performed within the United Kingdom Parliament cannot have intended that immunity to apply to conduct outside the United Kingdom. In any event, article 39(2) of the Vienna Convention , as applied by **\*161** section 20, only confers immunity in respect of acts performed in the exercise of functions which

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

international law recognises as official functions of a head of state.

The intentions of Parliament when passing the State Immunity Act 1978 must be related to the intentions behind the Extradition Act 1989. Section 22 of the Act of 1989 makes express reference to the extradition crimes of torture and hostage taking and section 23 to genocide. With such crimes state oppression is the paradigm and the head of state is the paradigm accused. Parliament cannot have picked out such crimes for mention while intending to grant immunity for a head of state.

If there is no immunity under the statutes then it is necessary to consider whether there is immunity under the common law, a question which must be approached with caution for several reasons. First, it is appropriate to resolve any uncertainties by reference to the intentions of Parliament as articulated in legislation. Second, section 1 of the Diplomatic Privileges Act 1964 provides that its provisions shall "have effect in substitution for any previous enactment or rule of law." Third, the purpose of the State Immunity Act 1978, as stated in the long title, is "to make new provision with respect to the immunities and privileges of heads of state."

 The English courts are open to the concept of consulting customary international law, as it has evolved over time, as a basis for the common law: see Trendtex Trading Corporation v. Central Bank of Nigeria[1977] Q.B.529 , 551-554, 576-579; I Congreso del Partido[1983] 1 A.C. 244 , 261 and Littrell v. United States of America (No. 2) [1995] 1 W.L.R. 82

 The common law has long since rejected absolute immunity in favour of a restricted theory which developed primarily in the context of civil proceedings and commercial matters: see the Trendtex and I Congreso cases. Parliament has continued this restricting trend in, for example, the torts exception in section 5 of the Act of 1978 reflecting a policy against immunity in respect of death or personal injury even for the purposes of civil proceedings. Such an exception is also found in the Foreign Sovereign Immunities Act 1976 of the United States. Consequently there can be no immunity, for example, for a political assassination: see Letelier v. Republic of Chile (1980) 488 F.Supp. 665 , 673; Shaw, International Law , 4th ed.

(1997), p. 510-511 and J.R. Crawford "A Foreign State Immunities Act for Australia?" in The Australian Yearbook of International Law (1983) , ed. D.W. Greig.

Apart from the conventions, the starting point is the Charter of the Nuremberg Tribunal (1945 ) which was annexed to the London Agreement. It is important to note that the London Agreement was an international agreement which was signed by 19 states in addition to the four victorious powers. It was intended from the first to be a law making exercise. The principles of the Charter were affirmed by General Assembly Resolution 95 of 11 December 1946 . The victorious powers transformed themselves into the United Nations (the axis powers were not admitted until 1955) and all members signed Resolution 95. General Assembly resolutions are used for a variety of purposes and some, such as Resolution 95, are consciously law-making. Those law making powers are not to be taken lightly. **\*162**

The academic sources of customary international law tend to recognise a limited immunity enjoyed by a former head of state in respect of acts committed while acting as head of state. However, state immunity does not usually get discussed in the context of criminal liability. The only case in which a head of state claimed immunity in respect of criminal charges is Erich Honecker of East Germany: In re Honecker (1984) 80 I.L.R. 365 . The opinion of jurists on criminal liability in a general context is clear that there is no immunity: see Oppenheim's International Law, vol. I, pp. 1043-1044 and footnote 3 on p. 366 and Sir Arthur Watts Q.C., Hague Lectures, "The Legal Position in International Law of Heads of States, Heads of Governments and Foreign Ministers" (1994-III) 247 Recueil des cours, pp. 52, 82-84, 88-89, 112-113. In so much as the passage in Satow's Guide to Diplomatic Practice , 5th ed. (1979), p. 10, para. 2.4 appears to disagree it is unlikely that the editors of such a specialised work would be concerned with developments in other areas of international law.

For further academic support for the proposition that immunity does not apply to crimes under international law see Manual of Military Law, Part III: The Law of War on Land, (1958) (ed. Sir Hersch Lauterpacht), pp. 179, 180, paras. 632, 637; Restatement of the Law 3rd: The Foreign Relations Law of the

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

United States, vol. 1 (1986), p. 471, para. 464, note 14 and Brownlie's Principles of Public International Law 4th ed. (1990), p. 335.

Roncarelli v. Duplessis [1959] S.C.R.121 involved an official using his office to carry out a private and personal policy. There is no warrant for treating that case as determinative of the question whether acts would normally be described as "private" or committed "in person."

Duke of Brunswick v. King of Hanover (1848) 2 H.L.Cas. 1 should be seen as a non-justiciability case rather than an act of state case. The act of state doctrine has no application to the applicant's case. The decision predates several major developments in international law such as the Geneva Convention of 1864 , the harbinger of developments in the human rights field: see Oppenheim's International Law, vol. II, pp. 227-228. Even in 1848 the courts would not have ignored a piratical sovereign. It is important not to give an ambit to the Duke of Brunswick decision which is unrelated to recent developments. Similarly Hatch v. Baez, 7 Hun 596 which relies heavily on the Duke of Brunswick case is of little authority.

There is no place for the act of state doctrine in the present case. It is the English policy of judicial self-restraint. The policy represents a supplementary principle but is not intended to block the effective operation of legislation. It is concerned with issues of justiciability which are not at all similar to issues of immunity which rely on the application of rules of law. Foreign acts of state may be disregarded if contrary to public policy in England: see Oppenheimer v. Cattermole [1976] A.C. 249 , 278.

In so far as act of state is a principle of public international law it does not permit recognition of foreign acts of state which are contrary to international law: see *Oppenheim's International Law* , vol. 1, pp. 365-366 and Restatement of the Law 3rd: The Foreign Relations Law of the United States, vol. 1 (1986), p. 370, para. 443, and pp. 374-375. **\*163**

Extradition procedure is sui generis. The element of discretion has been canalised and transposed to the Home Secretary, hence the elements of the act of state doctrine are matters for him. There are grounds for the view that act of state does not apply to cases involving criminal charges against individuals. There

is no English precedent to the contrary and American cases involve states for the most part and civil liability. Act of state is no more than a general principle of policy and is not a source of overriding principles.

There is no link between the creation of new principles of international law relating to crimes and the universality of jurisdiction of national courts as perceived by Lord Slynn of Hadley [2000] 1 A.C. 61 , 79c-d. The existence of universal jurisdiction is a normal concomitant of universal crimes but not a requirement: see *Oppenheim's International Law,* vol. I, p. 468 and Shaw, International Law, p. 470. All crimes classed as international crimes attract no immunity.

There are not many criminal cases involving heads of state and examples of actual trials are very few. There are a few American cases which all involve waiver of immunity by the successor government. The low incidence of such cases is of no relevance.

The Government of Chile is not a party to these proceedings and is not impleaded. The immunity of a state itself cannot confer immunity from prosecution for international crimes. Chile is herself a party to the Torture Convention. Chile cannot confer or withdraw immunity in these circumstances. Chile does not have sole jurisdiction for the offences charged against the applicant. Issues of human rights are not part of the reserved areas of a state.

*Duffy Q.C.* following. The effect of section 134 of the Criminal Justice Act 1988 is that our courts are competent to deal with the crime of torture wherever it occurs and despite the official context in which the act was done (the purported performance of official duties is a constituent element of the crime). Section 134 leaves no scope for a domestic jurisdiction/invasion of sovereignty ouster or a defence based on the act of state doctrine. Section 1(1) of the Taking of Hostages Act 1982 also provides for the personal criminal responsibility of the perpetrator regardless of his nationality or where the event occurred.

Section 134 refers without qualification to "public officials" or persons acting in an official capacity. A former head of state cannot be excluded from its ambit. The ordinary meaning of the words does not support limitation, and, as a provision giving effect to the

[2000] 1 A.C. 147                                                                                                          Page 14
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

United Kingdom's obligations under a Convention it should, where possible, be construed compatibly with those obligations. Thirdly, and decisively, the inclusion of heads of state is clear from the travaux of the Torture Convention are considered: see Burgers and Danelius, Handbook on the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, (1984 ), pp. 41-46 and 119. Fourthly, to reject the exclusion of heads of state will put the Torture Convention in line with other international standards such as the Rome Statute of the International Criminal Court. Under customary international law heads of state are responsible internationally for grave crimes against humanity including torture. *164

There is no need to consider public international law to reach the conclusions, based on the domestic statutes alone, that personal criminal responsibility exists in this country for the crimes for which the applicant's extradition is sought, that our courts are competent to rule on such crimes when committed in an official capacity, and that no scope is left for an act of state doctrine.

If personal criminal responsibility were to be tempered by state immunity the United Kingdom's obligations under the Torture Convention would be seriously compromised. To recognise a ratione materiae immunity in respect of complicity in torture would be to contradict the very scheme of the Torture Convention. In November 1998 the Committee Against Torture, the authoritative body established under article 17 of the Convention, recommended that the applicant's case should be considered by the public prosecutor with a view to initiating criminal proceedings in this country in the event that the decision is made not to extradite him. That recommendation is irreconcilable with the existence of a legitimate immunity for the applicant in this matter.

Section 20(1) of the State Immunity Act 1978, properly construed, is concerned with the international functions of a head of state. At most, it confers a ratione materiae immunity with regard to the international functions of a former head of state. The applicant cannot make out any immunity claim based on the Act. For the relationship between the common law and statute see *Bennion on Statutory Interpretation* , 3rd ed. (1997), pp. 133-135. Where statute is silent on whether the common law is to be abolished or modified the approach to be taken is that outlined in [Harrison v. Tew [1990] 2 A.C. 523] . Applying that test of inconsistency it is clear that the immunity claimed is inconsistent with the statutory schemes to be found in the various Acts concerning hostage-taking and torture.

To give effect to the will of the legislature any common law criminal immunity of a former head of state which may have existed prior to these enactments was modified by them so that the overriding effect of the statutory provisions for criminal jurisdiction can have effect.

Consideration of the relationship between the common law and public international law produces the same result. The common law, absent statutory adjustment, is to be read consistently with public international law. The residual ratione materiae immunity enjoyed by a former head of state does not encompass that individual's conduct when it constitutes behaviour which is contrary to international criminal standards that states have engaged to enforce before their courts or by way of extradition.

[Reference was made to the Amnesty International document "United Kingdom: The Pinochet case - Universal jurisdiction and the absence of immunity for crimes against humanity" (January 1999) and the U.N.Security Council Resolution of 27 February 1995 on the arrest of persons responsible for acts within the jurisdiction of the Rwanda Tribunal.]

Instruments such as the Torture Convention mean that any customary international immunity of a serving head of state should be modified so as to make these fundamental norms effective against all who exercise any state power or function. *165

At the heart of Chile's case is the claim that Chile has sole jurisdiction and the subject matter of this dispute concerns Chile's internal affairs. However, in Advisory Opinion No. 4 of 7 February 1923 ( United Kingdom v. France the Permanent Court of International Justice ) ruled that there was no automatic reserved internal affairs domain.

To regard the rule against torture as jus cogens and erga omnes underlines its fundamental place in the public policy of international law. Chile's assertion that jus cogens is not a principle which justifies sup-

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

planting pre-existing international law but is confined
to treaties is unacceptable: see In re Barcelona Trac-
tion, Light and Power Co. Ltd. [1970] I.C.J. Rep. 3 .

The effect of Chile's signature and ratification of the
Torture Convention means that Chile has accepted
the Convention's scheme that an alleged torturer is to
be tried in the country in which he is found unless he
is extradited for trial elsewhere. By its ratification of
the treaty Chile has accepted this scheme by the most
formal manner known to international law, and
should be taken to have consented in principle to the
exercises of the jurisdiction which its treaty obliga-
tions envisage.

 *Clive Nicholls Q.C., Clare Montgomery Q.C., Helen
Malcolm, James Cameron* and *Julian B. Knowles* for
the applicant.

*Montgomery Q.C.* States and organs of states, includ-
ing heads of state and former heads of state, are enti-
tled to absolute immunity from criminal proceedings
before national courts just as a state is entitled to im-
munity in respect of sovereign government acts. Far
from being an anomalous relic, immunity from for-
eign courts ensures that competent jurisdiction is
allocated to the state concerned. It is a doctrine of
competence not impunity.

There are four hurdles which the appellants have to
overcome to establish that immunity has been over-
ridden in the instant case. (1) They must show that
there exists a body of international criminal law over-
riding immunity for the alleged crimes. There is not
the hint of a suggestion that immunity in front of a
foreign national court has been done away with. (2)
They must prove that the international crime existed
at the time the conduct complained of occurred or
that when the international crime was created it was
intended to have retrospective effect. (3) They must
establish a universal jurisdiction in respect of the
international crime so that Spain may assert it is
prosecuting a crime in international law rather than
asserting a permissive national jurisdiction over a
non-international crime. The parties to the Conven-
tion on the Prevention and Suppression of the Crime
of Genocide (1948 ) agreed on the establishment of
an international crime to be tried before an interna-
tional court or the home court of the perpetrators. If
Israel prosecutes for genocide it is doing so on the
basis of a permissive national jurisdiction not under

that Convention. (4) They must establish that there is
no conflict between rules of immunity and the princi-
ples which govern international crime. Rules of in-
ternational law deal with liability, not jurisdiction.
The recognition of a human right is quite different
from conferring jurisdiction to try those who infringe
it.

At the turn of the century there was an internationally
accepted doctrine of absolute immunity in respect of
all civil and criminal jurisdiction: see Chung Chi
Cheung v. The King [1939] A.C. 160 and **\*166**
Compania Naviera Vascongado v. S.S. Cristina
[1938] A.C. 485 . If that doctrine is to be limited
there must be some developed competing rule of in-
ternational law, created during the course of the cen-
tury, limiting immunity in respect of identifiable in-
ternational crimes and evidenced by a consistent and
general state practice engendered by the belief that
the practice is obligatory. Under the Torture and Hos-
tage Taking Conventions or customary international
law there must be an absolute duty to exert criminal
process by extradition or before domestic courts
without exception or scope for derogation of any sort
for either the state or purposes of diplomatic immu-
nity. If there is any derogation there is no reason in
principle for saying a derogation cannot apply to a
head of state. Any scope for the exercise of a discre-
tion will militate against an absolute rule.

Under the Nuremberg trials process the vast majority
of people were tried before the national courts of
their own states. All the crimes criminalised under
the Rome Statute of the International Criminal Court
will be identified as ordinary national crimes. Most
cases will be tried on home territory. There is no uni-
versal jurisdiction for such crimes. That is the posi-
tion under international law.

 The Conventions relied on by the appellants do not
establish the rule for which they contend. Article 1of
the Torture Convention defines torture as the inten-
tional infliction of pain by "public officials" or those
acting in an official capacity. Article 4refers to "all"
torture and refers to all "forms" rather than "wherever
occurring." There is nothing to alter the immunities
under the Vienna Convention or any other immuni-
ties.

 The term "public officials" does not include heads of
state. The Nuremberg Charter, the Convention on the

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

Prevention and Suppression of the Crime of Geno-cide (1948), the Yugoslav and Rwanda Charters and the Rome Statute all refer specifically to heads of state as well as public officials. It is therefore inconceivable that the framers of the Torture Convention intended to include heads of state within the definition of public officials. The Criminal Justice Act 1988 is equally silent on the position of heads of state and Parliament must also have intended to exclude heads of state as Lord Slynn of Hadley concluded [2000] 1 A.C. 84a-b. The Hostages Convention and the Taking of Hostages Act 1982 are equally silent. [Reference was also made to Crawford, "The I.L.C. Adopts a Statute for an International Criminal Court" (1995) 89 A.J.I.L. 404 and Shubber "The International Convention Against the Taking of Hostages," *British Yearbook of International Law 1982* .]

The primary jurisdiction under the Torture Convention and the other Conventions is given to the state the offender comes from or where the offence took place and the obligation is to extradite a person to that state. Article 4 of the Torture Convention requires criminalisation of torture but is not concerned with jurisdiction. Article 5 does not require that the United Kingdom claims jurisdiction for all cases of torture wherever occurring. The Convention does not require that the United Kingdom try a Chilean for torture occurring in Chile if Chile refuses to exercise the jurisdiction. Either state has complete freedom whether or not to act.

Even though the Chilean Constitution outlawed torture it can still be described as a sovereign act if it is performed by a person as part of his **167** official functions. State immunity covers all people performing an official role. Acts done in connection with foreign relations, by the military or the police, are acts which are a manifestation of public and governmental power: see Propend Finance Pty. Ltd. v. Sing, The Times, 2 May 1997; Court of Appeal (Civil Division) Transcript No. 572 of 1997 . The perpetrator is liable but it is his home state which can assert jurisdiction over him or waive immunity.

Although by ratifying the Torture Convention Chile has accepted Spain's right to try Chileans for torturing Spaniards in Chile, the Convention has no retrospective effect and the crux of this case is that it does not deal with Spanish victims but with Chilean victims. The Convention is not about immunity but

about liability. The whole basis of diplomatic immunity would be undermined if the Convention gave jurisdiction for all acts of torture. The signatories were not intending that effect. It is because of the possibility of waiver of immunity by a home state that the Torture Convention allocates a right to any state to try anybody, although jurisdiction over torture will rarely raise issues of immunity.

Waiver of immunity must be either explicit or, if implicit, clear. Customary international law does not seem to recognise implied waiver. The only enactment which does is the American Foreign Sovereign Immunities Act 1976 . Waiver is not an issue when an international tribunal asserts a jurisdiction over a state. The issue of waiver only arises when national courts are trying to assert jurisdiction. If the Torture Convention has to be seen as a waiver of immunity by all signatories it does not override the immunities under the Vienna Convention: see Frolova v. Union of Soviet Socialist Republics (1985) 761 F.2d 370, 376; Sampson v. Federal Republic of Germany (1997) 975 F.Supp. 1108 and Smith v. Socialist People's Libyan Arab Jamahiriya (1995) 886 F.Supp. 306 . It is one thing for a state to assert a principle of international law by signing a Convention, quite another to relinquish jurisdiction: see East Timor (Portugal v. Australia) Judgment, [1995] I.C.J. Rep. 90 . It is necessary for the appellants to show there was no immunity at the time the alleged acts occurred see: Princz v. Federal Republic of Germany , 26 F.3d 1166. The international Conventions concerned here were simply not dealing with immunity: see Reimann, "A Human Rights Exception to Sovereign Immunity: Some Thoughts on Princz" (1995) 16:403 M.J.I.L. 403.

The Torture Convention is the high point of the appellants' case but there is still a distinction between acts of state and assertion of jurisdiction. It takes more than one Convention to overturn hundreds of years of practice in the area.

Even if the Torture Convention has removed the head-of-state immunity it has not overriden previous rules which were relevant at the time the acts occurred. The language of the Convention is prospective and, in any event, the principle of non-retroactivity should not be broken without clear words. Nor did Parliament in enacting its provisions intend the Convention to have retrospective effect:

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

see *Hansard* , H.L. 6th Series vol. 135 (1987-1988), 13-24 June. The Criminal Justice Act 1988 itself provided that section 134 should apply to offences two months after it *168 came into effect. Even if Chile has accepted third-party jurisdiction by ratifying the Torture Convention it still has a vested right to assert immunity up to the point when the Convention came into effect: see Carl Marks & Co. Inc. v. Union of Soviet Socialist Republics (1987) 665 F.Supp. 32; (1988) 841 F.2d 263 and Jacobus v. Colgate (1916) 217 N.Y. 235 .

The State Immunity Act 1978 applies to civil proceedings alone and the absolute immunity for states in criminal matters is left unaffected: see the Lord Chancellor's statement, *Hansard* , H.L.Debates, 17 January 1978, cols. 51-52. The problem about section 20 of the Act was intended to address is the one identified by Sir Arthur Watts Q.C., Hague Lectures, "The Legal Position in International Law of Heads of States, Heads of Governments and Foreign Ministers" (1994-III) 247 Recueil des cours, pp. 53-58. The avowed purpose of section 20 was the private capacity protection but it is wider than that as the immunity covers both public and private acts: see also The British Yearbook of International Law 1980, pp. 429-436. Section 20 in clear and unequivocal terms confers the privileges contained in the Diplomatic Privileges Act 1964 on a head of state, whether or not he is in the United Kingdom. The intended effect of the amendment was to extend immunity to heads of state by mirroring customary international law. The Act and the Vienna Convention, article 31, confer on a former head of state an immunity ratione materiae for acts effected in his official capacity.

Parliament intended to extend to a head of state and a former head of state the full article 39(2) protection for official acts. In In re Former Syrian Ambassador to the German Democratic Republic (unreported), 10 June 1997, Federal Constitutional Court, Case No. 2 BvR 1516/96 the court concluded that article 39 protection will stand even in the face of war crimes.

If the position is not governed by section 20 the customary international law position and test are exactly the same in that a former head of state has immunity for acts effected in his official capacity: see Watts at p. 66. See also *Satow's Guide to Diplomatic Practice* , pp. 8-10; *Oppenheim's International Law* , vol. I, para. 456; The American Law Institute Restatement

of the Law 3d: Foreign Relations Law of the United States (1986) vol. 1, p. 471, section 464; *Lewis, State and Diplomatic Immunity* , 3rd ed. (1999), pp. 125-126. The analyses of these writers are reflected in case law: see Duke of Brunswick v. King of Hanover (1848) 2 H.L.Cas. 1 . That was applied in Hatch v. Baez, 7 Hun 596 and followed in the United States in Underhill v. Hernandez (1897) 168 U.S. 250

In determining whether an act is sovereign, public or governmental and whether it is an official act for which a common law immunity subsists, assistance can be gained from the analysis which has been undertaken in identifying the bounds of the restrictive doctrine of state immunity in the context of distinguishing private commercial and trading transactions from transactions of state: see I Congreso del Partido [1983] 1 A.C. 244 and Trendtex Trading Corporation v. Central Bank of Nigeria [1977] Q.B. 529 . There is nothing to indicate that those restrictions on immunity which relate to certain civil proceedings are also intended to apply to criminal proceedings. *169

If Sucharitkul, "State Immunities and trading Activities in International Law" (1959) is correct in eliding civil and criminal proceedings then United Kingdom law is wider than international law and it is necessary to look at the issues considered in I Congreso del Partido and to decide on which side of the state/personal activity line the acts concerned here fall.

The American cases are distinguishable. They all involve either a waiver, private acts which cannot sensibly be said to have been done under the colour of state authority, or specific exceptions to immunity under the Foreign Sovereign Immunities Act 1976: see Jimenez v. Aristeguieta (1962) 311 F.2d 547 ; United States of America v. Noriega (1990) 746 F.Supp. 1506 ; (1997) 117 F.3d 1206; Hilao v. Estate of Marcos, 25 F.3d 1467 ; Lafontant v. Aristide (1994) 844 F.Supp. 128 ; Nelson v. Saudi Arabia (1991) 88 I.L.R. 189 ; Siderman de Blake v. Republic of Argentina, 965 F.2d 699 ; Argentine Republic v. Amerada Hess Shipping Corporation (1989) 109 S.Ct. 683 ; Al-Adsani v. Government of Kuwait, 107 I.L.R. 536 and Princz v. Federal Republic of Germany, 26 F.3d 1166 .

The approach of the courts of other countries has been the same: see In re Honecker, 80 I.L.R. 365 and

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

Marcos and Marcos v. Federal Department of Police (1989) 102 I.L.R. 198 . The established practice is for states not to try foreign heads of state.

The United States and other countries have enacted specific exceptions to immunity but not one has enacted a human rights exception. Given the importance of establishing state practice that is significant. There is state practice condemning torture but none which denies immunity or vests jurisdiction. The American courts have taken the approach that they have claimed jurisdiction but do not intend to overrule immunity.

 State practice has to be extensive and uniform over a significant period of time before any principle of jus cogens can arise: see North Sea Continental Shelf Case Judgment [1969] I.C.J. Rep. 3 . Even a convention or United Nations General Assembly Resolution does not become part of international law without state practice. The practice emerges when all the aspirations expressed in the convention or resolution are accepted by states and acted upon. When a high ideal, e.g. to prosecute crimes against humanity, is expressed, the practice is often the opposite - to give complete immunity to certain categories of people without carving out a human rights exception. In the face of such contrary practice it is impossible to say that immunity is overridden: see Saltany v. Reagan (1988) 702 F.Supp. 319 and Persinger v. Islamic Republic of Iran, 729 F.2d 835

State practice shows that there is immunity except for international crimes, namely genocide, war crimes and crimes against humanity. The definition of those crimes requires that they take place in the context of an armed conflict, even if it is only an internal conflict. They are crimes which threaten the peace or the world order. Torture does not and is not an international crime: see Higgins, Problems and Process: International Law and How We Use It (1994), pp. 87-89. The mere existence of a treaty to cover the conduct concerned does not make it an international crime. There are numerous treaties covering controlled drugs but possession of cannabis is not an international crime. **\*170**

The precursor agreements to the Torture Convention do not support the appellants' case that it establishes customary rules. The General Assembly Resolution of 1973 and the Draft Agreement of 1975 demonstrate that torture was condemned in terms of aspiration only and that nothing was done to encourage third state jurisdiction. The most powerful argument against the Torture Convention as evidence of a customary international law practice is that it took until 1987 for the Convention to come into effect.

 The appellants' argument that in any event the crimes alleged are crimes against humanity and have been since Nuremberg also fails. Crimes against humanity are always associated with armed conflict: see the Yugoslav Tribunal Statute and the Draft Code of Crimes Against the Peace and Security of Mankind (1996 ). The only agreement which took crimes against humanity out of an armed conflict scenario was the Draft Agreement of 1954 and the 1996 Draft reinstated the connection: see also Polyukhovich v. Commonwealth of Australia (1991) 91 I.L.R. 1 .

International Law Commission Drafts have little weight as evidence of existing customary international law. If anything they are evidence of a lack of universal practice. The law on immunity is clearer as there is evidence of universal practice: see Higgins Problems and Process: International Law and How We Use It, pp. 87-89 and Brownlie, "Contemporary problems concerning the jurisdictional immunity of states," Institute of International Law Yearbook 1987, vol. 62, part 1. p. 13.

 There was no conflict in Chile except on the day of the coup. The allegations against the applicant do not fall within the definition of crimes against humanity. The Spanish allegations are of torture, murder and conspiracy, not crimes against humanity.

 In relation to pre-coup conduct, any conduct complained of before 11 September 1973 is covered by either immunity or the act of state doctrine. Acts done pursuant to the planning and execution of a coup are, if the coup is successful, the acts of the state and protected: see Underhill v. Hernandez, 168 U.S. 250 and Oetjen v. Central Leather Co. (1918) 246 U.S. 297 . Once there is the nucleus of a government the act of state doctrine applies from the start of the revolution, not from the formation of the new government: see Buttes Gas and Oil Co. v. Hammer [1982] A.C. 888 and article 15 of the International Law Commission Draft Articles on State Responsibility.

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

Pre-coup conduct in 1973 was not an offence under English law and does not satisfy the extradition requirement of double criminality as at that time the statutes which could make the conduct a crime under English law had not been enacted. They have to rely on Lord Bingham of Cornhill C.J.'s formulation of the test and Lord Lloyd of Berwick [2000] 1 A.C. 61, 88d-e. Consideration has to be given to the time when the action occurred but the point goes further as consideration of the principle of double criminality under the Extradition Act 1989 shows.

The Extradition Act 1989 consolidated procedures for extradition to foreign states and Commonwealth countries and provided for new arrangements under the European Convention on Extradition (1957 ). The principle of double criminality must be the same for all circumstances. The **\*171** definition of an extradition crime for Schedule 1cases in paragraph 20 requires one to look back to the Extradition Act 1870 (33 & 34 Vict. c. 52).Section 26 of that Act defines an extradition crime and Schedule 1specifies the relevant date as the date of the alleged crime. [Reference was also made to United States of America v. Allard [1991] 1 S.C.R. 861; the Interdepartmental Working Party Report, "A Review of the Law and Practice of Extradition in the United Kingdom," (1982); the Green Paper, "Extradition" 1985 (Cmnd. 9421) and the White Paper "Criminal Justice Plans for Legislation," 1986 (Cmnd. 9658).]

The magistrate must exercise the extradition jurisdiction in the same way as the domestic criminal jurisdiction: see The Law Commission and The Scottish Law Commission "Report on the Consolidation of Legislation Relating to Extradition" 1989 (Law Com. No. 182; Scottish Law Com. 119). He must apply the law which existed at the time of the offence. The objective is to give the defendant the same rights as a defendant under English law: see Bassiouni, International Extradition: United States Law and Practice, 3rd ed. (1996), pp. 497-500, 596-598 and Shearer, Extradition in International Law (1971), pp. 136-139.

In the light of these authorities which were not before the Divisional Court or the previous Appellate Committee, the applicant cannot be extradited to Spain to stand trial in respect of acts which would not have been contrary to United Kingdom law at the time they were done because the provisions of the Torture Convention had not been brought into effect.

"Conduct" in section 2 of the Act of 1989 is not just any activity taken out of its element and time but conduct which is punishable under United Kingdom law at the time when it takes place. The relevant time for determining double criminality is thus the date of the alleged crime.

Nicholls Q.C. following. Even if "conduct" in section 2 of the Extradition Act 1989 contains no temporal element the pre-coup conduct is not an extradition crime because it is not the conduct with which the applicant is charged in Spain. For there to be liability to extradition under section 1 there must be a link between the offence with which a defendant is accused in the foreign state and the offences alleged in the extradition proceedings. It is not permissible for the Crown Prosecution Service to draft charges about the pre-coup period as that is not conduct complained about by Spain. It has been raised solely to avoid the immunity issue. The requesting state must specify the conduct complained about so the requested state can draft its own matching charges. It is incumbent on the magistrate to have regard to the crime with which the defendant is accused in the foreign state: see In re Nielsen [1984] A.C. 606 .

All the Spanish charges relate to repression after the coup, not to conspiracies and plots. The applicant is not charged with a pre-coup conspiracy. Although the House can look at all the documentation now produced by the appellants, the first provisional warrant is definitive because it fixes the starting point. In so far as a plan is mentioned it is merely as factual background. All the substantive allegations relate to post-coup activities.

Applying the non retrospectivity principle and considering the current charges on the basis that section 134 came into force on 29 September **\*172** 1988 very few survive. Hostage taking is not made out and conspiracy before the acts became criminal falls away.

Lawrence Collins Q.C. for the Government of Chile. Chile is intervening to defend its national sovereignty, to assert its interest in having the matters at issue dealt with in Chile, maintain the rule of law in Chile and to protect the national jurisdiction from outside interference contrary to international law, but not to defend the applicant's acts as head of state. The Government of Chile deplores the fact that the government at the time violated human rights and reaf-

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

firms its commitment to human rights. Chile's asser- tion of its own immunity is not intended as a personal shield for the applicant nor to grant him immunity from prosecution in Chile or impunity.

The sole questions for present purposes are whether a person is immune under section 1 of the Extradition Act 1989 in relation to conduct defined in section 2 and whether that conduct is immune under section 20 of the State Immunity Act 1978. Whether conduct amounts to an offence under English law is irrele- vant. Section 1(1) of the Act of 1989 is general in its terms but it is natural to read it as subject to the nor- mal immunities applicable to diplomats and heads of state. Such immunities are to be found only in the Act of 1978 and customary international law. Section 134 of the Criminal Justice Act does not provide an im- plied escape from immunity. The United Nations Committee Against Torture [1990] II, No. 1-2 H.R.L.J. 14 has decided that the Torture Convention does not have retrospective effect.

The Republic of Chile claims immunity from the courts of the United Kingdom for acts alleged to have been carried out by its former head of state, over which Chile and its national courts have sole jurisdic- tion. The sovereign equality of states and the mainte- nance of international relations require that the courts of one state should not adjudicate on the governmen- tal acts of another,or intervene in its internal affairs. Head of state immunity is an aspect of state immu- nity, which applies equally to criminal and civil pro- ceedings and includes immunity for agents of the state acting in exercise of sovereign authority: see Yearbook of the International Law Commission 1980, vol. II (Part2), "Jurisdictional Immunities of States and their Property, Second Report," pp. 14-15, 18-19, 207-210; Zoernsch v. Waldock[1964] 1 W.L.R. 675; Propend Finance Pty. Ltd. v. Sing The Times, 2 May 1997 , ; Church of Scientology Case (1978) 65 I.L.R. 193 and Herbage v. Meese (1990) 747 F.Supp. 60 . The immunity is for the benefit of the state, not the individual, and only the state may choose whether to waive it: see Jaffe v. Miller (1993) 13 O.R.(3d) 745 . Littrell v. United States of America (No. 2) [1995] 1 W.L.R. 82 and Holland v. Lampen Wolfe [1999] 1 W.L.R. 188, C.A. show the parallel immunities of the individual and the state. If immu- nity, or absence of immunity, depends on questions of fact, then a party asserting immunity, or its ab- sence, must show that there is a serious issue to be tried.

The rules of comity require that the United Kingdom does not assert or assist in the assertion of jurisdiction over the internal acts of a foreign state: see I Con- greso del Partido [1983] 1 A.C. 244 ; Buck v. Attor- ney-General [1965] Ch. 745 and Institut de Droit International Annuaire, *173 vol. 64-II (1991), p. 389 "Contemporary Problems Concerning the Immunity of States in Relation to Questions of Jurisdiction and Enforcement." The Spanish charges are substantially based on the Report of the Chilean National Com- mission on Truth and Reconciliation (1991). As re- quired by Presidential Decree No. 355 of 25 April 1990 the commission passed on relevant evidence to the Chilean courts and made proposals for action. These are not matters for foreign courts: see Azanian Peoples Organisation (A.Z.A.P.O.) v. President of the Republic of South Africa (1996) 8 B.C.L.R. 1015 , a decision of the South African Court of Appeal on the status and constitutionality of amnesties granted by the South African Truth and Reconciliation Commis- sion.

The immunity of an existing head of state for acts performed in his governmental capacity is well rec- ognised. A similar immunity applies to a former head of state: see Sir Arthur Watts Q.C., Hague Lectures, "The Legal Position in International Law of Heads of States, Heads of Governments and Foreign Ministers" (1994-III) 247 Recueil des cours, p. 89; Hatch v. Baez, 7 Hun 596 and Marcos and Marcos v. Federal Department of Police, 102 I.L.R. 198 .

In some cases state immunity has been denied to an individual claiming it. They involved circumstances where the acts concerned were the personal and pri- vate acts of the head of state ( Ex-King Farouk of Egypt v. Christian Dior (1957) 24 I.L.R. 228 and Société Jean Desses v. Prince Farouk (1963) 65 I.L.R. 37) , where the foreign state either did not claim or waived immunity ( In re Grand Jury Pro- ceedings, John Doe 700 (1987) 817 F.2d 1108 ; Re- public of Philippines v. Marcos (1986) 806 F.2d 344 ; Hilao v. Estate of Marcos, 25 F.3d 1467 and Paul v. Avril (1993) 812 F.Supp. 207) , where the defendant was not recognised as head of state ( United States of America v. Noriega, 746 F.Supp. 1506 ; (1997) 117 F.3d 1206), or where the state had ceased to exist ( In re Honecker, 80 I.L.R. 365 ).

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

Both international law and the State Immunity Act 1978 recognise a clear parallel between former head of state immunity and the immunity of former diplomatic agents now codified in article 39(2) of the Vienna Convention on Diplomatic Relations: see, *Denza, Diplomatic Law* , 2nd ed. (1998), pp. 357-363; Yearbook of the International Law Commission 1991, vol. II (Part 2) "Jurisdictional Immunities of States and their Property," p. 18; Mann, Studies in International Law (1973), pp. 422-433; Marcos and Marcos v. Federal Department of Police (1989) 102 I.L.R. 198 and Zoernsch v. Waldock [1964] 1 W.L.R. 675 . In re Former Syrian Ambassador to the German Democratic Republic, 10 June 1997, Federal Constitutional Court, Case No. 2 BvR 1516/96 stands alone in saying there is a major difference between diplomatic immunity and state immunity.

The test for immunity is whether the act is a governmental act or sovereign act: see I Congreso del Partido [1983] 1 A.C. 244 . The applicant is not charged with private acts. The term "official acts" which so influenced the panel on the previous hearing [2000] 1 A.C. 61 finds no place in article 39(2). "Official" is misleading as it carries connotations of legality. The French use the expression "an act of public power:" Société Levant Express Transport v. Chemins de fer du gouvernement iranien (1969) in *Grands Arrêts* 3rd ed. (1998), p. 372. The paradigm case of the exercise **\*174** of sovereign power is military and police action: see Claim against Empire of Iran (1963) 45 I.L.R. 57 ; Duke of Brunswick v. King of Hanover, 2 H.L.Cas. 1 ; Nelson v. Saudi Arabia, 88 I.L.R. 189 ; Kendall v. Kingdom of Saudi Arabia (1965) 65 Adm. 885 .

The only issue in the instant case is the jurisdiction of the foreign courts, not the legitimacy of the applicant's acts. Immunity subsists irrespective of whether the acts are illegal or unauthorised according to internal law or contrary to international law, since the whole purpose of state immunity is to prevent such issues being litigated in a foreign national court unless the state consents by treaty or otherwise. Chile is merely concerned to assert its national immunity and sole jurisdiction over the illegal acts. Wholly illegal acts can still be public acts: see Velasquez Rodriguez Case (1989) 95 I.L.R. 232.

There are two strands to the cases in international law on the imputed responsibility of the state for acts against aliens. For example, either the state is liable directly for the acts of its soldiers or is liable in a form of negligence for allowing a mob to take over: see In re United States Diplomatic and Consular Staff in Tehran , [1980] I.C.J. Rep. 3; 61 I.L.R. 504. These are not cases of vicarious liability but of state responsibility because the state is regarded as having done the deed.

Although there is no necessary correlation between state responsibility and state immunity the former offers the best guide as to where the immunity starts: see Brownlie's Principles of Public International Law, 5th ed. (1998), pp. 450, 454; Thomas H.Youmans (U.S.A.) v. United Mexican States (1926) 4 U.N.R.I.A.A. 110; The Maal Case (1903) 10 U.N.R.I.A.A. 730; Estate of Jean-Baptiste Caire (France) v. United Mexican States (1929) 5 U.N.R.I.A.A. 516.

The State Immunity Act 1978 does not cover the whole issue of immunity. In so far as section 20 and customary international law are not co-extensive customary international law is decisive.

The prohibition of torture by international law has the character of jus cogens or obligation erga omnes. The limits and application of jus cogens, a mandatory rule from which states cannot by agreement derogate, are controversial: see Brownlie's Principles of Public International Law, 5th ed. (1998), pp. 516-517 and Sinclair, The Vienna Convention on the Law of Treaties , 2nd ed. (1984), p. 209. It is not a rule of jurisdiction and does not supplant pre-existing customary international law. The concept of obligation erga omnes is used to widen the power of states to complain about the infringement of an obligation in international law but does not confer jurisdiction on international or national tribunals where it does not otherwise exist: see East Timor (Portugal v. Australia), In re [1995] I.C.J. Rep. 90, 122, para. 29; United States of America and Republic of France v. Dollfus Mieg et Cie. S.A.and Bank of England [1949] Ch. 369; [1950] Ch. 333, C.A.; [1952] A.C. 582 and The Monetary Gold [1954] I.C.J. Rep. 19.

Jus cogens and erga omnes do not impose on questions of immunity, nor is there any connection between those concepts and the personal responsibility of heads of state before international tribunals. The jurisdiction of an international court depends on the

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

will of the parties. The statutes of international tribunals draw a distinction between heads of *175 state and government officials and the international conventions dealing with jurisdiction of national courts do not affect head of state immunity because they do not expressly override it.

The use of national courts for the trial of war crimes depends on the laws of war. The fact that heads of state or former heads of state can be liable before international tribunals leaves unaffected state immunity before a national court. State immunity is unaffected by the jurisdictional provisions of a treaty unless it is expressly waived. Consequently the Torture Convention and the Hostages Convention leave head of state immunity intact. There is no rule of international law that immunity ceases to be available in cases of violations of peremptory norms.

The law of war crimes is such that no conclusions can be derived from it which are applicable to other emerging international crimes. The basis of the jurisdiction is the right of a belligerent to punish war criminals who fall into its hands: see Oppenheim's International Law, vol. II, (1952), pp. 581, 587. The tribunals set up after the Second World War were established by the victors as belligerent or occupying powers assuming the sovereignty of the defeated country: see *Manual of Military Law* , (1958), Part III "The Law of War on Land," ed. Sir Hersch Lauterpacht, pp. 173-184 and Lord Wright "War Crimes under International Law" (1946) L.Q.R. 45.

Article 7 of the Nuremberg Charter under which heads of state could be held liable before the tribunal was preceded by four years of intense discussion: see Stone, Legal Controls of International Conflict (1959), p. 357 and McDougal and Feliciano, The International Law of War: Transnational Coercion and World Public Order, (1994), p. 707. It is the formula which has been followed only in setting up subsequent war crimes tribunals: see article 7(2) of the Yugoslav Statute , article 6(2) of the Rwanda Statute . The only exception is article 27(1) of the Rome Statute of the International Criminal Court which is unexceptionable as any jurisdiction is based on the consent of the signatories. The powers over an existing or former head of state are exactly the same as they were in 1946: see the International Draft Code of Offences Against the Peace and Security of Mankind 1954 and General Assembly Resolution 3074

(XXVIII) of 3 December 1973 . The International Law Commission Draft Code of Crimes 1996 is intended to be a recommendation for the future and is not a statement of present law as it contains almost no citation of state practice. It is prospective in nature and has provision for non-retroactivity.

The Rome Statute of the International Criminal Court is little evidence of customary international law and is mainly a political statement. In any event it has been signed but not ratified. However, it contains in article 98a clear affirmation of state immunity in national courts, although in the vast majority of cases an accused will be tried before the courts of his own country so immunity will not arise. This is the closest one gets to an international statute dealing with international crimes and it reasserts state and diplomatic immunity.

 Chile ratified the Torture Convention on 30 September 1988 and it came into force in October 1988 but has no retrospective effect: see U.N.Committee Against Torture [1990] II, No. 1-2 H.R.L.J. 134. Under the Convention, however, no other state can try a torturer if his home *176 state claims immunity for him. There is no trace of discussion of immunity being waived before the Convention was opened for signature. Waiver of immunity by treaty must be express: see Yearbook of the International Law Commission 1991, vol. II (Part 2), p. 27; Argentine Republic v. Amerada Hess Shipping Corporation , 109 S.Ct. 683 and the discussion in *Oppenheim's International Law* , vol. I, p. 351. A term can only be implied into a treaty for necessity, not to give the treaty maximum effect: see Oppenheim's International Law, vol. I, p. 1271. There is no obligation in the Torture Convention to which one can attach the implied waiver. Waiver cannot be implied on the basis that certain provisions of the treaty will not work without it. All the states which are signatories to the convention cannot be taken to have waived jurisdiction over public officials without express words. If that was thought to have been the effect of the Convention it would have been expressly stated.

The scheme of the Convention does encroach on territoriality but extended jurisdiction does not entail a waiver of immunity. The Convention is primarily concerned with the country where the torture took place and issues of third party jurisdiction are marginal to its overall thrust. To have waived immunity

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

in such a marginal area would have been a major step
for the parties.

  The immunity is the immunity of the state and has to
be claimed by the state. This will only occur in ex-
ceptional circumstances. The normal procedure will
be for the country where the torture occurred to re-
quest the return of the alleged torturer or repudiate
him, but not to claim immunity. In any event, al-
though the articles concerning criminal responsibility
apply to heads of state the provisions do not abrogate
head of state immunity.

  An application by Spain to extradite a non-Spanish
national for acts done outside Spain is not within the
Torture Convention. Chile has not requested the ex-
tradition of the applicant as he is not a fugitive from
Chile - his wish is to return to Chile.

  The submissions apply equally to the Hostages Con-
vention. There can have been no implied waiver be-
cause the Convention, although applicable to public
officials, was not designed to deal with hostages
taken by a state: see In re United States Diplomatic
and Consular Staff in Tehran , Judgment, [1980]
I.C.J. Rep. 3; 61 I.L.R. 504, 555.

To accept that torture has been prohibited since the
1970s is not to agree that it was also an international
crime. It means that there is an obligation on states to
ensure that no torture takes place within their territo-
ries. It is likely that, today, systematic and state
planned torture would be regarded as a crime against
humanity resulting in the personal responsibility of
the actor and universal jurisdiction in regard to him.
There is a growing consensus that crimes against
humanity do not necessarily have to be allied to
armed conflict. That, however, says nothing about
immunity. There is no possible conflict between im-
munity and universal jurisdiction. There is no rule of
customary international law requiring an exception to
state immunity for breach of international law. On the
contrary, state practice shows that in the United
States and the United Kingdom state immunity legis-
lation is subject to no such exception. The most im-
portant modern pronouncement of the International
Court of Justice on the development of a customary
rule is *177 to be found in the North Sea Continental
Shelf Case, Judgment [1969] I.C.J. Rep. 3, 44.

It is clear from the decision in Argentine Republic v.

Amerada Hess Shipping Corporation , 109 S.Ct. 683
and McDowell, "Contemporary Practise of the United
States Relating to International Law" (1976) 70
A.J.I.L. 817 that the American Foreign Sovereign
Immunities Act 1976 was passed with international
law in mind and that the Departments of State
and Justice were involved in drafting the legislation.
Consequently the Act can be regarded as declaratory
of international law: see also Siderman de Blake v.
Republic of Argentina , 965 F.2d 699 and Al-Adsani
v. Government of Kuwait , 107 I.L.R. 536.

The approach in these cases is equally applicable to
claims against agents of the state as it is to the claims
against the state itself. There is no rule of customary
international law which requires a further exception
to the accepted principles of state immunity from
foreign national courts for breach of international
law: see, Schreuer "State Immunity: Some Recent
Developments," Hersch Lauterpacht Memorial Lec-
tures (1988), p. 60.

  *David Lloyd Jones* as amicus curiae. It is still a live
issue whether the applicant was head of state from 11
September 1973. In the past such questions have usu-
ally been resolved by executive certificate. In the
absence of one it is permissible to consider evidence
of fact and Chilean law: see Duff Development Co.
Ltd. v. Government of Kelantan[1924] A.C. 797,
824. Although that passage was criticised in The
Arantzazu Mendi [1939] A.C. 256, 264, no objection
can be taken to admitting secondary evidence in the
circumstances of the present case.

The United Kingdom recognised the new Govern-
ment of Chile in September 1973. In English law that
recognition was retroactive to the date when the gov-
ernment took control: see Aksionairnoye Obschestvo
A.M. Luther v. James Sagor & Co.[1921] 3 K.B. 532.

There is general consensus that there is a measure of
continuing immunity ratione materie for a former
head of state in respect of his acts as head of state:
see Satow's Guide to Diplomatic Practice, pp. 8-10;
*Oppenheim's International Law* , vol. 1, para. 456;
Sir Arthur Watts Q.C., Hague Lectures, "The Legal
Position in International Law of Heads of States,
Heads of Governments and Foreign Ministers"
(1994-III) 247 Recueil des cours, pp. 52-58; *Mann,
Studies in International Law* (1973), pp. 422-433;
Hatch v. Baez , 7 Hun 596 and Marcos and Marcos v.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

Federal Department of Police , 102 I.L.R. 198. The rationale of the continuing immunity is that for a national court to exercise jurisdiction over the official acts of a former head of a foreign state would be to exercise jurisdiction over the state itself. The same rationale applies to the immunity granted to diplomats and other state officials. National principles reflect to varying degrees the principle of nonintervention in the internal affairs of other states: see *Oppenheim's International Law* vol. I, pp. 365-370; Zoernsch v. Waldock[1964] 1 W.L.R. 675, 692. Dinstein, "Diplomatic Immunity from Jurisdiction Ratione Materiae" (1966) 15 I.C.L.Q. 76, 81, 83, 86, 87 supports the view that not every act of state commands immunity from jurisdiction. In English law immunity ratione materiae and act of state nonjusticiability are separate doctrines, but they share the same rationale. *178

The effect of section 20(1) of the State Immunity Act 1978 and the Vienna Convention on Diplomatic Relations is that a former head of state enjoys immunity from criminal proceedings in the United Kingdom in respect of his official acts performed in the exercise of his functions as head of state. This coincides exactly with the position in customary international law. If section 20 does not apply to the acts of a head of state while not in the United Kingdom and there is no statutory rule covering that situation it becomes easier to argue that any immunity granted by the common law is overridden by the Torture Convention. Section 20 should be interpreted in the light of the international law background and consistently with international law obligations unless the language of the statute compels the opposite conclusion: see Alcom Ltd. v. Republic of Colombia[1984] A.C. 580, 597. The statute applies the rules applicable to the head of a diplomatic mission by analogy to the head of state. There is a clear analogy between the two. For this purpose there is no significance in the fact that a diplomat is "received" by the state. Section 20 provides a comprehensive code as to the way a head of state is to be treated by the United Kingdom. Of the possible restrictions, it would be strange if the section 20 immunity only applied to the foreign head of state's acts in the United Kingdom as hardly any of them are performed here. The provision does not say it is intended only to cover a visiting head of state in his official functions as a dignitary: see Hansard (H.L. Debates), 16 March 1978, col. 1536-1537; Sir Arthur Watts Q.C., Hague Lectures, "The Legal Position in International Law of Heads of States, Heads

of Governments and Foreign Ministers" (1994-III) 247 Recueil des cours, p. 66 and Lewis, State and Diplomatic Immunity, 3rd ed. (1999), pp. 87, 89. A limitation to matters arising in the United Kingdom from the private acts of a visiting head of state is not warranted by the wording of the statute or the rules of customary international law. There is no justification for confining the immunity to the representative functions of a head of state. Section 20 imports the whole body of international privileges and immunities.

Section 20 should be read in conjunction with articles 31 and 39(2) of the Vienna Convention on Diplomatic Relations as creating a rule of general application on immunities for heads of state. A former head of state enjoys immunity from the criminal jurisdiction of the United Kingdom in respect of his official acts performed in the exercise of his functions as head of state. This does not connote a requirement of legality in the municipal law of the head of state. That law cannot be decisive of the scope of the immunity ratione materiae of a former head of state. Article 3 of the Vienna Convention was not incorporated into English law, but the immunities of a head of state under international law still apply. The difference in position between a head of state and a head of government can be met by supplementing the head of government's immunity. If section 20 does not apply to a former head of state, then under the common law reflecting international law he enjoys immunity ratione materiae to the same extent as under the proposed reading of section 20.

The starting point in considering whether the applicable rule of immunity is that at the date of the extradition request or the date of the conduct is that immunity is a procedural exception to jurisdiction and in *179 general current law applies: see *Denza, Diplomatic Law,* pp. 256-257 and Empson v. Smith [1966] 1Q.B.426. However, different considerations may apply where the applicable rule of immunity depends on the legality of the conduct itself. That question should be answered by reference to the law in force at the date of the conduct: see *per* Lord Slynn of Hadley [2000] 1 A.C. 61, 81g-82a; cf. *per* Lord Steyn, at p. 117e-f.

If torture by a head of state is now outlawed under international law and therefore justiciable before foreign courts it is necessary for that point to have been reached at the time of the conduct. It is not enough to

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

say that the conduct is illegal today. On the inter-temporal law see Jennings, The Acquisition of Territory in International Law, (1963), pp. 28-31 and article 28 of the Vienna Convention on the Law of Treaties.

There is no absolute rule that waiver of immunity must be express: see Frolova v. Union of Soviet Socialist Republics (1985) 761 F.2d 370. When parties enter into a later conflicting treaty it may expressly or impliedly vary its predecessor: article 59of the Vienna Convention on the Law of Treaties. The parties to the Torture Convention may be taken to have restricted immunity ratione materiae with prospective effect.

When considering the scope of the official acts of a head of state the legality of the conduct in question under the law of that state or the scope of his actual authority under that law cannot be the governing considerations. An act may be ultra vires but nevertheless be official for the purpose of immunity if performed in ostensible exercise of the actor's public authority: see Republic of Philippines v. Marcos , 806 F.2d 344; Jaffe v. Miller (1993) 13 O.R.(3d) 745. [Reference was made to Sir Arthur Watts Q.C., Hague Lectures, "The Legal Position in International Law of Heads of States, Heads of Governments and Foreign Ministers" (1994-III) 247 Recueil des cours, pp., 56-57; Jimenez v. Aristeguieta (1962) 311 F.2d 547 and Duke of Brunswick v. King of Hanover , 2 H.L.Cas. 1.] If legality under the law of the state concerned were determinative, the more repugnant its laws the greater would be the extent of the immunity to which the former head of state would be entitled. An act may be attributed to the state for purposes of state responsibility but is not necessarily regarded as an act of state: contrast Thomas H. Youmans (U.S.A.) v. United Mexican States (1926) 4 U.N.R.I.A.A. 110 and United States of America v. Noriega (1990) 746 F.Supp. 1506. As to a possible exception to the act of state doctrine in relation to illegality in international law see Kuwait Airways Corporation v. Iraqi Airways Co. (unreported), 29 July 1998. When considering whether the acts of a head of state are public or private it is necessary to look at the purpose and motive of the action. The United States authorities support the proposition that official acts are those taken on behalf of the state and do not include private acts of the actor himself and also the proposition that the fact that a head of state is

alleged to have utilised his official position to engage in criminal activity does not necessarily make that activity a public act: see United States of America v. Noriega (1990) 746 F.Supp. 1506; Underhill v. Hernandez , 168 U.S. 250 and Jimenez v. Aristeguieta (1962) 311 F.2d 547.

In considering the offences alleged to have taken place outside Chile, a literal approach to the statutory provisions and a purposive approach based on the rationale for the immunity produce different results. On the **180** literal approach the acts done abroad are none the less official: see Kuwait Airways Corporation v. Iraqi Airways Co. [1995] 1 W.L.R. 1147, 1163a. On the purposive approach the rationale for the immunity, non-interference in the internal affairs of another state, no longer applies. Accordingly, although in one sense acts outside Chile can be regarded as official acts, the rule does not extend to grant immunity as acts which are not within the proper jurisdiction of the state cannot attract immunity: see Duke of Brunswick v. King of Hanover (1848) 2 H.L.Cas. 1; [1983] 2 Lloyd's Rep. 171; Underhill v. Hernandez , 168 U.S. 250 and Liu v. Republic of China , 892 F.2d 1419.

There is a growing body of authority supporting the proposition that the act of state doctrine does not legitimately exempt every sovereign act from jurisdiction: see, Dinstein "Diplomatic Immunity from Jurisdiction Ratione Materiae" (1966) 15 I.C.L.Q., 87; In re Goering (1946) 13 I.L.R. 203; Attorney-General of Israel v. Eichmann , 36 I.L.R. 5; Prosecutor v. Blaskic (Subpoenae) (1997) 110 I.L.R. 607.

In the United States the domestic act of state doctrine, at least in its initial form, reflected notions of the independence of sovereign states: Underhill v. Hernandez (1897) 168 U.S. 250; Banco Nacional de Cuba v. Sabbatino (1964) 376 U.S. 398; Kirkpatrick & Co. Inc. v. Environmental Tectonics Corporation International , 110 S.Ct. 701; Kadic v. Karadzic (1995) 70 F.3d 232 and The Restatement of the Law 3rd: Foreign Relations Law of the United States, vol. 1, (1986), sections 443-444, pp. 366-389. The Antiterrorism and Effective Death Penalty Act 1996 creates a further exception to the statutory immunity of a foreign state and is in effect a human rights exception to the immunity. The Foreign Sovereign Immunities Act 1976 is not concerned with criminal jurisdiction.

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

The United Kingdom act of state non-justiciability doctrine may also admit of exceptions in the case of conduct contrary to public international law: Kuwait Airways Corporation v. Iraqi Airways Co. (unreported), 29 July 1998 and Kuwait Airways Corporation v. Iraqi Airways Co. [1995] 1 W.L.R. 1147; cf. Buttes Gas and Oil Co. v. Hammer[1982] A.C. 888, 926, 937, 938. If the applicant enjoys immunity pursuant to section 20(1) of the State Immunity Act 1978 it is not necessary to consider whether, in addition, the issues raised fall within an independent rule of non-justiciability. If however, he is not entitled to the statutory immunity because the conduct in question was not official conduct performed in the exercise of his functions as a head of state or was outside his proper jurisdiction as head of state, the principle of non-justiciability can have no application.

The Torture Convention creates an offence which can only be committed by an official or a person acting in a public capacity. The Hostages Convention creates an offence which can be committed by an official. The contracting states are required to establish jurisdiction and exercise it in very wide circumstances. They have accepted that courts of other contracting states will exercise jurisdiction over such official acts: articles 5 and 7 of the Torture Convention . The treaties have widespread support and have almost certainly become customary international law. Their provisions have been incorporated into United Kingdom law by **181 section 134 of the Criminal Justice Act 1988 and section 1(1) of the Taking of Hostages Act 1982 . Consequently allegations of torture and, probably, hostage taking by an official of a foreign state in the purported performance of his official duties are justiciable before the English courts. This might suggest that the proposed rationale for the subsisting immunity of a former head of state is absent in each case.

The argument that the Torture Convention has an overriding effect which removes all immunities goes further than the appellants need to go and perhaps goes too far. The Convention is concerned primarily with criminal offences in municipal law and the exercise of jurisdiction. It does not deal directly with immunity. There is no clear indication that it intends to override or carve out exceptions to the immunities of currently serving diplomats or heads of state. The Convention would not be unworkable if those immunities remained, i.e., if it affected immunity ratione

materiae but not ratione personae.

Although Chile is not impleaded in these proceedings the right of immunity the applicant asserts is indeed the right of Chile.

On their new case alleging pre-coup conspiracy the appellants have to show that the offences alleged are contrary to the law of Spain, that the requirements of the Extradition Act 1989 are satisfied, that the conduct is "official" for the purposes of section 134 of the Criminal Justice Act 1988 and that no principle of immunity or non-justiciability applies. Ahead of state does not have immunity ratione materiae in respect of acts performed before he became head of state although such acts may be attributable to the state for the purposes of state responsibility.

*Montgomery Q.C.* in reply. The argument that a purposive approach to the act of state doctrine allows for a human rights exception is flawed: Kuwait Airways Corporation v. Iraqi Airways Co. , 29 July 1998. Act of state cannot be imported and grafted on to state immunity (in the English sense). Non-justiciability is relevant to act of state and not immunity: see Littrell v. United States of America (No. 2)[1995] 1 W.L.R. 82. Waiver of immunity must be express: Frolova v. Union of Soviet Socialist Republics (1985) 761 F.2d 370.

*Jones Q.C.* in reply. Two propositions of fundamental importance to modern extradition law and practice in relation to the definition of "extradition crime" in section 2(1) of the Extradition Act 1989 apply to all European Convention on Extradition (1957 ) requests falling within Part III of the Act. First, it is necessary that the conduct of which the defendant is accused would constitute, at the time when a decision-maker considers the matter in the United Kingdom proceedings, the crime specified in the authority to proceed in corresponding circumstances in the United Kingdom, whether or not the conduct constituted that crime when it had been committed. Second, it is necessary to examine, not the foreign law, but only the facts submitted by the requesting state under section 7(2 ) of the Act, article 12 of the European Convention on Extradition and further particulars submitted in accordance with article 13 , in order to identify the conduct of which a defendant is accused within the meaning of section 1(1)(a) of the Act.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

The issue whether the criminal conduct alleged amounts to an extradition crime has not previously been argued in depth by the **\*182** appellants because it was believed that it had been settled in the Divisional Court and by dicta of Lord Lloyd of Berwick [2000] 1 A.C. 88e-f. No argument was presented by the applicant on this question at the first hearing of the appeal.

The plain and literal language of section 2 of the Act of 1989 requires an examination as to whether the conduct is criminal in the United Kingdom at the time the decision maker considers the matter. An extradition crime according to section 2(1)(a) of the Act is one that "would constitute" rather than one that "would have constituted" a crime in the United Kingdom and section 7(5 ) refers to crimes that "would be constituted" not "would have been constituted." The opening words of section 2 expressly state that the definition of extradition crime in Schedule 1to the Act is excluded. Accordingly the definition in Schedule 1which is expressly stated in the opening words of the Schedule to be derived from the Extradition Act 1870 cannot apply. The applicant's reliance on the Act of 1870 as an aid to construction of section 2 is misconceived.

Various other provisions of the Act make it plain that the "extradition crime" test has to be applied by reference to the current state of English law alone: see, sections 2(2), 7(5), 8(3), 9(8) (9) and 22(6 ). None of the requirements of section 7(1) or article 12 of the Extradition Convention is helpful in the construction of section 2(1) of the Act.

The scheme of extradition under the Act of 1989 is retrospective. A double criminality requirement for conduct to be criminal in both requesting and requested states at the time of the commission of the offence creates anomalies and arbitrary divisions into extraditable and non-extraditable conduct. A simple double criminality test applicable at the time of the extradition proceedings is both desirable and practical.

This view leads to no unfairness so long as the acts alleged are acts which are illegal in England, Spain and Chile now: see Bassiouni, International Extradition: United States Law and Practice. It is also consistent with the Act being phrased in the present tense.

It has been held in the Divisional Court that crimes committed in a foreign state before the coming into force of the Act of 1989 create a liability to be extradited although no express provision of the Act declares that it is to have retrospective effect. Crimes committed in a foreign country at a time that the foreign country was not included under the Act of 1989 create a liability to be extradited: see Reg. v. Secretary of State for the Home Department, Ex parte Hill[1999] Q.B. 886 All conduct of which the applicant is accused was universally recognised as criminal when committed.

The Act of 1989 consolidated Acts containing contrasting approaches to double criminality all of which inform the construction of "extradition crime." The Extradition Act 1870 was rooted in a list system. The function of the magistrate was to perform a single composite test. He simply examined the conduct, including the time and place of commission and asked himself whether that conduct amounted to a listed crime when it had been committed.

The Fugitive Offenders Act 1881 , applicable to rendition within Her Majesty's Dominions, provided a very different scheme which assists with **\*183** construction of the Fugitive Offenders Act 1967 and the Act of 1989. Unlike the Act of 1870 the magistrate had a two stage function. Section 9 gave a definition of crimes for which a defendant was extraditable requiring that under the law of the requesting country the crime was punishable by 12 months' imprisonment or more. A person might be extradited for conduct which was not criminal in the United Kingdom at the time it was committed or at all. The second duty of the magistrate, set out in section 5, was to commit the defendant if he found probable cause that, applying the law of the other country and English rules of evidence, he was guilty. The Fugitive Offenders Act 1967, applicable to colonies and designated Commonwealth countries, required that the offence in the requesting and requested states be effectively identical. However it did not require that the crime was a crime in the United Kingdom at the time it was committed. The magistrate had a two stage function in contrast to the one stage function under the Act of 1870.

Section 3(1)(c) which used the words "would constitute an offence" has plainly mutated into the easier

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

requirements of the Act of 1989 in section 2(1)(a) and (b). Section 7(5) has similarly mutated into section 9(8) of the Act of 1989.

 The Australian Extradition Act 1988 provides an international precedent for the plain construction of the term "extradition crime:" see sections 7 and 19(2). The relevant time is specified to be the time when the request is made. The use of the present tense in the Act of 1989 allows the same inference to be drawn as is expressly stated in the Australian statute.

The Extradition Act 1989 was brought into effect to fulfill the United Kingdom's obligations under the Extradition Convention which the United Kingdom signed in 1957: see the European Convention on Extradition Order 1990 (S.I. 1990 No. 1507). In enacting the Act of 1989 Parliament was trying to pull together under one statute the three different things which were covered by the earlier Acts. It was easier to fit the Convention provisions into an area where the 12 month sentence rule already applied. Parliament was trying to give a looser definition of extradition crime. The result was a simple double criminality test.

 Parts I and II of the Act have different tests. The date of the commission of the crime is applicable for Schedule 1 cases. For other cases the only relevant date is the date of the request.

 In In re Nielsen [1984] A.C. 606, it was held that under the Act of 1870 there was no need under the definition of extradition crime for the magistrate to consult the treaty or foreign law at all to determine whether the fugitive criminal was accused of an extradition crime. By contrast the interpretation of the Fugitive Offenders Act 1967 led to the conclusion that the particulars in the foreign warrant had to be consulted independently of the evidence in the case in order to determine the "act or omission" of which the defendant was accused according to the foreign law and then to inquire whether that amounted to an English crime: see Government of Canada v. Aronson [1990] 1 A.C. 579. The two tests under that Act are two completely different tests unlike the one test of the Act of 1870.

The government papers preceding the enactment of the Act of 1989 ("A Review of the Law and Practice of Extradition in the United Kingdom: Report of the Interdepartmental Working Party" (May 1982), *184 the Green Paper on "Extradition" of 1985 (Cmnd. 9421) and the White Paper on "Criminal Justice: Plans for Legislation" of 1986 (Cmnd. 9658)) show that it was intended that: in order to satisfy the double criminality requirement a new simplified conduct test would be established eliminating the need to consult the foreign law and replacing the rule in the Aronson case, the list-based system of defining extraditable conduct would disappear and, in respect of states party to the European Convention on Extradition, the prima facie case requirement would be abrogated. Nothing in those preparatory works suggest that double criminality requires an evidential finding in respect of the dates at which conduct occurred in Convention countries.

Reg. v. Secretary of State for the Home Department, Ex parte Hill [1999] Q.B. 886 reasserts that the definition of "extradition crime" in section 2(1) calls for no examination of the foreign law but simply for an assessment of the conduct alleged.

The appellants' case pleads a course of conduct which includes murder, torture etc. There can be no possible retrospectivity argument in the light of section 1(4) of the Criminal Justice Act 1977 . The allegation is that there was a conspiracy over 18 years which landed in Spain in 1975 when the applicant was in Spain for the funeral of Franco when he met those who took part in a later murder in Italy. Those facts if relating to England would confer jurisdiction on England: see Reg. v. Doot [1973] A.C. 807. It does the same for Spain when there is an international conspiracy and something is done in Spain in furtherance of the conspiracy. Spain then has jurisdiction to try the whole conspiracy.

It is impossible to say that extradition for the crimes alleged against the applicant is unfair. If a statute allowing for retrospective extradition infringes no rights, is not penal and does not impose disabilities it is difficult to see that such extradition is inherently unfair: see L'Office Cherifien des Phosphates v. Yamashita-Shinnihon Steamship Co. Ltd. [1994] 1 A.C. 486, 525. In those cases where there may be unfairness all the safeguards, including section 11(3) of the Act and the discretion of the Secretary of State provide ample protection for the accused. The rule of double criminality is only one of the many safeguards found in the Act of 1989. Those safeguards have

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

been present to differing extents in all the extradition statutes. The rationale behind the double criminality principle is that a country does not send a person under compulsion from its jurisdiction to be tried or punished abroad for crimes alien to its own system of law. There is no need to write into a statute a further artificial safeguard which that rationale does not call for.

Extradition is primarily an executive act. All the legislation has ever provided for is a series of procedural safeguards to ensure that certain conditions of legality and fairness are fulfilled before this executive act can take place. Extradition proceedings do not expose the applicant to either conviction or penalty. Retrospective extradition does not infringe any rights as there is no right never to be extradited, nor is it inherently unfair. The purpose of the proceedings is simply to enable another government to try a fugitive under laws in force at the time of the offence in the requesting state. Where in an individual case there is injustice or oppression, the provisions of section 11(3) of the Act of 1989 and the *185 unfettered discretion of the Secretary of State under sections 7(4) and 12(1) protect the defendant.

As a matter of law the disappearances alleged constitute continuing offences of torture to this day, providing thousands of torture charges since the Act of 1989 came into force.

*Greenwood* following. The military junta which took power in Chile on 11 September 1973 left the office of head of state open until either 26 June 1974, when the applicant was appointed Supreme Chief of the Nation and invested with the sash of office previously worn by the Presidents of Chile, or 17 December 1974 when he was appointed President. If he was already head of state it is difficult to comprehend to what he was appointed on those dates.

The question whether the United Kingdom is under a duty to Chile to accord immunity to the applicant in respect of all or any of the draft charges has to be decided by reference to the common law as, it is now accepted, section 20(1) of the State Immunity Act 1978 is not applicable.

While immunity and act of state are separate concepts it is only immunity ratione personae which is clearly and invariably distinguished from act of state.

Many cases are cited in relation to both immunity ratione materiae and act of state: see, e.g. , Duke of Brunswick v. King of Hanover , 2 H.L.Cas. 1 and Underhill v. Hernandez, 168 U.S. 250. If the applicant is not immune there is no place for application of the act of state doctrine. However, the converse is true. If the act of state doctrine would not apply then there is no reason or duty to accord immunity ratione materiae.

The Torture Convention and section 134 of the Criminal Justice Act 1988 do not operate to override all immunity. Neither operates to remove the immunity ratione personae of a serving diplomat. Immunity ratione personae is a question of status. To say he cannot be prosecuted for torture is merely to say that his office shields him. A diplomat is not immune from the jurisdiction of his home state and if he were to return to the host state after leaving office he would be open to prosecution. However, once a diplomat has ceased to be accredited, he has only immunity ratione materiae for acts performed in the exercise of his functions as a diplomat. It is that immunity which cannot extend to torture.

Since section 20(1)(a) of the Act of 1978 accords immunity ratione personae to a serving head of state while he is in the United Kingdom, in practice the United Kingdom could not exercise criminal jurisdiction over a serving head of state in the absence of waiver. It is immunity ratione materiae alone which is affected by the Torture Convention and other international instruments of that kind.

The supposed immunity of all officials and former officials of one state from the criminal jurisdiction of other states is not supported by the practice of states. The very idea of a state being subject to the criminal process is almost, if not wholly theoretical. Neither In re Honecker , 80 I.L.R. 365 nor Marcos and Marcos v. Federal Department of Police , 102 I.L.R. 198 is directly in point. There have been no cases in which former heads of state have been prosecuted before the national courts of another state, but as the Permanent Court of International Justice held in *186 The Case of the S.S. Lotus Judgment No. 9 of 7 September 1927, P.C.I.J., Series A, No. 10, the fact that states do not prosecute a particular category of offence or defendant does not in itself establish that they may not do so. The reaction of other states to the proceedings against the applicant, particularly the

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

extradition requests from France and Switzerland, suggest that those countries have formed a prima facie opinion that the applicant has no immunity.

There is a substantial body of state practice in other contexts asserting the right to exercise jurisdiction over the officials and former officials of foreign states. States have always exercised criminal jurisdiction over foreign officials and former officials in respect of crimes committed on the territory of the forum state: see In re Former Syrian Ambassador to the German Democratic Republic , 10 June 1997, Federal Constitutional Court, Case No. 2 BvR 1516/96.

States have asserted a broad extraterritorial jurisdiction over offences which are frequently committed by officials of foreign states. Whatever misgivings might exist about the Nuremberg trial the principle that states could try officials of foreign states for war crimes was the subject of unanimous confirmation by the U.N.General assembly in 1946. Cases regarding immunity from civil jurisdiction such as Argentine Republic v. Amerada Hess Shipping Corporation , 109 S.Ct. 683; Siderman de Blake v. Republic of Argentina , 965 F.2d 699 and Al-Adsani v. Government of Kuwait ,) 107 I.L.R. 536 are not in point.

The thesis that the official act of a state official is an act of state in the non-technical sense and is accordingly imputable to the state, which alone can be held liable for it, confuses the idea that the act is attributable to the state so that the state can be held responsible for it with the concept of criminal responsibility. The conclusion does not follow since the criminal responsibility of the individual is in addition to, not in substitution for, the responsibility (which is civil in character and which can normally be enforced only on the international plane) of the state. The proposition is the act of state defence put forward in numerous war crimes cases and rejected.

The principle of par in parem non habet imperium is not absolute and has to be balanced against other factors, including the fact that states have accepted through agreements such as the Torture Convention that certain conduct of their officials will be the subject of adjudication in other states. The principle of non-intervention is undoubtedly important but it presupposes that the matters in question do fall within the internal affairs of a particular state. Acts of murder or torture committed by the agents of state Ain

the territory of state B cannot be regarded as part of the internal affairs of state A. Moreover, during the course of the century the treatment by a state of its own citizens, at least in certain areas of fundamental importance, has ceased to be regarded as a matter of internal affairs. The violation of a norm of jus cogens certainly is not so regarded.

In In re United States Diplomatic and Consular Staff in Tehran [1980] I.C.J. Rep. 3; 61I. L.R. 504 the International Court did not exonerate Iran of all responsibility. It found that the Iranian government was not responsible for the take-over of the embassy itself but concluded that, **187** within days, the government was supporting the students in their continued occupation.

It is common ground that torture, hostage taking and murder were at no time part of the functions of the head of state of Chile. The Chilean Constitution prohibited torture at all relevant times and the military government always denied that there had been any departure from this prohibition. This is to be contrasted with the attitude of the United States government to the death row phenomenon which it has always maintained does not amount to cruel and unusual punishment contrary to the Constitution.

The conduct alleged falls within the scope of an international crime whether one applies the Torture Convention or the customary law of crimes against humanity. The allegations clearly suggest widespread or systematic use of torture against a civilian population - a crime against humanity. The supposed requirement of a nexus with armed conflict, if it was ever part of international law, ceased to be so many years ago: see the International Law Commission Draft Code of 1954; Prosecutor v. Tadic (unreported), 7 May 1997, International Criminal Tribunal for the former Yugoslavia, Case No. IT-94-1-T and article 3 of the Statute of the Rwanda Tribunal.

Torture under the Torture Convention can only be committed by an official and the Convention is therefore totally inconsistent with the notion of immunity for officials in respect of torture.

Nicholls Q.C. in reply. It is a fallacy to read "would constitute" in section 2(1) and 2(2) of the Act as "would have constituted." "Conduct" in section 2 means the acts alleged in the foreign state together

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

with their associated geographical and temporal components. Section 2 requires the conduct to have been criminal at the time it was committed.

The references in section 22(4) of the Act of 1989 to offences of torture and hostage-taking and other "Convention cases" are related to their parent Conventions (which are and were intended to be prospective) and suggest that those offences are to be construed by reference to their temporal element and that extradition ought not to be allowed for such offences if committed prior to the coming into force of the Convention.

If "conduct" is devoid of any geographical and temporal components, section 9(8) leads to the principle of double criminality operating in different ways depending on whether the request is from a Convention country or a country in respect of which a prima facie case needs to be established. That produces absurd results which Parliament cannot have intended. While the applicant could, on that interpretation, be extradited to Spain he could not be extradited to Chile, the United States or any Commonwealth country. The appellants have failed to address this absurdity.

If the European Convention on Extradition had removed the evidence requirement the scheme of the Convention would have demonstrated that double criminality was irrelevant. The contrary is the case. The scheme makes clear that double criminality is to be preserved. The removal of the requirement of a prima facie case was a significant weakening of protection for the accused. The Convention would not also have removed **\*188** the other significant protection of double criminality without express words to that effect.

It is clear that it was the intention of the Convention that the requested state consider the time at which the offence was committed in the course of deciding whether an offence was extraditable.

Although there is no need for the extradition treaty to have been in force at the date of the conduct nevertheless double criminality requires the conduct to have been criminal in the requested state at the time of its commission. For the distinction between the two principles see the Restatement of the Law 3d: The Foreign Relations Law of the United States (s. 476) and Bassiouni, International Extradition: United

States Law and Practice, pp. 497, 500, 598.

Reg. v. Secretary of State for the Home Department, Ex parte Hill[1999] Q.B. 886 was concerned with conduct prior to the coming into force of the Act enabling extradition and is therefore irrelevant to the instant issue.

The Act of 1989 was a consolidating Act. As such it is presumed not to have changed the law. It would therefore be surprising if the Act introduced a wholly new test for double criminality when both the Fugitive Offenders Act 1967 and the Extradition Act 1870 required the conduct to have been criminal in the United Kingdom at the date of its commission in the foreign state or colony. There is nothing in the legislative history of the provisions which became the Act of 1989 (which were included originally in the Criminal Justice Act 1988 but were never brought into force) to suggest that Parliament intended the Act to enact a significantly altered double criminality principle.

In any event, to allow extradition for conduct which was not criminal in the United Kingdom at the time of its commission and which could not be tried there would be unfair and would breach article 7 of the European Convention for the Protection of Human Rights and Fundamental Freedoms.

Their Lordships took time for consideration. 24 March. Lord Browne-Wilkinson.

My Lords, as is well known, this case concerns an attempt by the Government of Spain to extradite Senator Pinochet from this country to stand trial in Spain for crimes committed (primarily in Chile) during the period when Senator Pinochet was head of state in Chile. The interaction between the various legal issues which arise is complex. I will therefore seek, first, to give a short account of the legal principles which are in play in order that my exposition of the facts will be more intelligible.

**Outline of the law**

In general, a state only exercises criminal jurisdiction over offences which occur within its geographical boundaries. If a person who is alleged to have committed a crime in Spain is found in the United

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

Kingdom, Spain can apply to the United Kingdom to extradite him to Spain. The power to extradite from the United Kingdom for an "extradition crime" is now contained in the Extradition Act 1989 . That Act defines what **189** constitutes an "extradition crime." For the purposes of the present case, the most important requirement is that the conduct complained of must constitute a crime under the law both of Spain and of the United Kingdom. This is known as the double criminality rule.

Since the Nazi atrocities and the Nuremberg trials, international law has recognised a number of offences as being international crimes. Individual states have taken jurisdiction to try some international crimes even in cases where such crimes were not committed within the geographical boundaries of such states. The most important of such international crimes for present purposes is torture which is regulated by the International Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment 1984 (1990) (Cm. 1775). The obligations placed on the United Kingdom by that Convention (and on the other 110 or more signatory states who have adopted the Convention) were incorporated into the law of the United Kingdom by section 134 of the Criminal Justice Act 1988 . That Act came into force on 29 September 1988. Section 134 created a new crime under United Kingdom law, the crime of torture. As required by the Torture Convention "all" torture wherever committed worldwide was made criminal under United Kingdom law and triable in the United Kingdom. No one has suggested that before section 134 came into effect torture committed outside the United Kingdom was a crime under United Kingdom law. Nor is it suggested that section 134 was retrospective so as to make torture committed outside the United Kingdom before 29 September 1988 a United Kingdom crime. Since torture outside the United Kingdom was not a crime under U.K. law until 29 September 1988, the principle of double criminality which requires an Act to be a crime under both the law of Spain and of the United Kingdom cannot be satisfied in relation to conduct before that date if the principle of double criminality requires the conduct to be criminal under United Kingdom law *at the date it was committed* . If, on the other hand, the double criminality rule only requires the conduct to be criminal under U.K. law *at the date of extradition* the rule was satisfied in relation to all torture alleged against Senator Pinochet whether it took place before or after 1988. The Spanish courts have held that they

have jurisdiction over all the crimes alleged.

In these circumstances, the first question that has to be answered is whether or not the definition of an "extradition crime" in the Act of 1989 requires the conduct to be criminal under U.K. law at the date of commission or only at the date of extradition.

 This question, although raised, was not decided in the Divisional Court. At the first hearing in this House [2000] 1 A.C. 61 it was apparently conceded that all the matters charged against Senator Pinochet were extradition crimes. It was only during the hearing before your Lordships that the importance of the point became fully apparent. As will appear, in my view only a limited number of the charges relied upon to extradite Senator Pinochet constitute extradition crimes since most of the conduct relied upon occurred long before 1988. In particular, I do not consider that torture committed outside the United Kingdom before 29 September 1988 was a crime under U.K. law. It follows that the main question discussed at the earlier stages of this *190 case - is a former head of state entitled to sovereign immunity from arrest or prosecution in the U.K. for acts of torture - applies to far fewer charges. But the question of state immunity remains a point of crucial importance since, in my view, there is certain conduct of Senator Pinochet (albeit a small amount) which does constitute an extradition crime and would enable the Home Secretary (if he thought fit) to extradite Senator Pinochet to Spain unless he is entitled to state immunity. Accordingly, having identified which of the crimes alleged is an extradition crime, I will then go on to consider whether Senator Pinochet is entitled to immunity in respect of those crimes. But first I must state shortly the relevant facts.

**The facts**

 On 11 September 1973 a right-wing coup evicted the left-wing regime of President Allende. The coup was led by a military junta, of whom Senator (then General) Pinochet was the leader. At some stage he became head of state. The Pinochet regime remained in power until 11 March 1990 when Senator Pinochet resigned.

 There is no real dispute that during the period of the Senator Pinochet regime appalling acts of barbarism were committed in Chile and elsewhere in the world:

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

torture, murder and the unexplained disappearance of individuals, all on a large scale. Although it is not alleged that Senator Pinochet himself committed any of those acts, it is alleged that they were done in pursuance of a conspiracy to which he was a party, at his instigation and with his knowledge. He denies these allegations. None of the conduct alleged was committed by or against citizens of the United Kingdom or in the United Kingdom.

In 1998 Senator Pinochet came to the United Kingdom for medical treatment. The judicial authorities in Spain sought to extradite him in order to stand trial in Spain on a large number of charges. Some of those charges had links with Spain. But most of the charges had no connection with Spain. The background to the case is that to those of left-wing political convictions Senator Pinochet is seen as an arch-devil: to those of right-wing persuasions he is seen as the saviour of Chile. It may well be thought that the trial of Senator Pinochet in Spain for offences all of which related to the State of Chile and most of which occurred in Chile is not calculated to achieve the best justice. But I cannot emphasise too strongly that that is no concern of your Lordships. Although others perceive our task as being to choose between the two sides on the grounds of personal preference or political inclination, that is an entire misconception. Our job is to decide two questions of law: are there any extradition crimes and, if so, is Senator Pinochet immune from trial for committing those crimes. If, as a matter of law, there are no extradition crimes or he is entitled to immunity in relation to whichever crimes there are, then there is no legal right to extradite Senator Pinochet to Spain or, indeed, to stand in the way of his return to Chile. If, on the other hand, there are extradition crimes in relation to which Senator Pinochet is not entitled to state immunity then it will be open to the Home Secretary to extradite him. The task of this House is only to decide those points of law.**\*191**

On 16 October 1998 an international warrant for the arrest of Senator Pinochet was issued in Spain. On the same day, a magistrate in London issued a provisional warrant ("the first warrant") under section 8 of the Extradition Act 1989 . He was arrested in a London hospital on 17 October 1998. On 18 October the Spanish authorities issued a second international warrant. A further provisional warrant ("the second warrant") was issued by the magistrate at Bow Street Magistrates' Court on 22 October 1998 accusing

Senator Pinochet of:

"(1) Between 1 January 1988 and December 1992 being a public official intentionally inflicted severe pain or suffering on another in the performance or purported performance of his official duties; (2) between 1 January 1988 and 31 December 1992 being a public official, conspired with persons unknown to intentionally inflict severe pain or suffering on another in the performance or purported performance of his official duties; (3) between 1 January 1982 and 31 January 1992 he detained other persons (the hostages) and in order to compel such persons to do or to abstain from doing any act threatened to kill, injure or continue to detain the hostages; (4) between 1 January 1982 and 31 January 1992 conspired with persons unknown to detain other persons (the hostages) and in order to compel such persons to do or to abstain from doing any act, threatened to kill, injure or continue to detain the hostages; (5) between January 1976 and December 1992 conspired together with persons unknown to commit murder in a Convention country."

Senator Pinochet started proceedings for habeas corpus and for leave to move for judicial review of both the first and the second provisional warrants. Those proceedings came before the Divisional Court (Lord Bingham of Cornhill C.J., Collins and Richards JJ.) which on 28 October 1998 quashed both warrants. Nothing turns on the first warrant which was quashed since no appeal was brought to this House. The grounds on which the Divisional Court quashed the second warrant were that Senator Pinochet (as former head of state) was entitled to state immunity in respect of the acts with which he was charged. However, it had also been argued before the Divisional Court that certain of the crimes alleged in the second warrant were not "extradition crimes" within the meaning of the Act of 1989 because they were not crimes under U.K. law at the date they were committed. Whilst not determining this point directly, Lord Bingham of Cornhill C.J. held that, in order to be an extradition crime, it was not necessary that the conduct should be criminal at the date of the conduct relied upon but only at the date of request for extradition.

The Crown Prosecution Service (acting on behalf of the Government of Spain) appealed to this House with the leave of the Divisional Court. The Divisional

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

Court certified the point of law of general importance as being "the proper interpretation and scope of the immunity enjoyed by a former head of state from arrest and extradition proceedings in the United Kingdom in respect of acts committed while he was head of state." Before the appeal came on for hearing in this House for the first time, on 4 November 1998 the Government of Spain submitted a formal request for extradition which greatly expanded the list of crimes alleged in the second **192** provisional warrant so as to allege a widespread conspiracy to take over the Government of Chile by a coup and thereafter to reduce the country to submission by committing genocide, murder, torture and the taking of hostages, such conduct taking place primarily in Chile but also elsewhere.

The appeal first came on for hearing before this House between 4 and 12 November 1998. The Committee heard submissions by counsel for the Crown Prosecution Service as appellants (on behalf of the Government of Spain), Senator Pinochet, Amnesty International as interveners and an independent amicus curiae. Written submissions were also entertained from Human Rights Watch. That Committee entertained argument based on the extended scope of the case as put forward in the request for extradition. It is not entirely clear to what extent the Committee heard submissions as to whether all or some of those charges constituted "extradition crimes." There is some suggestion in the judgments that the point was conceded. Certainly, if the matter was argued at all it played a very minor role in that first hearing. Judgment was given on 25 November 1998. The appeal was allowed [2000] 1 A.C. 61 by a majority (Lord Nicholls of Birkenhead, Lord Steyn and Lord Hoffmann; Lord Slynn of Hadley and Lord Lloyd of Berwick dissenting) on the grounds that Senator Pinochet was not entitled to immunity in relation to crimes under international law. On 15 January 1999 that judgment of the House was set aside [2000] 1 A.C. 119 on the grounds that the Committee was not properly constituted. The appeal came on again for re-hearing on 18 January 1999 before your Lordships. In the meantime the position had changed yet again. First, the Home Secretary had issued to the magistrate authority to proceed under section 7 of the Act of 1989. In deciding to permit the extradition to Spain to go ahead he relied in part on the decision of this House at the first hearing that Senator Pinochet was not entitled to immunity. He did not authorise the extradition proceedings to go ahead on the charge of genocide: accordingly no further arguments were addressed to us on the charge of genocide which has dropped out of the case.

Secondly, the Republic of Chile applied to intervene as a party. Up to this point Chile had been urging that immunity should be afforded to Senator Pinochet, but it now wished to be joined as a party. Any immunity precluding criminal charges against Senator Pinochet is the immunity not of Senator Pinochet but of the Republic of Chile. Leave to intervene was therefore given to the Republic of Chile. The same amicus, Mr. Lloyd Jones, was heard as at the first hearing as were counsel for Amnesty International. Written representations were again put in on behalf of Human Rights Watch.

Thirdly, the ambit of the charges against Senator Pinochet had widened yet again. Spain had put in further particulars of the charges which they wished to advance. In order to try to bring some order to the proceedings, Mr. Alun Jones, for the Crown Prosecution Service, prepared a schedule of the 32 U.K. criminal charges which correspond to the allegations made against Senator Pinochet under Spanish law, save that the genocide charges are omitted. The charges in that schedule are fully analysed and considered in the speech of my noble and learned friend, Lord Hope of Craighead, who summarises the charges as follows: charges **193** 1, 2 and 5: conspiracy to torture between 1 January 1972 and 20 September 1973 and between 1 August 1973 and 1 January 1990; charge 3: conspiracy to take hostages between 1 August 1973 and 1 January 1990; charge 4: conspiracy to torture in furtherance of which murder was committed in various countries including Italy, France, Spain and Portugal, between 1 January 1972 and 1 January 1990; charges 6 and 8: torture between 1 August 1973 and 8 August 1973 and on 11 September 1973; charges 9 and 12: conspiracy to murder in Spain between 1 January 1975 and 31 December 1976 and in Italy on 6 October 1975; Charges 10 and 11: attempted murder in Italy on 6 October 1975; charges 13-29; and 31-32: torture on various occasions between 11 September 1973 and May 1977; charge 30: torture on 24 June 1989. I turn then to consider which of those charges are extradition crimes.

**Extradition crimes**

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

As I understand the position, at the first hearing in the House of Lords the Crown Prosecution Service did not seek to rely on any conduct of Senator Pinochet occurring before 11 September 1973 (the date on which the coup occurred) or after 11 March 1990 (the date when Senator Pinochet retired as head of state). Accordingly, as the case was then presented, if Senator Pinochet was entitled to immunity such immunity covered the whole period of the alleged crimes. At the second hearing before your Lordships, however, the Crown Prosecution Service extended the period during which the crimes were said to have been committed: for example, see charges 1 and 4 where the conspiracies are said to have started on 1 January 1972, i.e. at a time before Senator Pinochet was head of state and therefore could be entitled to immunity. In consequence at the second hearing counsel for Senator Pinochet revived the submission that certain of the charges, in particular those relating to torture and conspiracy to torture, were not "extradition crimes" because *at the time the acts were done* the acts were not criminal under the law of the United Kingdom. Once raised, this point could not be confined simply to the period (if any) before Senator Pinochet became head of state. If the double criminality rule requires it to be shown that at the date of the conduct such conduct would have been criminal under the law of the United Kingdom, any charge based on torture or conspiracy to torture occurring before 29 September 1988 (when section 134 of the Criminal Justice Act 1988 came into force) could not be an "extradition crime" and therefore could not in any event found an extradition order against Senator Pinochet.

Under section 1(1 ) of the Act of 1989 a person who is accused of an "extradition crime" may be arrested and returned to the state which has requested extradition. Section 2 defines "extradition crime" so far as relevant as follows:

"(1) In this Act, except in Schedule 1, 'extradition crime' means - (a) conduct in the territory of a foreign state, a designated Commonwealth country or a colony which, if it occurred in the United Kingdom, would constitute an offence punishable with imprisonment for a term of 12 months, or any greater punishment, **194** and which, however described in the law of the foreign state, Commonwealth country or colony, is so punishable under that law; (b) an extraterritorial offence against the law of a foreign state,

designated Commonwealth country or colony which is punishable under that law with imprisonment for a term of 12 months, or any greater punishment, and which satisfies - (i) the condition specified in subsection (2) below; or (ii) all the conditions specified in sub-section (3) below. (2) The condition mentioned in subsection (1)(b) (i) above is that in corresponding circumstances equivalent conduct would constitute an extraterritorial offence against the law of the United Kingdom punishable with imprisonment for a term of 12 months, or any greater punishment. (3) The conditions mentioned in subsection (1)(b) (ii) above are - (a) that the foreign state, Commonwealth country or colony bases its jurisdiction on the nationality of the offender; (b) that the conduct constituting the offence occurred outside the United Kingdom; and (c) that, if it occurred in the United Kingdom, it would constitute an offence under the law of the United Kingdom punishable with imprisonment for a term of 12 months, or any greater punishment."

The question is whether the references to conduct "which, if it occurred in the United Kingdom, would constitute an offence" in section 2(1)(a) and (3)(c) refer to a hypothetical occurrence which took place at the date of the request for extradition ("the request date") or the date of the actual conduct ("the conduct date"). In the Divisional Court, Lord Bingham of Cornhill C.J. held that the words required the acts to be criminal only at the request date. He said:

"I would however add on the retrospectivity point that the conduct alleged against the subject of the request need not in my judgment have been criminal here at the time the alleged crime was committed abroad. There is nothing in section 2 which so provides. What is necessary is that at the time of the extradition request the offence should be a criminal offence here and that it should then be punishable with 12 months' imprisonment or more. Otherwise section 2(1)(a) would have referred to conduct which would at the relevant time 'have constituted' an offence and section 2(3)(c) would have said 'would have constituted.' I therefore reject this argument." Lord Lloyd (who was the only member of the Committee to express a view on this point at the first hearing) took the same view. He said, at p. 88:

"But I agree with the Divisional Court that this argument is bad. It involves a misunderstanding of section 2 of the Extradition Act 1989. Section 2(1)(a) refers

[2000] 1 A.C. 147                                                                                  Page 36
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

to conduct which *would* constitute an offence in the United Kingdom *now* . It does not refer to conduct which *would* have constituted an offence *then* ."

My Lords, if the words of section 2 are construed in isolation there is room for two possible views. I agree with Lord Bingham of Cornhill C.J. and Lord Lloyd that, if read in isolation, the words "if it occurred ... would constitute" read more easily as a reference to a hypothetical event **\*195** happening now, i.e. at the request date, than to a past hypothetical event, i.e. at the conduct date. But in my judgment the right construction is not clear. The word "it" in the phrase "if it occurred ..." is a reference back to the actual conduct of the individual abroad which, by definition, is a past event. The question then would be "would that past event (including the date of its occurrence) constitute an offence under the law of the United Kingdom." The answer to that question would depend upon the United Kingdom law at that date.

But of course it is not correct to construe these words in isolation and your Lordships had the advantage of submissions which strongly indicate that the relevant date is the conduct date. The starting point is that the Act of 1989 regulates at least three types of extradition.

First, extradition to a Commonwealth country, to a colony or to a foreign country which is not a party to the European Convention on Extradition. In this class of case (which is not the present one) the procedure under Part III of the Act of 1989 requires the extradition request to be accompanied by evidence sufficient to justify arrest under the Act: section 7(2)(b). The Secretary of State then issues his authority to proceed which has to specify the offences under U.K. law which "would be constituted by equivalent conduct in the United Kingdom:" section 7(5). Under section 8 the magistrate is given power to issue a warrant of arrest if he is supplied with such evidence "as would in his opinion justify the issue of a warrant for the arrest of a person accused:" section 8(3). The committal court then has to consider, amongst other things, whether "the evidence would be sufficient to warrant his trial if the extradition crime *had* taken place within jurisdiction of the court:" section 9(8)(a) (emphasis added). In my judgment these provisions clearly indicate that the conduct must be criminal under the law of the United Kingdom at the conduct date and not only at the request date. The whole

process of arrest and committal leads to a position where under section 9(8) the magistrate has to be satisfied that, under the law of the United Kingdom, if the conduct " *had* occurred" the evidence was sufficient to warrant his trial. This is a clear reference to the position at the date when the conduct in fact occurred. Moreover, it is in my judgment compelling that the evidence which the magistrate has to consider has to be sufficient to "warrant his trial." Here what is under consideration is not an abstract concept whether a hypothetical case is criminal but a hard practical matter - would this case in relation to this defendant be properly committed for trial if the conduct in question had happened in the United Kingdom? The answer to that question must be "No" unless at that date the conduct was criminal under the law of the United Kingdom.

The second class of case dealt with by the Act of 1989 is where extradition is sought by a foreign state which, like Spain, is a party to the European Extradition Convention . The requirements applicable in such a case are the same as those I have dealt with above in relation to the first class of case save that the requesting state does not have to present evidence to provide the basis on which the magistrate can make his order to commit. The requesting state merely supplies the information. But this provides no ground for distinguishing Convention cases from the first class **\*196** of case. The double criminality requirement must be the same in both classes of case.

Finally, the third class of case consists of those cases where there is an Order in Council in force under the Extradition Act 1870 (33 & 34 Vict. c.52). In such cases, the procedure is not regulated by Part III of the Act of 1989 but by Schedule 1 to the Act of 1989: see section 1(3). Schedule 1 contains, in effect, the relevant provisions of the Act of 1870, which subject to substantial amendments had been in force down to the passing of the Act of 1989. The scheme of the Act of 1870 was to define "extradition crime" as meaning "a crime which, if committed in England ... would be one of the crimes described in the first schedule to this Act:" section 26 . The first schedule to the Act of 1870 contains a list of crimes and is headed: "The following list of crimes is to be construed according to the law existing in England ... *at the date of the alleged crime* , whether by common law or by statute made before or after the passing of this Act." (Emphasis added.)

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

It is therefore quite clear from the words I have emphasised that under the Act of 1870 the double criminality rule required the conduct to be criminal under English law at the conduct date not at the request date. Paragraph 20 of Schedule 1 to the Act of 1989 provides:

"'extradition crime,' in relation to any foreign state, is to be construed by reference to the Order in Council under section 2 of the Extradition Act 1870 applying to that state as it had effect immediately before the coming into force of this Act and to any amendments thereafter made to that Order."

Therefore in this class of case regulated by Schedule 1 to the Act of 1989 the same position applies as it formerly did under the Act of 1870, i.e. the conduct has to be a crime under English law at the conduct date. It would be extraordinary if the same Act required criminality under English law to be shown at one date for one form of extradition and at another date for another. But the case is stronger than that. We were taken through a trawl of the travaux préparatoires relating to the Extradition Convention and the departmental papers leading to the Act of 1989. They were singularly silent as to the relevant date. But they did disclose that there was no discussion as to changing the date on which the criminality under English law was to be demonstrated. It seems to me impossible that the legislature can have intended to change that date from the one which had applied for over a hundred years under the Act of 1870 (i.e. the conduct date) by a side wind and without investigation.

**The charges which allege extradition crimes**

The consequences of requiring torture to be a crime under U.K. law at the date the torture was committed are considered in Lord Hope's speech. As he demonstrates, the charges of torture and conspiracy to torture relating to conduct before 29 September 1988 (the date on which section 134 came into effect) are not extraditable, i.e. only those parts of the conspiracy to torture alleged in charge 2 and of torture and conspiracy to torture alleged in charge 4 which relate to the period after that date and *197 the single act of torture alleged in charge 30 are extradition crimes relating to torture.

Lord Hope also considers, and I agree, that the only charge relating to hostage-taking (charge 3) does not disclose any offence under the Taking of Hostages Act 1982 . The statutory offence consists of taking and detaining a person (the hostage), so as to compel someone who is not the hostage to do or abstain from doing some act: section 1. But the only conduct relating to hostages which is charged alleges that the person detained (the so-called hostage) was to be forced to do something by reason of threats to injure other non-hostages which is the exact converse of the offence. The hostage charges therefore are bad and do not constitute extradition crimes.

Finally, Lord Hope's analysis shows that the charge of conspiracy in Spain to murder in Spain (charge 9) and such conspiracies in Spain to commit murder in Spain, and such conspiracies in Spain prior to 29 September 1988 to commit acts of torture in Spain, as can be shown to form part of the allegations in charge 4 are extradition crimes.

I must therefore consider whether, in relation to these two surviving categories of charge, Senator Pinochet enjoys sovereign immunity. But first it is necessary to consider the modern law of torture.

**Torture**

Apart from the law of piracy, the concept of personal liability under international law for international crimes is of comparatively modern growth. The traditional subjects of international law are states not human beings. But consequent upon the war crime trials after the 1939-45 World War, the international community came to recognise that there could be criminal liability under international law for a class of crimes such as war crimes and crimes against humanity. Although there may be legitimate doubts as to the legality of the Nuremberg Charter: Charter of the International Military Tribunal, adopted by the Big Four Powers (1945) in my judgment those doubts were stilled by the Affirmation of the Principles of International Law Recognised by the Charter of the Nuremberg Tribunal adopted by the United Nations General Assembly on 11 December 1946 (G.A. Res. 95, 1st Sess., 1144; U.N. Doc. A/236 (1946)). That affirmation affirmed the principles of international law recognised by the Charter of the Nuremberg Tribunal and the judgment of the tribunal and directed the committee on the codification of international law to

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                                                 Page 38

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

treat as a matter of primary importance plans for the formulation of the principles recognised in the Charter of the Nuremberg Tribunal. At least from that date onwards the concept of personal liability for a crime in international law must have been part of international law. In the early years state torture was one of the elements of a war crime. In consequence torture, and various other crimes against humanity, were linked to war or at least to hostilities of some kind. But in the course of time this linkage with war fell away and torture, divorced from war or hostilities, became an international crime on its own: see *Oppenheim's International Law,* vol. I, 9th ed. (1992) (ed. Sir Robert Jennings Q.C. and Sir Arthur Watts Q.C.), p. 996; note 6 to article 18 of the International **\*198** Law Commission Draft Code of Crimes Against the Peace and Security of Mankind; Prosecutor v. Furundzija (unreported), 10 December 1998, International Criminal Tribunal for the Former Yugoslavia, Case No. IT-95-17/1-T 10. Ever since 1945, torture on a large scale has featured as one of the crimes against humanity: see, for example, U.N. General Assembly Resolutions 3059, 3452 and 3453 passed in 1973 and 1975; Statutes of the International Criminal Tribunals for the Former Yugoslavia (article 5 ) and Rwanda ( article 3 ).

 Moreover, the Republic of Chile accepted before your Lordships that the international law prohibiting torture has the character of jus cogens or a peremptory norm, i.e. one of those rules of international law which have a particular status. In the Furundzija case, at paragraphs 153 and 154, the tribunal said:

"Because of the importance of the values it protects, [the prohibition of torture] has evolved into a peremptory norm or jus cogens, that is, a norm that enjoys a higher rank in the international hierarchy than treaty law and even 'ordinary' customary rules. The most conspicuous consequence of this higher rank is that the principle at issue cannot be derogated from by states through international treaties or local or special customs or even general customary rules not endowed with the same normative force ... Clearly, the jus cogens nature of the prohibition against torture articulates the notion that the prohibition has now become one of the most fundamental standards of the international community. Furthermore, this prohibition is designed to produce a deterrent effect, in that it signals to all members of the international community and the individuals over whom they wield authority that the prohibition of torture is an absolute value from which nobody must deviate." See also the cases cited in note 170 to the *Furundzija* case.

The jus cogens nature of the international crime of torture justifies states in taking universal jurisdiction over torture wherever committed. International law provides that offences jus cogens may be punished by any state because the offenders are "common enemies of all mankind and all nations have an equal interest in their apprehension and prosecution:" Demjanjuk v. Petrovsky (1985) 603 F.Supp. 1468; 776 F.2d 571.

It was suggested by Miss Montgomery, for Senator Pinochet, that although torture was contrary to international law it was not strictly an international crime in the highest sense. In the light of the authorities to which I have referred (and there are many others) I have no doubt that long before the Torture Convention of 1984 state torture was an international crime in the highest sense.

 But there was no tribunal or court to punish international crimes of torture. Local courts could take jurisdiction: see the Demjanjuk case; Attorney-General of Israel v. Eichmann (1962) 36 I.L.R. 5. But the objective was to ensure a general jurisdiction so that the torturer was not safe wherever he went. For example, in this case it is alleged that during the Pinochet regime torture was an official, although unacknowledged, weapon of government and that, when the regime was about to end, it passed legislation designed to afford an amnesty to those who had **\*199** engaged in institutionalised torture. If these allegations are true, the fact that the local court had jurisdiction to deal with the international crime of torture was nothing to the point so long as the totalitarian regime remained in power: a totalitarian regime will not permit adjudication by its own courts on its own shortcomings. Hence the demand for some international machinery to repress state torture which is not dependent upon the local courts where the torture was committed. In the event, over 110 states (including Chile, Spain and the United Kingdom) became state parties to the Torture Convention. But it is far from clear that none of them practised state torture. What was needed therefore was an international system which could punish those who were guilty of torture and which did not permit the evasion of punishment by the torturer moving from one state to an-

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

other. The Torture Convention was agreed not in order to create an international crime which had not previously existed but to provide an international system under which the international criminal - the torturer - could find no safe haven. Burgers and Danelius (respectively the chairman of the United Nations Working Group on the 1984 Torture Convention and the draftsmen of its first draft) say, in their Handbook on the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1988), p. 131, that it was "an essential purpose [of the Convention] to ensure that a torturer does not escape the consequences of his acts by going to another country."

**The Torture Convention**

Article 1 of the Convention defines torture as the intentional infliction of severe pain and of suffering with a view to achieving a wide range of purposes "when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiesence of a public official or other person acting in an official capacity." Article 2(1 ) requires each state party to prohibit torture on territory within its own jurisdiction and article 4 requires each state party to ensure that "all" acts of torture are offences under its criminal law. Article 2(3) outlaws any defence of superior orders. Under article 5(1 ) each state party has to establish its jurisdiction over torture (a) when committed within territory under its jurisdiction (b) when the alleged offender is a national of that state, and (c) in certain circumstances, when the victim is a national of that state. Under article 5(2 ) a state party has to take jurisdiction over any alleged offender who is found within its territory. Article 6 contains provisions for a state in whose territory an alleged torturer is found to detain him, inquire into the position and notify the states referred to in article 5(1) and to indicate whether it intends to exercise jurisdiction. Under article 7 the state in whose territory the alleged torturer is found shall, if he is not extradited to any of the states mentioned in article 5(1), submit him to its authorities for the purpose of prosecution. Under article 8(1 ) torture is to be treated as an extraditable offence and under article 8(4 ) torture shall, for the purposes of extradition, be treated as having been committed not only in the place where it occurred but also in the state mentioned in article 5(1).**\*200** *Who is an "official" for the purposes of the Torture Convention?*

The first question on the Convention is whether acts done by a head of state are done by "a public official or other person acting in an official capacity" within the meaning of article 1. The same question arises under section 134 of the Criminal Justice Act 1988 . The answer to both questions must be the same. In his judgment at the first hearing Lord Slynn, at pp. 1476-1477, held that a head of state was neither a public official nor a person acting in an official capacity within the meaning of article 1: he pointed out that there are a number of international conventions (for example the Statute of the International Criminal Tribunal for the Former Yugoslavia (1993) and the Statute of the International Criminal Tribunal for Rwanda (1994 )) which refer specifically to heads of state when they intend to render them liable. Lord Lloyd apparently did not agree with Lord Slynn on this point since he thought that a head of state who was a torturer could be prosecuted in his own country, a view which could not be correct unless such head of state had conducted himself as a public official or in an official capacity.

It became clear during the argument that both the Republic of Chile and Senator Pinochet accepted that the acts alleged against Senator Pinochet, if proved, were acts done by a public official or person acting in an official capacity within the meaning of article 1. In my judgment these concessions were correctly made. Unless a head of state authorising or promoting torture is an official or acting in an official capacity within article 1, then he would not be guilty of the international crime of torture even within his own state. That plainly cannot have been the intention. In my judgment it would run completely contrary to the intention of the Convention if there was anybody who could be exempt from guilt. The crucial question is not whether Senator Pinochet falls within the definition in article 1: he plainly does. The question is whether, even so, he is procedurally immune from process. To my mind the fact that a head of state can be guilty of the crime casts little, if any, light on the question whether he is immune from prosecution for that crime in a foreign state.

**Universal jurisdiction**

There was considerable argument before your Lordships concerning the extent of the jurisdiction to prosecute torturers conferred on states other than

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

those mentioned in article 5(1). I do not find it necessary to seek an answer to all the points raised. It is enough that it is clear that in all circumstances, if the article 5(1) states do not choose to seek extradition or to prosecute the offender, other states must do so. The purpose of the Convention was to introduce the principle aut dedere aut punire - either you extradite or you punish: Burgers and Danelius, Handbook, p. 131. Throughout the negotiation of the Convention certain countries wished to make the exercise of jurisdiction under article 5(2) dependent upon the state assuming jurisdiction having refused extradition to an article 5(1) state. However, at a session in 1984 all objections to the principle of aut dedere aut punire were withdrawn. "The inclusion of universal jurisdiction in the draft Convention was no longer opposed by any delegation:" Working Group on the Draft Convention U.N. Doc. E/CN. 4/1984/72, para. 26. If **\*201** there is no prosecution by, or extradition to, an article 5(1) state, the state where the alleged offender is found (which will have already taken him into custody under article 6) must exercise the jurisdiction under article 5(2) by prosecuting him under article 7(1).

I gather the following important points from the Torture Convention: (1) torture within the meaning of the Convention can only be committed by "a public official or other person acting in an official capacity," but these words include a head of state. A single act of official torture is "torture" within the Convention; (2) superior orders provide no defence; (3) if the states with the most obvious jurisdiction (the article 5(1) states) do not seek to extradite, the state where the alleged torturer is found must prosecute or, apparently, extradite to another country, i.e. there is universal jurisdiction; (4) there is no express provision dealing with state immunity of heads of state, ambassadors or other officials; (5) since Chile, Spain and the United Kingdom are all parties to the Convention, they are bound under treaty by its provisions whether or not such provisions would apply in the absence of treaty obligation. Chile ratified the Convention with effect from 30 October 1988 and the United Kingdom with effect from 8 December 1988.

## State immunity

This is the point around which most of the argument turned. It is of considerable general importance internationally since, if Senator Pinochet is not entitled to

immunity in relation to the acts of torture alleged to have occurred after 29 September 1988, it will be the first time so far as counsel have discovered when a local domestic court has refused to afford immunity to a head of state or former head of state on the grounds that there can be no immunity against prosecution for certain international crimes.

Given the importance of the point, it is surprising how narrow is the area of dispute. There is general agreement between the parties as to the rules of statutory immunity and the rationale which underlies them. The issue is whether international law grants state immunity in relation to the international crime of torture and, if so, whether the Republic of Chile is entitled to claim such immunity even though Chile, Spain and the United Kingdom are all parties to the Torture Convention and therefore "contractually" bound to give effect to its provisions from 8 December 1988 at the latest.

It is a basic principle of international law that one sovereign state (the forum state) does not adjudicate on the conduct of a foreign state. The foreign state is entitled to procedural immunity from the processes of the forum state. This immunity extends to both criminal and civil liability. State immunity probably grew from the historical immunity of the person of the monarch. In any event, such personal immunity of the head of state persists to the present day: the head of state is entitled to the same immunity as the state itself. The diplomatic representative of the foreign state in the forum state is also afforded the same immunity in recognition of the dignity of the state which he represents. This immunity enjoyed by a head of state in power and an ambassador in post is a complete immunity **\*202** attaching to the person of the head of state or ambassador and rendering him immune from all actions or prosecutions whether or not they relate to matters done for the benefit of the state. Such immunity is said to be granted ratione personae.

What then when the ambassador leaves his post or the head of state is deposed? The position of the ambassador is covered by the Vienna Convention on Diplomatic Relations (1961). After providing for immunity from arrest (article 29) and from criminal and civil jurisdiction (article 31), article 39(1) provides that the ambassador's privileges shall be enjoyed from the moment he takes up post; and para-

[2000] 1 A.C. 147                                                                                                      Page 41
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

graph (2) provides:

"When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist."

The continuing partial immunity of the ambassador after leaving post is of a different kind from that enjoyed ratione personae while he was in post. Since he is no longer the representative of the foreign state he merits no particular privileges or immunities as a person. However in order to preserve the integrity of the activities of the foreign state during the period when he was ambassador, it is necessary to provide that immunity is afforded to his *official* acts during his tenure in post. If this were not done the sovereign immunity of the state could be evaded by calling in question acts done during the previous ambassador's time. Accordingly under article 39(2) the ambassador, like any other official of the state, enjoys immunity in relation to his official acts done while he was an official. This limited immunity, ratione materiae, is to be contrasted with the former immunity ratione personae which gave complete immunity to all activities whether public or private.

In my judgment at common law a former head of state enjoys similar immunities, ratione materiae, once he ceases to be head of state. He too loses immunity ratione personae on ceasing to be head of state: see Sir Arthur Watts Q.C., Hague Lectures, "The Legal Position in International Law of Heads of States, Heads of Government and Foreign Ministers" 1994-III 247 Recueil des cours, p. 88 and the cases there cited. He can be sued on his private obligations: Ex-King Farouk of Egypt v. Christian Dior (1957) 24 I.L.R. 228; Jimenez v. Aristeguieta (1962) 311 F.2d 547. As ex-head of state he cannot be sued in respect of acts performed whilst head of state in his public capacity: Hatch v. Baez (1876) 7 Hun 596. Thus, at common law, the position of the former ambassador and the former head of state appears to be much the same: both enjoy immunity for acts done in performance of their respective functions whilst in office.

I have belaboured this point because there is a strange feature of the United Kingdom law which I must mention shortly. The State Immunity Act 1978 modifies the traditional complete immunity normally afforded by the common law in claims for damages against foreign states. Such modifications are contained in Part I of the Act. Section 16(1) provides **\*203** that nothing in Part I of the Act is to apply to criminal proceedings. Therefore Part I has no direct application to the present case. However, Part III of the Act contains section 20(1), which provides:

"Subject to the provisions of this section and to any necessary modifications, the Diplomatic Privileges Act 1964 shall apply to - (a) a sovereign or other head of state ... as it applies to a head of a diplomatic mission." The correct way in which to apply article 39(2) of the Vienna Convention to a former head of state is baffling. To what "functions" is one to have regard? When do they cease since the former head of state almost certainly never arrives in this country let alone leaves it? Is a former head of state's immunity limited to the exercise of the functions of a member of the mission, or is that again something which is subject to "necessary modification?" It is hard to resist the suspicion that something has gone wrong. A search was done on the parliamentary history of the section . From this it emerged that the original section 20(1)(a) read "a sovereign or other head of state who is in the United Kingdom at the invitation or with the consent of the Government of the United Kingdom." On that basis the section would have been intelligible. However it was changed by a government amendment the mover of which said that the clause as introduced "leaves an unsatisfactory doubt about the position of heads of state who are not in the United Kingdom;" he said that the amendment was to ensure that heads of state would be treated like heads of diplomatic missions "irrespective of presence in the United Kingdom." The parliamentary history, therefore, discloses no clear indication of what was intended. However, in my judgment it does not matter unduly since Parliament cannot have intended to give heads of state and former heads of state greater rights than they already enjoyed under international law. Accordingly, "the necessary modifications" which need to be made will produce the result that a former head of state has immunity in relation to acts done as part of his official functions when head of state. Accordingly, in my judgment, Senator Pinochet as former head of state enjoys immunity ratione materiae in relation to acts done by him as head of state

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                                                    Page 42
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

as part of his official functions as head of state.

The question then which has to be answered is whether the alleged organisation of state torture by Senator Pinochet (if proved) would constitute an act committed by Senator Pinochet as part of his official functions as head of state. It is not enough to say that it cannot be part of the functions of the head of state to commit a crime. Actions which are criminal under the local law can still have been done officially and therefore give rise to immunity ratione materiae. The case needs to be analysed more closely.

Can it be said that the commission of a crime which is an international crime against humanity and jus cogens is an act done in an official capacity on behalf of the state? I believe there to be strong ground for saying that the implementation of torture as defined by the Torture Convention cannot be a state function. This is the view taken by Sir Arthur Watts Q.C. in his Hague Lecture who said, at p. 82: *204

"While generally international law ... does not directly involve obligations on individuals personally, that is not always appropriate, particularly for acts of such seriousness that they constitute not merely international wrongs (in the broad sense of a civil wrong) but rather international crimes which offend against the public order of the international community. States are artificial legal persons: they can only act through the institutions and agencies of the state, which means, ultimately, through its officials and other individuals acting on behalf of the state. For international conduct which is so serious as to be tainted with criminality to be regarded as attributable only to the impersonal state and not to the individuals who ordered or perpetrated it is both unrealistic and offensive to common notions of justice. The idea that individuals who commit international crimes are *internationally* accountable for them has now become an accepted part of international law. Problems in this area - such as the non-existence of any standing international tribunal to have jurisdiction over such crimes, and the lack of agreement as to what acts are internationally criminal for this purpose - have not affected the general acceptance of the principle of individual responsibility for international criminal conduct." Later he said, at p. 84: "It can no longer be doubted that as a matter of general customary international law a head of state will personally be liable to be called to account if there is sufficient evidence

that he authorised or perpetrated such serious international crimes."

It can be objected that Sir Arthur was looking at those cases where the international community has established an international tribunal in relation to which the regulating document *expressly* makes the head of state subject to the tribunal's jurisdiction: see, for example, the Nuremberg Charter, article 7; the Statute of the International Criminal Tribunal for Former Yugoslavia ; the Statute of the International Criminal Tribunal for Rwanda and the Statute of the International Criminal Court . It is true that in these cases it is expressly said that the head of state or former head of state is subject to the court's jurisdiction. But those are cases in which a new court with no existing jurisdiction is being established. The jurisdiction being established by the Torture Convention and the Hostages Convention is one where existing domestic courts of all the countries are being authorised and required to take jurisdiction internationally. The question is whether, in this new type of jurisdiction, the only possible view is that those made subject to the jurisdiction of each of the state courts of the world in relation to torture are not entitled to claim immunity.

I have doubts whether, before the coming into force of the Torture Convention, the existence of the international crime of torture as jus cogens was enough to justify the conclusion that the organisation of state torture could not rank for immunity purposes as performance of an official function. At that stage there was no international tribunal to punish torture and no general jurisdiction to permit or require its punishment in domestic courts. Not until there was some form of universal jurisdiction for the punishment of the crime of torture could it really be talked about as a fully constituted international crime. But in my judgment *205 the Torture Convention did provide what was missing: a worldwide universal jurisdiction. Further, it required all member states to ban and outlaw torture: article 2. How can it be for international law purposes an official function to do something which international law itself prohibits and criminalises? Thirdly, an essential feature of the international crime of torture is that it must be committed "by or with the acquiesence of a public official or other person acting in an official capacity." As a result all defendants in torture cases will be state officials. Yet, if the former head of state has immunity, the man most

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

responsible will escape liability while his inferiors (the chiefs of police, junior army officers) who carried out his orders will be liable. I find it impossible to accept that this was the intention.

Finally, and to my mind decisively, if the implementation of a torture regime is a public function giving rise to immunity ratione materiae, this produces bizarre results. Immunity ratione materiae applies not only to ex-heads of state and ex-ambassadors but to all state officials who have been involved in carrying out the functions of the state. Such immunity is necessary in order to prevent state immunity being circumvented by prosecuting or suing the official who, for example, actually carried out the torture when a claim against the head of state would be precluded by the doctrine of immunity. If that applied to the present case, and if the implementation of the torture regime is to be treated as official business sufficient to found an immunity for the former head of state, it must also be official business sufficient to justify immunity for his inferiors who actually did the torturing. Under the Convention the international crime of torture can only be committed by an official or someone in an official capacity. They would all be entitled to immunity. It would follow that there can be no case outside Chile in which a successful prosecution for torture can be brought unless the State of Chile is prepared to waive its right to its officials' immunity. Therefore the whole elaborate structure of universal jurisdiction over torture committed by officials is rendered abortive and one of the main objectives of the Torture Convention - to provide a system under which there is no safe haven for torturers - will have been frustrated. In my judgment all these factors together demonstrate that the notion of continued immunity for ex-heads of state is inconsistent with the provisions of the Torture Convention.

For these reasons in my judgment if, as alleged, Senator Pinochet organised and authorised torture after 8 December 1988, he was not acting in any capacity which gives rise to immunity ratione materiae because such actions were contrary to international law, Chile had agreed to outlaw such conduct and Chile had agreed with the other parties to the Torture Convention that all signatory states should have jurisdiction to try official torture (as defined in the Convention) even if such torture were committed in Chile.

As to the charges of murder and conspiracy to murder, no one has advanced any reason why the ordinary rules of immunity should not apply and Senator Pinochet is entitled to such immunity.

For these reasons, I would allow the appeal so as to permit the extradition proceedings to proceed on the allegation that torture in pursuance of a conspiracy to commit torture, including the single act of **\*206** torture which is alleged in charge 30, was being committed by Senator Pinochet after 8 December 1988 when he lost his immunity.

In issuing to the magistrate an authority to proceed under section 7 of the Extradition Act 1989 , the Secretary of State proceeded on the basis that the whole range of torture charges and murder charges against Senator Pinochet would be the subject matter of the extradition proceedings. Your Lordships' decision excluding from consideration a very large number of those charges constitutes a substantial change in the circumstances. This will obviously require the Secretary of State to reconsider his decision under section 7 in the light of the changed circumstances.

Lord Goff of Chieveley.

My Lords,

## I. Introduction

The background to the present appeal is set out, with economy and lucidity, in the opinion of my noble and learned friend Lord Browne-Wilkinson, which I have had the opportunity of reading in draft. I gratefully adopt his account and, to keep my own opinion as short as reasonably possible, I do not propose to repeat it. The central question in the appeal is whether Senator Pinochet is entitled as former head of state to the benefit of state immunity ratione materiae in respect of the charges advanced against him, as set out in the schedule of charges prepared by Mr. Alun Jones on behalf of the Government of Spain.

## II. The principal issue argued on the appeal

Before the Divisional Court, and again before the first Appellate Committee, it was argued on behalf of the Government of Spain that Senator Pinochet was not entitled to the benefit of state immunity basically

[2000] 1 A.C. 147                                                                                                                                    Page 44

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

on two grounds, viz. first, that the crimes alleged against Senator Pinochet are so horrific that an exception must be made to the international law principle of state immunity; and second, that the crimes with which he is charged are crimes against international law, in respect of which state immunity is not available. Both arguments were rejected by the Divisional Court, but a majority of the first Appellate Committee accepted the second argument. The leading opinion was delivered by Lord Nicholls of Birkenhead, whose reasoning was of great simplicity. He said [2000] 1 A.C. 61, 108-109:

"In my view, article 39(2) of the Vienna Convention, as modified and applied to former heads of state by section 20 of the Act of 1978, is apt to confer immunity in respect of acts performed in the exercise of functions which international law recognises as functions of a head of state, irrespective of the terms of his domestic constitution. This formulation, and this test for determining what are the functions of a head of state for this purpose, are sound in principle and were not the subject of controversy before your Lordships. International law does not require the grant of any wider immunity. And it hardly needs saying that torture of his own subjects, or of aliens, would not be regarded by international law as a function of a head of state. All *207 states disavow the use of torture as abhorrent, although from time to time some still resort to it. Similarly, the taking of hostages, as much as torture, has been outlawed by the international community as an offence. International law recognises, of course, that the functions of a head of state may include activities which are wrongful, even illegal, by the law of his own state or by the laws of other states. But international law has made plain that certain types of conduct, including torture and hostage-taking, are not acceptable conduct on the part of anyone. This applies as much to heads of state, or even more so, as it does to everyone else; the contrary conclusion would make a mockery of international law." Lord Hoffmann agreed, and Lord Steyn delivered a concurring opinion to the same effect.

Lord Slynn of Hadley and Lord Lloyd of Berwick, however, delivered substantial dissenting opinions. In particular, Lord Slynn, at pp. 77e-82a, considered in detail the "developments in international law relating to what are called international crimes." On the basis of the material so reviewed by him, he concluded, at p. 79c-d:

"It does not seem to me that it has been shown that there is any state practice or general consensus let alone a widely supported convention that all crimes against international law should be justiciable in national courts on the basis of the universality of jurisdiction. Nor is there any jus cogens in respect of such breaches of international law which requires that a claim of state or head of state immunity, itself a well established principle of international law, should be overridden." He went on to consider whether international law now recognises that certain crimes, and in particular crimes against humanity, are outwith the protection of head of state immunity. He referred to the relevant material, and observed, at p. 81:

"except in regard to crimes in particular situations before international tribunals these measures did not in general deal with the question as to whether otherwise existing immunities were taken away. Nor did they always specifically recognise the jurisdiction of, or confer jurisdiction on, national courts to try such crimes." He then proceeded to examine the Torture Convention of 1984 , the Genocide Convention of 1948 and the Taking of Hostages Convention of 1983 , and concluded that none of them had removed the long established immunity of former heads of state.

I have no doubt that, in order to consider the validity of the argument advanced on behalf of the Government of Spain on this point, it was necessary to carry out the exercise so performed by Lord Slynn; and I am therefore unable, with all respect, to accept the simple approach of the majority of the first Appellate Committee. Furthermore, I wish to record my respectful agreement with the analysis, and conclusions, of Lord Slynn set out in the passages from his opinion to which I have referred. I intend no disrespect to the detailed arguments advanced before your Lordships on behalf of the appellants in this matter, when I say that in my opinion *208 they did not succeed in shaking the reasoning, or conclusions, of Lord Slynn which I have set out above. However, having regard to (1) the extraordinary impact on this case of the double criminality rule, to which I will refer in a moment, and (2) the fact that a majority of your Lordships have formed the view that, in respect of the very few charges (of torture or conspiracy to torture) which survive the impact of the double criminality rule, the effect of the Torture Convention is that in any event Senator Pinochet is not entitled to

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

the benefit of state immunity, the present issue has ceased to have any direct bearing on the outcome of the case. In these circumstances, I do not consider it necessary or appropriate to burden this opinion with a detailed consideration of the arguments addressed to the Appellate Committee on this issue. However, I shall return to the point when I come to consider the topic of state immunity later in this opinion.

### III. The double criminality rule

During the course of the hearing before your Lordships, two new issues emerged or acquired an importance which they had not previously enjoyed. The first of these is the issue of double criminality, to which I now turn.

At the hearing before your Lordships Mr. Alun Jones, for the appellants, sought to extend backwards the period during which the crimes charged were alleged to have been committed, with the effect that some of those crimes could be said to have taken place before the coup following which Senator Pinochet came into power. The purpose was obviously to enable the appellants to assert that, in respect of these crimes, no immunity as former head of state was available to him. As a result Miss Clare Montgomery, for Senator Pinochet, revived the submission that certain of the charges related to crimes which were not extradition crimes because they were not, at the time they were alleged to have been committed, criminal under the law of this country, thus offending against the double criminality rule. Mr. Alun Jones replied to this argument but, for the reasons given by my noble and learned friend, Lord Browne-Wilkinson, with which I am respectfully in complete agreement, I, too, am satisfied that Miss Montgomery's submission was well founded.

The appellants did not, however, analyse the consequences of this argument, if successful, in order to identify the charges against Senator Pinochet which would survive the application of the double criminality rule. That substantial task has, however, been undertaken by my noble and learned friend, Lord Hope of Craighead, to whom your Lordships owe a debt of gratitude. His analysis I respectfully accept. As he

truly says, the impact upon the present case is profound. The great mass of the offences with which Senator Pinochet is charged must be excluded, as must also be the charge of hostage-taking which does not disclose an offence under the Taking of Hostages Act 1982. The principal charges which survive are those which relate to acts of torture alleged to have been committed, or conspiracies to torture which are alleged to have been active, after 29 September 1988, the date on which section 134 of the Criminal Justice Act 1988 (which gave effect to the Torture Convention in this country) came into effect. These are: charge 30, which relates to a **\*209** single act of torture alleged to have been committed on 24 June 1989; and charges 2 and 4, which allege conspiracies to torture between 1 August 1973 and 1 January 1972 respectively, and 1 January 1990, in so far as they relate to the relatively brief period between 29 September 1988 and 1 January 1990. In addition, however, the charge of conspiracy to commit murder in Spain (charge 9), and such conspiracies to commit murder in Spain as can be shown to form part of the allegations in charge 4, also survive.

### IV. State immunity

Like my noble and learned friend, Lord Browne-Wilkinson, I regard the principles of state immunity applicable in the case of heads of state and former heads of state as being relatively non-controversial, though the legislation on which they are now based, the State Immunity Act 1978 , is in a strange form which can only be explained by the legislative history of the Act.

There can be no doubt, in my opinion, that the Act is intended to provide the sole source of English law on this topic. This is because the long title to the Act provides, inter alia, that the Act is "to make *new* provision with regard to the immunities and privileges of heads of state." Since in the present case we are concerned with immunity from criminal process, we can ignore Part I (which does not apply to criminal proceedings) and turn straight to Part III, and in particular to section 20. Section 20(1) provides: "Subject to the provisions of this section and to any necessary modifications, the Diplomatic Privileges Act 1964 shall apply to - (a) a sovereign or other head of state ... as it applies to the head of a diplomatic mission."

The function of the Diplomatic Privileges Act 1964 is

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                 Page 46
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

to give effect to the Vienna Convention on Diplomatic Relations in this country, the relevant articles of which are scheduled to the Act. The problem is, of course, how to identify the "necessary modifications" when applying the Vienna Convention to heads of state. The nature of the problem is apparent when we turn to article 39 of the Convention, which provides:

"(1) Every person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving state on proceeding to take up his post or, if already in its territory, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed. (2) When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist." At first this seems very strange, when applied to a head of state. However, the scales fall from our eyes when we discover from the legislative history of the Act that it was originally intended to apply only to a sovereign or **\*210** other head of state in this country at the invitation or with the consent of the government of this country, but was amended to provide also for the position of a head of state who was not in this country - hence the form of the long title, which was amended to apply simply to heads of state. We have, therefore, to be robust in applying the Vienna Convention to heads of state "with the necessary modifications." In the case of a head of state, there can be no question of tying article 39(1) or (2) to the territory of the receiving state, as was suggested on behalf of the appellants. Once that is realised, there seems to be no reason why the immunity of a head of state under the Act should not be construed as far as possible to accord with his immunity at customary international law, which provides the background against which this statute is set: see Alcom Ltd. v. Republic of Colombia[1984] A.C. 580, 597g, *per* Lord Diplock. The effect is that a head of state will, under the statute as at international law, enjoy state immunity ratione personae so long as he is in office, and after he ceases to hold office will enjoy the concomitant immunity ratione materiae "in respect of acts performed [by him] in the exercise of his functions [as head of state]," the critical question being

"whether the conduct was engaged in under colour of or in ostensible exercise of the head of state's public authority:" see Sir Arthur Watts Q.C., "The Legal Position in International Law of Heads of States, Heads of Governments and Foreign Ministers," (1994-III) 247 Recueil des cours, at p. 56. In this context, the contrast is drawn between governmental acts, which are functions of the head of state, and private acts, which are not.

There can be no doubt that the immunity of a head of state, whether ratione personae or ratione materiae, applies to both civil and criminal proceedings. This is because the immunity applies to any form of legal process. The principle of state immunity is expressed in the Latin maxim par in parem non habet imperium, the effect of which is that one sovereign state does not adjudicate on the conduct of another. This principle applies as between states, and the head of a state is entitled to the same immunity as the state itself, as are the diplomatic representatives of the state. That the principle applies in criminal proceedings is reflected in the Act of 1978, in that there is no equivalent provision in Part III of the Act to section 16(4) which provides that Part I does not apply to criminal proceedings.

However, a question arises whether any limit is placed on the immunity in respect of criminal offences. Obviously the mere fact that the conduct is criminal does not of itself exclude the immunity, otherwise there would be little point in the immunity from criminal process; and this is so even where the crime is of a serious character. It follows, in my opinion, that the mere fact that the crime in question is torture does not exclude state immunity. It has however been stated by Sir Arthur Watts, at pp. 81-84, that a head of state may be personally responsible:

"for acts of such seriousness that they constitute not merely international wrongs (in the broad sense of a civil wrong) but rather international crimes which offend against the public order of the international community."**\*211** He then referred to a number of instruments, including the Charter of the Nuremberg Tribunal (1945 ), the Tokyo Convention: Charter of the International Military Tribunal for the trial of major war criminals in the Far East (1946), the International Law Commission's Draft Code of Crimes Against the Peace and Security of Mankind (provisionally adopted in 1988), and the Statute of the In-

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

ternational Criminal Tribunal for the Former Yugoslavia (1993 ), all of which expressly provide for the responsibility of heads of state, apart from the Charter of the Tokyo Tribunal which contains a similar provision regarding the official position of the accused. He concluded, at p. 84:

"It can no longer be doubted that as a matter of general customary international law a head of state will personally be liable to be called to account if there is sufficient evidence that he authorised or perpetrated such serious international crimes."

So far as torture is concerned, however, there are two points to be made. The first is that it is evident from this passage that Sir Arthur is referring not just to a specific crime as such, but to a crime which offends against the *public order of the international community*, for which a head of state may be *internationally* (his emphasis) accountable. The instruments cited by him show that he is concerned here with crimes against peace, war crimes and crimes against humanity. Originally these were limited to crimes committed in the context of armed conflict, as in the case of the Nuremberg and Tokyo Charters, and still in the case of the Yugoslavia Statute, though there it is provided that the conflict can be international or internal in character. Subsequently, the context has been widened to include, inter alia, torture "when committed as part of a widespread or systematic attack against a civilian population" on specified grounds. A provision to this effect appeared in the International Law Commission's Draft Code of Crimes of 1996 (which was, I understand, provisionally adopted in 1988), and also appeared in the Statute of the International Tribunal for Rwanda (1994 ), and in the Rome Statute of the International Criminal Court (adopted by the United Nations Diplomatic Conference on Plenipotentiaries on the Establishment of an International Criminal Court on 17 July 1998); and see also the view expressed obiter by the U.S. Court of Appeals in Siderman de Blake v. Republic of Argentina (1992) 965 F.2d 699, 716. I should add that these developments were foreshadowed in the International Law Commission's Draft Code of Crimes of 1954; but this was not adopted, and there followed a long gap of about 35 years before the developments in the 1990s to which I have referred. It follows that these provisions are not capable of evidencing any settled practice in respect of torture outside the context of armed conflict until well after

1989 which is the latest date with which we are concerned in the present case. The second point is that these instruments are all concerned with international responsibility before international tribunals, and not with the exclusion of state immunity in criminal proceedings before national courts. This supports the conclusion of Lord Slynn [1998] 3 W.L.R. 1456, 1474 that "except in regard to crimes in particular situations before international tribunals these measures did not in general deal with the **\*212** question whether otherwise existing immunities were taken away," with which I have already expressed my respectful agreement.

It follows that, if state immunity in respect of crimes of torture has been excluded at all in the present case, this can only have been done by the Torture Convention itself.

**V. Torture Convention**

I turn now to the Torture Convention of 1984, which lies at the heart of the present case. This is concerned with the jurisdiction of national courts, but its "essential purpose" is to ensure that a torturer does not escape the consequences of his act by going to another country: see the Handbook on the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment by Burgers (the Chairman-Rapporteur of the Convention) and Danelius, at p. 131. The articles of the Convention proceed in a logical order. Article 1 contains a very broad definition of torture. For present purposes, it is important that torture has to be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Article 2 imposes an obligation on each state party to take effective measures to prevent acts of torture in any territory under its jurisdiction. Article 3 precludes refoulement of persons to another state where there are substantial grounds for believing that he would be in danger of being subjected to torture. Article 4 provides for the criminalisation of torture by each state party. Article 5 is concerned with jurisdiction. Each state party is required to establish its jurisdiction over the offences referred to in article 4 in the following cases: "(a) When the offences are committed in any territory under its jurisdiction ... (b) When the alleged offender is a national of that state; (c) When the victim is a national of that state if that state considers it appropriate" and also "over such offences

[2000] 1 A.C. 147                                                                                           Page 48

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

in cases where the alleged offender is present in any
territory under its jurisdiction and it does not extra-
dite him ..."

Article 7 is concerned with the exercise of jurisdic-
tion. Article 7(1) provides:

"The state party in territory under whose jurisdiction
a person alleged to have committed any offence re-
ferred to in article 4 is found shall in the cases con-
templated in article 5, if it does not extradite him,
submit the case to its competent authorities for the
purpose of prosecution." This provision reflects the
principle aut dedere aut punire, designed to ensure
that torturers do not escape by going to another coun-
try.

I wish at this stage to consider briefly the question
whether a head of state, if not a public official, is at
least a "person acting in a public capacity" within
article 1(1) of the Torture Convention. It was my first
reaction that he is not, on the ground that no one
would ordinarily describe a head of state such as a
monarch or the president of a republic as a "public
official," and the subsidiary words "other person act-
ing in a public capacity" appeared to be intended to
catch a person who, while not a public official, has
fulfilled the role of a public official, for example, on
a **213** temporary or ad hoc basis. Miss Montgomery,
for Senator Pinochet, submitted that the words were
not apt to include a head of state relying in particular
on the fact that in a number of earlier conventions
heads of state are expressly mentioned in this context
in addition to responsible government officials. How-
ever, Dr. Collins for the Republic of Chile conceded
that, in the Torture Convention, heads of state must
be regarded as falling within the category of "other
person acting in a public capacity;" and in these cir-
cumstances I am content to proceed on that basis.
The effect of Dr. Collins's concession is that a head
of state could be held responsible for torture commit-
ted during his term of office, although (as Dr. Collins
submitted) the state of which he was head would be
able to invoke the principle of state immunity, ratione
personae or materiae, in proceedings brought against
him in another national jurisdiction if it thought right
to do so. Accordingly, on the argument now under
consideration, the crucial question relates to the
availability of state immunity.

It is to be observed that no mention is made of state

immunity in the Convention. Had it been intended to
exclude state immunity, it is reasonable to assume
that this would have been the subject either of a sepa-
rate article, or of a separate paragraph in article 7,
introduced to provide for that particular matter. This
would have been consistent with the logical frame-
work of the Convention, under which separate provi-
sion is made for each topic, introduced in logical or-
der.

*VI. The issue whether immunity ratione materiae has
been excluded under the Torture Convention*

**(a) The argument**

I now come to the second of the two issues which
were raised during the hearing of the appeal, viz.
whether the Torture Convention has the effect that
state parties to the Convention have agreed to ex-
clude reliance on state immunity ratione materiae in
relation to proceedings brought against their public
officials, or other persons acting in an official capac-
ity, in respect of torture contrary to the Convention.
In broad terms I understand the argument to be that,
since torture contrary to the Convention can only be
committed by a public official or other person acting
in an official capacity, and since it is in respect of the
acts of these very persons that states can assert state
immunity ratione materiae, it would be inconsistent
with the obligations of state parties under the Con-
vention for them to be able to invoke state immunity
ratione materiae in cases of torture contrary to the
Convention. In the case of heads of state this objec-
tive could be achieved on the basis that torture con-
trary to the Convention would not be regarded as
falling within the functions of a head of state while in
office, so that although he would be protected by
immunity ratione personae while in office as head of
state, no immunity ratione materiae would protect
him in respect of allegations of such torture after he
ceased to hold office. There can, however, be no
doubt that, before the Torture Convention, torture by
public officials could be the subject of state immu-
nity. Since therefore exclusion of immunity is said to
result from the Torture Convention and there is no
express term of the **214** Convention to this effect,
the argument has, in my opinion, to be formulated as
dependent upon an implied term in the Convention. It
is a matter of comment that, for reasons which will
appear in a moment, the proposed implied term has
not been precisely formulated; it has not therefore

[2000] 1 A.C. 147                                                                                      Page 49
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

been exposed to that valuable discipline which is always required in the case of terms alleged to be implied in ordinary contracts. In any event, this is a different argument from that which was advanced to your Lordships by the appellants and those supporting them, which was that both torture contrary to the Torture Convention , and hostage-taking contrary to the Taking of Hostages Convention , constituted crimes under international law, and that such crimes cannot be part of the functions of a head of state as a matter of international law.

The argument now under consideration was not advanced before the Divisional Court; nor can it have been advanced before the first Appellate Committee, or it would have been considered by both Lord Slynn of Hadley and Lord Lloyd of Berwick in their dissenting opinions. It was not advanced before your Lordships by the appellants and those supporting them, either in their written cases, or in their opening submissions. In fact, it was introduced into the present case as a result of interventions by members of the Appellate Committee in the course of the argument. This they were, of course, fully entitled to do; and subsequently the point was very fairly put both to Miss Montgomery for Senator Pinochet and to Dr. Collins for the Government of Chile. It was subsequently adopted by Mr. Lloyd Jones, the amicus curiae, in his oral submissions to the Committee. The appellants, in their written submissions in reply, restricted themselves to submitting that "The conduct alleged in the present case is not conduct which amounts to official acts performed by the [applicant] in the exercise of his functions [as head of state]." They did not at that stage go so far as to submit that any torture contrary to the Torture Convention would not amount to such an official act. However, when he came to make his final oral submissions on behalf of the appellants, Professor Greenwood, following the lead of Mr. Lloyd Jones, and perhaps prompted by observations from the Committee to the effect that this was the main point in the case, went beyond his clients' written submissions in reply and submitted that, when an offence of torture is committed by an official within the meaning of section 134 of the Criminal Justice Act 1988 and article 1 of the Torture Convention, no immunity ratione materiae can attach in respect of that act.

It is surprising that an important argument of this character, if valid, should previously have been over-

looked by the fourteen counsel (including three distinguished Professors of International Law) acting for the appellants, and for Amnesty International and Human Rights Watch which are supporting the appellants in this litigation. The concern thereby induced as to the validity of the argument is reinforced by the fact that it receives no support from the literature on the subject and, on the material before your Lordships, appears never to have been advanced before. At all events, having given the matter the most careful consideration, I am satisfied that it must be rejected as contrary to principle and authority, and indeed contrary to common sense. *215 *(b) Waiver of immunity by treaty must be express*

On behalf of the Government of Chile Dr. Collins's first submission was that a state's waiver of its immunity by treaty must always be express. With that submission, I agree.

I turn first to *Oppenheim's International Law* , vol. I. The question of waiver of state immunity is considered, at pp. 351-355, from which I quote the following passage:

"A state, although in principle entitled to immunity, may waive its immunity. It may do so by expressly submitting to the jurisdiction of the court before which it is sued, either by express consent given in the context of a particular dispute which has already arisen, or by consent given in advance in a contract or an international agreement ... A state may also be considered to have waived its immunity by implication, as by instituting or intervening in proceedings, or taking any steps in the proceedings relating to the merits of the case ..." It is significant that, in this passage, the only examples given of implied waiver of immunity relate to actual submission by a state to the jurisdiction of a court or tribunal by instituting or intervening in proceedings, or by taking a step in proceedings.

A similar approach is to be found in the Report of the International Law Commission on the Jurisdictional Immunities of States and their Property reported in 1991 Y.B.I.L.C., vol. II, Part 2, in which a fuller exposition of the subject is to be found. Article 7 of the Commission's Draft Articles on this subject is entitled "Express consent to exercise of jurisdiction." Article 7(1) provides:

[2000] 1 A.C. 147                                                                                      Page 50
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

"A state cannot invoke immunity from jurisdiction in a proceeding before a court of another state with regard to a matter or case if it has expressly consented to the exercise of jurisdiction by the court with regard to the matter or case: (a) by international agreement; (b) in a written contract; or (c) by a declaration before the court or by a written communication in a specific proceeding." I turn to the commentary on article 7(1), from which I quote paragraph (8) in full:

"In the circumstances under consideration, that is, in the context of the state against which legal proceedings have been brought, there appear to be several recognisable methods of expressing or signifying consent. In this particular connection, the consent should not be taken for granted, nor readily implied. Any theory of 'implied consent' as a possible exception to the general principles of state immunities outlined in this part should be viewed not as an exception in itself, but rather as an added explanation or justification for an otherwise valid and generally recognised exception. There is therefore no room for implying the consent of an unwilling state which has not expressed its consent in a clear and recognisable manner, including by the means provided in article 8" - which is concerned with the effect of participation in a proceeding before a court - "It remains to be **\*216** seen how consent would be given or expressed so as to remove the obligation of the court of another state to refrain from the exercise of its jurisdiction against an equally sovereign state." The two examples then provided of how such consent would be given or expressed are (i) consent given in a written contract, or by a declaration or a written communication in a specific proceeding, and (ii) consent given in advance by international agreement. In respect of the latter, reference is made, in paragraph (10), to such consent being *expressed* in a provision of a treaty concluded by states; there is no reference to such consent being implied.

The general effect of these passages is that, in a treaty concluded between states, consent by a state party to the exercise of jurisdiction against it must, as Dr. Collins submitted, be express. In general, moreover, implied consent to the exercise of such jurisdiction is to be regarded only as an added explanation or justification for an otherwise valid and recognised exception, of which the only example given is actual submission to the jurisdiction of the courts of another state.

The decision of the Supreme Court of the United States in Argentine Republic v. Amerada Hess Shipping Corporation (1989) 109 S.Ct. 683 is consistent with the foregoing approach. In an action brought by a shipowner against the Argentine Republic for the loss of a ship through an attack by aircraft of the Argentine Air Force, the defendant relied upon state immunity. Among other arguments the plaintiff suggested that the defendant had waived its immunity under certain international agreements to which the United States was party. For this purpose, the plaintiff invoked paragraph 1605(a) (1) of the Foreign Sovereign Immunities Act 1976 , which specifies, as one of a number of exceptions to immunity of foreign states, a case in which the foreign state has waived its immunity either explicitly or by implication. It was the plaintiff's contention that there was an implicit waiver in the relevant international agreements. This submission was tersely rejected by Rehnquist C.J., at p. 693, who delivered the judgment of the court, in the following words: "Nor do we see how a foreign state can waive its immunity under paragraph 1605(a) (1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts ..." Once again, the emphasis is on the need for an express waiver of immunity in an international agreement. This cannot be explained away as due to the provisions of the United States Act. On the contrary, the Act contemplates the possibility of waiver by implication; but in the context of a treaty the Supreme Court was only prepared to contemplate express waiver.

I turn next to the State Immunity Act 1978 , the provisions of which are also consistent with the principles which I have already described. In Part I of the Act (which does not apply to criminal proceedings: see section 16(4)) it is provided by section 1(1) that "A state is immune from the jurisdiction of the courts of the United Kingdom except as provided in the following provisions of this Part of this Act." For the present purposes, the two relevant provisions are section 2, concerned with submission to the jurisdiction, and section 9, concerned with submissions to arbitration by an agreement in writing. Section 2(2) recognises that a state may submit to **\*217** the jurisdiction by a prior written agreement, which I read as referring to an express agreement to submit. There is no suggestion in the Act that an implied agreement to submit would be sufficient, except in so far as an

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

actual submission to the jurisdiction of a court of this country, may be regarded as an implied waiver of immunity; but my reading of the Act leads me to understand that such a submission to the jurisdiction is here regarded as an express rather than an implied waiver of immunity or agreement to submit to the jurisdiction. This is consistent with Part III of the Act, which by section 20 provides that, subject to the provisions of that section and to any necessary modifications, the Diplomatic Privileges Act 1964 shall apply to a sovereign or other head of state. Among the articles of the Vienna Convention on Diplomatic Relations so rendered applicable by section 2 of the Act of 1964 is article 32 concerned with waiver of immunity, paragraph 2 of which provides that such waiver must always be express, which I read as including an actual submission to the jurisdiction, as well as an express agreement in advance to submit. Once again, there is no provision for an implied agreement.

In the light of the foregoing it appears to me to be clear that, in accordance both with international law, and with the law of this country which on this point reflects international law, a state's waiver of its immunity by treaty must, as Dr. Collins submitted, always be express. Indeed, if this was not so, there could well be international chaos as the courts of different state parties to a treaty reach different conclusions on the question whether a waiver of immunity was to be implied.

**(c) The functions of public officials and others acting in an official capacity**

However it is, as I understand it, suggested that this well established principle can be circumvented in the present case on the basis that it is not proposed that state parties to the Torture Convention have agreed to waive their state immunity in proceedings brought in the states of other parties in respect of allegations of torture within the Convention. It is rather that, for the purposes of the Convention, such torture does not form part of the functions of public officials or others acting in an official capacity including, in particular, a head of state. Moreover since state immunity ratione materiae can only be claimed in respect of acts done by an official in the exercise of his functions as such, it would follow, for example, that the effect is that a former head of state does not enjoy the benefit of immunity ratione materiae in respect of such tor-

ture after he has ceased to hold office.

In my opinion, the principle which I have described cannot be circumvented in this way. I observe first that the meaning of the word "functions" as used in this context is well established. The functions of, for example, a head of state are governmental functions, as opposed to private acts; and the fact that the head of state performs an act, other than a private act, which is criminal does not deprive it of its governmental character. This is as true of a serious crime, such as murder or torture, as it is of a lesser crime. As Lord Bingham of Cornhill C.J. said in the Divisional Court: ***218**

"a former head of state is clearly entitled to immunity in relation to criminal acts performed in the course of exercising public functions. One cannot therefore hold that any deviation from good democratic practice is outside the pale of immunity. If the former sovereign is immune from process in respect of some crimes, where does one draw the line?" It was in answer to that question that the appellants advanced the theory that one draws the line at crimes which may be called "international crimes." If, however, a limit is to be placed on governmental functions so as to exclude from them acts of torture within the Torture Convention, this can only be done by means of an implication arising from the Convention itself. Moreover, as I understand it, the only purpose of the proposed implied limitation upon the functions of public officials is to deprive them, or as in the present case a former head of state, of the benefit of state immunity; and in my opinion the policy which requires that such a result can only be achieved in a treaty by express agreement, with the effect that it cannot be so achieved by implication, renders it equally unacceptable that it should be achieved indirectly by means of an implication such as that now proposed.

**(d) An implication must in any event be rejected**

In any event, however, even if it were possible for such a result to be achieved by means of an implied term, there are, in my opinion, strong reasons why any such implication should be rejected.

I recognise that a term may be implied into a treaty, if the circumstances are such that "the parties must have intended to contract on the basis of the inclusion in the treaty of a provision whose effect can be stated

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

with reasonable precision;" see *Oppenheim's International Law* , vol. I, pp. 1271- 1272, n. 4. It would, however, be wrong to assume that a term may be implied into a treaty on the same basis as a term may be implied into an ordinary commercial contract, for example to give the contract business efficacy (as to which see *Treitel, The Law of Contract,* 9th ed. (1995), pp. 185 et seq.). This is because treaties are different in origin, and serve a different purpose. Treaties are the fruit of long negotiation, the purpose being to produce a draft which is acceptable to a number, often a substantial number, of state parties. The negotiation of a treaty may well take a long time, running into years. Draft after draft is produced of individual articles, which are considered in depth by national representatives, and are the subject of detailed comment and consideration. The agreed terms may well be the fruit of "horse-trading" in order to achieve general agreement, and proposed articles may be amended, or even omitted in whole or in part, to accommodate the wishes or anxieties of some of the negotiating parties. In circumstances such as these, it is the text of the treaty itself which provides the only safe guide to its terms, though reference may be made, where appropriate, to the travaux préparatoires. But implied terms cannot, except in the most obvious cases, be relied on as binding the state parties who ultimately sign the treaty, who will in all probability include those who were not involved in the preliminary negotiations. **\*219**

In this connection, however, I wish first to observe that the assumption underlying the present argument, viz. that the continued availability of state immunity is inconsistent with the obligations of state parties to the Convention, is in my opinion not justified. I have already summarised the principal articles of the Convention; and at this stage I need only refer to article 7 which requires that a state party under whose jurisdiction a person alleged to have committed torture is found, shall, in the cases contemplated in article 5, if it does not extradite him, submit the case to its competent authorities for the purpose of prosecution. I wish to make certain observations on these provisions. First of all, in the majority of cases which may arise under the Convention, no question of state immunity will arise at all, because the public official concerned is likely to be present in his own country. Even when such a question does arise, there is no reason to assume that state immunity will be asserted by the state of which the alleged torturer is a public official; on the contrary, it is only in unusual cases, such as the present, that this is likely to be done. In any event, however, not only is there no mention of state immunity in the Convention, but in my opinion it is not inconsistent with its express provisions that, if steps are taken to extradite him or to submit his case to the authorities for the purpose of prosecution, the appropriate state should be entitled to assert state immunity. In this connection, I comment that it is not suggested that it is inconsistent with the Convention that immunity ratione personae should be asserted; if so, I find it difficult to see why it should be inconsistent to assert immunity ratione materiae.

The danger of introducing the proposed implied term in the present case is underlined by the fact that there is, as Dr. Collins stressed to your Lordships, nothing in the negotiating history of the Torture Convention which throws any light on the proposed implied term. Certainly the travaux préparatoires shown to your Lordships reveal no trace of any consideration being given to waiver of state immunity. They do however show that work on the draft Convention was on foot as long ago as 1979, five years before the date of the Convention itself. It is surely most unlikely that during the years in which the draft was under consideration no thought was given to the possibility of the state parties to the Convention waiving state immunity. Furthermore, if agreement had been reached that there should be such a waiver, express provision would inevitably have been made in the Convention to that effect. Plainly, however, no such agreement was reached. There may have been recognition at an early stage that so many states would not be prepared to waive their immunity that the matter was not worth pursuing; if so, this could explain why the topic does not surface in the travaux préparatoires. In this connection it must not be overlooked that there are many reasons why states, although recognising that in certain circumstances jurisdiction should be vested in another national court in respect of acts of torture committed by public officials within their own jurisdiction, may nevertheless have considered it imperative that they should be able, if necessary, to assert state immunity. The Torture Convention applies not only to a series of acts of systematic torture, but to the commission of, even acquiescence in, a single act of physical or mental torture. Extradition can nowadays be sought, in some parts of the world, on the basis of a simple allegation unsupported by **\*220** prima facie evidence. In certain circumstances torture may, for compelling political reasons, be the subject of an amnesty, or some other form of settlement, in

[2000] 1 A.C. 147                                                                                                            Page 53

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

the state where it has been, or is alleged to have been, committed.

Furthermore, if immunity ratione materiae was excluded, former heads of state and senior public officials would have to think twice about travelling abroad, for fear of being the subject of unfounded allegations emanating from states of a different political persuasion. In this connection, it is a mistake to assume that state parties to the Convention would only wish to preserve state immunity in cases of torture in order to shield public officials guilty of torture from prosecution elsewhere in the world. Such an assumption is based on a misunderstanding of the nature and function of state immunity, which is a rule of international law restraining one sovereign state from sitting in judgment on the sovereign behaviour of another. As Lord Wilberforce said in I Congreso del Partido[1983] 1 A.C. 244, 272: "The whole purpose of the doctrine of state immunity is to prevent such issues being canvassed in the courts of one state as to the acts of another." State immunity ratione materiae operates therefore to protect former heads of state, and (where immunity is asserted) public officials, even minor public officials, from legal process in foreign countries in respect of acts done in the exercise of their functions as such, including accusation and arrest in respect of alleged crimes. It can therefore be effective to preclude any such process in respect of alleged crimes, including allegations which are misguided or even malicious - a matter which can be of great significance where, for example, a former head of state is concerned and political passions are aroused. Preservation of state immunity is therefore a matter of particular importance to powerful countries whose heads of state perform an executive role, and who may therefore be regarded as possible targets by governments of states which, for deeply felt political reasons, deplore their actions while in office. But, to bring the matter nearer home, we must not overlook the fact that it is not only in the United States of America that a substantial body of opinion supports the campaign of the I.R.A. to overthrow the democratic government of Northern Ireland. It is not beyond the bounds of possibility that a state whose government is imbued with this opinion might seek to extradite from a third country, where he or she happens to be, a responsible Minister of the Crown, or even a more humble public official such as a police inspector, on the ground that he or she has acquiesced in a single act of physical or mental torture in Northern Ireland. The well known case of Ireland v. United Kingdom (1978) 2 E.H.R.R. 25 provides an indication of circumstances in which this might come about.

Reasons such as these may well have persuaded possible state parties to the Torture Convention that it would be unwise to give up the valuable protection afforded by state immunity. Indeed, it would be strange if state parties had given up the immunity ratione materiae of a head of state which is regarded as an essential support for his immunity ratione personae. In the result, the subject of waiver of state immunity could well not have been pursued, on the basis that to press for its adoption would only imperil the very substantial advantages which could be achieved by **221** the Convention even if no waiver of state immunity was included in it. As I have already explained, in cases arising under the Convention, state immunity can only be relevant in a limited number of cases. This is because the offence is normally committed in the state to which the official belongs. There he is unprotected by immunity, and under the Convention the state has simply to submit the case to the competent authorities. In practice state immunity is relevant in only two cases - where the offender is present in a third state, or where the offender is present in a state one of whose nationals was the victim, that state being different from the state where the offence was committed. A case such as the present must be regarded as most unusual. Having regard to considerations such as these, not to press for exclusion of state immunity as a provision of the Convention must have appeared to be a relatively small price to pay for the major achievement of widespread agreement among states (your Lordships were informed that 116 states had signed the Convention) in respect of all the other benefits which the Convention conferred. After all, even where it was possible for a state to assert state immunity, in many cases it would not wish to expose itself to the opprobrium which such a course would provoke; and in such cases considerable diplomatic or moral pressure could be exerted upon it to desist.

I wish to stress the implications of the fact that there is no trace in the travaux préparatoires of any intention in the Convention to exclude state immunity. It must follow, if the present argument is correct, first that it was so obvious that it was the intention that immunity should be excluded that a term could be implied in the Convention to that effect, and second

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

that, despite that fact, during the negotiating process none of the states involved thought it right to raise the matter for discussion. This is remarkable. Moreover, it would have been the duty of the responsible senior civil servants in the various states concerned to draw the attention of their governments to the consequences of this obvious implication, so that they could decide whether to sign a Convention in this form. Yet nothing appears to have happened. There is no evidence of any question being raised, still less of any protest being made, by a single state party. The conclusion follows either that every state party was content without question that state immunity should be excluded sub silentio, or that the responsible civil servants in all these states, including the United Kingdom, failed in their duty to draw this very important matter to the attention of their governments. It is difficult to imagine that either of these propositions can be correct. In particular it cannot, I suspect, have crossed the minds of the responsible civil servants that state immunity was excluded sub silentio in the Convention.

 The cumulative effect of all these considerations is, in my opinion, to demonstrate the grave difficulty of recognising an implied term, whatever its form, on the basis that it must have been agreed by all the state parties to the Convention that state immunity should be excluded. In this connection it is particularly striking that, in Burgers and Danelius, Handbook on the Torture Convention, it is recognised, at p. 31, that the obligation of a state party, under article 5(1) of the Convention, to establish jurisdiction over offences of torture committed within its territory, is subject to an exception in the case of those benefiting from **222** special immunities, including foreign diplomats. It is true that this statement could in theory be read as limited to immunity ratione personae; but in the absence of explanation it should surely be read in the ordinary way as applicable both to immunity ratione personae and its concomitant immunity ratione materiae, and in any event the total silence in this passage on the subject of waiver makes it highly improbable that there was any intention that immunity ratione materiae should be regarded as having been implicitly excluded by the Convention. Had there been such an intention, the authors would have been bound to refer to it. They do not do so.

The background against which the Torture Convention is set adds to the improbability of the proposition

that the state parties to the Convention must have intended, directly or indirectly, to exclude state immunity ratione materiae. Earlier Conventions made provision for an international tribunal. In the case of such Conventions, no question of par in parem non habet imperium arose; but heads of state were expressly mentioned, so ensuring that they are subject to the jurisdiction of the international tribunal. In the case of the Taking of Hostages Convention and the Torture Convention, jurisdiction was vested in the national courts of state parties to the Convention. Here, therefore, for the first time the question of waiver of state immunity arose in an acute form. Curiously, the suggestion appears to be that state immunity was waived only in the case of the Torture Convention. Apart from that curiosity, however, for state parties to exclude state immunity in a Convention of this kind would be a remarkable surrender of the basic protection afforded by international law to all sovereign states, which underlines the necessity for immunity to be waived in a treaty, if at all, by express provision; and, having regard in particular to the express reference to heads of state in earlier Conventions, state parties would have expected to find an express provision in the Torture Convention if it had been agreed that state immunity was excluded. That it should be done by implication in the Torture Convention seems, in these circumstances, to be most improbable.

 I add that the fact that 116 states have become party to the Torture Convention reinforces the strong impression that none of them appreciated that, by signing the Convention, each of them would silently agree to the exclusion of state immunity ratione materiae. Had it been appreciated that this was so, I strongly suspect that the number of signatories would have been far smaller. It should not be forgotten that national representatives involved in the preliminary discussions would have had to report back to their governments about the negotiation of an important international convention of this kind. Had such a representative, or indeed a senior civil servant in a country whose government was considering whether the country should become a party to the Convention, been asked by his Secretary of State the question whether state immunity would be preserved, it is unlikely that a point would have occurred to him which had been overlooked by all the 14 counsel (including, as I have said, three distinguished professors of international law) appearing for the appellants and their supporters in the present case. It is far more

[2000] 1 A.C. 147                                                          Page 55
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

probable that he would have had in mind the clear and simple words of Rehnquist C.J. in the Amerada Hess case, 109 S.Ct. 683 and have answered that, since there *223 was no mention of state immunity in the Convention, it could not have been affected. This demonstrates how extraordinary it would be, and indeed what a trap would be created for the unwary, if state immunity could be waived in a treaty sub silentio. Common sense therefore supports the conclusion reached by principle and authority that this cannot be done.

**(e) Conclusion**

For these reasons I am of the opinion that the proposed implication must be rejected not only as contrary to principle and authority, but also as contrary to common sense.

**VII. The conclusion of Lord Hope of Craighead**

My noble and learned friend, Lord Hope of Craighead, having concluded that, so far as torture is concerned, only charges 2 and 4 (in so far as they apply to the period after 29 September 1988) and charge 30 survive the application of the double criminality point, has nevertheless concluded that the benefit of state immunity is not available to Senator Pinochet in respect of these three charges. He has reached this conclusion on the basis that (1) the two conspiracy charges, having regard to paragraph 9(3) of the extradition request, reveal charges that Senator Pinochet was party to a conspiracy to carry out a systematic, if not a widespread, attack on a section of the civil population, i.e. to torture those who opposed or might oppose his government, which would constitute a crime against humanity (see, e.g. , article 7(1) of the Rome Statute of the International Criminal Court 1998 ); and (2) the single act of torture alleged in charge 30 shows that an alleged earlier conspiracy to carry out such torture, constituting a crime against humanity, was still alive when that act was perpetrated after 29 September 1988. Furthermore, although he is (as I understand the position) in general agreement with Lord Slynn of Hadley's analysis, he considers that such a crime against humanity, or a conspiracy to commit such a crime, cannot be the subject of a claim to state immunity in a national court, even where it is alleged to have taken place before 1 January 1990.

I must first point out that, apart from the single act of torture alleged in charge 30, the only other cases of torture alleged to have occurred since 29 September 1988 are two cases, referred to in the extradition request but not made the subject of charges, which are alleged to have taken place in October 1988. Before that, there is one case alleged in 1984, before which it is necessary to go as far back as 1977. In these circumstances I find it very difficult to see how, after 29 September 1988, it could be said that there was any systematic or widespread campaign of torture, constituting an attack on the civilian population, so as to amount to a crime against humanity. Furthermore, in so far as it is suggested that the single act of torture alleged in charge 30 represents the last remnant of a campaign which existed in the 1970s, there is, quite apart from the factual difficulty of relating the single act to a campaign which is alleged to have been in existence so long ago, the question whether it would be permissible, in the context of extradition, to have regard to the earlier charges of torture, *224 excluded under the double criminality rule, in order to establish that the single act of torture was part of a campaign of systematic torture which was still continuing in June 1989. This raises a question under section 6(4)(b) and (5) of the Extradition Act 1989, provisions which are by no means clear in themselves or easy to apply in the unusual circumstances of the present case.

In truth, however, the real problem is that, since the appellants did not consider the position which would arise if they lost the argument on the double criminality point, they did not address questions of this kind. If they had done so, the matter would have been argued out before the Appellate Committee, and Miss Montgomery and Dr. Collins would have had an opportunity to reply and would no doubt have had a good deal to say on the subject. This is after all a criminal matter, and it is no part of the function of the court to help the prosecution to improve their case. In these circumstances it would not, in my opinion, be right to assist the prosecution by now taking such a point as this, when they have failed to do so at the hearing, in order to decide whether or not this is a case in which it would be lawful for extradition to take place.

I wish to add that, in any event, for the reasons given by Lord Slynn of Hadley to which I have already referred, I am of the opinion that in 1989 there was

[2000] 1 A.C. 147                                                                                    Page 56

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

no settled practice that state immunity ratione mate-
riae was not available in criminal proceedings before
a national court concerning an alleged crime
against humanity, or indeed as to what constituted a
crime against humanity: see [2000] 1 A.C. 61, 79c-d
and 80-81. This is a matter which I have already con-
sidered in Part IV of this opinion.

 For all these reasons I am, with great respect, unable
to accompany the reasoning of my noble and learned
friend on these particular points.

**VIII. Conclusion**

 For the above reasons, I am of the opinion that by far
the greater part of the charges against Senator Pino-
chet must be excluded as offending against the dou-
ble criminality rule; and that, in respect of the surviv-
ing charges - charge 9, charge 30 and charges 2 and 4
(in so far as they can be said to survive the double
criminality rule) - Senator Pinochet is entitled to the
benefit of state immunity ratione materiae as a former
head of state. I would therefore dismiss the appeal of
the Government of Spain from the decision of the
Divisional Court.

Lord Hope of Craighead.

 My Lords, this is an appeal against the decision of
the Divisional Court to quash the provisional war-
rants of 16 and 22 October 1998 which were issued
by the metropolitan stipendiary magistrate under
section 8(1)(b) of the Extradition Act 1989 . The ap-
plication to quash had been made on two grounds.
The first was that Senator Pinochet as a former head
of state of the Republic of Chile was entitled to im-
munity from arrest and extradition proceedings in the
United Kingdom in respect of acts committed when
he was head of state. The second was that the charges
which had been made against him specified conduct
which would not have been punishable in England
when the acts *225 were done, with the result that
these were not extradition crimes for which it would
be lawful for him to be extradited.

The Divisional Court quashed the first warrant, in
which it was alleged that Senator Pinochet had mur-
dered Spanish citizens in Chile, on the ground that it
did not disclose any offence for which he could be
extradited to Spain. Its decision on that point has not
been challenged in this appeal. It also quashed the

second warrant, in which it was alleged that Senator
Pinochet was guilty of torture, hostage-taking, con-
spiracy to take hostages and conspiracy to commit
murder. It did so on the ground that Senator Pinochet
was entitled to immunity as a former head of state
from the process of the English courts. The court held
that the question whether these were offences for
which, if he had no immunity, it would be lawful for
him to be extradited was not a matter to be consid-
ered in that court at that stage. But Lord Bingham of
Cornhill C.J. said that it was not necessary for this
purpose that the conduct alleged constituted a crime
which would have been punishable in this country at
the time when it was alleged to have been committed
abroad.

 When this appeal was first heard in your Lordships'
House the argument was directed almost entirely to
the question whether Senator Pinochet was entitled as
a former head of state to claim sovereign immunity in
respect of the charges alleged against him in the sec-
ond provisional warrant. It was also argued that the
offences of torture and hostage-taking were not of-
fences for which he could be extradited until these
became offences for which a person could be prose-
cuted extraterritorially in the United Kingdom. But
the second argument appears to have been regarded
as no more than a side issue at that stage. This is not
surprising in view of the terms of the second provi-
sional warrant. The offences which it specified ex-
tended over periods lasting well beyond the date
when the conduct became extraterritorial offences in
this country. Only Lord Lloyd of Berwick dealt with
this argument in his speech, and he confined himself
to one brief comment. He said that it involved a mis-
understanding of section 2 of the Extradition Act
1989 , as in his view section 2(1)(a) referred to con-
duct which would constitute an offence in the United
Kingdom now, not to conduct which would have
constituted an offence then: [2000] 1 A.C. 61, 88d-e.

**The offences alleged against Senator Pinochet**

 Four offences were set out in the second provisional
warrant of 22 October 1998. These were: (1) torture
between 1 January 1988 and December 1992; (2)
conspiracy to torture between 1 January 1988 and
31December 1992; (3) (a) hostage-taking and (b)
conspiracy to take hostages between 1 January 1982
and 31 January 1992; and (4) conspiracy to commit
murder between January 1976 and December 1992.

[2000] 1 A.C. 147                                                                                                                    Page 57
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

These dates must be compared with the date of the coup which brought Senator Pinochet to power in Chile, which was 11 September 1973, and the date when he ceased to be head of state, which was 11March 1990. Taking the dates in the second provisional warrant at their face value, it appears (a) that he was not being charged with any acts of torture prior to 1 January 1988, (b) that he was not being charged with **226** any acts of hostage-taking or conspiracy to take hostages prior to I January 1982 and (c) that he was not being charged with any conspiracy to commit murder prior to January 1976. On the other hand he was being charged with having committed these offences up to December 1992, well after the date when he ceased to be head of state in Chile.

The Government of Spain has taken the opportunity of the interval between the end of the first hearing of this appeal and the second hearing to obtain further details from the Spanish judicial authorities. It has explained that the provisional warrant was issued under circumstances of urgency and that the facts are more developed and complex than first appeared. And a number of things have happened since the date of the first hearing which, it is submitted, mean that the provisional warrant no longer has any life or effect. On 9 December 1998 the Secretary of State issued an authority to proceed under section 7(4) of the Act of 1989. On 10 December 1998 the Spanish indictment was preferred in Madrid, and on 24 December 1998 further particulars were drafted in accordance with article 13 of the European Convention on Extradition for furnishing with the extradition request.

Mr. Alun Jones for the appellants said that it would be inappropriate for your Lordships in these circumstances to confine an examination of the facts to those set out in the provisional warrant and that it would be unfair to deprive him of the ability to rely on material which has been served within the usual time limits imposed in the extradition process. He invited your Lordships to examine all the material which was before the Secretary of State in December, including the formal request which was signed at Madrid on 3 November 1998 and the further material which has now been submitted by the Spanish Government. Draft charges have been prepared, of the kind which are submitted in extradition proceedings as a case is presented to the magistrate at the begin-ning of the main hearing under s ection 9(8 ) of the Act. This has been done to demonstrate how the charges which are being brought by the Spanish judicial authorities may be expressed in terms of English criminal law, to show the offences which he would have committed by his conduct against the law of this country.

The crimes which are alleged in the Spanish request are murder on such a scale as to amount to genocide and terrorism, including torture and hostage-taking. The Secretary of State has already stated in his authority to proceed that Senator Pinochet is not to be extradited to Spain for genocide. So that part of the request must now be left out of account. But my impression is that the omission of the allegation of genocide is of little consequence in view of the scope which is given in Spanish law to the allegations of murder and terrorism.

It is not our function to investigate the allegations which have been made against Senator Pinochet, and it is right to place on record the fact that his counsel, Miss Montgomery, told your Lordships that they are all strenuously denied by him. It is necessary to set out the nature and some of the content of these allegations, on the assumption that they are supported by the information which the Spanish judicial authorities have made available. This is because they form an essential part of the background to the issues of law which have been raised in this appeal. But the following summary must not be taken as a statement that the **227** allegations have been shown to be true by the evidence, because your Lordships have not considered the evidence.

The material which has been gathered together in the extradition request by the Spanish judicial authorities alleges that Senator Pinochet was party to a conspiracy to commit the crimes of murder, torture and hostage-taking, and that this conspiracy was formed before the coup. He is said to have agreed with other military figures that they would take over the functions of government and subdue all opposition to their control of it by capturing and torturing those who opposed them, who might oppose them or who might be thought by others to be likely to oppose them. The purpose of this campaign of torture was not just to inflict pain. Some of those who were to be tortured were to be released, to spread words of the steps that would be taken against those who opposed

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                                                                                    Page 58

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

the conspirators. Many of those who were to be tortured were to be subjected to various other forms of atrocity, and some of them were to be killed. The plan was to be executed in Chile and in several other countries outside Chile.

When the plan was put into effect victims are said to have been abducted, tortured and murdered pursuant to the conspiracy. This was done first in Chile, and then in other countries in South America, in the United States and in Europe. Many of the acts evidencing the conspiracy are said to have been committed in Chile before 11 September 1973. Some people were tortured at a naval base in August 1973. Large numbers of persons were abducted, tortured and murdered on 11 September 1973 in the course of the coup before the junta took control and Senator Pinochet was appointed its President. These acts continued during the days and weeks after the coup. A period of repression ensued, which is said to have been at its most intense in 1973 and 1974. The conspiracy is said to have continued for several years thereafter, but to have declined in intensity during the decade before Senator Pinochet retired as head of state on 11 March 1990. It is said that the acts committed in other countries outside Chile are evidence of the primary conspiracies and of a variety of sub-conspiracies within those states.

The draft charges which have been prepared in order to translate these broad accusations into terms of English law may be summarised as follows: (1) conspiracy to torture between 1 January 1972 and 10 September 1973 and between 1 August 1973 and 1 January 1990 - charges 1, 2 and 5; (2) conspiracy to take hostages between 1 August 1973 and 1 January 1990 - charge 3; (3) conspiracy to torture in furtherance of which murder was committed in various countries including Italy, France, Spain and Portugal between 1 January 1972 and 1 January 1990 - charge 4; (4) torture between 1 August 1973 and 8 August 1973 and on 11 September 1973 - charges 6 and 8 (there is no charge 7); (5) conspiracy to murder in Spain between 1 January 1975 and 31 December 1976 and in Italy on 6 October 1975 - charges 9 and 12; (6) attempted murder in Italy on 6 October 1975 - charges 10 and 11; (7) torture on various occasions between 11 September 1973 and May 1977 - charges 13 to 29 and 31 to 32; and (8) torture on 24 June 1989 - charge 30.

This summary shows that some of the alleged conduct relates to the period before the coup when Senator Pinochet was not yet head of state. Charges 1 and 5 (conspiracy to torture) and charge 6 (torture) relate **\*228** exclusively to that period. Charges 2 and 4 (conspiracy to torture) and charge 3 (conspiracy to take hostages) relate to conduct over many years including the period before the coup. None of the conduct now alleged extends beyond the period when Senator Pinochet ceased to be head of state.

Only one charge (charge 30 - torture on 24 June 1989) relates exclusively to the period after 29 September 1988 when section 134 of the Criminal Justice Act 1988 , to which I refer later, was brought into effect. But charges 2 and 4 (conspiracy to torture) and charge 3 (conspiracy to take hostages) which relate to conduct over many years extend over this period also. Two acts of torture which are said to have occurred between 21 and 28 October 1988 are mentioned in the extradition request. They have not been included as separate counts in the list of draft charges, but it is important not to lose sight of the fact that the case which is being made against Senator Pinochet by the Spanish judicial authorities is that each act of torture has to be seen in the context of a continuing conspiracy to commit torture. As a whole, the picture which is presented is of a conspiracy to commit widespread and systematic torture and murder in order to obtain control of the government and, having done so, to maintain control of government by those means for as long as might be necessary.

Against that background it is necessary first to consider whether the relevant offences for the purposes of this appeal are those which were set out in the second provisional warrant or those which are set out in the draft charges which have been prepared in the light of the further information which has been obtained from the Spanish judicial authorities.

On one view it might be said that, as the appeal is against the decision of the Divisional Court to quash the second provisional warrant, your Lordships should be concerned only with the charges which were set out in that document. If that warrant was bad on the ground that the charges which it sets out are charges in respect of which Senator Pinochet has immunity, everything else that has taken place in reliance upon that warrant must be bad also. If he was entitled to immunity, no order should have been

[2000] 1 A.C. 147                                                                                          Page 59
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

made against him in the committal proceedings and the Secretary of State should not have issued an authority to proceed. But article 13 of the European Convention on Extradition (1957 ) which, following the enactment of the Extradition Act 1989, the United Kingdom has now ratified (see the European Convention on Extradition Order 1990 (S.I. 1990 No. 1507)), provides that if the information communicated by the requesting party is found to be insufficient to allow the requested party to make a decision in pursuance of the Convention the requested party may ask for the necessary supplementary information to be provided to it by the requesting party.

It is clear that the first provisional warrant was prepared in circumstances of some urgency, as it was believed that Senator Pinochet was about to leave the United Kingdom in order to return to Chile. Once begun, the procedure was then subject to various time limits. There was also the problem of translating the Spanish accusations, which cover so many acts over so long a period, into the terms of English criminal law. I do not think that it is surprising that the full extent of the allegations *229 which were being made was not at first appreciated. In my opinion the Spanish judicial authorities were entitled to supplement the information which was originally provided in order to define more clearly the charges which were the subject of the request. On this view it would be right to regard the material which is now available as explanatory of the charges which the second provisional warrant was intended to comprise. Mr. Clive Nicholls for Senator Pinochet said that he was content with this approach in the interests of finality.

**Are the alleged offences "extradition crimes?"**

 If your Lordships are willing, as I suggest we should be, to examine this material it is necessary to subject it to further analysis. The starting point is section 1(1) of the Extradition Act 1989, which provides that a person who is accused in a foreign state of the commission of an extradition crime may be arrested and returned to that state in accordance with the extradition procedures in Part III of the Act. The expression "extradition crime" is defined in section 2 of the Act under two headings. The first, which is set out in section 2(1)(a), refers to:

"conduct in the territory of a foreign state ... which, if it occurred in the United Kingdom, would constitute an offence punishable with imprisonment for a term of 12 months, or any greater punishment, and which, however described in the law of the foreign state, Commonwealth country or colony, is so punishable under that law." The second, which is set out in section 2(1)(b) read with section 2(2), refers to an extraterritorial offence against the law of a foreign state which is punishable under that law with imprisonment for a term of 12 months or any greater punishment, and which in corresponding circumstances would constitute an extraterritorial offence against the law of the United Kingdom punishable with imprisonment for a term of 12 months or any greater punishment.

For reasons which have been explained by my noble and learned friend, Lord Browne-Wilkinson, the critical issue on the question of sovereign immunity relates to the effect of the United Nations Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment of 10 December 1984 and the offences which allege torture. As to those alleged offences which do not fall within the scope of the Torture Convention and which could not be prosecuted here under section 134 of the Criminal Justice Act 1988, any loss of immunity would have to be decided on other grounds. But there is no need to examine this question in the case of those alleged offences for which Senator Pinochet could not in any event be extradited. The purpose of the following analysis is to remove from the list of draft charges those charges which fall into that category either because they are not extradition crimes as defined by section 2 of the Extradition Act 1989 or because for any other reason other than on grounds of immunity they are charges on which Senator Pinochet could not be extradited.

This analysis proceeds on the basis that the definition of the expression "extradition crime" in section 2 of the Act of 1989 requires the conduct *230 which is referred to in section 2(1)(a) to have been an offence which was punishable in the United Kingdom when that conduct took place. It also proceeds on the basis that it requires the extraterritorial offence which is referred to in section 2(1)(b) to have been an extraterritorial offence in the United Kingdom on the date when the offence took place. The principle of double criminality would suggest that this was the right approach, in the absence of an express provision to the contrary. The tenses used in section 2 seem to me to

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

be equivocal on this point. They leave it open to ex-amination in the light of the provisions of the Act as a whole. The argument in favour of the date when the conduct took place has particular force in the case of those offences listed in section 22(4) of the Act. These have been made extraterritorial offences in order to give effect to international conventions, but neither the conventions nor the provisions which gave effect to them were intended to operate retro-spectively.

I respectfully agree with the reasons which my noble and learned friend, Lord Browne-Wilkinson, has given for construing the definition as requiring that the conduct must have been punishable in the United Kingdom when it took place, and that it is not suffi-cient for the appellants to show that it would be pun-ishable here were it to take place now.

**Hostage-taking**

 An offence under the Taking of Hostages Act 1982 is one of those offences, wherever the act takes place, which is deemed by section 22(6) of the Extradition Act 1989 to be an offence committed within the terri-tory of any other state against whose law it is an of-fence. This provision gives effect to the International Convention against the Taking of Hostages of 18 December 1979 (1983 ) (Cmnd. 9100). Under section 1 of the Act of 1982 hostage-taking is an extraterrito-rial offence against the law of the United Kingdom. Section 1(1) of that Act defines the offence in these terms:

"A person, whatever his nationality, who, in the United Kingdom or elsewhere - (a) detains any other person ('the hostage'), and (b) in order to compel a state, international governmental organisation or per-son to do or to abstain from doing any act, threatens to kill, injure or continue to detain the hostage, com-mits an offence." Mr. Jones accepted that he did not have particulars of any case of hostage-taking. He said that his case was that Senator Pinochet was in-volved in a conspiracy to take hostages for the pur-poses which were made unlawful by section 1 of the Act. Charge 3 of the draft charges, which is the only charge which alleges conspiracy to take hostages, states that the course of conduct which was to be pur-sued was to include the abduction and torture of per-sons as part of a campaign to terrify and subdue those who were disposed to criticise or oppose Senator

Pinochet or his fellow conspirators. Those who were not detained were to be intimidated, through the ac-counts of survivors and by rumour, by fear that they might suffer the same fate. Those who had been de-tained were to be compelled to divulge information to the conspirators by the threatened *231 injury and detention of others known to the abducted persons by the conspirators.

But there is no allegation that the conspiracy was to threaten to kill, injure or detain those who were being detained in order to compel others to do or to abstain from doing any act. The narrative shows that the al-leged conspiracy was to subject persons already de-tained to threats that others would be taken and that they also would be tortured. This does not seem to me to amount to a conspiracy to take hostages within the meaning of section 1 of the Act of 1982. The pur-pose of the proposed conduct, as regards the detained persons, was to subject them to what can best be de-scribed as a form of mental torture.

 One of the achievements of the Torture Convention was to provide an internationally agreed definition of torture which includes both physical and mental tor-ture in the terms set out in article 1:

"For the purposes of this Convention, 'torture' means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a per-son for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind ..." The offence of torture under English law is constituted by section 134(1) of the Criminal Justice Act 1988, which pro-vides:

"A public official or person acting in an official ca-pacity, whatever his nationality, commits the offence of torture if in the United Kingdom or elsewhere he intentionally inflicts severe pain or suffering on an-other in the performance or purported performance of his official duties." Section 134(3) provides that it is immaterial whether the pain or suffering is physical or mental and whether it is caused by an act or an omission. So, in conformity with the Convention, the offence includes mental as well as physical torture. It seems to me that the conspiracy which charge 3 al-

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

leges against Senator Pinochet was a conspiracy to inflict mental torture, and not a conspiracy to take hostages.

I would hold therefore that it is not necessary for your Lordships to examine the Hostage Convention in order to see whether its terms were such as to deprive a former head of state of any immunity from a charge that he was guilty of hostage-taking. In my opinion Senator Pinochet is not charged with the offence of hostage-taking within the meaning of section 1(1) of the Taking of Hostages Act 1982.

**Conspiracy to murder and attempted murder**

 The charges of conspiracy to torture include allegations that it was part of the conspiracy that some of those who were abducted and tortured would thereafter be murdered. Charge 4 alleges that in furtherance of that agreement about four thousand persons of many nationalities were murdered in Chile and in various other countries outside Chile. Two other *232 charges, charges 9 and 12, allege conspiracy to murder - in one case of a man in Spain and in the other of two people in Italy. Charge 9 states that Senator Pinochet agreed in Spain with others who were in Spain, Chile and France that the proposed victim would be murdered in Spain. Charge 12 does not say that anything was done in Spain in furtherance of the alleged conspiracy to murder in Italy. There is no suggestion in either of these charges that the proposed victims were to be tortured. Two further charges, charges 10 and 11, allege the attempted murder of the two people in Italy who were the subject of the conspiracy to commit murder there. Here again there is no suggestion that they were to be tortured before they were murdered.

Murder is a common law crime which, before it became an extraterritorial offence if committed in a convention country under section 4 of the Suppression of Terrorism Act 1978 , could not be prosecuted in the United Kingdom if it was committed abroad except in the case of a murder committed abroad by a British citizen: Offences against the Person Act 1861 (24 & 25 Vict. c. 100), section 9, as amended. A murder or attempted murder committed by a person in Spain, whatever his nationality, is an extradition crime for the purposes of his extradition to Spain from the United Kingdom under section 2(1)(a) of the Extradition Act 1989 as it is conduct which would

be punishable here if it occurred in this country. But the allegation relating to murders in Spain and elsewhere which is made against Senator Pinochet is not that he himself murdered or attempted to murder anybody. It is that the murders were carried out, or were to be carried out, in Spain and elsewhere as part of a conspiracy and that he was one of the conspirators.

Section 1 of the Criminal Law Act 1977 created a new statutory offence of conspiracy to commit an offence triable in England and Wales. The offence of conspiracy which was previously available at common law was abolished by section 5. Although the principal offence was defined in the statute more narrowly, in other respects it codified the pre-existing law. It came into force on 1 December 1977 (S.I. 1977 No. 1682 (C.58)). Subsection (4) of that section provides:

"In this Part of this Act 'offence' means an offence triable in England and Wales, except that it includes murder notwithstanding that the murder in question would not be so triable if committed in accordance with the intention of the parties to the agreement." The effect of that subsection is that a person, whatever his nationality, who agrees in England to a course of conduct which will involve the offence of murder abroad may be prosecuted here for the offence of conspiracy to murder even although the murder itself would not have been triable in this country. It re-enacted a provision to the same effect in section 4 of the Offences against the Person Act 1861 , which it in part repealed: see Schedule 13 to the Act of 1977. Section 4 of the Act of 1861 was in these terms:

"All persons who shall conspire, confederate, and agree to murder any person, whether he be a subject of Her Majesty or not, and whether he be within the Queen's Dominions or not, and whosoever *233 shall solicit, encourage, persuade, or endeavour to persuade, or shall propose to any person, to murder any other person, whether he be a subject of Her Majesty or not, and whether he be within the Queen's Dominions or not, shall be guilty of a misdemeanour, and being convicted thereof shall be liable, at the discretion of the court, to be kept in penal servitude for any term not more than 10 and not less than three years - or to be imprisoned for any term not exceeding two years, with or without hard labour." So the conduct

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                                         Page 62
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

which is alleged against Senator Pinochet in charge 9 - that between 1 January 1975 and 31 December 1976 he was a party to a conspiracy in Spain to murder someone in Spain - *is* an offence for which he could, unless protected by immunity, be extradited to Spain under reference to section 4 of the Act of 1861, as it remained in force until the relevant part of it was repealed by the Act of 1977. This is because his participation in the conspiracy in Spain was conduct by him in Spain for the purposes of section 2(1)(a) of the Extradition Act 1989.

The conduct which is alleged against him in charge 4 is that he was a party to a conspiracy to murder, in furtherance of which about four thousand people were murdered in Chile and in various countries outside Chile including Spain. It is implied that this conspiracy was in Chile, so I would hold that this is *not* conduct by him in Spain for the purposes of section 2(1)(a) of Act of 1989. The question then is whether it is an extraterritorial offence within the meaning of section 2(1)(b) of that Act.

A conspiracy to commit a criminal offence in England is punishable here under the common law rules as to extraterritorial conspiracies even if the conspiracy was formed outside England and nothing was actually done in this country in furtherance of the conspiracy: Somchai Liangsiriprasert v. Government of the United States of America [1991] 1 A.C. 225. In that case it was held by the Judicial Committee, applying the English common law, that a conspiracy to traffic in a dangerous drug in Hong Kong entered into in Thailand could be tried in Hong Kong although no act pursuant to that conspiracy was done in Hong Kong. Lord Griffiths, delivering the judgment of the Board, said, at p. 251:

"Their Lordships can find nothing in precedent, comity or good sense that should inhibit the common law from regarding as justiciable in England inchoate crimes committed abroad which are intended to result in the commission of criminal offences in England."

 In Reg. v. Sansom [1991] 2 Q.B. 130 the appellants had been charged with conspiracy contrary to section 1 of the Criminal Law Act 1977, which does not in terms deal with extraterritorial conspiracies. The Court of Appeal rejected the argument that the principle laid down in the Somchai case referred only to the common law and that it could not be applied to

conspiracies charged under the Act of 1977. Taylor L.J. said, at p. 138b, that it should now be regarded as the law of England on this point.

As Lord Griffiths observed in the Somchai case, at p. 244c, it is still true, as a broad general statement, that English criminal law is local in its effect and that the criminal law does not concern itself with crimes committed abroad. But I consider that the common law of England **\*234** would, applying the rule laid down in the Somchai case, also regard as justiciable in England a conspiracy to commit an offence anywhere which was triable here as an extraterritorial offence in pursuance of an international convention, even although no act was done here in furtherance of the conspiracy. I do not think that this would be an unreasonable extension of the rule. It seems to me that on grounds of comity it would make good sense for the rule to be extended in this way in order to promote the aims of the Convention.

Prior to the coming into force of the Suppression of Terrorism Act 1978, a conspiracy which was formed outside this country to commit murder in some country other than England in pursuance of which nothing was done in England to further that conspiracy would not be punishable in England, as it was not the intention that acts done in pursuance of the conspiracy would result in the commission of a criminal offence in this country. The presumption against the extraterritorial application of the criminal law would have precluded such conduct from being prosecuted here. Section 4(1) of the Act of 1978 gives the courts of the United Kingdom jurisdiction over a person who does any act in a convention country which, if he had done that act in a part of the United Kingdom, would have made him guilty in that part of the United Kingdom of an offence mentioned in some, but not all, of the paragraphs of Schedule 1 to that Act. Murder is one of the offences to which that provision applies. But that Act, which was passed to give effect to the European Convention on the Suppression of Terrorism of 27 January 1977 , did not come into force until 21 August 1978 (S.I. 1978 No. 1063 (C.28)). And Chile is not a Convention country for the purposes of that Act, nor is it one of the non-Convention countries to which its provisions have been applied by section 5 of the Act of 1978. Only two non-Convention countries have been so designated. These are the United States (S.I. 1986 No. 2146) and India (S.I. 1993 No. 2533).

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

Applying these principles, the only conduct alleged against Senator Pinochet as conspiracy to murder in charge 4 for which he could be extradited to Spain is that part of it which alleges that he was a party to a conspiracy in Spain to commit murder in Spain prior to 21 August 1978. As for the allegation that he was a party to a conspiracy in Spain or elsewhere to commit murder in a country which had been designated as a convention country after that date, the extradition request states that acts in furtherance of the conspiracy took place in France in 1975, in Spain in 1975 and 1976 and in the United States and Portugal in 1976. These countries have now been designated as countries to which the Suppression of Terrorism Act 1978 applies. But the acts which are alleged to have taken place there all predate the coming into force of that Act. So the extraterritorial jurisdiction cannot be applied to them.

The alleged offences of attempted murder in Italy are not, as such, offences for which Senator Pinochet could be extradited to Spain under reference to section 2(1)(a) of the Act of 1989 because the alleged conduct did not take place in Spain and because he is not of Spanish nationality. But for their date they would have been offences for which he could have been extradited from the United Kingdom to Spain under reference to section 2(1)(b), on the grounds, first, that murder is now an extraterritorial **235** offence under section 4(1)(a) of the Suppression of Terrorism Act 1978 as it is an offence mentioned in paragraph 1 of Schedule 1 to that Act, Italy has been designated as a Convention country (S.I. 1986 No. 1137) and, second, that an offence of attempting to commit that offence is an extraterritorial offence under section 4(1)(b) of the Act of 1978. But the attempted murders in Italy which are alleged against Senator Pinochet are said to have been committed on 6 October 1975. As the Act of 1978 was not in force on that date, these offences are not capable of being brought within the procedures laid down by that Act.

Finally, to complete the provisions which need to be reviewed under this heading, mention should be made of an amendment which was made to Schedule 1 to the Suppression of Terrorism Act 1978 by section 22 of the Criminal Justice Act 1988, which includes within the list of offences set out in that schedule the offence of conspiracy. That section appears in Part I of the Act of 1988, most of which was repealed before having been brought into force following the enactment of the Extradition Act 1989. But section 22 was not repealed. It was brought into force on 5 June 1990 (S.I. 1990 No. 1145 (C.32)). It provides that there shall be added at the end of the Schedule a new paragraph in these terms: "21. An offence of conspiring to commit any offence mentioned in a preceding paragraph of this Schedule." At first sight it might seem that the effect of this amendment was to introduce a statutory extraterritorial jurisdiction in regard to the offence of conspiracy, wherever the agreement was made to participate in the conspiracy. But this offence does not appear in the list of offences in that Schedule in respect of which section 4(1) of the Suppression of Terrorism Act 1978 gives jurisdiction, if committed in a Convention country, as extraterritorial offences. In any event section 22 was not brought into force until 5 June 1990 (S.I. 1990 No. 1145 (C.32)). This was after that date when Senator Pinochet is alleged to have committed the offence of conspiracy.

**Torture and conspiracy to torture**

Torture is another of those offences, wherever the act takes place, which is deemed by section 22(6) of the Extradition Act 1989 to be an offence committed within the territory of any other state against whose law it is an offence. This provision gives effect to the Torture Convention of 10 December 1984. But section 134 of the Criminal Justice Act 1988 also gave effect to the Torture Convention. It made it a crime under English law for a public official or a person acting in an official capacity to commit acts of both physical and mental torture: see subsection (3). And it made such acts of torture an extraterritorial offence wherever they were committed and whatever the nationality of the perpetrator: see subsection (1). Read with the broad definition which the expression "torture" has been given by article 1 of the Convention and in accordance with ordinary principles, the offence which section 134 lays down must be taken to include the ancillary offences of counselling, procuring, commanding and aiding or abetting acts of torture and of being an accessory before or after the fact to such acts. All of these offences became extraterritorial offences against the law of the United Kingdom within the **236** meaning of section 2(2) of the Extradition Act 1989 as soon as section 134 was brought into force on 29 September 1988.

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

Section 134 does not mention the offence of conspiracy to commit torture, nor does article 1 of the Convention, nor does section 22(6) of the Extradition Act 1989. So, while the courts of the United Kingdom have extraterritorial jurisdiction under section 134 over offences of official torture wherever in the world they were committed, that section does not give them extraterritorial jurisdiction over a conspiracy to commit torture in any other country where the agreement was made outside the United Kingdom and no acts in furtherance of the conspiracy took place here. Nor is it conduct which can be deemed to take place in the territory of the requesting country under section 22(6) of the Act of 1989.

 However, the general statutory offence of conspiracy under section 1 of the Criminal Law Act 1977 extends to a conspiracy to commit any offence which is triable in England and Wales. Among those offences are all the offences over which the courts in England and Wales have extraterritorial jurisdiction, including the offence under section 134 of the Act of 1988. And, for reasons already mentioned, I consider that the common law rule as to extraterritorial conspiracies laid down in Somchai Liangsiriprasert v. Government of the United States of America [1991] 1 A.C. 225 applies if a conspiracy which was entered into abroad was intended to result in the commission of an offence, wherever it was intended to be committed, which is an extraterritorial offence in this country. Accordingly the courts of this country could try Senator Pinochet for acts of torture in Chile and elsewhere after 29 September 1988, because they are extraterritorial offences under section 134 of the Act of 1988. They could also try him here for conspiring in Chile or elsewhere after that date to commit torture, wherever the torture was to be committed, because torture after that date is an extraterritorial offence and the courts in England have jurisdiction over such a conspiracy at common law.

**Torture prior to 29 September 1989**

 Section 134 of the Criminal Law Act 1988 did not come into force until 29 September 1988. But acts of physical torture were already criminal under English law. Among the various offences against the person which would have been committed by torturing would have been the common law offence of assault occasioning actual bodily harm or causing injury and the statutory offence under section 18 of the Offences against the Person Act 1861 of wounding with intent to cause grievous bodily harm. A conspiracy which was entered into in England to commit these offences in England was an offence at common law until the common law offence was replaced on 1 December 1977 by the statutory offence of conspiracy in section 1 of the Criminal Law Act 1977 which remains in force and available. As I have said, I consider that a conspiracy which was entered into abroad to commit these offences in England would be triable in this country under the common law rule as to extraterritorial conspiracies which was laid down in Somchai Liangsiriprasert v. Government of the United States of America [1991] 1 A.C. 225 applies if they were extraterritorial offences at the time of the alleged conspiracy. ***237**

However none of these offences, if committed prior to the coming into force of section 134 of the Criminal Justice Act 1988, could be said to be extraterritorial offences against the law of the United Kingdom within the meaning of section 2(2) of the Extradition Act 1989 as there is no basis upon which they could have been tried extraterritorially in this country. The offences listed in Schedule 1 to the Suppression of Terrorism Act 1978 include the common law offence of assault and the statutory offences under the Offences against the Person Act 1861. But none of these offences are included in the list of offences which are made extraterritorial offences if committed in a convention country by section 4(1) of the Extradition Act 1989. So the rule laid down in the Somchai case cannot be applied to any conspiracy to commit these offences in any country outside England, as it would not be an extraterritorial conspiracy according to English law. Senator Pinochet could only be extradited to Spain for such offences under reference to section 2(1)(a) of the Act of 1989 if he was accused of conduct in Spain which, if it occurred in the United Kingdom, would constitute an offence which would be punishable in this country. Section 22(6) of the Act of 1989 is of no assistance, because torture contrary to the Torture Convention had not yet become an offence in this country.

None of the charges of conspiracy to torture and none of the various torture charges allege that Senator Pinochet did anything in Spain which might qualify under section 2(1)(a) of the Act of 1989 as conduct in that country. All one can say at this stage is that, if the information presented to the magistrate under

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

section 9(8) of the Act of 1989 in regard to charge 4 were to demonstrate (i) that he did something *in Spain* prior to 29 September 1988 to commit acts of torture there, or (ii) that he was party to a conspiracy *in Spain* to commit acts of torture *in Spain* , that *would* be conduct in Spain which would meet the requirements of section 2(1)(a) of that Act.

**Torture after 29 September 1989**

 The effect of section 134 of the Criminal Justice Act 1988 was to make acts of official torture, wherever they were committed and whatever the nationality of the offender, an extraterritorial offence in the United Kingdom. The section came into force two months after the passing of the Act on 29 September 1988, and it was not retrospective. As from that date official torture was an extradition crime within the meaning of section 2(1) of the Extradition Act 1989 because it was an extraterritorial offence against the law of the United Kingdom.

 The general offence of conspiracy which was introduced by section 1 of the Criminal Law Act 1977 applies to any offence triable in England and Wales: section 1(4). So a conspiracy which took place here after 29 September 1988 to commit offences of official torture, wherever the torture was to be carried out and whatever the nationality of the alleged torturer, is an offence for which Senator Pinochet could be tried in this country if he has no immunity. This means that a conspiracy to torture which he entered into in Spain after that date is an offence for which he could be extradited to Spain, as it would be an extradition offence under section 2(1)(a) of the Act of 1989. But, as I have said, I consider that the **\*238** common law of England would, applying the rule laid down in Somchai Liangsiriprasert v. Government of the United States of America [1991] 1 A.C. 225, also regard as justiciable in England a conspiracy to commit an offence which was triable here as an extraterritorial offence in pursuance of an international convention, even although no act was done here in furtherance of the conspiracy. This means that he could be extradited to Spain under reference to section 2(1)(b) of the Act of 1989 on charges of conspiracy to torture entered into anywhere which related to periods after that date. But, as section 134 of the Act of 1988 does not have retrospective effect, he could not be extradited to Spain for any conduct in Spain or elsewhere amounting to a conspiracy to commit tor-

ture, wherever the torture was to be carried out, which occurred before 29 September 1988.

The conduct which is alleged against Senator Pinochet under the heading of conspiracy in charge 4 is not confined to the allegation that he was a party to an agreement that people were to be tortured. Included in that charge is the allegation that many people in various countries were murdered after being tortured in furtherance of the conspiracy that they would be tortured and then killed. So this charge includes charges of torture as well as conspiracy to torture. And it is broad enough to include the ancillary offences of counselling, procuring, commanding, aiding or abetting, or of being accessory before or after the fact to, these acts of torture. Ill-defined as this charge is, I would regard it as including allegations of torture and of conspiracy to torture after 29 September 1988 for which, if he has no immunity, Senator Pinochet could be extradited to Spain on the ground that, as they were extraterritorial offences against the law of the United Kingdom, they were extradition crimes within the meaning of section 2(1) of the Act of 1989.

 What is the effect of the qualification which I have just mentioned, as to the date on which these allegations of torture and conspiracy to torture first became offences for which, at the request of Spain, Senator Pinochet could be extradited? In the circumstances of this case its effect is a profound one. It is to remove from the proceedings the entire course of such conduct in which Senator Pinochet is said to have engaged from the moment he embarked on the alleged conspiracy to torture in January 1972 until 29 September 1988. The only offences of torture and conspiracy to torture which are punishable in this country as extraterritorial offences against the law of the United Kingdom within the meaning of section 2(2) of the Act of 1989 are those offences of torture and conspiracy to torture which he is alleged to have committed on or after 29 September 1988. But almost all the offences of torture and murder, of which there are alleged to have been about 4,000 victims, were committed during the period of repression which was at its most intense in 1973 and 1974. The extradition request alleges that during the period from 1977 to 1990 only about 130 such offences were committed. Of that number only three have been identified in the extradition request as having taken place after 29 September 1988. Of the various offences which are

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

listed in the draft charges only charge 30, which refers to one act of official torture in Chile on 24 June 1989, relates exclusively to the period after 29 September 1988. Two of the charges of conspiracy to commit torture extend in part over **\*239** the period after that date. Charge 2 alleges that Senator Pinochet committed this offence during the period from 1 August 1973 to 1 January 1990, but it does not allege that any acts of torture took place in furtherance of that conspiracy. Charge 4 alleges that he was party to a conspiracy to commit torture in furtherance of which acts of murder following torture were committed in various countries including Spain during the period from 1 January 1972 to 1 January 1990. The only conduct alleged in charges 2 and 4 for which Senator Pinochet could be extradited to Spain is that part of the alleged conduct which relates to the period after 29 September 1988.

Although the allegations of conspiracy to torture in charge 2 and of torture and conspiracy to torture in charge 4 must now be restricted to the period from 29 September 1988 to 1 January 1990, the fact that these allegations remain available for the remainder of the period is important because of the light which they cast on the single act of torture alleged in charge 30. For reasons which I shall explain later, I would find it very difficult to say that a former head of state of a country which is a party to the Torture Convention has no immunity against an allegation of torture committed in the course of governmental acts which related only to one isolated instance of alleged torture. But that is not the case which the Spanish judicial authorities are alleging against Senator Pinochet. Even when reduced to the period from 29 September 1988 until he left office as head of state, when the provisions for specialty protection in section 6(4) of the Extradition Act 1989 would ensure was the only period in respect of which the Spanish judicial authorities would be entitled to bring charges against him if he were to be extradited, the allegation is that he was a party to the use of torture as a systematic attack on all those who opposed or who might oppose his government.

The extradition request states that between August 1977, when the National Intelligence Directorate (D.I.N.A.) was dissolved and replaced by the National Intelligence Bureau (C.N.I.), the C.N.I., the Directorate of Communications of the Militarised Police (D.I.C.O.M.C.A.R.) and the Avenging Martyrs

Commando (C.O.V.E.R.M.A.), while engaged in a policy of repression acting on orders emanating from Augusto Pinochet, systematically performed torture on detainees. Among the methods which are said to have been used was the application of electricity to sensitive parts of the body, and it is alleged that the torture sometimes led to the victim's death. Charge 30 alleges that the victim died after having been tortured by inflicting electric shock. The two victims of an incident in October 1988, which is mentioned in the extradition request but is not the subject of a separate count in the list of draft charges, are said to have shown signs of the application of electricity after autopsy. It appears that the evidence has revealed only these three instances after 29 September 1988 when acts of official torture were perpetrated in pursuance of this policy. Even so, this does not affect the true nature and quality of those acts. The significance of charges 2 and 4 may be said to lie in the fact that they show that a policy of systematic torture was being pursued when those acts were perpetrated.

I must emphasise that it is not our function to consider whether or not the evidence justifies this inference, and I am not to be taken as saying that **\*240** it does. But it is plain that the information which is before us is capable of supporting the inference that the acts of torture which are alleged during the relevant period were of that character. I do not think that it would be right to approach the question of immunity on a basis which ignores the fact that this point is at least open to argument. So I consider that the argument that Senator Pinochet has no immunity for this reduced period is one which can properly be examined in the light of developments in customary international law regarding the use of widespread or systematic torture as an instrument of state policy.

**Charges which are relevant to the question of immunity**

The result of this analysis is that the only charges which allege extradition crimes for which Senator Pinochet could be extradited to Spain if he has no immunity are: (1) those charges of conspiracy to torture in charge 2, of torture and conspiracy to torture in charge 4 and of torture in charge 30 which, irrespective of where the conduct occurred, became extraterritorial offences as from 29 September 1988 under section 134 of the Criminal Justice Act 1988 and under the common law as to extra territorial con-

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                                                Page 67

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

spiracies; (2) the conspiracy *in Spain* to murder *in Spain* which is alleged in charge 9; (3) such conspiracies *in Spain* to commit murder in Spain and such conspiracies *in Spain* prior to 29 September 1988 to commit acts of torture *in Spain* , as can be shown to form part of the allegations in charge 4.

So far as the law of the United Kingdom is concerned, the only country where Senator Pinochet could be put on trial for the full range of the offences which have been alleged against him by the Spanish judicial authorities is Chile.

**State immunity**

Section 20(1)(a) of the State Immunity Act 1978 provides that the Diplomatic Privileges Act 1964 applies, subject to "any necessary modifications," to a head of state as it applies to the head of a diplomatic mission. The generality of this provision is qualified by section 20(5), which restricts the immunity of the head of state in regard to civil proceedings in the same way as Part I of the Act does for diplomats. This reflects the fact that section 14 already provides that heads of state are subject to the restrictions in Part I. But there is nothing in section 20 to indicate that the immunity from criminal proceedings which article 31(1) of the Vienna Convention as applied by the Act of 1964 gives to diplomats is restricted in any way for heads of state. Section 23(3), which provides that the provisions of Parts I and II of the Act do not operate retrospectively, makes no mention of Part III. I infer from this that it was not thought that Part III would give rise to the suggestion that it might operate in this way.

It seems to me to be clear therefore that what section 20(1) did was to give statutory force in the United Kingdom to customary international law as to the immunity which heads of state, and former heads of state in particular, enjoy from proceedings in foreign national courts. Marcos and Marcos v. Federal Department of Police (1989) 102 I.L.R 198, 203 supports **\*241** this view, as it was held in that case that the article 39(2) immunity was available under customary international law to the former head of State of the Republic of the Philippines.

The question then is to what extent does the immunity which article 39(2) gives to former diplomats have to be modified in its application to former heads

of state? The last sentence of article 39(2) deals with the position after the functions of the diplomat have come to an end. It provides that "with respect to acts performed by such person in the exercise of his functions as a member of the mission, immunity shall continue to subsist." It is clear that this provision is dealing with the residual immunity of the former diplomat ratione materiae, and not with the immunity ratione personae which he enjoys when still serving as a diplomat. In its application to a former head of state this provision raises two further questions: (1) does it include functions which the head of state performed outside the receiving state from whose jurisdiction he claims immunity, and (2) does it include acts of the kind alleged in this case - which Mr. Alun Jones accepts were not private acts but were acts done in the exercise of the state's authority?

As to the first of these two further questions, it is plain that the functions of the head of state will vary from state to state according to the acts which he is expected or required to perform under the constitution of that state. In some countries which adhere to the traditions of constitutional monarchy these will be confined largely to ceremonial or symbolic acts which do not involve any executive responsibility. In others the head of state is head of the executive, with all the resources of the state at his command to do with as he thinks fit within the sphere of action which the constitution has given to him. I have not found anything in customary international law which would require us to confine the expression "his functions" to the lowest common denominator. In my opinion the functions of the head of state are those which his own state enables or requires him to perform in the exercise of government. He performs these functions wherever he is for the time being as well as within his own state. These may include instructing or authorising acts to be done by those under his command at home or abroad in the interests of state security. It would not be right therefore to confine the immunity under article 39(2) to acts done in the receiving state. I would not regard this as a "necessary modification" which has to be made to it under section 20(1) of the Act of 1978.

As to the second of those questions, I consider that the answer to it is well settled in customary international law. The test is whether they were private acts on the one hand or governmental acts done in the exercise of his authority as head of state on the other.

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                                                    Page 68

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

It is whether the act was done to promote the state's interests - whether it was done for his own benefit or gratification or was done for the state: United States of America v. Noriega (1990) 746 F.Supp. 1506, 1519-1521. Sir Arthur Watts Q.C. in his Hague Lectures, "The Legal Position in International Law of Heads of States, Heads of Governments and Foreign Ministers" (1994-III) 247 Recueil des cours, p. 56, said: "The critical test would seem to be whether the conduct was engaged in under colour of or in ostensible exercise of the head of state's public authority." The sovereign or governmental acts of *242 one state are not matters upon which the courts of other states will adjudicate: I Congreso del Partido[1983] 1 A.C. 244, 262c, per Lord Wilberforce. The fact that acts done for the state have involved conduct which is criminal does not remove the immunity. Indeed the whole purpose of the residual immunity ratione materiae is to protect the former head of state against allegations of such conduct after he has left office. Ahead of state needs to be free to promote his own state's interests during the entire period when he is in office without being subjected to the prospect of detention, arrest or embarrassment in the foreign legal system of the receiving state: see United States v. Noriega , at p. 1519; Lafontant v. Aristide (1994) 844 F.Supp. 128, 132. The conduct does not have to be lawful to attract the immunity.

It may be said that it is not one of the functions of a head of state to commit acts which are criminal according to the laws and constitution of his own state or which customary international law regards as criminal. But I consider that this approach to the question is unsound in principle. The principle of immunity ratione materiae protects all acts which the head of state has performed in the exercise of the functions of government. The purpose for which they were performed protects these acts from any further analysis. There are only two exceptions to this approach which customary international law has recognised. The first relates to criminal acts which the head of state did under the colour of his authority as head of state but which were in reality for his own pleasure or benefit. The examples which Lord Steyn [2000] 1 A.C. 61, 115c-e gave of the head of state who kills his gardener in a fit of rage or who orders victims to be tortured before him in agony seem to me plainly to fall into this category and, for this reason, to lie outside the scope of the immunity. The second relates to acts the prohibition of which has acquired the status under international

law of jus cogens. This compels all states to refrain from such conduct under any circumstances and imposes an obligation erga omnes to punish such conduct. As Sir Arthur Watts Q.C. said in his Hague Lectures, p. 89, n. 198, in respect of conduct constituting an international crime, such as war crimes, special considerations apply.

But even in the field of such high crimes as have achieved the status of jus cogens under customary international law there is as yet no general agreement that they are outside the immunity to which former heads of state are entitled from the jurisdiction of foreign national courts. There is plenty of source material to show that war crimes and crimes against humanity have been separated out from the generality of conduct which customary international law has come to regard as criminal. These developments were described by Lord Slynn of Hadley [2000] 1 A.C. 61, 80e-81a and I respectfully agree with his analysis. As he said, at p. 81a-b, except in regard to crimes in particular situations where international tribunals have been set up to deal with them and it is part of the arrangement that heads of state should not have any immunity, there is no general recognition that there has been a loss of immunity from the jurisdiction of foreign national courts. This led him to sum the matter up in this way, at p. 81: *243

"So it is necessary to consider what is needed, in the absence of a general international convention defining or cutting down head of state immunity, to define or limit the former head of state immunity in particular cases. In my opinion it is necessary to find provision in an international convention to which the state asserting, and the state being asked to refuse, the immunity of a former head of state for an official act is a party; the convention must clearly define a crime against international law and require or empower a state to prevent or prosecute the crime, whether or not committed in its jurisdiction and whether or not committed by one of its nationals; it must make it clear that a national court has jurisdiction to try a crime alleged against a former head of state, or that having been a head of state is no defence and that expressly or impliedly the immunity is not to apply so as to bar proceedings against him. The convention must be given the force of law in the national courts of the state; in a dualist country like the United Kingdom that means by legislation, so that with the necessary conditions and machinery the crime may be

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

prosecuted there in accordance with the conditions to be found in the convention."

That is the background against which I now turn to the Torture Convention. As all the requirements which Lord Slynn laid out in the passage at p. 81d-f save one are met by it, when read with the provisions of sections 134 and 135 of the Criminal Justice Act 1988 which gave the force of law to the Convention in this country, I need deal only with the one issue which remains. Did it make it clear that a former head of state has no immunity in the courts of a state which has jurisdiction to try the crime?

**The Torture Convention and loss of immunity**

The Torture Convention is an international instrument. As such, it must be construed in accordance with customary international law and against the background of the subsisting residual former head of state immunity. Article 32(2) of the Vienna Convention , which forms part of the provisions in the Diplomatic Privileges Act 1964 which are extended to heads of state by section 20(1) of the State Immunity Act 1978, subject to "any necessary modifications," states that waiver of the immunity accorded to diplomats "must always be express." No modification of that provision is needed to enable it to apply to heads of state in the event of it being decided that there should be a waiver of their immunity. The Torture Convention does not contain any provision which deals expressly with the question whether heads of state or former heads of state are or are not to have immunity from allegations that they have committed torture.

But there remains the question whether the effect of the Torture Convention was to remove the immunity by necessary implication. Although article 32(2) says that any waiver must be express, we are required nevertheless to consider whether the effect of the Convention was necessarily to remove the immunity. This is an exacting test. Section 1605(a)(1) of the United States Federal Sovereignty Immunity Act provides for an implied waiver, but this section has been narrowly **\*244** construed: Siderman de Blake v. Republic of Argentina , 965 F.2d 699, 720; Princz v. Federal Republic of Germany (1994) 26 F.3d 1166, 1174; Argentine Republic v. Amerada Hess Shipping Corporation , 109 S.Ct. 683, 693. In international law the need for clarity in this matter is obvious. The general rule is that international treaties should, so far as possible, be construed uniformly by the national courts of all states.

The preamble to the Torture Convention explains its purpose. After referring to article 5 of the Universal Declaration of Human Rights which provides that no one shall be subjected to torture or other cruel, inhuman or degrading treatment and to the United Nations Declaration of 9 December 1975 regarding torture and other cruel, inhuman or degrading treatment or punishment, it states that it was desired "to make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world." There then follows in article 1 a definition of the term "torture" for the purposes of the Convention. It is expressed in the widest possible terms. It means "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted" for such purposes as obtaining information or a confession, punishment, intimidation or coercion or for any reason based on discrimination of any kind. It is confined however to official torture by its concluding words, which require such pain or suffering to have been "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."

This definition is so broadly framed as to suggest on the one hand that heads of state must have been contemplated by its concluding words, but to raise the question on the other hand whether it was also contemplated that they would by necessary implication be deprived of their immunity. The words "public official" might be thought to refer to someone of lower rank than the head of state. Other international instruments suggest that where the intention is to include persons such as the head of state or diplomats they are mentioned expressly in the instrument: see article 27 of the Rome Statute of the International Criminal Court which was adopted on 17 July 1998. But a head of state who resorted to conduct of the kind described in the exercise of his function would clearly be "acting in an official capacity." It would also be a strange result if the provisions of the Convention could not be applied to heads of state who, because they themselves inflicted torture or had instigated the carrying out of acts of torture by their officials, were the persons primarily responsible for the perpetration of these acts.

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

Yet the idea that the framing of the definition in these terms in itself was sufficient to remove the immunity from prosecution for all acts of torture is also not without difficulty. The jus cogens character of the immunity enjoyed by serving heads of state ratione personae suggests that, on any view, that immunity was not intended to be affected by the Convention. But once one immunity is conceded it becomes harder, in the absence of an express provision, to justify the removal of the other immunities. It may also be noted that Burgers and Danelius, Handbook on the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, at p. 131, make this comment on article 5(1 ) of the Convention which sets out the measures which each state party is **\*245** required to take to establish its jurisdiction over the offences of torture which it is required by article 4 to make punishable under its own criminal law:

"This means, first of all, that the state shall have jurisdiction over the offence when it has been committed in its territory. Under international or national law, there may be certain limited exceptions to this rule, e.g. in regard to foreign diplomats, foreign troops, parliament members or other categories benefiting from special immunities, and such immunities may be accepted in so far as they apply to criminal acts in general and are not unduly extensive." These observations, although of undoubted weight as Jan Herman Burgers of the Netherlands was a Chairman-Rapporteur to the Convention, may be thought to be so cryptic as to defy close analysis. But two points are worth making about them. The first is that they recognise that the provisions of the Convention are not inconsistent with at least some of the immunities in customary international law. The second is that they make no mention of any exception which would deprive heads of state or former heads of state of their customary international law immunities. The absence of any reference to this matter suggests that the framers of the Convention did not consider it. The Reports of the Working Group on the Draft Convention to the Economic and Social Council of the Commission on Human Rights show that many meetings were held to complete its work. These extended over several years, and many issues were raised and discussed before the various delegations were content with its terms. If the issue of head of state and former head of state immunity was discussed at any of these meetings, it would without doubt have been mentioned in the reports. The issue would have been rec-

ognised as an important one on which the delegations would have to take instructions from their respective governments. But there is no sign of this in any of the reports which have been shown to us.

The absence of any discussion of the issue is not surprising, once it is appreciated that the purpose of the Convention was to put in place as widely as possible the machinery which was needed to make the struggle against torture more effective throughout the world. There was clearly much to be done, as the several years of discussion amply demonstrate. According to *Burgers and Danelius* , p. 1, the principal aim was to strengthen the existing position by a number of supportive measures. A basis had to be laid down for legislation to be enacted by the contracting states. An agreed definition of torture, including mental torture, had to be arrived at for the adoption by states into their own criminal law. Provisions had to be agreed for the taking of extraterritorial jurisdiction to deal with these offences and for the extradition of offenders to states which were seeking to prosecute them. As many states do not extradite their own citizens and the Convention does not oblige states to extradite, they had to undertake to take such measures as might be necessary to establish jurisdiction over these offences in cases where the alleged offender was present within their territory but was not to be extradited. For many, if not all, states these arrangements were innovations upon their domestic law. Waiver of immunities was not **\*246** mentioned. But, as Yoram Dinstein, "Diplomatic Immunity from Jurisdiction Ratione Materiae" (1966) 15 I.C.L.Q. 76, 80 had already pointed out it would be entirely meaningless to waive the immunity unless local courts were able, as a consequence, to try the offender.

These considerations suggest strongly that it would be wrong to regard the Torture Convention as having by necessary implication removed the immunity ratione materiae from former heads of state in regard to every act of torture of any kind which might be alleged against him falling within the scope of article 1. In Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 714-717 it was held that the alleged acts of official torture, which were committed in 1976 before the making of the Torture Convention, violated international law under which the prohibition of official torture had acquired the status of jus cogens. Cruel acts had been perpetrated over a period of seven days by men acting under the direction of the military

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

governor. Argentina was being ruled by an anti-semitic military junta, and epithets were used by those who tortured him which indicated that Jose Siderman was being tortured because of his Jewish faith. But the definition in article 1 is so wide that any act of official torture, so long as it involved "severe" pain or suffering, would be covered by it.

As *Burgers and Danelius* point out at p. 122, although the definition of torture in article 1 may give the impression of being a very precise and detailed one, the concept of "severe pain and suffering" is in fact rather a vague concept, on the application of which to a specific case there may be very different views. There is no requirement that it should have been perpetrated on such a scale as to constitute an international crime in the sense described by Sir Arthur Watts in his Hague Lectures at p. 82, that is to say a crime which offends against the public order of the international community. A single act of torture by an official against a national of his state within that state's borders will do. The risks to which former heads of state would be exposed on leaving office of being detained in foreign states upon an allegation that they had acquiesced in an act of official torture would have been so obvious to governments that it is hard to believe that they would ever have agreed to this. Moreover, even if your Lordships were to hold that this was its effect, there are good reasons for doubting whether the courts of other states would take the same view. An express provision would have removed this uncertainty.

Nevertheless there remains the question whether the immunity can survive Chile's agreement to the Torture Convention if the torture which is alleged was of such a kind or on such a scale as to amount to an international crime. Sir Arthur Watts Q.C. in his Hague Lectures, p. 82 states that the idea that individuals who commit international crimes are internationally accountable for them has now become an accepted part of international law. The international agreements to which states have been striving in order to deal with this problem in international criminal courts have been careful to set a threshold for such crimes below which the jurisdiction of those courts will not be available. The Statute of the International Tribunal for the Former Yugoslavia (1993) includes torture in article 5 as one of the crimes against humanity. In paragraph 48 of his Report to the United Nations the Secretary-General explained that crimes **\*247** against

humanity refer to inhuman acts of a very serious nature, such as wilful killing, torture or rape, committed as part of a widespread or systematic attack against any civilian population. Similar observations appear in paragraphs 131 to 135 of the Secretary-General's Report of 9 December 1994 on the Rwanda conflict. Article 3 of the Statute of the International Criminal Tribunal for Rwanda (1994 ) included torture as one of the crimes against humanity "when committed as part of a widespread or systematic attack against any civilian population" on national, political, ethnic or other grounds. Article 7 of the Rome Statute contains a similar limitation to acts of widespread or systematic torture.

The allegations which the Spanish judicial authorities have made against Senator Pinochet fall into that category. As I sought to make clear in my analysis of the draft charges, we are not dealing in this case - even upon the restricted basis of those charges on which Senator Pinochet could lawfully be extradited if he has no immunity - with isolated acts of official torture. We are dealing with the remnants of an allegation that he is guilty of what would now, without doubt, be regarded by customary international law as an *international* crime. This is because he is said to have been involved in acts of torture which were committed in pursuance of a policy to commit systematic torture within Chile and elsewhere as an instrument of government. On the other hand it is said that, for him to lose his immunity, it would have to be established that there was a settled practice for crime of this nature to be so regarded by customary international law at the time when they were committed. I would find it hard to say that it has been shown that any such settled practice had been established by 29 September 1988. But we must be careful not to attach too much importance to this point, as the opportunity for prosecuting such crimes seldom presents itself.

Despite the difficulties which I have mentioned, I think that there are sufficient signs that the necessary developments in international law were in place by that date. The careful discussion of the jus cogens and erga omnes rules in regard to allegations of official torture in Siderman de Blake v. Republic of Argentina , 26 F.2d 699, 714-718, which I regard as persuasive on this point, shows that there was already widespread agreement that the prohibition against official torture had achieved the status of a jus cogens norm. Articles which were published in 1988 and

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

1989 are referred to, at p. 717, in support of this view. So I think that we can take it that that was the position by 29 September 1988. Then there is the Torture Convention of 10 December 1984. Having secured a sufficient number of signatories, it entered into force on 26 June 1987. In my opinion, once the machinery which it provides was put in place to enable jurisdiction over such crimes to be exercised in the courts of a foreign state, it was no longer open to any state which was a signatory to the Convention to invoke the immunity ratione materiae in the event of allegations of systematic or widespread torture committed after that date being made in the courts of that state against its officials or any other person acting in an official capacity.

As Sir Arthur Watts Q.C. has explained in his Hague Lectures, at p. 82, the general principle in such cases is that of individual responsibility for international criminal conduct. After a review of various general **\*248** international instruments relating mainly but not exclusively to war crimes, of which the most recent was the International Law Commission's Draft Code of Crimes Against the Peace and Security of Mankind of 1988 , he concludes, at p. 84, that it can no longer be doubted that as a matter of general customary international law a head of state will personally be liable to be called to account if there is sufficient evidence that he authorised or perpetrated such serious international crimes. A head of state is still protected while in office by the immunity ratione personae, but the immunity ratione materiae on which he would have to rely on leaving office must be denied to him.

I would not regard this as a case of waiver. Nor would I accept that it was an implied term of the Torture Convention that former heads of state were to be deprived of their immunity ratione materiae with respect to all acts of official torture as defined in article 1. It is just that the obligations which were recognised by customary international law in the case of such serious international crimes by the date when Chile ratified the Convention are so strong as to override any objection to it on the ground of immunity ratione materiae to the exercise of the jurisdiction over crimes committed after that date which the United Kingdom had made available.

I consider that the date as from which the immunity ratione materiae was lost was 30 October 1988, which was the date when Chile's ratification of the Torture Convention on 30 September 1988 took effect. Spain had already ratified the Convention. It did so on 21 October 1987. The Convention was ratified by the United Kingdom on 8 December 1988 following the coming into force of section 134 of the Criminal Justice Act 1988. On the approach which I would take to this question the immunity ratione materiae was lost when Chile, having ratified the Convention to which section 134 gave effect and which Spain had already ratified, was deprived of the right to object to the extraterritorial jurisdiction which the United Kingdom was able to assert over these offences when the section came into force. But I am content to accept the view of my noble and learned friend, Lord Saville of Newdigate, that Senator Pinochet continued to have immunity until 8 December 1988 when the United Kingdom ratified the Convention.

## Conclusion

It follows that I would hold that, while Senator Pinochet has immunity ratione materiae from prosecution for the conspiracy in Spain to murder in Spain which is alleged in charge 9 and for such conspiracies in Spain to murder in Spain and such conspiracies in Spain prior to 8 December 1988 to commit acts of torture in Spain as could be shown to be part of the allegations in charge 4, he has no immunity from prosecution for the charges of torture and of conspiracy to torture which relate to the period after that date. None of the other charges which are made against him are extradition crimes for which, even if he had no immunity, he could be extradited. On this basis only I, too, would allow the appeal, to the extent necessary to permit the extradition to proceed on the charges of torture and conspiracy to torture relating to the period after 8 December 1988.**\*249**

The profound change in the scope of the case which can now be made for the extradition to Spain of Senator Pinochet will require the Secretary of State to reconsider his decision to give authority to proceed with the extradition process under section 7(4) of the Extradition Act 1989 and, if he decides to renew that authority, with respect to which of the alleged crimes the extradition should be authorised. It will also make it necessary for the magistrate, if renewed authority to proceed is given, to pay very careful attention to the question whether the information which is laid

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

before him under section 9(8) of the Act supports the allegation that torture in pursuance of a conspiracy to commit systematic torture, including the single act of torture which is alleged in charge 30, was being committed by Senator Pinochet after 8 December 1988 when he lost his immunity.

Lord Hutton.

 My Lords, the rehearing of this appeal has raised a number of separate issues which have been fully considered in the speech of my noble and learned friend, Lord Browne-Wilkinson, which I have had the benefit of reading in draft. I am in agreement with his reasoning and conclusion that the definition of an "extradition crime" in the Extradition Act 1989 requires the conduct to be criminal under United Kingdom law at the date of commission. I am also in agreement with the analysis and conclusions of my noble and learned friend, Lord Hope of Craighead as to the alleged crimes in respect of which Senator Pinochet could be extradited apart from any issue of immunity. I further agree with the view of Lord Browne-Wilkinson that Senator Pinochet is entitled to immunity in respect of charges of murder and conspiracy to murder, but I wish to make some observations on the issue of immunity claimed by Senator Pinochet in respect of charges of torture and conspiracy to torture.

 Senator Pinochet ceased to be head of state of Chile on 11 March 1990, and he claims immunity as a former head of state. The distinction between the immunity of a serving head of state and the immunity of a former head of state is discussed by Sir Arthur Watts Q.C. in his monograph, "The Legal Position in International Law of Heads of States, Heads of Governments and Foreign Ministers." He states, at p. 53:

"It is well established that, put broadly, a head of state enjoys a wide immunity from the criminal, civil and administrative jurisdiction of other states. This immunity - to the extent that it exists - becomes effective upon his assumption of office, even in respect of events occurring earlier. Ahead of state's immunity is enjoyed in recognition of his very special status as a holder of his state's highest office." And, at p. 88:

"A former head of state is entitled under international law to none of the facilities, immunities and privileges which international law accords to heads of states in office. After his loss of office he may be sued in relation to his private activities, both those taking place while he was still head of state, as well as those occurring before becoming head of state or since ceasing to be head of state."**250** And, at p. 89:

"Ahead of state's official acts, performed in his public capacity as head of state, are however subject to different considerations. Such acts are acts of the state rather than the head of state's personal acts, and he cannot be sued for them even after he has ceased to be head of state. The position is similar to that of acts performed by an ambassador in the exercise of his functions, for which immunity continues to subsist even after the ambassador's appointment has come to an end."

 Section 20 in Part III of the State Immunity Act 1978 provides that, subject to any necessary modifications, the Diplomatic Privileges Act 1964 shall apply to a sovereign or other head of state, and section 2 of the Act of 1964 provides that the articles of the Vienna Convention on Diplomatic Relations set out in Schedule 1 to the Act shall have the force of law in the United Kingdom. The articles set out in Schedule 1 include articles 29, 31 and 39. Article 29 provides: "The person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention." Article 31 provides: "(1) A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving state." Article 39 provides:

"(1) Every person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving state on proceedings to take up his post or, if already in its territory, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed. (2) When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist."

 One of the issues raised before your Lordships is whether section 20 of the State Immunity Act 1978

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

relates only to the functions carried out by a foreign head of state when he is present within the United Kingdom, or whether it also applies to his actions in his own state or in another country. Section 20 is a difficult section to construe, but I am of opinion that, with the necessary modifications, the section applies the provisions of the Diplomatic Privileges Act, and therefore the articles of the Vienna Convention, to the actions of a head of state in his own country or elsewhere, so that, adopting the formulation of Lord Nicholls of Birkenhead [1998] 3 W.L.R. 1456, 1499e in the earlier hearing, with the addition of seven words, the effect of section 20 of the Act of 1978, section 2 of the Diplomatic Privileges Act and of the articles of the Vienna Convention is that: "A former head of state shall continue to enjoy immunity from the criminal jurisdiction of the United Kingdom with respect to acts performed by him, whether in his own country or elsewhere, in the exercise of his functions as a head of state."**251**

I consider, however, that section 20 did not change the law in relation to the immunity from criminal jurisdiction to which a former head of state was entitled in the United Kingdom but gave statutory form to the relevant principle of international law which was part of the common law.

 Therefore the crucial question for decision is whether, if committed, the acts of torture (in which term I include acts of torture and conspiracy to commit torture) alleged against Senator Pinochet were carried out by him in the performance of his functions as head of state. I say "if committed" because it is not the function of your Lordships in this appeal to decide whether there is evidence to substantiate the allegations and Senator Pinochet denies them. Your Lordships had the advantage of very learned and detailed submissions from counsel for the parties and the interveners and from the amicus curiae (to which submissions I would wish to pay tribute) and numerous authorities from many jurisdictions were cited.

 It is clear that the acts of torture which Senator Pinochet is alleged to have committed were not acts carried out in his private capacity for his personal gratification. If that had been the case they would have been private acts and it is not disputed that Senator Pinochet, once he had ceased to be head of state, would not be entitled to claim immunity in respect of them. It was submitted on his behalf that the acts of

torture were carried out for the purposes of protecting the state and advancing its interests, as Senator Pinochet saw them, and were therefore governmental functions and were accordingly performed as functions of the head of state. It was further submitted that the immunity which Senator Pinochet claimed was the immunity of the state of Chile itself. In the present proceedings Chile intervened on behalf of Senator Pinochet and in paragraph 10 of its written case Chile submitted:

"the immunity of a head of state (or former head of state) is an aspect of state immunity ... Immunity of a head of state in his public capacity is equated with state immunity in international law ... Actions against representatives of a foreign government in respect of their governmental or official acts are in substance proceedings against the state which they represent, and the immunity is for the benefit of the state."

 Moreover, it was submitted that a number of authorities established that the immunity which a state is entitled to claim in respect of the acts of its former head of state or other public officials applies to acts which are unlawful and criminal.

 My Lords, in considering the authorities it is necessary to have regard to a number of matters. First, it is a principle of international law that a state may not be sued in the courts of another state without its consent (although this principle is now subject to exceptions - the exceptions in the law of the United Kingdom being set out in the State Immunity Act 1978).*Halsbury's Laws of England,* 4th ed., vol. 18 (1977), p. 794, para. 1548 states:

"An independent sovereign state may not be sued in the English courts against its will and without its consent. This immunity from **252** the jurisdiction is derived from the rules of international law, which in this respect have become part of the law of England. It is accorded upon the grounds that the exercise of jurisdiction would be incompatible with the dignity and independence of any superior authority enjoyed by every sovereign state. The principle involved is not founded upon any technical rules of law, but upon broad considerations of public policy, international law and comity."

 Secondly, many of the authorities cited by counsel were cases where an action in tort for damages was

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

brought against a state. Thirdly, a state is responsible for the actions of its officials carried out in the ostensible performance of their official functions notwithstanding that the acts are performed in excess of their proper functions. *Oppenheim's International Law* , vol. I, pp. 545-546, para. 165 states:

"In addition to the international responsibility which a state clearly bears for the official and authorised acts of its administrative officials and members of its armed forces, a state also bears responsibility for internationally injurious acts committed by such persons in the ostensible exercise of their official functions but without that state's command or authorisation, or in excess of their competence according to the internal law of the state, or in mistaken, ill-judged or reckless execution of their official duties. A state's administrative officials and members of its armed forces are under its disciplinary control, and all acts of such persons in the apparent exercise of their official functions or invoking powers appropriate to their official character are prima facie attributable to the state. It is not always easy in practice to draw a clear distinction between unauthorised acts of officials and acts committed by them in their private capacity and for which the state is not directly responsible. With regard to members of armed forces the state will usually be held responsible for their acts if they have been committed in the line of duty, or in the presence of and under the orders of an official superior."

Fourthly, in respect of the jurisdiction of the courts of the United Kingdom, foreign states are now expressly given immunity in civil proceedings (subject to certain express exceptions) by statute. Part I of the State Immunity Act 1978 relating to civil proceedings provides in section 1(1): "A state is immune from the jurisdiction of the courts of the United Kingdom except as provided in the following provisions of this Part of this Act." But Part I of the Act has no application to criminal jurisdiction and section 16(4 ) in Part I provides: "This Part of this Act does not apply to criminal proceedings." In the United States of America section 1604 of the Foreign Sovereign Immunities Act 1976 provides:

"Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the states except as provided in sections 1605 to 1607 of this chapter."**\*253** Counsel for Sena-

tor Pinochet and for Chile relied on the decision of the Court of Appeal in Al-Adsani v. Government of Kuwait (1996) 107 I.L.R. 536 where the plaintiff brought an action for damages in tort against the government of Kuwait claiming that he had been tortured in Kuwait by officials of that government. The Court of Appeal upheld a claim by the government of Kuwait that it was entitled to immunity. Counsel for the plaintiff submitted that the rule of international law prohibiting torture is so fundamental that it is jus cogens which overrides all other principles of international law, including the principle of sovereign immunity. This submission was rejected by the Court of Appeal on the ground that immunity was given by section 1 of the State Immunity Act 1978 and that the immunity was not subject to an overriding qualification in respect of torture or other acts contrary to international law which did not fall within one of the express exceptions contained in the succeeding sections of the Act. Ward L.J. stated, at pp. 549-550:

"Unfortunately, the Act is as plain as plain can be. A foreign state enjoys no immunity for acts causing personal injury committed in the United Kingdom and if that is expressly provided for the conclusion is impossible to escape that state immunity *is* afforded in respect of acts of torture committed outside this jurisdiction."

A similar decision was given by the United States Court of Appeals, Ninth Circuit, in Siderman de Blake v. Republic of Argentina , 965 F.2d 699 where an Argentine family brought an action for damages in tort against Argentina and one of its provinces for acts of torture by military officials. Argentina claimed that it was entitled to immunity under the Foreign Sovereign Immunities Act and the Court of Appeals, with reluctance, upheld this claim. The argument advanced on behalf of the plaintiffs was similar to that advanced in the Al-Adsani case, but the court ruled that it was obliged to reject it because of the express provisions of the Foreign Sovereign Immunities Act, stating at pp. 718-719:

"The Sidermans argue that since sovereign immunity itself is a principle of international law, it is trumped by jus cogens. In short, they argue that when a state violates jus cogens, the cloak of immunity provided by international law falls away, leaving the state amenable to suit. As a matter of international law, the Sidermans' argument carries much force ... Unfortu-

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                                                    Page 76

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

nately, we do not write on a clean slate. We deal not only with customary international law, but with an affirmative Act of Congress, the F.S.I.A. We must interpret the F.S.I.A. through the prism of Amerada Hess . Nothing in the text or legislative history of the F.S.I.A. explicitly addresses the effect violations of jus cogens might have on the F.S.I.A.'s cloak of immunity. Argentina contends that the Supreme Court's statement in Amerada Hess that the F.S.I.A. grants immunity 'in those cases involving alleged violations of international law that do not come within one of the F.S.I.A.'s exceptions,' 109 S.Ct. 683, 688, precludes the Sidermans' reliance on jus cogens in this case. Clearly, the F.S.I.A. does not specifically provide for an exception to sovereign immunity based on jus cogens. In Amerada Hess , the court had no occasion to *254 consider acts of torture or other violations of the peremptory norms of international law, and such violations admittedly differ in kind from transgressions of jus dispositivum, the norms derived from international agreements or customary international law with which the Amerada Hess court dealt. However, the court was so emphatic in its pronouncement 'that immunity is granted in those cases involving alleged violations of international law that do not come within one of the F.S.I.A.'s exceptions,' Amerada Hess , at p. 688, and so specific in its formulation and method of approach, at p. 690 ('Having determined that the F.S.I.A. provides the sole basis for obtaining jurisdiction over a foreign state in federal court, we turn to whether any of the exceptions enumerated in the Act apply here'), that we conclude that if violations of jus cogens committed outside the United States are to be exceptions to immunity, Congress must make them so. The fact that there has been a violation of jus cogens does not confer jurisdiction under the F.S.I.A."

It has also been decided that where an action for damages in tort is brought against officials of a foreign state for actions carried out by them in ostensible exercise of their governmental functions, they can claim state immunity, notwithstanding that their actions were illegal. The state itself, if sued directly for damages in respect of their actions would be entitled to immunity and this immunity would be impaired if damages were awarded against the officials and then the state was obliged to indemnify them. In Jaffe v. Miller (1993) 13 O.R.(3d) 745 government officials were sued in tort for laying false criminal charges and for conspiracy for kidnap, and it was held that they were entitled to claim immunity. Finlayson J.A., de-

livering the judgment of the Ontario Court of Appeal, stated at pp. 758-759:

"I also agree with the reasoning on this issue put forward by counsel for the respondents. Counsel submitted that to confer immunity on a government department of a foreign state but to deny immunity to the functionaries, who in the course of their duties performed the acts, would render the State Immunity Act ineffective. To avoid having its action dismissed on the ground of state immunity, a plaintiff would have only to sue the functionaries who performed the acts. In the event that the plaintiff recovered judgment, the foreign state would have to respond to it by indemnifying its functionaries, thus, through this indirect route, losing the immunity conferred on it by the Act. Counsel submitted that when functionaries are acting within the scope of their official duties, as in the present case, they come within the definition of 'foreign state.'" In my opinion these authorities and similar authorities relating to claims for damages in tort against states and government officials do not support the claim of Senator Pinochet to immunity from criminal proceedings in the United Kingdom because the immunity given by Part I of the State Immunity Act 1978 does not apply to criminal proceedings.

Counsel for Senator Pinochet and for Chile further submitted that under the rules of international law courts recognise the immunity of a *255 former head of state in respect of criminal acts committed by him in the purported exercise of governmental authority. In Marcos and Marcos v. Federal Department of Police , 102 I.L.R. 198 the United States instituted criminal proceedings against Ferdinand Marcos, the former President of the Philippines, and his wife, who had been a minister in the Philippine Government. They were accused of having abused their positions to acquire for themselves public funds and works of art. The United States authorities sought legal assistance from the Swiss authorities to obtain banking and other documents in order to clarify the nature of certain transactions which were the subject of investigation. Mr. Marcos and his wife claimed immunity as the former leaders of a foreign state. In its judgment the Swiss federal tribunal stated, at p. 203:

"The immunity in relation to their functions which the appellants enjoyed therefore subsisted for those criminal acts which were allegedly committed while

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

they were still exercising their powers in the Repub-
lic of the Philippines. The proceedings brought
against them before the United States courts could
therefore only be pursued pursuant to an express
waiver by the State of the Philippines of the immu-
nity which public international law grants them not as
a personal advantage but for the benefit of the state
over which they ruled." The tribunal then held that
the immunity could not be claimed by Mr. and Mrs.
Marcos in Switzerland because there had been an
express waiver by the State of the Philippines. How-
ever I would observe that in that case Mr. and Mrs.
Marcos were not accused of violating a rule of inter-
national law which had achieved the status of jus
cogens.

Counsel also relied on the decision of the Federal
Constitutional Court of the Federal Republic of Ger-
many In re Former Syrian Ambassador to the Ger-
man Democratic Republic (unreported), 10 June
1997, Federal Constitutional Court, Case No. 2 BvR
1516/96. In that case the former Syrian ambassador
to the German Democratic Republic was alleged to
have failed to prevent a terrorist group from remov-
ing a bag of explosives from the Syrian Embassy, and
a few hours later the explosives were used in an at-
tack which left one person dead and more than 20
persons seriously injured. Following German unifica-
tion and the demise of the German Democratic Re-
public in 1990 a District Court in Berlin issued an
arrest warrant against the former ambassador for
complicity in murder and the causing of an explosion.
The Provincial Court quashed the warrant but the
Court of Appeal overruled the decision of the Provin-
cial Court and restored the validity of the warrant,
holding that "The complainant was held to have con-
tributed to the attack by omission. He had done noth-
ing to prevent the explosives stored at the embassy
building from being removed." The former ambassa-
dor then lodged a constitutional complaint claiming
that he was entitled to diplomatic immunity.

The Constitutional Court rejected the complaint and
held that the obligation limited to the former German
Democratic Republic to recognise the continuing
immunity of the complainant, according to article
39(2) of **256** the Vienna Convention, was not trans-
ferred to the Federal Republic of Germany by the
international law of state succession.

Counsel for Senator Pinochet and for Chile relied on

the following passage in the judgment of the constitu-
tional court:

"For the categorisation as an official act, it is irrele-
vant whether the conduct is legal according to the
legal order of the Federal Republic of Germany (see
above B.II.2.a(bb)) and whether it fulfilled diplo-
matic functions in the sense of article 3 of the
V.C.D.R. (see also the position taken by the [Swiss]
Federal Political Department on 12 May 1961,
Schweizerisches Jahrbuch für internationles Recht
('s.J.I.R.') 21 (1964) 171; however, a different posi-
tion was taken by the Federal Political Department on
31 January 1979, reproduced in S.J.I.R. 36 (1980)
210, 211 f.). The commission of criminal acts does
not simply concern the functions of the mission. If a
criminal act was never considered as official, there
would be no substance to continuing immunity. In
addition, there is no relevant customary international
law exception from diplomatic immunity here (see
Preamble to the V.C.D.R., 5th paragraph) ... Diplo-
matic immunity from criminal prosecution basically
knows no exception for particularly serious violations
of law. The diplomat can in such situations only be
declared persona non grata."

 However, two further parts of the judgment are to be
noted. First, it appears that the explosives were left in
the embassy when the ambassador was absent, and
his involvement began after the explosives had been
left in the embassy. The report states:

"The investigation conducted by the Public Prosecu-
tor's Office concluded that the bombing attack was
planned and carried out by a terrorist group. The
complainant's sending state had, in a telegram, in-
structed its embassy in East Berlin to provide every
possible assistance to the group. In the middle of Au-
gust 1983 a member of the terrorist group appeared in
the embassy while the complainant was absent and
requested permission from the then third secretary to
deposit a bag in the embassy. In view of the telegram,
which was known to him, the third secretary granted
that permission. "Later, the member of the terrorist
group returned to the embassy and asked the third
secretary to transport the bag to West Berlin for him
in an embassy car. At the same time, he revealed that
there were explosives in the bag. The third secretary
informed the complainant of the request. The com-
plainant first ordered the third secretary to bring him
the telegram, in order to read through the text care-

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                                          Page 78

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

fully once again, and then decided that the third sec-
retary could refuse to provide the transportation. Af-
ter the third secretary had returned and informed the
terrorist of this, the terrorist took the bag, left the
embassy and conveyed the explosive in an unknown
manner towards West Berlin."

It appears that these facts were taken into account by
the constitutional court when it stated: **\*257**

"The complainant acted in the exercise of his official
functions as a member of the mission, within the
meaning of article 39(2) (2) of the V.C.D.R., because
he is charged with an omission that lay within the
sphere of his responsibility as ambassador, and which
is to that extent attributable to the sending state. The
complainant was charged with having done nothing
to prevent the return of the explosive. The Court of
Appeal derived the relevant obligation of conduct out
of the official responsibility of the complainant, as
leader of the mission, for objects left in the embassy.
After the explosive was left in the embassy and there-
fore in the complainant's sphere of control and re-
sponsibility, he was obligated, within the framework
of his official duties, to decide how the explosive
would then be dealt with. The complainant made
such a decision, apparently on the basis of the tele-
graphed instruction from his sending state, so that
private interests are not discernible (on the classifica-
tion of activities on the basis of instructions see the
Bingham case in McNair, International Law Opin-
ions, vol. 1 (1956), pp. 196, 197; *Denza, Diplomatic
Law* (1976), p. 249f.; Salmon, Manuel de Droit Dip-
lomatique (1994), p. 458ff.). Instead, the complainant
responded to the third secretary directly, in his posi-
tion as the superior official, and, according to the
view of the Court of Appeal, sought the best solution
for the embassy."

In addition the constitutional court stated that the
rules of diplomatic law constitute a self-contained
regime and drew a distinction between the immunity
of a diplomat and the immunity of a head of state or
governmental official and stated:

" Article 7 of the Charter of the International Military
Tribunal of Nuremberg (U.N.T.S. vol. 82, p. 279) and
following it article 7(2) of the Statute of the Interna-
tional Criminal Tribunal for Yugoslavia (I.L.M. 32
(1993) p. 1192), as well as article 6(2) of the Statute
for the International Criminal Tribunal for Rwanda

(I.L.M. 33 (1994), p. 1602) state that the official po-
sition of an accused, whether as a leader of a state or
as a responsible official in a government department,
does not serve to free him from responsibility or
mitigate punishment. Exemptions from immunity for
cases of war criminals, violations of international law
and offences against jus cogens under international
law have been discussed as developments of this rule
... However, as the wording of article 7 of the Charter
of the International Military Tribunal of Nuremberg
makes clear, these exceptions are relevant only to the
applicable law of state immunity and the immunity of
state organs that flows directly from it, in particular
for members of the government, and not to diplo-
matic immunity. State immunity and diplomatic im-
munity represent two different institutions of interna-
tional law, each with their own rules, so that no infer-
ence can be drawn from any restrictions in one sphere
as to possible effects in the other."

Therefore I consider that the passage in the judgment
relied on by counsel does not give support to the ar-
gument that acts of torture, although criminal, can be
regarded as functions of a head of state. **\*258**

In 1946 the General Assembly of the United Nations
affirmed: "The principles of international law recog-
nised by the Charter of the Nuremberg Tribunal and
the judgment of the Tribunal" and gave the following
directive to its International Law Commission:

"This Committee on the codification of international
law established by the resolution of the General As-
sembly of 11 December 1946, to treat as a matter of
primary importance plans for the formulation, in the
context of a general codification of offences against
the peace and security of mankind, or of an interna-
tional criminal code, of the principles recognised in
the Charter of the Nuremberg Tribunal and in the
judgment of the Tribunal." Pursuant to this directive
the 1950 Report of the International Law Commis-
sion to the General Assembly set out the following
principle followed by the commentary contained in
paragraph 103:

"The fact that a person who committed an act which
constitutes a crime under international law acted as
head of state or responsible government official does
not relieve him from responsibility under interna-
tional law. 103. This principle is based on article 7 of
the Charter of the Nuremberg Tribunal. According to

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

the Charter and the judgment, the fact that an individual acted as head of state or responsible government official did not relieve him from international responsibility. 'The principle of international law which, under certain circumstances, protects the representatives of a state,' said the Tribunal, 'cannot be applied to acts which are condemned as criminal by international law. The authors of these acts cannot shelter themselves behind their official position in order to be freed from punishment ... ' The same idea was also expressed in the following passage of the findings: 'He who violates the laws of war cannot obtain immunity while acting in pursuance of the authority of the state if the state in authorising action moves outside its competence under international law.'"

The 1954 International Law Commission draft code of offences against the peace and security of mankind provided in article III: "The fact that a person acted as head of state or as responsible Government official does not relieve him of responsibility for committing any of the offences defined in the code." The Statute of the International Criminal Tribunal for the Former Yugoslavia established by the Security Council of the United Nations in 1993 for the prosecution of persons responsible for serious violations of international humanitarian law committed in the territory of the former Yugoslavia since 1991 provided in article 7(2): "The official position of any accused person, whether as head of state or government or as a responsible government official, shall not relieve such person of criminal responsibility nor mitigate punishment." The Statute of the International Criminal Tribunal for Rwanda established by the Security Council of the United Nations in 1994 for the prosecution of persons responsible for genocide and other serious violations of international humanitarian law committed in the territory of Rwanda in 1994 provided in article 6(2): "The official position of any accused person, whether as **\*259** head of state or government or as a responsible government official shall not relieve such person of criminal responsibility nor mitigate punishment." The 1996 Draft Code of the International Law Commission of Crimes Against the Peace and Security of Mankind provided in article 7: "The official position of an individual who commits a crime against the peace and security of mankind, even if he acted as head of state or government, does not relieve him of criminal responsibility or mitigate punishment." In July 1998 in Rome the United Nations Diplomatic Conference of Plenipo-

tentiaries on the Establishment of an International Criminal Court adopted the Statute of the International Criminal Court. The preamble to the Statute states, inter alia:

"Mindful that during this century millions of children, women and men have been victims of unimaginable atrocities that deeply shock the conscience of humanity, Recognising that such grave crimes threaten the peace, security and well-being of the world, Affirming that the most serious crimes of concern to the international community as a whole must not go unpunished and that their effective prosecution must be ensured by taking measures at the national level and by enhancing international co-operation, Determined to put an end to impunity for the perpetrators of these crimes and thus to contribute to the prevention of such crimes ... Determined to these ends and for the sake of present and future generations, to establish an independent permanent International Criminal Court in relationship with the United Nations system, with jurisdiction over the most serious crimes of concern to the international community as a whole, Emphasising that the International Criminal Court established under this Statute shall be complementary to national criminal jurisdictions, Resolved to guarantee lasting respect for the enforcement of international justice, Have agreed as follows ..."

Article 5 of the Statute provides that jurisdiction of the court shall be limited to the most serious crimes of concern to the international community as a whole which include crimes against humanity. Article 7 states that "crime against humanity" means a number of acts including murder and torture when committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack.

Article 27 provides:

"(1) This Statute shall apply equally to all persons without any distinction based on official capacity. In particular, official capacity as a head of state or government, a member of a government or parliament, an elected representative or a government official shall in no case exempt a person from criminal responsibility under this Statute, nor shall it, in and of itself, constitute a ground for reduction of sentence. (2) Immunities or special procedural rules which may

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

attach to the official capacity of a person, whether under national or international law, shall not bar the court from exercising its jurisdiction over such a person."**260**

Therefore since the end of the second world war there has been a clear recognition by the international community that certain crimes are so grave and so inhuman that they constitute crimes against international law and that the international community is under a duty to bring to justice a person who commits such crimes. Torture has been recognised as such a crime. The preamble to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment 1984, which has been signed by the United Kingdom, Spain and Chile and by over one hundred other nations, states:

"Considering that, in accordance with the principles proclaimed in the Charter of the United Nations, recognition of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world, Recognising that those rights derive from the inherent dignity of the human person, Considering the obligation of states under the Charter, in particular article 55, to promote universal respect for, and observance of, human rights and fundamental freedoms, Having regard to article 5 of the Universal Declaration of Human Rights and article 7 of the International Covenant on Civil and Political Rights , both of which provide that no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment, Having regard also to the Declaration on Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted by the General Assembly on 9 December 1975, Desiring to make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world, Have agreed as follows ..." Article 1 defines "torture" as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for purposes specified in the article such as punishment or intimidation or obtaining information or a confession, and such pain and suffering is inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."

The Convention then contains a number of articles

designed to make the measures against public officials who commit acts of torture more effective. Burgers and Danelius, Handbook on the Convention, stated, at p. 1:

"It is expedient to redress at the outset a widespread misunderstanding as to the objective of the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, adopted by the General Assembly of the United Nations in 1984 . Many people assume that the Convention's principal aim is to outlaw torture and other cruel, inhuman or degrading treatment or punishment. This assumption is not correct in so far as it would imply that the prohibition of these practices is established under international law by the Convention only and that this prohibition will be binding as a rule of international law only for those states which have become parties to the Convention. On the contrary, the Convention is based upon the recognition that the above-mentioned practices are already outlawed **261** under international law. The principal aim of the Convention is to strengthen the existing prohibition of such practices by a number of supportive measures."

As your Lordships hold that there is no jurisdiction to extradite Senator Pinochet for acts of torture prior to 29 September 1988, which was the date on which section 134 of the Criminal Justice Act 1988 came into operation, it is unnecessary to decide when torture became a crime against international law prior to that date, but I am of opinion that acts of torture were clearly crimes against international law and that the prohibition of torture had acquired the status of jus cogens by that date.

The appellants accepted that in English courts a serving head of state is entitled (ratione personae) to immunity in respect of acts of torture which he has committed. *Burgers and Danelius* , referring to the obligation of a state party to the convention to establish its jurisdiction over offences of torture, recognise that some special immunities may exist in respect of acts of torture and state, at p. 131:

"Under international or national law, there may be certain limited exceptions to this rule, e.g. in regard to foreign diplomats, foreign troops, parliament members or other categories benefiting from special immunities, and such immunities may be accepted in so far as they apply to criminal acts in general and are

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

not unduly extensive." It is also relevant to note that
article 98 of the 1998 Rome Statute establishing the
International Criminal Court provides:

"The court may not proceed with a request for sur-
render or assistance which would require the re-
quested state to act inconsistently with its obligations
under international law with respect to the state or
diplomatic immunity of a person or property of a
third state, unless the court can first obtain the co-
operation of that third state for the waiver of the im-
munity."

 But the issue in the present case is whether Senator
Pinochet, as a former head of state, can claim immu-
nity (ratione materiae) on the grounds that acts of
torture committed by him when he was head of state
were done by him in exercise of his functions as head
of state. In my opinion he is not entitled to claim such
immunity. The Torture Convention makes it clear
that no state is to tolerate torture by its public offi-
cials or by persons acting in an official capacity and
article 2 requires that: "(1) Each state party shall take
effective legislative, administrative, judicial or other
measures to prevent acts of torture in any territory
under its jurisdiction." Article 2 further provides that:
"(2) No exceptional circumstances whatsoever,
whether a state of war or a threat of war, internal po-
litical instability or any other public emergency, may
be invoked as a justification of torture." Article 4
provides:

"(1) Each state party shall ensure that all acts of tor-
ture are offences under its criminal law. The same
shall apply to an attempt to commit torture and to an
act by any person which constitutes complicity or
participation in torture. (2) Each state party shall
make **262** these offences punishable by appropriate
penalties which take into account their grave nature."
Article 7 provides:

"(1) The state party in the territory under whose ju-
risdiction a person alleged to have committed any
offence referred to in article 4 is found shall in the
cases contemplated in article 5, if it does not extradite
him, submit the case to its competent authorities for
the purpose of prosecution." I do not accept the ar-
gument advanced by counsel on behalf of Senator
Pinochet that the provisions of the Convention were
designed to give one state jurisdiction to prosecute a
public official of another state in the event of that

state deciding to waive state immunity. I consider
that the clear intent of the provisions is that an offi-
cial of one state who has committed torture should be
prosecuted if he is present in another state.

Therefore having regard to the provisions of the Tor-
ture Convention, I do not consider that Senator Pino-
chet or Chile can claim that the commission of acts of
torture after 29 September 1988 were functions of the
head of state. The alleged acts of torture by Senator
Pinochet were carried out under colour of his position
as head of state, but they cannot be regarded as func-
tions of a head of state under international law when
international law expressly prohibits torture as a
measure which a state can employ in any circum-
stances whatsoever and has made it an international
crime. It is relevant to observe that in 1996 the mili-
tary government of Chile informed a United Nations
working group on human rights violations in Chile
that torture was unconditionally prohibited in Chile,
that the constitutional prohibition against torture was
fully enforced and that:

"It is therefore apparent that the practice of inflicting
unlawful ill-treatment has not been instituted in our
country as is implied by the resolution" - a U.N. reso-
lution critical of Chile - "and that such ill-treatment is
not tolerated; on the contrary, a serious, comprehen-
sive and coherent body of provisions exist to prevent
the occurrence of such ill-treatment and to punish
those responsible for any type of abuse." It is also
relevant to note that in his opening oral submissions
on behalf of Chile Dr.Lawrence Collins stated:

"the Government of Chile, several of whose present
members were in prison or exile during those years,
deplores the fact that the governmental authorities of
the period of the dictatorship committed major viola-
tions of human rights in Chile. It reaffirms its com-
mitment to human rights, including the prohibition of
torture." In its written submissions (which were re-
peated by Dr. Collins in his oral submissions) Chile
stated:

"The Republic intervenes to assert its own interest
and right to have these matters dealt with in Chile.
The purpose of the intervention is not to defend the
actions of Senator Pinochet whilst he was head of
**263** state. Nor is the purpose to prevent him from
being investigated and tried for any crime he is al-
leged to have committed whilst in office, provided

[2000] 1 A.C. 147                                                                                                                          Page 82
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

that any investigation and trial takes place in the only appropriate courts, namely those of Chile. The democratically elected Government of the Republic of Chile upholds the commitment of the Republic under international conventions to the maintenance and promotion of human rights. The position of the Chilean Government on state immunity is not intended as a personal shield for Senator Pinochet, but is intended to defend Chilean national sovereignty, in accordance with generally accepted principles of international law. Its plea, therefore, does not absolve Senator Pinochet from responsibility in Chile if the acts alleged against him are proved." My Lords, the position taken by the democratically elected Government of Chile that it desires to defend Chilean national sovereignty and considers that any investigation and trial of Senator Pinochet should take place in Chile is understandable. But in my opinion that is not the issue which is before your Lordships; the issue is whether the commission of acts of torture taking place after 29 September 1988 was a function of the head of state of Chile under international law. For the reasons which I have given I consider that it was not.

Article 32(2) of the Vienna Convention set out in Schedule 1 to the Diplomatic Privileges Act 1964 provides that: "waiver must always be express." I consider, with respect, that the conclusion that after 29 September 1988 the commission of acts of torture was not under international law a function of the head of state of Chile does not involve the view that Chile is to be taken as having impliedly waived the immunity of a former head of state. In my opinion there has been no waiver of the immunity of a former head of state in respect of his functions as head of state. My conclusion that Senator Pinochet is not entitled to immunity is based on the view that the commission of acts of torture is not a function of a head of state, and therefore in this case the immunity to which Senator Pinochet is entitled as a former head of state does not arise in relation to, and does not attach to, acts of torture.

A number of international instruments define a crime against humanity as one which is committed on a large scale. Article 18 of the Draft Code of Crimes against the Peace and Security of Mankind 1996 provides:

"A crime against humanity means any of the following acts, when committed in a systematic manner or a large scale and instigated or directed by a government or by any organisation or group: (a) murder; (b) extermination; (c) torture ..." And article 7 of the 1998 Rome Statute of the International Criminal Court provides:

"For the purposes of this statute, 'crime against humanity' means any of the following acts when committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack: (a) murder; (b) extermination ... (f) torture ..."**264**

However, article 4 of the Torture Convention provides that: "Each state party shall ensure that *all* acts of torture are offences under its criminal law." (Emphasis added.)

Therefore I consider that a single act of torture carried out or instigated by a public official or other person acting in an official capacity constitutes a crime against international law, and that torture does not become an international crime only when it is committed or instigated on a large scale. Accordingly I am of opinion that Senator Pinochet cannot claim that a single act of torture or a small number of acts of torture carried out by him did not constitute international crimes and did not constitute acts committed outside the ambit of his functions as head of state.

For the reasons given by *Oppenheim's International Law* , vol. I, p. 545, which I have cited in an earlier part of this judgment, I consider that under international law Chile is responsible for acts of torture carried out by Senator Pinochet, but could claim state immunity if sued for damages for such acts in a court in the United Kingdom. Senator Pinochet could also claim immunity if sued in civil proceedings for damages under the principle stated in Jaffe v. Miller , 13 O.R.(3d) 745. But I am of opinion that there is no inconsistency between Chile and Senator Pinochet's entitlement to claim immunity if sued in civil proceedings for damages and Senator Pinochet's lack of entitlement to claim immunity in criminal proceedings for torture brought against him personally. This distinction between the responsibility of the state for the improper and unauthorised acts of a state official outside the scope of his functions and the individual responsibility of that official in criminal proceedings for an international crime is recognised in article 4 and the commentary thereon in the 1996 Draft Report

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                              Page 83
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

of the International Law Commission:

" *Responsibility of states* . The fact that the present Code provides for the responsibility of individuals for crimes against the peace and security of mankind is without prejudice to any question of the responsibility of states under international law. *Commentary* . (1) Although, as made clear by article 2, the present Code addresses matters relating to the responsibility of individuals for the crimes set out in Part II, it is possible, indeed likely, as pointed out in the commentary to article 2, that an individual may commit a crime against the peace and security of mankind as an 'agent of the state,' 'on behalf of the state,' 'in the name of the state' or even in a de facto relationship with the state, without being vested with any legal power. (2) The 'without prejudice' clause contained in article 4 indicates that the present Code is without prejudice to any question of the responsibility of a state under international law for a crime committed by one of its agents. As the commission already emphasised in the commentary to article 19 of the draft articles on state responsibility, the punishment of individuals who are organs of the state 'certainly does not exhaust the prosecution of the international responsibility incumbent upon the state for internationally wrongful acts which are attributed to it in such cases by reason of the conduct of its organs'. The state may thus remain responsible and be unable to exonerate **\*265** itself from responsibility by invoking the prosecution or punishment of the individuals who committed the crime."

Therefore for the reasons which I have given I am of opinion that Senator Pinochet is not entitled to claim immunity in the extradition proceedings in respect of conspiracy to torture and acts of torture alleged to have been committed by him after 29 September 1988 and to that extent I would allow the appeal. However I am in agreement with the view of Lord Browne-Wilkinson that the Secretary of State should reconsider his decision under section 7 of the Extradition Act 1989 in the light of the changed circumstances arising from your Lordships' decision.

Lord Saville of Newdigate.

My Lords, in this case the Government of Spain seeks the extradition of Senator Pinochet (the former head of state of Chile) to stand trial in Spain for a number of alleged crimes. On this appeal two questions of law arise.

Senator Pinochet can only be extradited for what in the Extradition Act 1989 is called an extradition crime. Thus the first question of law is whether any of the crimes of which he stands accused in Spain is an extradition crime within the meaning of that Act. As to this, I am in agreement with the reasoning and conclusions in the speech of my noble and learned friend, Lord Browne-Wilkinson. I am also in agreement with the reasons given by my noble and learned friend, Lord Hope of Craighead, in his speech for concluding that only those few allegations that he identifies amount to extradition crimes.

These extradition crimes all relate to what Senator Pinochet is said to have done while he was head of state of Chile. The second question of law is whether, in respect of these extradition crimes, Senator Pinochet can resist the extradition proceedings brought against him on the grounds that he enjoys immunity from these proceedings.

In general, under customary international law serving heads of state enjoy immunity from criminal proceedings in other countries by virtue of holding that office. This form of immunity is known as immunity ratione personae. It covers all conduct of the head of state while the person concerned holds that office and thus draws no distinction between what the head of state does in his official capacity (i.e. what he does as head of state for state purposes) and what he does in his private capacity.

Former heads of state do not enjoy this form of immunity. However, in general under customary international law a former head of state does enjoy immunity from criminal proceedings in other countries in respect of what he did in his official capacity as head of state. This form of immunity is known as immunity ratione materiae.

These immunities belong not to the individual but to the state in question. They exist in order to protect the sovereignty of that state from interference by other states. They can, of course, be modified or removed by agreement between states or waived by the state in question.

In my judgment the effect of section 20(1)(a) of the State Immunity Act 1978 is to give statutory force to

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

these international law immunities.

The relevant allegations against Senator Pinochet concern not his private activities but what he is said to have done in his official capacity **\*266** when he was head of state of Chile. It is accepted that the extradition proceedings against him are criminal proceedings. It follows that unless there exists, by agreement or otherwise, any relevant qualification or exception to the general rule of immunity ratione materiae, Senator Pinochet is immune from this extradition process.

The only possible relevant qualification or exception in the circumstances of this case relates to torture.

I am not persuaded that before the Torture Convention there was any such qualification or exception. Although the systematic or widespread use of torture became universally condemned as an international crime, it does not follow that a former head of state, who as head of state used torture for state purposes, could under international law be prosecuted for torture in other countries where previously under that law he would have enjoyed immunity ratione materiae.

The Torture Convention set up a scheme under which each state becoming a party was in effect obliged either to extradite alleged torturers found within its jurisdiction or to refer the case to its appropriate authorities for the purpose of prosecution. Thus as between the states who are parties to the Convention, there is now an agreement that each state party will establish and have this jurisdiction over alleged torturers from other state parties.

This country has established this jurisdiction through a combination of section 134 of the Criminal Justice Act 1988 and the Extradition Act 1989. It ratified the Torture Convention on 8 December 1988. Chile's ratification of the Convention took effect on 30 October 1988 and that of Spain just over a year earlier.

It is important to bear in mind that the Convention applies (and *only* applies) to any act of torture "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." It thus covers what can be described as official torture and must therefore include torture carried out for state purposes. The

words used are wide enough to cover not only the public officials or persons acting in an official capacity who themselves inflict torture but also (where torture results) those who order others to torture or who conspire with others to torture.

To my mind it must follow in turn that a head of state, who for state purposes resorts to torture, would be a person acting in an official capacity within the meaning of this Convention. He would indeed to my mind be a prime example of an official torturer.

It does not follow from this that the immunity enjoyed by a serving head of state, which is entirely unrelated to whether or not he was acting in an official capacity, is thereby removed in cases of torture. In my view it is not, since immunity ratione personae attaches to the office and not to any particular conduct of the office holder.

On the other hand, the immunity of a former head of state does attach to his conduct whilst in office and is wholly related to what he did in his official capacity.

So far as the states that are parties to the Convention are concerned, I cannot see how, so far as torture is concerned, this immunity can exist consistently with the terms of that Convention. Each state party has **\*267** agreed that the other state parties can exercise jurisdiction over alleged official torturers found within their territories, by extraditing them or referring them to their own appropriate authorities for prosecution; and thus to my mind can hardly simultaneously claim an immunity from extradition or prosecution that is necessarily based on the official nature of the alleged torture.

Since 8 December 1988 Chile, Spain and this country have all been parties to the Torture Convention. So far as these countries at least are concerned it seems to me that from that date these state parties are in agreement with each other that the immunity ratione materiae of their former heads of state cannot be claimed in cases of alleged official torture. In other words, so far as the allegations of official torture against Senator Pinochet are concerned, there is now by this agreement an exception or qualification to the general rule of immunity ratione materiae.

I do not reach this conclusion by implying terms into the Torture Convention, but simply by applying its

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

express terms. A former head of state who it is alleged resorted to torture for state purposes falls in my view fairly and squarely within those terms and on the face of it should be dealt with in accordance with them. Indeed it seems to me that it is those who would seek to remove such alleged official torturers from the machinery of the Convention who in truth have to assert that by some process of implication or otherwise the clear words of the Convention should be treated as inapplicable to a former head of state, notwithstanding he is properly described as a person who was " *acting in an official capacity* ."

I can see no valid basis for such an assertion. It is said that if it had been intended to remove immunity for alleged official torture from former heads of state there would inevitably have been some discussion of the point in the negotiations leading to the treaty. I am not persuaded that the apparent absence of any such discussions takes the matter any further. If there were states that wished to preserve such immunity in the face of universal condemnation of official torture, it is perhaps not surprising that they kept quiet about it.

It is also said that any waiver by states of immunities must be express, or at least unequivocal. I would not dissent from this as a general proposition, but it seems to me that the express and unequivocal terms of the Torture Convention fulfil any such requirement. To my mind these terms demonstrate that the states who have become parties have clearly and unambiguously agreed that official torture should now be dealt with in a way which would otherwise amount to an interference in their sovereignty.

For the same reasons it seems to me that the wider arguments based on act of state or non-justiciability must also fail, since they are equally inconsistent with the terms of the Convention agreed by these state parties.

I would accordingly allow this appeal to the extent necessary to permit the extradition proceedings to continue in respect of the crimes of torture and (where it is alleged that torture resulted) of conspiracy to torture, allegedly committed by Senator Pinochet after 8 December 1988. I would add that I agree with what my noble and learned friend, Lord Hope of Craighead, has said at the end of his speech with regard to the need for the **\*268** Secretary of State to reconsider his decision and (if renewed authority to proceed is given) the very careful attention the magistrate must pay to the information laid before him.

Lord Millett.

My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Browne-Wilkinson. Save in one respect, I agree with his reasoning and conclusions. Since the one respect in which I differ is of profound importance to the outcome of this appeal, I propose to set out my own process of reasoning at rather more length than I might otherwise have done.

State immunity is not a personal right. It is an attribute of the sovereignty of the state. The immunity which is in question in the present case, therefore, belongs to the Republic of Chile, not to Senator Pinochet. It may be asserted or waived by the state, but where it is waived by treaty or convention the waiver must be express. So much is not in dispute.

The doctrine of state immunity is the product of the classical theory of international law. This taught that states were the only actors on the international plane; the rights of individuals were not the subject of international law. States were sovereign and equal: it followed that one state could not be impleaded in the national courts of another; par in parem non habet imperium. States were obliged to abstain from interfering in the internal affairs of one another. International law was not concerned with the way in which a sovereign state treated its own nationals in its own territory. It is a cliché of modern international law that the classical theory no longer prevails in its unadulterated form. The idea that individuals who commit crimes recognised as such by international law may be held internationally accountable for their actions is now an accepted doctrine of international law. The adoption by most major jurisdictions of the restrictive theory of state immunity, enacted into English law by Part I of the State Immunity Act 1978, has made major inroads into the doctrine as a bar to the jurisdiction of national courts to entertain civil proceedings against foreign states. The question before your Lordships is whether a parallel, though in some respects opposite, development has taken place so as to restrict the availability of state immunity as a bar to the criminal jurisdiction of national courts.

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                                    Page 86

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

 Two overlapping immunities are recognised by international law; immunity ratione personae and immunity ratione materiae. They are quite different and have different rationales.

 Immunity ratione personae is a status immunity. An individual who enjoys its protection does so because of his official status. It enures for his benefit only so long as he holds office. While he does so he enjoys absolute immunity from the civil and criminal jurisdiction of the national courts of foreign states. But it is only narrowly available. It is confined to serving heads of state and heads of diplomatic missions, their families and servants. It is not available to serving heads of government who are not also heads of state, military commanders and those in charge of the security forces, or their subordinates. It would have been available to Hitler but not to Mussolini or Tojo. It is reflected in English law by section 20(1) of the State Immunity Act 1978, enacting customary **269** international law and the Vienna Convention on Diplomatic Relations (1961).

 The immunity of a serving head of state is enjoyed by reason of his special status as the holder of his state's highest office. He is regarded as the personal embodiment of the state itself. It would be an affront to the dignity and sovereignty of the state which he personifies and a denial of the equality of sovereign states to subject him to the jurisdiction of the municipal courts of another state, whether in respect of his public acts or private affairs. His person is inviolable; he is not liable to be arrested or detained on any ground whatever. The head of a diplomatic mission represents his head of state and thus embodies the sending state in the territory of the receiving state. While he remains in office he is entitled to the same absolute immunity as his head of state in relation both to his public and private acts.

 This immunity is not in issue in the present case. Senator Pinochet is not a serving head of state. If he were, he could not be extradited. It would be an intolerable affront to the Republic of Chile to arrest him or detain him.

 Immunity ratione materiae is very different. This is a subject matter immunity. It operates to prevent the official and governmental acts of one state from being called into question in proceedings before the courts of another, and only incidentally confers im-

munity on the individual. It is therefore a narrower immunity but it is more widely available. It is available to former heads of state and heads of diplomatic missions, and any one whose conduct in the exercise of the authority of the state is afterwards called into question, whether he acted as head of government, government minister, military commander or chief of police, or subordinate public official. The immunity is the same whatever the rank of the office-holder. This too is common ground. It is an immunity from the civil and criminal jurisdiction of foreign national courts but only in respect of governmental or official acts. The exercise of authority by the military and security forces of the state is the paradigm example of such conduct. The immunity finds its rationale in the equality of sovereign states and the doctrine of non-interference in the internal affairs of other states: see Duke of Brunswick v. King of Hanover (1848) 2 H.L.Cas. 1; Hatch v. Baez , 7 Hun 596; Underhill v. Hernandez (1897) 168 U.S. 250. These hold that the courts of one state cannot sit in judgment on the sovereign acts of another. The immunity is sometimes also justified by the need to prevent the serving head of state or diplomat from being inhibited in the performance of his official duties by fear of the consequences after he has ceased to hold office. This last basis can hardly be prayed in aid to support the availability of the immunity in respect of criminal activities prohibited by international law.

 Given its scope and rationale, it is closely similar to and may be indistinguishable from aspects of the Anglo-American act of state doctrine. As I understand the difference between them, state immunity is a creature of international law and operates as a plea in bar to the jurisdiction of the national court, whereas the act of state doctrine is a rule of domestic law which holds the national court incompetent to adjudicate upon the lawfulness of the sovereign acts of a foreign state.**270**

 Immunity ratione materiae is given statutory form in English law by the combined effect of section 20(1) of the State Immunity Act 1978 the Diplomatic Privileges Act 1964 and article 39(2) of the Vienna Convention. The Act of 1978 is not without its difficulties. The former head of state is given the same immunity "subject to all necessary modifications" as a former diplomat, who continues to enjoy immunity in respect of acts committed by him "in the exercise of his functions." The functions of a diplomat are lim-

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

ited to diplomatic activities, i.e. acts performed in his representative role in the receiving state. He has no broader immunity in respect of official or governmental acts not performed in exercise of his diplomatic functions: see Dinstein, "Diplomatic Immunity from Jurisdiction Ratione Materiae" (1966) 15 I.C.L.Q. 76, 82. There is therefore a powerful argument for holding that, by a parity of reasoning, the statutory immunity conferred on a former head of state by the Act of 1978 is confined to acts performed in his capacity as head of state, i.e. in his representative role. If so, the statutory immunity would not protect him in respect of official or governmental acts which are not distinctive of a head of state, but which he performed in some other official capacity, whether as head of government, commander-in-chief or party leader. It is, however, not necessary to decide whether this is the case, for any narrow statutory immunity is subsumed in the wider immunity in respect of other official or governmental acts under customary international law.

The charges brought against Senator Pinochet are concerned with his public and official acts, first as Commander-in-Chief of the Chilean army and later as head of state. He is accused of having embarked on a widespread and systematic reign of terror in order to obtain power and then to maintain it. If the allegations against him are true, he deliberately employed torture as an instrument of state policy. As international law stood on the eve of the Second World War, his conduct as head of state after he seized power would probably have attracted immunity ratione materiae. If so, I am of opinion that it would have been equally true of his conduct during the period before the coup was successful. He was not then, of course, head of state. But he took advantage of his position as Commander-in-Chief of the army and made use of the existing military chain of command to deploy the armed forces of the state against its constitutional government. These were not private acts. They were official and governmental or sovereign acts by any standard.

The immunity is available whether the acts in question are illegal or unconstitutional or otherwise unauthorised under the internal law of the state, since the whole purpose of state immunity is to prevent the legality of such acts from being adjudicated upon in the municipal courts of a foreign state. A sovereign state has the exclusive right to determine what is and

is not illegal or unconstitutional under its own domestic law. Even before the end of the Second World War, however, it was questionable whether the doctrine of state immunity accorded protection in respect of conduct which was prohibited by international law. As early as 1841, according to Quincy Wright (see "The Law of the Nuremberg Trial" (1947) 41 A.J.I.L. 38, 71), many commentators held the view that: "the government's authority could not confer immunity upon its agents for acts beyond its powers under international law." Thus state immunity did not **\*271** provide a defence to a crime against the rules of war: see Sir Hersch Lauterpacht "The Subjects of the Law of Nations" (1947) 63 L.Q.R. 438, 442-443. Writing in "The Nuernberg Trial and Aggressive War" (1946) 59 Harv. L.Rev. 396 before the Nuremberg Tribunal delivered its judgment and commenting on the seminal judgment of Marshall C.J. in Schooner Exchange v. M'Faddon (1812) 11 U.S. (7 Cranch) 116, Sheldon Glueck observed, at p. 426:

"as Marshall implied, even in an age when the doctrine of sovereignty had a strong hold, the non-liability of agents of a state for 'acts of state' must rationally be based on the assumption that no member of the family of nations will order its agents to commit flagrant violations of international and criminal law." Glueck added, at pp. 427-428:

"in modern times a state is - ex hypothesi - incapable of ordering or ratifying acts which are not only criminal according to generally accepted principles of domestic penal law but also contrary to that international law to which all states are perforce subject. Its agents, in performing such acts, are therefore acting outside their legitimate scope; and must, in consequence, be held personally liable for their wrongful conduct." It seems likely that Glueck was contemplating trial before municipal courts, for more than half a century was to pass before the establishment of a truly international criminal tribunal. This would also be consistent with the tenor of his argument that the concept of sovereignty was of relatively recent origin and had been mistakenly raised to what he described as the "status of some holy fetish."

Whether conduct contrary to the peremptory norms of international law attracted state immunity from the jurisdiction of national courts, however, was largely academic in 1946, since the criminal jurisdiction of such courts was generally restricted to offences

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

committed within the territory of the forum state or elsewhere by the nationals of that state. In this connection it is important to appreciate that the International Military Tribunal (the Nuremberg Tribunal) which was established by the four allied powers at the conclusion of the Second World War to try the major war criminals was not, strictly speaking, an international court or tribunal. As Sir Hersch Lauterpacht explained in *Oppenheim's International Law,* vol. II, 7th ed. (1952), pp. 580-581 (ed. Sir Hersch Lauterpacht), the tribunal was: "the joint exercise, by the four states which established the tribunal, of a right which each of them was entitled to exercise separately on its own responsibility in accordance with international law."

In its judgment the tribunal described the making of the charter as an exercise of sovereign legislative power by the countries to which the German Reich had unconditionally surrendered, and of the undoubted right of those countries to legislate for the occupied territories which had been recognised by the whole civilised world. Article 7 of the Charter of the International Military Tribunal provided: **\*272**

"The official position of defendants, whether as heads of state or responsible officials in government departments, shall not be considered as freeing them from responsibility or mitigating punishment." (My emphasis.) In its judgment the tribunal ruled:

"the very essence of the Charter is that individuals have international duties which transcend the national obligations of obedience imposed by the individual state. He who violates the rules of war cannot obtain immunity while acting in pursuance of the authority of the state if the state in authorising action moves outside its competence under international law ... The principle of international law, which under certain circumstances protects the representatives of a state, cannot be applied to acts which are condemned as criminal by international law." (My emphasis.)

The great majority of war criminals were tried in the territories where the crimes were committed. As in the case of the major war criminals tried at Nuremberg, they were generally (though not always) tried by national courts or by courts established by the occupying powers. The jurisdiction of these courts has never been questioned and could be said to be territorial. But everywhere the plea of state immunity

was rejected in respect of atrocities committed in the furtherance of state policy in the course of the Second World War; and nowhere was this justified on the narrow (though available) ground that there is no immunity in respect of crimes committed in the territory of the forum state.

The principles of the Charter of the International Military Tribunal and the Judgment of the Tribunal were unanimously affirmed by Resolution 95 of the General Assembly of the United Nations in 1946. Thereafter it was no longer possible to deny that individuals could be held criminally responsible for war crimes and crimes against peace and were not protected by state immunity from the jurisdiction of national courts. Moreover, while it was assumed that the trial would normally take place in the territory where the crimes were committed, it was not suggested that this was the only place where the trial could take place.

The Nuremberg Tribunal ruled that crimes against humanity fell within its jurisdiction only if they were committed in the execution of or in connection with war crimes or crimes against peace. But this appears to have been a jurisdictional restriction based on the language of the Charter. There is no reason to suppose that it was considered to be a substantive requirement of international law. The need to establish such a connection was natural in the immediate aftermath of the Second World War. As memory of the war receded, it was abandoned.

In 1946 the General Assembly had entrusted the formulation of the principles of international law recognised in the Charter of the Nuremberg Tribunal and the judgment of the tribunal to the International Law Commission. It reported in 1954. It rejected the principle that international criminal responsibility for crimes against humanity should be limited to crimes committed in connection with war crimes or crimes against peace. It was, however, necessary to distinguish international crimes from **\*273** ordinary domestic offences. For this purpose, the commission proposed that acts would constitute international crimes only if they were committed at the instigation or the toleration of state authorities. This is the distinction which was later adopted in the Torture Convention. In my judgment it is of critical importance in relation to the concept of immunity ratione materiae. The very official or governmental character of the

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

acts which is necessary to found a claim to immunity ratione materiae, and which still operates as a bar to the civil jurisdiction of national courts, was now to be the essential element which made the acts an international crime. It was, no doubt, for this reason that the Commission's draft code provided that: "The fact that a person acted as head of state or as a responsible government official does not relieve him of responsibility for committing any of the offences defined in the code."

The landmark decision of the Supreme Court of Israel in Attorney-General of Israel v. Eichmann, 36 I.L.R. 5 is also of great significance. Eichmann had been a very senior official of the Third Reich. He was in charge of Department IV D-4 of the Reich Main Security Office, the department charged with the implementation of the Final Solution, and subordinate only to Heydrich and Himmler. He was abducted from Argentina and brought to Israel, where he was tried in the District Court for Tel Aviv. His appeal against conviction was dismissed by the Supreme Court. The means by which he was brought to Israel to face trial has been criticised by academic writers, but Israel's right to assert jurisdiction over the offences has never been questioned.

The court dealt separately with the questions of jurisdiction and act of state. Israel was not a belligerent in the Second World War, which ended three years before the state was founded. Nor were the offences committed within its territory. The District Court found support for its jurisdiction in the historic link between the state of Israel and the Jewish people. The Supreme Court preferred to concentrate on the international and universal character of the crimes of which the accused had been convicted, not least because some of them were directed against non-Jewish groups (Poles, Slovenes, Czechs and gipsies).

 As a matter of domestic Israeli law, the jurisdiction of the court was derived from an Act of 1950. Following the English doctrine of parliamentary supremacy, the court held that it was bound to give effect to a law of the Knesset even if it conflicted with the principles of international law. But it went on to hold that the law did not conflict with any principle of international law. Following a detailed examination of the authorities, including the judgment of the Permanent Court of International Justice in The Case of Lotus S.S. , Judgment No. 9 of 7 Sep-

tember 1927, P.C.I.J., Series A, No. 10 it concluded that there was no rule of international law which prohibited a state from trying a foreign national for an act committed outside its borders. There seems no reason to doubt this conclusion. The limiting factor that prevents the exercise of extraterritorial criminal jurisdiction from amounting to an unwarranted interference with the internal affairs of another state is that, for the trial to be fully effective, the accused must be present in the forum state.

Significantly, however, the court also held that the scale and international character of the atrocities of which the accused had been **\*274** convicted fully justified the application of the doctrine of universal jurisdiction. It approved the general consensus of jurists that war crimes attracted universal jurisdiction. See, for example, *Greenspan's Modern Law of Land Warfare* (1959), p. 420, where he writes:

"Since each sovereign power stands in the position of a guardian of international law, and is equally interested in upholding it, any state has the legal right to try war crimes, even though the crimes have been committed against the nationals of another power and in a conflict to which that state is not a party." This seems to have been an independent source of jurisdiction derived from customary international law, which formed part of the unwritten law of Israel, and which did not depend on the statute. The court explained that the limitation often imposed on the exercise of universal jurisdiction, that the state which apprehended the offender must first offer to extradite him to the state in which the offence was committed, was not intended to prevent the violation of the latter's territorial sovereignty. Its basis was purely practical. The great majority of the witnesses and the greater part of the evidence would normally be concentrated in that state, and it was therefore the most convenient forum for the trial.

Having disposed of the objections to its jurisdiction, the court rejected the defence of act of state. As formulated, this did not differ in any material respect from a plea of immunity ratione materiae. It was based on the fact that in committing the offences of which he had been convicted the accused had acted as an organ of the state, "whether as head of the state or a responsible official acting on the government's orders." The court applied article 7 of the Nuremberg Charter (which it will be remembered expressly re-

[2000] 1 A.C. 147                                                                                                    Page 90

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

ferred to the head of state) and which it regarded as having become part of the law of nations.

The case is authority for three propositions. (1) There is no rule of international law which prohibits a state from exercising extraterritorial criminal jurisdiction in respect of crimes committed by foreign nationals abroad. (2) War crimes and atrocities of the scale and international character of the Holocaust are crimes of universal jurisdiction under customary international law. (3) The fact that the accused committed the crimes in question in the course of his official duties as a responsible officer of the state and in the exercise of his authority as an organ of the state is no bar to the exercise of the jurisdiction of a national court.

The case was followed in the United States in Demjanjuk v. Petrovsky (1985) 603 F.Supp. 1468; affirmed 776 F.2d. 571. In the context of an extradition request by the State of Israel the court accepted Israel's right to try a person charged with murder in the concentration camps of Eastern Europe. It held that the crimes were crimes of universal jurisdiction, observing: "International law provides that certain offences may be punished by any state because the offenders are enemies of all mankind and all nations have an equal interest in their apprehension and punishment." The difficulty is to know precisely what is the ambit of the expression "certain offences."

Article 5 of the Universal Declaration of Human Rights of 1948 and article 7 of the International Covenant on Civil and Political Rights of 1966 **\*275** both provided that no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. A resolution of the General Assembly in 1973 proclaimed the need for international co-operation in the detection, arrest, extradition and punishment of persons guilty of war crimes and crimes against humanity. A further resolution of the General Assembly in 1975 proclaimed the desire to make the struggle against torture more effective throughout the world. The fundamental human rights of individuals, deriving from the inherent dignity of the human person, had become a commonplace of international law. Article 55 of the Charter of the United Nations was taken to impose an obligation on all states to promote universal respect for and observance of human rights and fundamental freedoms.

The trend was clear. War crimes had been replaced by crimes against humanity. The way in which a state treated its own citizens within its own borders had become a matter of legitimate concern to the international community. The most serious crimes against humanity were genocide and torture. Large scale and systematic use of torture and murder by state authorities for political ends had come to be regarded as an attack upon the international order. Genocide was made an international crime by the Genocide Convention in 1948 . By the time Senator Pinochet seized power, the international community had renounced the use of torture as an instrument of state policy. The Republic of Chile accepts that by 1973 the use of torture by state authorities was prohibited by international law, and that the prohibition had the character of jus cogens or obligation erga omnes. But it insists that this does not confer universal jurisdiction or affect the immunity of a former head of state ratione materiae from the jurisdiction of foreign national courts.

In my opinion, crimes prohibited by international law attract universal jurisdiction under customary international law if two criteria are satisfied. First, they must be contrary to a peremptory norm of international law so as to infringe a jus cogens. Secondly, they must be so serious and on such a scale that they can justly be regarded as an attack on the international legal order. Isolated offences, even if committed by public officials, would not satisfy these criteria. The first criterion is well attested in the authorities and textbooks: for a recent example, see the judgment of the international tribunal for the territory of the former Yugoslavia in Prosecutor v. Furundzija (unreported), 10 December 1998, where the court stated, at para. 156:

"at the individual level, that is, of criminal liability, it would seem that one of the consequences of the jus cogens character bestowed by the international community upon the prohibition of torture is that every state is entitled to investigate, prosecute, and punish or extradite individuals accused of torture, who are present in a territory under its jurisdiction." The second requirement is implicit in the original restriction to war crimes and crimes against peace, the reasoning of the court in the Eichmann case, and the definitions used in the more recent conventions establishing ad hoc international tribunals for the former Yugoslavia and Rwanda. **\*276**

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                     Page 91
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

Every state has jurisdiction under customary international law to exercise extraterritorial jurisdiction in respect of international crimes which satisfy the relevant criteria. Whether its courts have extraterritorial jurisdiction under its internal domestic law depends, of course, on its constitutional arrangements and the relationship between customary international law and the jurisdiction of its criminal courts. The jurisdiction of the English criminal courts is usually statutory, but it is supplemented by the common law. Customary international law is part of the common law, and accordingly I consider that the English courts have and always have had extraterritorial criminal jurisdiction in respect of crimes of universal jurisdiction under customary international law.

In their *Handbook* on the Torture Convention, Burgers and Danelius wrote at p. 1:

"Many people assume that the Convention's principal aim is to outlaw torture and other cruel, inhuman or degrading treatment or punishment. This assumption is not correct in so far as it would imply that the prohibition of these practices is established under international law by the Convention only and that this prohibition will be binding as a rule of international law only for those states which have become parties to the Convention. On the contrary, the Convention is based upon the recognition that the above-mentioned practices are already outlawed under international law. The principal aim of the Convention is to strengthen the existing prohibition of such practices by a number of supportive measures."

In my opinion, the systematic use of torture on a large scale and as an instrument of state policy had joined piracy, war crimes and crimes against peace as an international crime of universal jurisdiction well before 1984. I consider that it had done so by 1973. For my own part, therefore, I would hold that the courts of this country already possessed extraterritorial jurisdiction in respect of torture and conspiracy to torture on the scale of the charges in the present case and did not require the authority of statute to exercise it. I understand, however, that your Lordships take a different view, and consider that statutory authority is require before our courts can exercise extraterritorial criminal jurisdiction even in respect of crimes of universal jurisdiction. Such authority was conferred for the first time by section 134 of the Criminal Justice Act 1988 , but the section was not retrospective. I

shall accordingly proceed to consider the case on the footing that Senator Pinochet cannot be extradited for any acts of torture committed prior to the coming into force of the section .

The Torture Convention did not create a new international crime. But it redefined it. Whereas the international community had condemned the widespread and systematic use of torture as an instrument of state policy, the Convention extended the offence to cover isolated and individual instances of torture provided that they were committed by a public official. I do not consider that offences of this kind were previously regarded as international crimes attracting universal jurisdiction. The charges against Senator Pinochet, however, are plainly of the requisite character. The Convention thus affirmed and extended an existing international crime and imposed obligations on the parties to the Convention to take measures to **\*277** prevent it and to punish those guilty of it. As *Burgers and Danelius* explained, its main purpose was to introduce an institutional mechanism to enable this to be achieved. Whereas previously states were entitled to take jurisdiction in respect of the offence wherever it was committed, they were now placed under an obligation to do so. Any state party in whose territory a person alleged to have committed the offence was found was bound to offer to extradite him or to initiate proceedings to prosecute him. The obligation imposed by the Convention resulted in the passing of section 134 of the Criminal Justice Act 1988.

I agree, therefore, that our courts have statutory extraterritorial jurisdiction in respect of the charges of torture and conspiracy to torture committed after the section had come into force and (for the reasons explained by my noble and learned friend, Lord Hope of Craighead) the charges of conspiracy to murder where the conspiracy took place in Spain.

I turn finally to the plea of immunity ratione materiae in relation to the remaining allegations of torture, conspiracy to torture and conspiracy to murder. I can deal with the charges of conspiracy to murder quite shortly. The offences are alleged to have taken place in the requesting state. The plea of immunity ratione materiae is not available in respect of an offence committed in the forum state, whether this be England or Spain.

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                                                Page 92
[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

The definition of torture, both in the Convention and section 134, is in my opinion entirely inconsistent with the existence of a plea of immunity ratione materiae. The offence can be committed *only* by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. The official or governmental nature of the act, which forms the basis of the immunity, is an essential ingredient of the offence. No rational system of criminal justice can allow an immunity which is coextensive with the offence.

In my view a serving head of state or diplomat could still claim immunity ratione personae if charged with an offence under section 134. He does not have to rely on the character of the conduct of which he is accused. The nature of the charge is irrelevant; his immunity is personal and absolute. But the former head of state and the former diplomat are in no different position from anyone else claiming to have acted in the exercise of state authority. If the applicant's arguments were accepted, section 134 would be a dead letter. Either the accused was acting in a private capacity, in which case he cannot be charged with an offence under the section ; or he was acting in an official capacity, in which case he would enjoy immunity from prosecution. Perceiving this weakness in her argument, counsel for Senator Pinochet submitted that the United Kingdom took jurisdiction so that it would be available if, but only if, the offending state waived its immunity. I reject this explanation out of hand. It is not merely far-fetched; it is entirely inconsistent with the aims and object of the Convention. The evidence shows that other states were to be placed under an obligation to take action precisely because the offending state could not be relied upon to do so.

My Lords, the Republic of Chile was a party to the Torture Convention, and must be taken to have assented to the imposition of an obligation on foreign national courts to take and exercise criminal **278** jurisdiction in respect of the official use of torture. I do not regard it as having thereby waived its immunity. In my opinion there was no immunity to be waived. The offence is one which could only be committed in circumstances which would normally give rise to the immunity. The international community had created an offence for which immunity ratione materiae could not possibly be available. International law cannot be supposed to have established a

crime having the character of a jus cogens and at the same time to have provided an immunity which is coextensive with the obligation it seeks to impose.

In my opinion, acts which attract state immunity in civil proceedings because they are characterised as acts of sovereign power may, for the very same reason, attract individual criminal liability. The respondents relied on a number of cases which show that acts committed in the exercise of sovereign power do not engage the civil liability of the state even if they are contrary to international law. I do not find those decisions determinative of the present issue or even relevant. In England and the United States they depend on the terms of domestic legislation; though I do not doubt that they correctly represent the position in international law. I see nothing illogical or contrary to public policy in denying the victims of state sponsored torture the right to sue the offending state in a foreign court while at the same time permitting (and indeed requiring) other states to convict and punish the individuals responsible if the offending state declines to take action. This was the very object of the Torture Convention. It is important to emphasise that Senator Pinochet is not alleged to be criminally liable because he was head of state when other responsible officials employed torture to maintain him in power. He is not alleged to be vicariously liable for the wrongdoing of his subordinates. He is alleged to have incurred direct criminal responsibility for his own acts in ordering and directing a campaign of terror involving the use of torture. Chile insists on the exclusive right to prosecute him. The Torture Convention, however, gives it only the primary right. If it does not seek his extradition (and it does not) then the United Kingdom is obliged to extradite him to another requesting state or prosecute him itself.

My Lords, we have come a long way from what I earlier described as the classical theory of international law - a long way in a relatively short time. But as the Privy Council pointed out in In re Piracy Jure Gentium[1934] A.C. 586, 597, international law has not become a crystallised code at any time, but is a living and expanding branch of the law. Glueck observed, 59 Harv. L.Rev. 396, 398: "unless we are prepared to abandon every principle of growth for international law, we cannot deny that our own day has its right to institute customs." In a footnote to this passage he added:

[2000] 1 A.C. 147                                                                                                      Page 93

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

"Much of the law of nations has its roots in custom. Custom must have a beginning; and customary usages of states in the matter of national and personal liability for resort to prohibited methods of warfare and to wholesale criminalism have not been petrified for all time."

The law has developed still further since 1984, and continues to develop in the same direction. Further international crimes have been **\*279** created. Ad hoc international criminal tribunals have been established. A permanent international criminal court is in the process of being set up. These developments could not have been foreseen by Glueck and the other jurists who proclaimed that individuals could be held individually liable for international crimes. They envisaged prosecution before national courts, and this will necessarily remain the norm even after a permanent international tribunal is established. In future those who commit atrocities against civilian populations must expect to be called to account if fundamental human rights are to be properly protected. In this context, the exalted rank of the accused can afford no defence.

For my own part, I would allow the appeal in respect of the charges relating to the offences in Spain and to torture and conspiracy to torture wherever and whenever carried out. But the majority of your Lordships think otherwise, and consider that Senator Pinochet can be extradited only in respect of a very limited number of charges. This will transform the position from that which the Secretary of State considered last December. I agree with my noble and learned friend, Lord Browne-Wilkinson, that it will be incumbent on the Secretary of State to reconsider the matter in the light of the very different circumstances which now prevail.

Lord Phillips of Worth Matravers.

My Lords, the Spanish Government seeks extradition of Senator Pinochet to stand trial for crimes committed in a course of conduct spanning a lengthy period. My noble and learned friend, Lord Browne-Wilkinson, has described how, before your Lordships' House, the Spanish Government contended for the first time that the relevant conduct extended back to 1 January 1972, and now covered a significant period before Senator Pinochet became head of state and thus before acts done in that capacity could result

in any immunity. This change in the Spanish Government's case rendered critical issues that have hitherto barely been touched on. What is the precise nature of the double criminality rule that governs whether conduct amounts to an extradition crime and what parts of Senator Pinochet's alleged conduct satisfy that rule? On the first issue I agree with the conclusion reached by Lord Browne-Wilkinson and on the second I agree with the analysis of my noble and learned friend, Lord Hope of Craighead.

These conclusions greatly reduce the conduct that can properly form the subject of a request for extradition under our law. They leave untouched the question of whether the English court can assert any criminal jurisdiction over acts committed by Senator Pinochet in his capacity of head of state. It is on that issue, the issue of immunity, that I would wish to add some comments of my own.

**State immunity**

There is an issue as to whether the applicable law of immunity is to be found in the State Immunity Act 1978 or in principles of public international law, which form part of our common law. If the statute governs it must be interpreted, so far as is possible, in a manner which accords with public international law. Accordingly I propose to start by considering the position at public international law. **\*280** *The nature of the claim to immunity*

These proceedings have arisen because Senator Pinochet chose to visit the United Kingdom. By so doing he became subject to the authority that this state enjoys over all within its territory. He has been arrested and is threatened with being removed against his will to Spain to answer criminal charges which are there pending. That has occurred pursuant to our extradition procedures. Both the executive and the court has a role to play in the extradition process. It is for the court to decide whether the legal requirements which are a precondition to extradition are satisfied. If they are, it is for the Home Secretary to decide whether to exercise his power to order that Senator Pinochet be extradited to Spain.

If Senator Pinochet were still the head of state of Chile, he and Chile would be in a position to complain that the entire extradition process was a violation of the duties owed under international law to a

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                                                                                                              Page 94

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149
N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24
(1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

person of his status. Ahead of state on a visit to another country is inviolable. He cannot be arrested or detained, let alone removed against his will to another country, and he is not subject to the judicial processes, whether civil or criminal, of the courts of the state that he is visiting. But Senator Pinochet is no longer head of state of Chile. While as a matter of courtesy a state may accord a visitor of Senator Pinochet's distinction certain privileges, it is under no legal obligation to do so. He accepts, and Chile accepts, that this country no longer owes him any duty under international law by reason of his status, ratione personae. Immunity is claimed, ratione materiae, on the ground that the subject matter of the extradition process is the conduct by Senator Pinochet of his official functions when he was head of state. The claim is put thus in his written case:

"There is no distinction to be made between a head of state, a former head of state, a state official or a former state official, in respect of official acts performed under colour of their office. Immunity will attach to all official acts that are imputable or attributable to the state. It is therefore the nature of the conduct and the capacity of the applicant at the time of the conduct alleged, not the capacity of the applicant at the time of any suit, that is relevant."

We are not, of course, here concerned with a civil suit but with proceedings that are criminal in nature. Principles of the law of immunity that apply in relation to civil litigation will not necessarily apply to a criminal prosecution. The nature of the process with which this appeal is concerned is not a prosecution but extradition. The critical issue that the court has to address in that process is, however, whether the conduct of Senator Pinochet which forms the subject of the extradition request constituted a crime or crimes under English law. The argument in relation to extradition has proceeded on the premise that the same principles apply that would apply if Senator Pinochet were being prosecuted in this country for the conduct in question. It seems to me that that is an appropriate premise on which to proceed.

Why is it said to be contrary to international law to prosecute someone who was once head of state, or a state official, in respect of acts committed in his official capacity? It is common ground that the basis of *281 the immunity claimed is an obligation owed to Chile, not to Senator Pinochet. The immunity as-serted is Chile's. Were these civil proceedings in which damages were claimed in respect of acts committed by Senator Pinochet in the government of Chile, Chile could argue that it was itself indirectly impleaded. That argument does not run where the proceedings are criminal and where the issue is Senator Pinochet's personal responsibility, not that of Chile. The following general principles are advanced in Chile's written case as supporting the immunity claimed:

"(a) the sovereign equality of states and the maintenance of international relations require that the courts of one state will not adjudicate on the governmental acts of another state; (b) intervention in the internal affairs of other states is prohibited by international law; (c) conflict in international relations will be caused by such adjudication or intervention." These principles are illustrated by the following passage from Hatch v. Baez, 7 Hun 596, a case in which the former President of the Dominican Republic was sued in New York for injuries allegedly sustained at his hands in Santo Domingo:

"The counsel for the plaintiff relies on the general principle, that all persons, of whatever rank or condition, whether in or out of office, are liable to be sued for acts done by them in violation of law. Conceding the truth and universality of that principle, it does not establish the jurisdiction of our tribunals to take cognisance of the official acts of foreign governments. We think that, by the universal comity of nations and the established rules of international law, the courts of one country are bound to abstain from sitting in judgement on the acts of another government done within its own territory. Each state is sovereign throughout its domain. The acts of the defendant for which he is sued were done by him in the exercise of that part of the sovereignty of St. Domingo which belongs to the executive department of that government. To make him amenable to a foreign jurisdiction for such acts, would be a direct assault upon the sovereignty and independence of his country. The only remedy for such wrongs must be sought through the intervention of the government of the person injured ... The fact that the defendant has ceased to be president of St. Domingo does not destroy his immunity. That springs from the capacity in which the acts were done, and protects the individual who did them, because they emanated from a foreign and friendly government." This statement was made in the context

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

of civil proceedings. I propose to turn to the sources of international law to see whether they establish that those principles have given rise to a rule of immunity in relation to criminal proceedings.

**The sources of immunity**

Many rules of public international law are founded upon or reflected in conventions. This is true of those rules of state immunity which relate to **\*282** civil suit: see the European Convention on State Immunity 1972. It is not, however, true of state immunity in relation to criminal proceedings. The primary source of international law is custom, that is "a clear and continuous habit of doing certain actions which has grown up under the conviction that these actions are, according to international law, obligatory or right:" Oppenheim's International Law, vol. I, p. 27. Other sources of international law are judicial decisions, the writing of authors and "the general principles of law recognised by all civilised nations:" see article 38 of the Statute of the International Court of Justice . To what extent can the immunity asserted in this appeal be traced to such sources?

**Custom**

In what circumstances might a head of state or other state official commit a criminal offence under the law of a foreign state in the course of the performance of his official duties?

Prior to the developments in international law which have taken place in the last 50 years, the answer is very few. Had the events with which this appeal is concerned occurred in the 19th century, there could have been no question of Senator Pinochet being subjected to criminal proceedings in this country in respect of acts, however heinous, committed in Chile. This would not have been because he would have been entitled to immunity from process, but for a more fundamental reason. He would have committed no crime under the law of England and the courts of England would not have purported to exercise a criminal jurisdiction in respect of the conduct in Chile of any national of that state. I have no doubt that the same would have been true of the courts of Spain. Under international practice criminal law was territorial. This accorded with the fundamental principle of international law that one state must not intervene in the internal affairs of another. For one state

to have legislated to make criminal acts committed within the territory of another state by the nationals of the latter would have infringed this principle. So it would to have exercised jurisdiction in respect of such acts. An official of one state could only commit a crime under the law of another state by going to that state and committing a criminal act there. It is certainly possible to envisage a diplomat committing a crime within the territory to which he was accredited, and even to envisage his doing so in the performance of his official functions - though this is less easy. Well established international law makes provision for the diplomat. The Vienna Convention on Diplomatic Relations (1961 ) provides for immunity from civil and criminal process while the diplomat is in post and, thereafter, in respect of conduct which he committed in the performance of his official functions while in post. Customary international law provided a head of state with immunity from any form of process while visiting a foreign state. It is possible to envisage a visiting head of state committing a criminal offence in the course of performing his official functions while on a visit and when clothed with status immunity. What seems inherently unlikely is that a foreign head of state should commit a criminal offence in the performance of his official functions while on a visit and subsequently return after ceasing to be head of state. Certainly this cannot have happened with **\*283** sufficient frequency for any custom to have developed in relation to it. Nor am I aware of any custom which would have protected from criminal process a visiting official of a foreign state who was not a member of a special mission had he had the temerity to commit a criminal offence in the pursuance of some official function. For these reasons I do not believe that custom can provide any foundation for a rule that a former head of state is entitled to immunity from criminal process in respect of crimes committed in the exercise of his official functions.

**Judicial decisions**

In the light of the considerations to which I have just referred, it is not surprising that Senator Pinochet and the Republic of Chile have been unable to point to any body of judicial precedent which supports the proposition that a former head of state or other government official can establish immunity from criminal process on the ground that the crime was committed in the course of performing official functions. The best that counsel for Chile has been able to do is to

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

draw attention to the following obiter opinion of the Swiss Federal Tribunal in Marcos and Marcos v. Federal Department of Police , 102 I.L.R. 198, 202-203.

"The privilege of the immunity from criminal jurisdiction of heads of state ... has not been fully codified in the Vienna Convention [on Diplomatic Relations] ... But it cannot be concluded that the texts of conventions drafted under the aegis of the United Nations grant a lesser protection to heads of foreign states than to the diplomatic representatives of the state which those heads of states lead or universally represent ... articles 32 and 39 of the Vienna Convention must therefore apply by analogy to heads of state."

### Writings of authors

We have been referred to the writings of a number of learned authors in support of the immunity asserted on behalf of Senator Pinochet. *Oppenheim* , vol. I comments, at pp. 1043-1044, para. 456:

"All privileges mentioned must be granted to a head of state only so long as he holds that position. Therefore, after he has been deposed or has abdicated, he may be sued, at least in respect of obligations of a private character entered into while head of state. For his official acts as head of state he will, like any other agent of a state, enjoy continuing immunity." This comment plainly relates to civil proceedings.

**Satow's Guide to Diplomatic Practice** , 5th ed. (1979) deals in chapter 2 with the position of a visiting head of state. The authors deal largely with immunity from civil proceedings but state, at p. 10, para. 2.2, that under customary international law "he is entitled to immunity - probably without exception - from criminal and civil jurisdiction." After a further passage dealing with civil proceedings, the authors state, at p. 10, para. 2.4: *284

"A head of state who has been deposed or replaced or has abdicated or resigned is of course no longer entitled to privileges or immunities as a head of state. He will be entitled to continuing immunity in regard to acts which he performed while head of state, provided that the acts were performed in his official capacity; in this his position is no different from that of any agent of the state." Sir Arthur Watts Q.C. in his

Hague Lectures on "The Legal Position in International Law of Heads of State, Heads of Government and Foreign Ministers," (1994-III) 247 Recueil des cours deals with the loss of immunity of a head of state who is deposed on a foreign visit. He then adds, at p. 89:

"Ahead of state's official acts, performed in his public capacity as head of state, are however subject to different considerations. Such acts are acts of the state rather than the head of state's personal acts, and he cannot be sued for them even after he has ceased to be head of state. The position is similar to that of acts performed by an ambassador in the exercise of his functions, for which immunity continues to subsist even after the ambassador's appointment has come to an end." My Lords, I do not find these writings, unsupported as they are by any reference to precedent or practice, a compelling foundation for the immunity in respect of criminal proceedings that is asserted.

### General principles of law recognised by all civilised nations

The claim for immunity raised in this case is asserted in relation to a novel type of extraterritorial criminal jurisdiction. The nature of that jurisdiction I shall consider shortly. If immunity from that jurisdiction is to be established it seems to me that this can only be on the basis of applying the established general principles of international law relied upon by Chile to which I have already referred, rather than any specific rule of law relating to immunity from criminal process.

These principles underlie some of the rules of immunity that are clearly established in relation to civil proceedings. It is time to take a closer look at these rules, and at the status immunity that is enjoyed by a head of state ratione personae.

### Immunity from civil suit of the state itself

It was originally an absolute rule that the court of one state would not entertain a civil suit brought against another state. All states are equal and this was said to explain why one state could not sit in judgment on another. This rule was not viable once states began to involve themselves in commerce on a large scale and state practice developed an alternative restrictive rule of state immunity under which immu-

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

nity subsisted in respect of the public acts of the state but not for its commercial acts. A distinction was drawn between acts done jure imperii and acts done jure gestionis. This refinement of public international law was described by Lord Denning M.R. in Trendtex Trading Corporation v. Central Bank of Nigeria[1977] Q.B. 529. In that case the majority of the Court of Appeal held that the common law of England, of which international law forms part, had also changed to embrace the restrictive theory of state immunity from civil process. That change was about to be embodied in statute, the State Immunity Act 1978, which gave effect to the European Convention on State Immunity of 1972.

Part I of the Act starts by providing:

" *General immunity from jurisdiction* 1(1) A state is immune from the jurisdiction of the courts of the United Kingdom except as provided in the following provisions of this Part of this Act." Part I goes on to make provision for a number of exceptions from immunity, the most notable of which is, by section 3, that in relation to a commercial transaction entered into by the state. Part I does not apply to criminal proceedings: section 16(4).

**The immunity of a head of state ratione personae**

An acting head of state enjoyed by reason of his status absolute immunity from all legal process. This had its origin in the times when the head of state truly personified the state. It mirrored the absolute immunity from civil process in respect of civil proceedings and reflected the fact that an action against a head of state in respect of his public acts was, in effect, an action against the state itself. There were, however, other reasons for the immunity. It would have been contrary to the dignity of a head of state that he should be subjected to judicial process and this would have been likely to interfere with the exercise of his duties as a head of state. Accordingly the immunity applied to both criminal and civil proceedings and, in so far as civil proceedings were concerned, to transactions entered into by the head of state in his private as well as his public capacity.

When the immunity of the state in respect of civil proceedings was restricted to exclude commercial transactions, the immunity of the head of state in respect of transactions entered into on behalf of the state in his public capacity was similarly restricted, although the remainder of his immunity remained: see sections 14(1)(a) and 20(5) of the Act of 1978.

**Immunity ratione materiae**

This is an immunity of the state which applies to preclude the courts of another state from asserting jurisdiction in relation to a suit brought against an official or other agent of the state, present or past, in relation to the conduct of the business of the state while in office. While a head of state is serving, his status ensures him immunity. Once he is out of office, he is in the same position as any other state official and any immunity will be based upon the nature of the subject matter of the litigation. We were referred to a number of examples of civil proceedings against a former head of state where the validity of a claim to immunity turned, in whole or in part, on whether the transaction in question was one in which the defendant had acted in a public or a private capacity: Ex-King Farouk of Egypt v. Christian Dior, 24 I.L.R. 228; Société Jean Dessès v. Prince Farouk (1963) 65 I.L.R. 37; Jiminez v. Aristeguieta, 311 F.2d 547; United States v. Noriega, 117 F.3d 1206.

There would seem to be two explanations for immunity ratione materiae. The first is that to sue an individual in respect of the conduct of the state's business is, indirectly, to sue the state. The state would be obliged to meet any award of damage made against the individual. This reasoning has no application to criminal proceedings. The second explanation for the immunity is the principle that it is contrary to international law for one state to adjudicate upon the internal affairs of another state. Where a state or a state official is impleaded, this principle applies as part of the explanation for immunity. Where a state is not directly or indirectly impleaded in the litigation, so that no issue of state immunity as such arises, the English and American courts have none the less, as a matter of judicial restraint, held themselves not competent to entertain litigation that turns on the validity of the public acts of a foreign state, applying what has become known as the act of state doctrine. Two citations well illustrate the principle. 1. Underhill v. Hernandez , 168 U.S. 250, 252, *per* Fuller C.J.:

"Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the

[2000] 1 A.C. 147                                                                                                    Page 98

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves ... The immunity of individuals from suits brought in foreign tribunals for acts done within their own states, in the exercise of governmental authority, whether as civil officers or as military commanders, must necessarily extend to the agents of governments ruling by paramount force as matter of fact." 2. Buck v. Attorney-General[1965] Ch. 745, 770, *per* Diplock L.J.:

"As a member of the family of nations, the Government of the United Kingdom (of which this court forms part of the judicial branch) observes the rules of comity, videlicet, the accepted rules of mutual conduct as between state and state which each state adopts in relation to other states to adopt in relation to itself. One of those rules is that it does not purport to exercise jurisdiction over the internal affairs of any other independent state, or to apply measures of coercion to it or to its property, except in accordance with the rules of public international law. One of the commonest applications of this rule by the judicial branch of the United Kingdom Government is the well known doctrine of sovereign immunity. A foreign state cannot be impleaded in the English courts without its consent: see Duff Development Co. v. Kelantan Government [1924] A.C. 797, 820. As was made clear in Rahimtoola v. Nizam of Hyderabad [1958] A.C. 379, the application of the doctrine of sovereign immunity does not depend upon the persons between whom the issue is joined, but upon the subject matter of the issue. For the English court to pronounce upon the validity of a law of a foreign sovereign state within its own territory, so that the validity of that law became the res of the res **\*287** judicata in the suit, would be to assert jurisdiction over the internal affairs of that state. That would be a breach of the rules of comity."

It is contended on behalf of the applicant that the question of whether an official is acting in a public capacity does not depend upon whether he is acting within the law of the state on whose behalf he purports to act, or even within the limits of international law. His conduct in an official capacity will, whether lawful or unlawful, be conduct of the state and the state will be entitled to assert immunity in respect of it. In the field of civil litigation these propositions are supported by authority. There are a number of instances where plaintiffs have impleaded states claiming damages for injuries inflicted by criminal conduct on the part of state officials which allegedly violated international law. In those proceedings it was of the essence of the plaintiffs' case that the allegedly criminal conduct was conduct of the state and this was not generally in issue. What was in issue was whether the criminality of the conduct deprived the state of immunity and on that issue the plaintiffs failed. Counsel for the applicant provided us with an impressive, and depressing, list of such cases: Saltany v. Reagan (1988) 702 F.Supp. 319 (claims of assassination and terrorism); Siderman de Blake v. Republic of Argentina , 965 F.2d 699) (claim of torture); Princz v. Federal Republic of Germany , 26 F.3d 1166 (claim in respect of the Holocaust); Al-Adsani v. Government of Kuwait , 107 I.L.R. 536 (claim of torture); Sampson v. Federal Republic of Germany (1997) 975 F.Supp. 1108 (claim in respect of the Holocaust); Smith v. Socialist People's Libyan Arab Jamahiriya (1995) 886 F.Supp. 306; (1996) 101 F.3d 239 (claim in respect of Lockerbie bombing); Persinger v. Islamic Republic of Iran (1984) 729 F.2d 835 (claim in relation to hostage-taking at the U.S. Embassy).

It is to be observed that all but one of those cases involved decisions of courts exercising the federal jurisdiction of the United States, Al-Adsani v. Government of Kuwait being a decision of the Court of Appeal of this country. In each case immunity from civil suit was afforded by statute - in America, the Foreign Sovereign Immunities Act and, in England, the State Immunity Act 1978. In each case the court felt itself precluded by the clear words of the statute from acceding to the submission that state immunity would not protect against liability for conduct which infringed international law.

**The vital issue**

The submission advanced on behalf of the respondent in respect of the effect of public international law can, I believe, be summarised as follows. (1) One state will not entertain judicial proceedings against a former head of state or other state official of another state in relation to conduct performed in his official capacity. (2) This rule applies even if the conduct amounts to a crime against international law. (3) This rule applies in relation to both civil and criminal pro-

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
(Cite as: [2000] 1 A.C. 147)

ceedings.

For the reasons that I have given and if one proceeds on the premise that Part I of the State Immunity Act 1978 correctly reflects current international law, I believe that the first two propositions are made out in relation to civil proceedings. The vital issue is the extent to which they *288 apply to the exercise of criminal jurisdiction in relation to the conduct that forms the basis of the request for extradition. This issue requires consideration of the nature of that jurisdiction.

## The development of international criminal law

In the latter part of this century there has been developing a recognition among states that some types of criminal conduct cannot be treated as a matter for the exclusive competence of the state in which they occur. In *Oppenheim's International Law* , vol. I, p. 998 the authors commented:

"While no general rule of positive international law can as yet be asserted which gives to states the right to punish foreign nationals for crimes against humanity in the same way as they are, for instance, entitled to punish acts of piracy, there are clear indications pointing to the gradual evolution of a significant principle of international law to that effect. That principle consists both in the adoption of the rule of universality of jurisdiction and in the recognition of the supremacy of the law of humanity over the law of the sovereign state when enacted or applied in violation of elementary human rights in a manner which may justly be held to shock the conscience of mankind." The appellants, and those who have on this appeal been given leave to support them, contend that this passage, which appears verbatim in earlier editions, is out of date. They contend that international law now recognises a category of criminal conduct with the following characteristics. (1) It is so serious as to be of concern to all nations and not just to the state in which it occurs. (2) Individuals guilty of it incur criminal responsibility under international law. (3) There is universal jurisdiction in respect of it. This means that international law recognises the right of any state to prosecute an offender for it, regardless of where the criminal conduct took place. (4) No state immunity attaches in respect of any such prosecution.

My Lords, this is an area where international law is

on the move and the move has been effected by express consensus recorded in or reflected by a considerable number of international instruments. Since the Second World War states have recognised that not all criminal conduct can be left to be dealt with as a domestic matter by the laws and the courts of the territories in which such conduct occurs. There are some categories of crime of such gravity that they shock the conscience of mankind and cannot be tolerated by the international community. Any individual who commits such a crime offends against international law. The nature of these crimes is such that they are likely to involve the concerted conduct of many and liable to involve the complicity of the officials of the state in which they occur, if not of the state itself. In these circumstances it is desirable that jurisdiction should exist to prosecute individuals for such conduct outside the territory in which such conduct occurs.

I believe that it is still an open question whether international law recognises universal jurisdiction in respect of international crimes - that is the right, under international law, of the courts of any state to prosecute *289 for such crimes wherever they occur. In relation to war crimes, such a jurisdiction has been asserted by the State of Israel, notably in the prosecution of Adolf Eichmann, but this assertion of jurisdiction does not reflect any general state practice in relation to international crimes. Rather, states have tended to agree, or to attempt to agree, on the creation of international tribunals to try international crimes. They have however, on occasion, agreed by conventions, that their national courts should enjoy jurisdiction to prosecute for a particular category of international crime wherever occurring.

The principle of state immunity provides no bar to the exercise of criminal jurisdiction by an international tribunal, but the instruments creating such tribunals have tended, none the less, to make it plain that no exception from responsibility or immunity from process is to be enjoyed by a head of state or other state official. Thus the Charter of the Nuremberg Tribunal 1945 provides by article 7: "The official position of defendants, whether as head of state or responsible officials in government departments, shall not be considered as freeing them from responsibility or mitigating punishment." The Tokyo Charter of 1946, the Statute of the International Criminal Tribunal for the Former Yugoslavia of 1993, the Statute of the International Criminal Tribunal for

© 2011 Thomson Reuters.

[2000] 1 A.C. 147                                                                                           Page 100

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

Rwanda 1994 and the Statute of the International Criminal Court 1998 all have provisions to like effect.

Where states, by convention, agree that their national courts shall have jurisdiction on a universal basis in respect of an international crime, such agreement cannot implicitly remove immunities ratione personae that exist under international law. Such immunities can only be removed by express agreement or waiver. Such an agreement was incorporated in the Convention on the Prevention and Suppression of the Crime of Genocide 1948, which provides: "Persons committing genocide or any of the other acts enumerated in article III shall be punished, whether they are constitutionally responsible rulers, public officials, or private individuals." Had the Genocide Convention not contained this provision, an issue could have been raised as to whether the jurisdiction conferred by the Convention was subject to state immunity ratione materiae. Would international law have required a court to grant immunity to a defendant upon his demonstrating that he was acting in an official capacity? In my view it plainly would not. I do not reach that conclusion on the ground that assisting in genocide can never be a function of a state official. I reach that conclusion on the simple basis that no established rule of international law requires state immunity ratione materiae to be accorded in respect of prosecution for an international crime. International crimes and extra- territorial jurisdiction in relation to them are both new arrivals in the field of public international law. I do not believe that state immunity ratione materiae can coexist with them. The exercise of extraterritorial jurisdiction overrides the principle that one state will not intervene in the internal affairs of another. It does so because, where international crime is concerned, that principle cannot prevail. An international crime is as offensive, if not more offensive, to the international community when committed under colour of office. Once extraterritorial jurisdiction is established, it makes no sense to exclude from it acts done in an official capacity.**\*290**

There can be no doubt that the conduct of which Senator Pinochet stands accused by Spain is criminal under international law. The Republic of Chile has accepted that torture is prohibited by international law and that the prohibition of torture has the character of jus cogens and of obligation erga omnes. It is further accepted that officially sanctioned torture is forbidden by international law. The information provided by Spain accuses Senator Pinochet not merely of having abused his powers as head of state by committing torture, but of subduing political opposition by a campaign of abduction, torture and murder that extended beyond the boundaries of Chile. When considering what is alleged, I do not believe that it is correct to attempt to analyse individual elements of this campaign and to identify some as being criminal under international law and others as not constituting international crimes. If Senator Pinochet behaved as Spain alleged, then the entirety of his conduct was a violation of the norms of international law. He can have no immunity against prosecution for any crime that formed part of that campaign.

It is only recently that the criminal courts of this country acquired jurisdiction, pursuant to section 134 of the Criminal Justice Act 1984, to prosecute Senator Pinochet for torture committed outside the territorial jurisdiction, provided that it was committed in the performance, or purported performance, of his official duties. Section 134 was passed to give effect to the rights and obligations of this country under the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment of 1984, to which the United Kingdom, Spain and Chile are all signatories. That Convention outlaws the infliction of torture "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity:" (article 1). Each state party is required to make such conduct criminal under its law, wherever committed. More pertinently, each state party is required to prosecute any person found within its jurisdiction who has committed such an offence, unless it extradites that person for trial for the offence in another state. The only conduct covered by this Convention is conduct which would be subject to immunity ratione materiae, if such immunity were applicable. The Convention is thus incompatible with the applicability of immunity ratione materiae. There are only two possibilities. One is that the states parties to the Convention proceeded on the premise that no immunity could exist ratione materiae in respect of torture, a crime contrary to international law. The other is that the states parties to the Convention expressly agreed that immunity ratione materiae should not apply in the case of torture. I believe that the first of these alternatives is the correct one, but either must be fatal to the assertion by Chile and Senator Pinochet of immunity in respect of extradition proceedings based on torture.

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999
**(Cite as: [2000] 1 A.C. 147)**

## The State Immunity Act 1978

 I have referred earlier to Part I of the State Immunity Act 1978, which does not apply to criminal proceedings. Part III of the Act, which is of general application, is headed "Miscellaneous and Supplementary." Under this Part, section 20 provides: **\*291**

"(1) Subject to the provisions of this section and to any necessary modifications, the Diplomatic Privileges Act 1964 shall apply to - (a) a sovereign or other head of state; (b) members of his family forming part of his household; and (c) his private servants, as it applies to the head of a diplomatic mission, to members of his family forming part of his household and to his private servants." The Diplomatic Privileges Act 1964 was passed to give effect to the Vienna Convention on Diplomatic Relations of 1961. The preamble to the Convention records that "peoples of all nations from ancient times have recognised the status of diplomatic agents." The Convention codifies long standing rules of public international law as to the privileges and immunities to be enjoyed by a diplomatic mission. The Act of 1964 makes applicable those articles of the Convention that are scheduled to the Act. These include article 29, which makes the person of a diplomatic agent immune from any form of detention and arrest, article 31 which confers on a diplomatic agent immunity from the criminal and civil jurisdiction of the receiving state and article 39, which includes the following provisions:

"(1) Every person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving state on proceedings to take up his post or, if already in its territory, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed. (2) When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist." The question arises of how, after the "necessary modifications," these provisions should be applied to a head of state. All who have so far in these

proceedings given judicial consideration to this problem have concluded that the provisions apply so as to confer the immunities enjoyed by a diplomat upon a head of state in relation to his actions wherever in the world they take place. This leads to the further conclusion that a former head of state continues to enjoy immunity in respect of acts committed "in the exercise of his functions" as head of state, wherever those acts occurred.

For myself, I would not accord section 20 of the Act of 1978 such broad effect. It seems to me that it does no more than to equate the position of a head of state and his entourage visiting this country with that of a diplomatic mission within this country. Thus interpreted, section 20 accords with established principles of international law, is readily applicable and can appropriately be described as supplementary to the other Parts of the Act. As Lord Browne-Wilkinson has demonstrated, reference to the parliamentary history of the section discloses that this was precisely the original intention of section 20, for the section expressly provided that it applied to a head of state who was "in the United Kingdom at the invitation or with the consent of the Government of the **\*292** United Kingdom." Those words were deleted by amendment. The mover of the amendment explained that the object of the amendment was to ensure that heads of state would be treated like heads of diplomatic missions "irrespective of presence in the United Kingdom."

Senator Pinochet and Chile have contended that the effect of section 20, as amended, is to entitle Senator Pinochet to immunity in respect of any acts committed in the performance of his functions as head of state anywhere in the world, and that the conduct which forms the subject matter of the extradition proceedings, in so far as it occurred when Senator Pinochet was head of state, consisted of acts committed by him in performance of his functions as head of state.

 If these submissions are correct, the Act of 1978 requires the English court to produce a result which is in conflict with international law and with our obligations under the Torture Convention. I do not believe that the submissions are correct, for the following reasons.

 As I have explained, I do not consider that section 20

© 2011 Thomson Reuters.

[2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999 [2000] 1 A.C. 147 [1999] 2 W.L.R. 827 [1999] 2 All E.R. 97 6 B.H.R.C. 24 (1999) 96(17) L.S.G. 24 (1999) 149 N.L.J. 497 Times, March 25, 1999

**(Cite as: [2000] 1 A.C. 147)**

of the Act of 1978 has any application to conduct of a head of state outside the United Kingdom. Such conduct remains governed by the rules of public international law. Reference to the parliamentary history of the section, which I do not consider appropriate, serves merely to confuse what appears to me to be relatively clear.

If I am mistaken in this view and we are bound by the Act of 1978 to accord to Senator Pinochet immunity in respect of all acts committed "in performance of his functions as head of state," I would not hold that the course of conduct alleged by Spain falls within that description. Article 3 of the Vienna Convention, which strangely is not one of those scheduled to the Act of 1964, defines the functions of a diplomatic mission as including "protecting in the receiving state the interests of the sending state and of its nationals, within the limits permitted by international law." (The emphasis is mine.)

In so far as Part III of the Act of 1978 entitles a former head of state to immunity in respect of the performance of his official functions I do not believe that those functions can, as a matter of statutory interpretation, extend to actions that are prohibited as criminal under international law. In this way one can reconcile, as one must seek to do, the provisions of the Act of 1978 with the requirements of public international law.

For these reasons, I would allow the appeal in respect of so much of the conduct alleged against Senator Pinochet as constitutes extradition crimes. I agree with Lord Hope as to the consequences which will follow as a result of the change in the scope of the case.Appeal allowed to extent that extradition to proceed for offences of torture and conspiracy to torture occurring after 8 December 1988. (B. L. S. )

---

1. Extradition Act 1989, s. 2: see post, pp. 193G-194C.

2. Criminal Justice Act 1988, s. 134(1): see post, p. 231D-E.

3. Taking of Hostages Act 1982, s. 1(1) : see post, p.

230E-F.

4. State Immunity Act 1978, s. 20(1): see post, p. 203A.

5. Diplomatic Privileges Act 1964, Sch. 1, art. 39: see post, p. 209F-G.

END OF DOCUMENT

© 2011 Thomson Reuters.