**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**


KAPLAN, et al.,

                Plaintiffs,

                                                   Civ. No. 10-483(RCL)

      v.

THE CENTRAL BANK OF IRAN, et al.,

                Defendants.


**DECLARATION OF PATRICK L. CLAWSON**


I, Patrick L. Clawson, PhD, of the city of Washington in the District of Columbia, this 1st day of December, 2015, declare pursuant to 28 U.S.C. § 1746, as follows, subject to penalties of perjury:

**A.       Professional Background**

       1.       I am an expert on the Islamic Republic of Iran ("Iran") and have extensively studied and researched Iran and its sponsorship of terrorism, its economy, and its politics.  This affidavit is submitted to provide the Court with facts and evidence concerning Iran's funding of Hezbollah through the Central Bank of Iran in 2006 and before.

       2.       I am the Director of Research at the Washington Institute for Near East Policy ("The Washington Institute"), where I have been employed since 1997. My previous positions include five years as senior research professor at the Institute for National Strategic Studies of

the National Defense University and senior economist for four years each at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund. Most of my professional life has been spent studying the Middle East, in particular, Iran. My first scholarly article on the Middle East was published approximately thirty-five years ago, and my first work on the region for the Central Intelligence Agency was approximately twenty-five years ago.

3.      The Washington Institute is a think tank, in other words, a 501(c)(3) organization, which receives funding from a variety of individuals, all of whom are American, to conduct studies about U.S. foreign policy interests and concerns in the Middle East. As part of that work, the Washington Institute studies domestic and international issues relating to the Iranian government. My work includes extensive research regarding the Iranian Ministry of Intelligence and Security ("MOIS"), the Iranian Revolutionary Guard Corps (the "IRGC") and its Qods Division ("IRGC Qods ")  and the Iranian financial and banking system.

4.      As Director of Research at The Washington Institute, my duties include, *inter alia*, supervising a staff of about twenty senior researchers who study Middle East politics and terrorism, with considerable focus on Iran. Some of these researchers are well known for their expertise in the Middle East. For example, I have worked with Dennis Ross, President Clinton's Middle East Envoy and chief peace negotiator from 1993-2000 and President Obama's Special Assistant to the President and Senior Director of the Central Region (covering the Middle East) at the National Security Council from 2009-2013. I have also worked with former Deputy Assistant Secretary of the Treasury for Intelligence Matthew Levitt, responsible, *inter alia*, for following Iranian terror financing; and former Deputy Assistant Secretary of State, Scott Carpenter, who worked on Middle East reform programs. Under my supervision, the Washington

2

Institute's researchers have written more than twenty studies about Iran's security apparatus, support for terrorism including terror financing, political leadership, and U.S. and Western policies to counter Iranian terrorism and terror financing. I also regularly brief and receive briefings from senior United States military officials and senior officials of other governments friendly to the United States, about the threats from Iran, Iranian support of terrorism and Iranian strategy regarding terrorism.

5.       Over the last twenty-nine years, I have done contract consulting work on Iran for several U.S. government agencies, including the Central Intelligence Agency, the Defense Department, the State Department Bureau of Intelligence and Research, and through various contractors, the National Security Agency and the Defense Intelligence Agency.  While at the National Defense University, I worked closely with officials from a wide range of U.S. government agencies on the issue of Iran and Iranian support for terrorism, including close work with the Central Command (the U.S. military command responsible for the Middle East) and its subordinate commands, and with the staff of the Joint Chiefs of Staff.

6.       I have previously been designated and qualified by federal courts as an expert witness on issues relating to Iran, Iran's support for terrorism, its economy and other issues, and have given both live and written testimony in various cases brought against Iran for its sponsorship of terrorism, including *Cicippio v. Islamic Republic of Iran*, 18 F. Supp.2d 62, 68 (D. D.C. 1998); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8-9 (D.D.C. 1998); *Cronin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02890 (1999); *Higgins v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-00377 (1999); *Stehem v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00159 (2000); *Hegna v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00716 (2000);

3

*Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000);  *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000); *Elahi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02802 (1999); *Wagner v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-017999; *Polhill v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01798 (2000); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001); *Raffi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-850 (2001); *Kerr v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01994 (2001); *Surette v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-00570 (2001); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002); *Ungar v. Islamic Republic of Iran*, 271 F. Supp. 2d 91, 93 (D.D.C. 2002); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 (D.D.C. 2003); *Rieger v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 90 (D.D.C. 2003); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003); *Greenbaum v. Islamic Republic of Iran*, No. 02-2148, 2006 WL 2374221 at * 3 (D.D.C. Aug. 10, 2006); *Levin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 05-2494 (2007); *Owens v. Republic of Sudan*, et al., No. 01-2244, 2011 U.S. Dist. LEXIS 135961 (D.D.C. Nov. 28, 2011); *In Re Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570 (S.D.N.Y. Dec. 22, 2011), among others.

7.      I have also testified before the House International Relations, National Security, and Banking and Financial Services Committees and the Senate Foreign Relations and Banking Committees about Iran, Iranian terrorism, and the use of economic measures to discourage Iran from supporting terrorism.

8.      I have made presentations about the foreign and economic policy of Iran, including its support for terrorism, and about U.S. policy towards Iran at conferences sponsored

by, amongst other organizations, the Iranian Foreign Ministry's Institute for Political and International Studies in Tehran, Iran, the Royal Institute for International Affairs in London, UK, the Royal United Services Institute in London, UK, the Japanese Foreign Ministry in Tokyo, Japan, the Institute for Defense Studies and Analysis in New Delhi, India, the Shanghai Institute for International Studies in Shanghai, China, the Jaffee Center of Tel Aviv University in Tel Aviv, Israel, the Council for Foreign Relations in New York City, New York, the Nixon Center (part of the Nixon Presidential Library) and the Carnegie Endowment for International Peace in Washington, D.C., and a great many universities. I have given presentations concerning Iran at more than 200 symposiums in more than twenty countries.

9.     My books and monographs include: *How Iranians Might React to a Nuclear Deal* (The Washington Institute, 2014, with Mehdi Khalaji); *An Iranian Nuclear Outbreak is Not Inevitable* (The Washington Institute, 2011); *The Red Line: How to Assess Progress in U.S. Iran Policy* (The Washington Institute. 2010); *The Perfect Handshake with Iran: Prudent Military Strategy and Pragmatic Policy* (The Washington Institute, 2010); *Much Traction from Measured Steps: The Iranian Opposition, the Nuclear Issue, and the West* (The Washington Institute, 2010); *Engaging Iran: Lessons from the Past* (The Washington Institute for Near East Policy, 2009, edited); *The Last Resort: Consequences of Preventative Military Action Against Iran* (The Washington Institute, 2008, with Michael Eisenstadt); *Eternal Iran: Continuity and Chaos* (Palgrave Press, 2005, with Michael Rubin); *Getting Ready for a Nuclear-Ready Iran* (U.S. Army War College, 2005, with Henry Sokolski, edited); *Checking Iran's Nuclear Ambitions* (U.S. Army War College, 2004, with Henry Sokolski, edited); *Iran Under Khatami* (The Washington Institute for Near East Policy, 1998, with others); *Strategic Assessment*, (the

flagship annual report of the Institute for National Strategic Studies of the National Defense University, which I inaugurated and edited for three years, 1995-1997); *U.S. Sanctions on Iran* (Emirates Centre for Strategic Studies and Research, 1997); *Business as Usual? Western Policy Options Towards Iran* (American Jewish Committee 1995); *Energy Security in the Twenty-First Century* (National Defense University Press, 1995, edited); *Iran's Strategic Intentions and Capabilities* (National Defense University Press, 1994, edited); and *Iran's Challenge to the West: How, When, and Wh*y (the Washington Institute for Near East Policy, 1993).  The book I co-authored with Rudi Matthew and Willem Floor, *The Monetary History of Iran: From the Safavids to the Qajars*, was awarded the Houshang Pourshariati Iranian Studies Book Award for the best book about Iran in 2014 from the Middle East Studies Association, the organization of U.S. scholars studying the Middle East.

10.     In addition I have written about the contemporary Middle East, including about Iran, for a variety of news publications, including The New Republic, The New York Times, Wall Street Journal and Washington Post.  I have also authored more than forty scholarly articles for academic publications, such as Foreign Affairs, Survival, Washington Quarterly, International Journal of Middle East Studies, Middle East Journal, Les Cahiers de l'Orient and Oxford Bulletin of Economics and Statistics.

11.     From 1995 to 2012, I was senior editor of Middle East Quarterly, a journal of Middle Eastern affairs, which regularly publishes on Iranian politics and Iran's foreign policy. From 1990 through 1994, I was editor of Orbis, a foreign policy journal.

12.     I hold a Ph.D. in economics from the New School for Social Research and a B.A. from Oberlin College.

13.    I am able to read and/or speak Persian and French as well as some Hebrew, Spanish, and German. I read the Iranian press regularly through the internet. I also read other publications from Iran, including books in Persian.

14.    A copy of my CV is attached hereto as Exhibit A.

**B.    Nature of This Expert Witness Report**

15.    I have been asked by counsel for plaintiffs in the case of *Kaplan, et al. v. The Central Bank of Iran*, *et al.* to provide my professional opinion as to whether The Central Bank of Iran ("CBI"), whose name in the Persian language is Bank Markazi Iran, provided financing to Hezbollah in the period prior to and during the Second Lebanon War of 2006.

16.    My knowledge of Iran's sponsorship of terrorism and its use of its banking system for that purpose comes as a result of my routine and in-depth access to facts concerning Iran, its support of terrorism, its economy and politics and my extensive study of Iran as outlined herein, including my professional research and publishing in this field over the course of many years. Indeed, as part of my work, I spend at least one hour a day reviewing writings, including online sources, relating to Iran and other nations that sponsor terrorism.  Iran is a relatively open information country in which the competing political forces frequently reveal information about the country's security apparatus and debate issues relating to terrorism.  Iran even has many internet sites that publish information on these subjects.  From my years studying Iranian politics and given the competing sources that can be compared, I believe that I am able to determine whether Iranian reports on these subjects are credible.  Indeed, I use this information as a source to brief the United States and other governments.  Furthermore, Iran and some of the terrorist

groups it sponsors have been openly boastful about their relations, and have described and detailed their connections in print.

17.     Nevertheless, Iranian media are strictly regulated by the Iranian government. The Committee to Protect Journalists lists 30 imprisoned journalists in Iran, more than any country in the world except China.[1]   From leaks, it is known that the Iranian government issues official instructions about topics which cannot be discussed.  The lack of coverage in the Iranian media about Iran's financial relationship with Hezbollah and other terrorism groups, or even of U.S. accusations about deceptive practices by Iranian financial institutions, strongly suggest that coverage of these issues is forbidden.  Be that as it may, I am unaware of useful material from Iranian sources about terrorism financing by the Iranian government or activities of the CBI in this regard.

18.     My opinions set forth below are based upon my education, research, and experience as well as my review and analysis of documents and sources typically relied upon by experts in my field.  Such documents and sources include, but are not limited to: official speeches made by Iranian officials, U.S. officials, and the officials of other countries, my conversations with U.S. officials, former Iranian officials, and officials of other countries; and my review and analysis of relevant documents, including newspaper accounts (in both the English-language press and Persian language press).

## C.      Background Concerning Hezbollah and the Second Lebanon War

19.     Hezbollah's origins date to 1982, shortly after the 1979 Iranian Revolution, when Israel invaded Lebanon. Iran secretly instructed its most fervent supporters to form a clandestine

---

[1]  See https://cpj.org/imprisoned/2014.php.

organization within Amal, then the main organization in the Shiite community.  At first, the Iranian supporters used a variety of names to hide their activities, such as kidnapping Americans and other Westerners.  But by 1985-86, Hezbollah openly acknowledged its existence, presenting itself as more radical and more pro-Iranian than Amal.  The two fought a war in 1988, which Hezbollah won, cementing its position as the main Shiite organization.  During the period of its formation from 1982 through 1988, Hezbollah had few means of financial support other than aid from Iran.  In the last 25 years, Hezbollah has been able to parlay its military might into control over criminal enterprises, such as drug smuggling, and commercial activities such as television stations, which would in theory require regulatory approval from a Lebanese government in no position to impose rules on Hezbollah.  While Hezbollah has gained its own financial resources in addition to the substantial financial and military aid it continues to receive from Iran, the organization has remained highly responsive to Iranian directives even when those go against Hezbollah's own interests.  One reason is that Hezbollah's appeal to its hard-core supporters is as the ideological embodiment of the revolutionary values represented by the Islamic Republic of Iran.

20.     In short, Hezbollah was founded at Iran's direction, has always received substantial assistance from Iran, and has always been highly responsive to Iranian government directives. There is no doubt that Iran provides essential financial support to Hezbollah and that it did so prior to and during the Second Lebanon war.[2] This support has significantly increased

---

[2]     Indeed many U.S. Courts, including the Court in this case, have found that Iran has been providing material support to Hezbollah in the form of millions of dollar in financing and weapons since the 1980's. *See Kaplan v. Hezbollah*, 55 F. Supp.3d 189, 197 (D.D.C. 2014); *see also, e.g., Oveissi v. Islamic Republic of Iran,* 879 F. Supp.2d 44, 53 (D.D.C. 2012); *Kilburn v. Islamic Republic of Iran,* 699 F. Supp.2d 136, 153 (D.D.C. 2010); *Brewer v. Islamic Republic of Iran,* 664 F. Supp.2d 43, 54 (D.D.C.

Hezbollah's military capabilities, and assisted Hezbollah in the destruction it inflicted upon Israel's civilian population during the Second Lebanon War.

**D.   The Central Bank of Iran Is a Tool of the Iranian Government**

21.   CBI is not an independent entity, but acts at the direction of the Iranian government and pursuant to its policies. The attached Annex examines the relationship between CBI and the Iranian government from the perspective of the law, the practice, and comparative economics.  In brief:

    a)   In law, CBI is owned by and is tightly linked to the Iranian government. Iran's 1972 Monetary and Banking Law ("MBL"), which is still in force, provides that CBI is a joint-stock company whose capital is "wholly owned by the Government," to quote the MBL's Article 10(e).

    b)   In practice, the Iranian government exercises tight control over CBI and ignores the law by issuing direct orders to CBI.   For instance, in practice, the CBI governor serves at the pleasure of the president, rather than for the five-year term specified in the MBL.   In 2008, CBI chief Tahmasb Mazaheri was dismissed by presidential decree when he refused to resign. Second, the government cabinet regularly votes at its meetings to order CBI to extend loans for specific purposes, which is contrary to the procedures set out in the MBL.

    c)   From the perspective of comparative economics, CBI is not independent from the Iranian government unlike the central banks in most developed countries.

22.   In addition to the material contained in the attached Annex, the Iranian Revolutionary Constitution of 1979 provides that all Iranian banks are to be "owned publicly and

2009); *Ben Rafael v. Islamic Republic of Iran*, 540 F. Supp.2d 39, 47 (D.D.C. 2008); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp.2d 27, 43-44 (D.D.C. 2001); *Polhill v. Islamic Republic of Iran*, 2001 WL 34157508, at *4 (D.D.C. Aug. 23, 2001); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000).

administered by the state."[3] Actually, the government has fudged this provision, allowing private and semi-private banks.  But as the Research Division of the Library of Congress has correctly noted, all state and private banks in Iran are "strictly overseen by the Central Bank of Iran."[4]

23.     Both by law and in practice, the CBI is the Iranian government's banker.[5] Government revenue is deposited in the CBI; government expenditures are carried out through the CBI.  The relationship between the CBI and the government is even closer than specified in law or recommended by economists. The government misuses the CBI in ways contrary to Iranian law and to good economic practice, specifically by ordering the CBI to ensure how credit is allocated; that is, the Council of Ministers issues orders about how the CBI will administer credit policy, including to which sectors the CBI will extend loans.  This has had some disastrous effects on the Iranian economy, especially when loans equal to at least ten percent of national income were extended for ill-conceived and poorly planned housing projects.

24.     In sum, it is my expert opinion that the CBI is a tool of the government of Iran and operates as the Iranian government's banker.

25.     Since CBI operates as the Iranian government's banker, it is my expert opinion that Iran could not have transferred millions of dollars to Hezbollah (as many U.S. courts have found) without the funds passing through the CBI in one way or another.

---

[3]     See 2/23/01 Country Reports on Human Rights Practices for Iran, available at http://www.state.gov/j/drl/rls/hrrpt/2000/nea/786.htm.

[4]     See May 2008, Country Profile: Iran, Library of Congress – Federal Research Division, available at http://www.loc.gov/rr/frd/cs/profiles/Iran.pdf.

[5]     I am aware of one court that has found that the CBI is not engaged in typical "central banking activities." *See Peterson v. Islamic Republic of Iran*, 2013 WL 1155576, at *26 (S.D.N.Y. March 13,

**E.      CBI Supports Terrorism Generally**

26.      My conclusions above are supported by repeated statements by U.S. Government officials concerning CBI's support for terrorism.

27.      Statements by U.S. government officials, like the ones discussed below, are particularly reliable and are widely used by scholars and policymakers.   The Treasury Department has created a large structure headed by the Under Secretary for Terrorism and Financial Intelligence to follow terror financing, with two assistant secretaries, each with substantial staff, and two other large bureaucracies (the Financial Crimes Enforcement Network or FINCEN and the Office of Foreign Assets Control which enforces sanctions).   This structure, which is part of the U.S. intelligence community, has access to all the intelligence assets of the U.S. government, including signals intercepts and intelligence from informers.   It has the deserved reputation of being cautious and careful about its designations and public statements; indeed, some commentators and members of Congress complain that it is too slow to act.   In private conversations, Treasury officials explain that they place high priority on developing sufficiently detailed and well-documented dossiers so that the U.S. government has high confidence its judgments will stand up in court if challenged, with the result that sometimes the U.S. government spends years internally debating before a statement is released characterizing some entity as involved in terror financing.   As noted above, such statements are typically relied upon by Iran and terrorism experts in their research, and I myself routinely rely upon such statements in my research.

---

2013). This case is now on appeal to the Supreme Court of the United States on a different issue that has no bearing on the matters discussed herein.

28.     At a Press Roundtable in Germany on July 12, 2007, U.S. Under Secretary of the Treasury for Terrorism and Financial Intelligence, Stuart A. Levey, explained:

> The [Iranian] regime does *use its banks* to pursue not only its proliferation ambitions but also its funding of terrorism … we in the United States have taken action against Bank Saderat for its role in funneling money *from the Central Bank of Iran* to terrorist organizations [including] Hezbollah … Iran not only uses its banks for that purpose, but also *its banks engage in deceptive practices in order to engage in that business*.[6] [all of the emphasis in this paragraph added]

(emphasis added). Under Secretary Levey testified similarly before the United States Congress on April 1, 2008, correctly stating that "Iran uses its state-owned banks … for financing terrorism."[7]

29.     Moreover, as a direct result of the deceptive financial practices described by Under Secretary of the Treasury Levey, the U.S. Government has subjected Iranian banks, including CBI, to sanctions. Deputy Assistant Secretary of Treasury for Terrorism Financing and Financial Crimes Daniel Glaser provides a good summary of these sanctions, as of early 2008, in his April 17, 2008 testimony before the House Committee on Foreign Affairs Subcommittee on the Middle East and South Asia and Subcommittee on Terrorism, Nonproliferation and Trade. Consistent with the statements of Under Secretary of the Treasury Levey, Glaser explains the basis for the sanctions, as follows:

> Iran uses its global financial ties to pursue both the threat of terrorism and a nuclear program through an array of deceptive practices specifically designed to avoid suspicion and evade detection from the international financial community.... *[One]*

---

[6]     See 7/12/07 Press Roundtable with Under Secretray of the Treasury Stuart A. Levey, available at http://germany.usembassy.gov/levey-roundtable.html.

[7]     See 4/1/08 Under Secretary for Terrorism and Financial Intellignece Stuart A. Levey, Testimony Before the Senate Committee on Finance, available at http://www.finance.senate.gov/imo/media/doc/040108sltest.pdf

> ***method Iranian banks use to evade controls is to ask other financial institutions to remove their names when processing transactions through the international financial system....This practice is even used by the Central Bank of Iran*** to facilitate transactions for sanctioned Iranian banks.[8]

(emphasis added).

30.     In a March 2008 Advisory, the Department of the Treasury Financial Crimes Enforcement Network (FinCEN) similarly stated:

> Through state-owned banks, the Government of Iran disguises its involvement in … terrorism activities through an array of deceptive practices specifically designed to evade detection. ***The Central Bank of Iran and Iranian commercial banks have requested that their names be removed from global transactions in order to make it more difficult for intermediary financial institutions to determine the true parties in the transaction*** [emphasis added] … The U.S. Department of the Treasury is particularly concerned that the Central Bank of Iran may be facilitating transactions for sanctioned Iranian banks.[9]

31.     In a June 22, 1010 Advisory, FinCEN reinforced this stating:

> The Financial Crimes Enforcement Network (FinCEN) is issuing this advisory to supplement information previously provided on the serious threat of money laundering, terrorism finance, and proliferation finance emanating from the Islamic Republic of Iran, and to provide guidance to financial institutions regarding United Nations Security Council Resolution (UNSCR) 1929, adopted on June 9, 2010....[10]

---

[8]      See 4/17/08 Testimony of Daniel Glaser before Subcommittee on the Middle East and South Asia and the Subcommittee on Terrorism, Nonproliferation and Trade, available at http://www.iranwatch.org/sites/default/files/glaser-prepared-041708.pdf

[9]      See 3/20/08 Advisory, Department of the Treasury Financial Crimes Enforcement Network, available at https://www.fincen.gov/statutes_regs/guidance/pdf/fin-2008-a002.pdf.

[10]      See 6/22/2010 Advisory FIN-2010-A008, Department of the Treasury, Financial Control Enforcement Network, "Update on the Continuing Illicit Finance Threat Emanating from Iran ," available at https://www.fincen.gov/statutes_regs/guidance/pdf/fin-2010-a008.pdf.

32.     These Security Council actions, in addition to Financial Action Task Force (FATF)[11] statements regarding the risks posed by Iran and calling for countries to impose countermeasures, illustrate the increasing risk to the integrity of the international financial system posed by the Iranian financial sector as a whole, which is led by the Central Bank of Iran.

33.     On November 21, 2011, the U.S. Department of the Treasury issued a finding which, in the words of the November 21, 2011 Treasury Department press release:

> identified the Islamic Republic of Iran as ***a jurisdiction of primary money laundering concern*** under Section 311 of the USA PATRIOT Act (Section 311) based on Iran's support for terrorism; pursuit of weapons of mass destruction (WMD); reliance on state-owned or controlled agencies to facilitate WMD proliferation; ***and the illicit and deceptive financial activities that Iranian financial institutions – including the Central Bank of Iran*** – and other state-controlled entities engage in to facilitate Iran's illicit conduct and evade sanctions.[12]

(all emphasis in this paragraph added).[13]

34.     In response to the Section 311 PATRIOT Act Finding, Congress passed a series of provisions concerning CBI which were included in the National Defense Authorization Act for FY2012 ("NDAA FY 2012"), now codified as 22 U. S. Code 8513a, as follows:

(a) Findings

---

[11]     The Financial Action Task Force is an inter-governmental body whose 36 members include China, Russia, Japan, Korea, Australia, Canada, Mexico, the United States, and all the countries of the European Union, among others. Its purpose is to develop and promote policies to combat money laundering and terrorist financing around the world. Some though not all of its statements on Iran are available at http://www.fatf-gafi.org/publications/?hf=10&b=0&q=Iran&s=desc%28fatf_releasedate%29 (the other statements are available at other places on www.fatf-gafi.org).

[12]     See 11/21/11 U.S. Department of the Treasury Press Release, available at http://www.treasury.gov/press-center/press-releases/Pages/tg1367.aspx.

[13] Treasury never finalized the November 21, 2011 proposed designation of Iranian banks, including CBI, under the USA PATRIOT Act's Section 311 for a variety of reasons, including subsequent Congressional action concerning sanctions on CBI which in effect made the proposed designation moot.

Congress makes the following findings:

(1) On November 21, 2011, the Secretary of the Treasury issued a finding under section 5318A of title 31 that identified Iran as a jurisdiction of primary money laundering concern.

(2) In that finding, the Financial Crimes Enforcement Network of the Department of the Treasury wrote, "The Central Bank of Iran, which regulates Iranian banks, has assisted designated Iranian banks by transferring billions of dollars to these banks in 2011. *In mid-2011, the CBI transferred several billion dollars to designated banks, including Saderat, Mellat, EDBI and Melli, through a variety of payment schemes. In making these transfers, the CBI attempted to evade sanctions by minimizing the direct involvement of large international banks with both CBI and designated Iranian banks*. [emphasis added]

(3) On November 22, 2011, the Under Secretary of the Treasury for Terrorism and Financial Intelligence, David Cohen, wrote, "Treasury is calling out the entire Iranian banking sector, including the Central Bank of Iran, as posing terrorist financing, proliferation financing, and money laundering risks for the global financial system."

(b) Designation of financial sector of Iran as of primary money laundering concern

The financial sector of Iran, including the Central Bank of Iran, is designated as a primary money laundering concern for purposes of section 5318A of title 31 because of the threat to government and financial institutions resulting from the illicit activities of the Government of Iran, including its pursuit of nuclear weapons, support for international terrorism, and efforts to deceive responsible financial institutions and evade sanctions.

(c) Freezing of assets of Iranian financial institutions

The President shall, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), block and prohibit all transactions in all property and interests in property of an Iranian financial institution if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(d) *Imposition of sanctions with respect to the Central Bank of Iran and other Iranian financial institutions* [emphasis added]

16

(1) In general

Except as specifically provided in this subsection, beginning on the date that is 60 days after December 31, 2011, the President—

(A) shall prohibit the opening, and prohibit or impose strict conditions on the maintaining, in the United States of a correspondent account or a payable-through account by a foreign financial institution that the President determines has knowingly conducted or facilitated any significant financial transaction with the Central Bank of Iran or another Iranian financial institution designated by the Secretary of the Treasury for the imposition of sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.); and

(B) may impose sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) with respect to the Central Bank of Iran.

35.     While the NDAA FY 2012 contains certain specified exemptions (e.g., for agricultural goods) and permits presidential waiver in very limited circumstances (in the interests of U.S. national security), this in no way impacts the underlying finding that CBI is involved in financing terrorism.

36.     The fact that Iran has used CBI to transfer funds to terrorists prior to 2006 is also clear from other sources. For example, officials of terrorist groups, such as the Palestinian group Hamas, have described carrying tens of millions of dollars of cash notes in suitcases from Iran.[14] It is my expert opinion that this money was almost certainly assembled with a key role being played by CBI, as the Iranian government's banker.  This opinion is based on my experience in the developing countries I visited as an IMF official, where it was a universal practice that

---

[14]  In 2006, Mahmoud Zahar, then the foreign minister of the Hamas-led Palestinian Authority government, defended returning from a seven-country trip which included Iran with $20 million in four suitcases, saying "We are not going to allow anyone to prevent us." See www.ipsnews.net/2006/06/mideast-hamas-suitcase-economy.  Given the other countries on his itinerary (including China, Indonesia, and Pakistan), it seems highly probable this money came from Iran.

politically delicate transactions were carried out directly by the Central Banks of those countries. In addition, even in the case that such cash came from a government account in a commercial Iranian bank, CBI likely oversaw and facilitated the transaction. As explained above, CBI strictly oversees all Iranian banks. In that capacity, CBI closely monitors foreign exchange dealings and certainly would have been well informed about a large shipment of cash.

37.     In light of the above information, it is my expert opinion that Iran has used CBI for many years to transfer funds to support terrorism.

**E.     CBI's Support for Hezbollah Prior to and During the Second Lebanon War**

38.     Since Hezbollah is Iran's terrorist proxy in Lebanon and has enjoyed military and financial support from Iran since its formation in 1982, it is clear that Hezbollah is an important beneficiary of the terrorist financing provided by CBI.

39.     In this respect, the U.S. Government has found specifically that Iran used CBI to transfer many millions of dollars to Hezbollah in the years leading up to the Second Lebanon War (July 12, 2006 – August 14, 2006). In an October 25, 2007 Press Release, the U.S. Department of Treasury stated:

> … [] from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence.[15]

40.     The U.S. Treasury Department reiterated this finding one year later in a Press Release dated November 6, 2008, stating:  "Between 2001 and 2006, Bank Saderat transferred

---

[15] See 10/25/07 U.S. Department of Treasury Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism, available at http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

$50 million from the Central Bank of Iran through Bank Saderat's subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts that support acts of violence." [16]

## F.      Conclusion

41.      Hezbollah, a Shia Lebanese Islamist organization established in 1982, is a central regional client of Iran, which was established under Iranian auspices. Iran maintains the organization financially and through training and the provision of arms. Many U.S. Courts have so found.

42.      As Iran's central bank, which is subject to the control of the Iranian government both in law and practice and functions as the Iranian government's official banker, CBI plays a central role in Iran's transfer of funds to Hezbollah. Iran's financial institutions, led by CBI, have engaged in deceptive financial practices in order to accomplish the transfer of funds to terrorist groups, including Hezbollah, without detection. This activity has led CBI and other Iranian financial institutions to be subjected to strict U.S. sanctions with an express finding by the U.S. Government that CBI transferred millions of dollars to Hezbollah between 2001 and 2006.

---

[16] See 11/6/08 U.S. Department of Treasury Fact Sheet, available at: http://www.treasury.gov/press-center/press-releases/Pages/hp1258.aspx.

43.    CBI has engaged in these activities for many years, including during the period prior to and during the Second Lebanon War. Such financial support significantly increased Hezbollah's capability to carry out terrorist acts during and after the Second Lebanon War of 2006.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS
OF THE UNITED STATES OF AMERICA THAT THE FOREGOING
IS TRUE AND CORRECT.

*Patrick L. Clawson*     *December 1, 2015*

Patrick Clawson, PhD.       Date

20

Annex to Patrick Clawson's Declaration

# Relationship of Iran's Central Bank
# to the Iranian Government

### by Patrick Clawson
October 2015

The relationship between Iran's Central Bank, whose name in the Persian language is Bank Markazi Iran (CBI), and the Iranian government can be examined from the point of view of the legal framework, from actual practice, and from the perspective of economists. In law, CBI is owned by and is tightly linked to the Iranian government. In practice, the Iranian government exercises tight control over the CBI, ignoring the law by issuing direct orders to the CBI.  From the perspective of economists, the CBI has less independence from the government than do central banks in most developed countries.

**The Legal Framework**
The legal foundation of CBI remains the 1972 Monetary and Banking Law (MBL) – also referred to as the Monetary and Banking Act – despite the intervening 1979 revolution. The MBL can be found on the official website of the CBI, both in the Persian and English languages; the location is http://www.cbi.ir/simplelist/1457.aspx. The English translation is excellent; it accurately represents the Persian original. The post-revolutionary laws about banking – the Nationalization of Banks Law, the Law on Unsury (Interest) Free Banking Operations, and the Administration Law of Banks – have little if any implication for that legal foundation. Since the adoption of the Law on Unsury (Interest) Free Banking Operations, the MBL provisions about the CBI regulating interest rates has been modified to the extent that different terminology is used to conform with the theory that banking is done without interest, but the practical difference is small. Those laws can also be found in the Persian and English languages on the CBI website.

     The MBL provides that CBI is a joint-stock company exempt, unless otherwise stipulated, from the general laws and regulations applying to ministries and other government entities. The capital is set at five billion rials, now approximately equal to $500,000 but in 1972 equal to approximately $70 million. That capital is "wholly owned by the Government," to quote MBL Article 10 (e).

     The MBL provides that the forum of the shareholders is the General Meeting. Membership in that seems to have changed a bit over

the years as ministries were divided or consolidated, but both law and practice has been that the only attendees are the CBI Governor and members of the cabinet, that is, government ministers. The MBL specifies that the General Meetings shall consist of the CBI Governor, the Minister of Finance and Economic Affairs, and one other minister appointed by the Council of Ministers. Members of other organs of the Bank may attend meetings of the General Meeting but do not have a vote. The General Meeting approves the balance sheet and the amount of net profit. MBL Article 25 (b) provides that all CBI profit after provisions for a contingency reserve "shall go to the Government."

As provided in the MBL, there is a Supervisory Board, elected upon recommendation of the Minister of Finance and Economic Affairs by the General Meetings, which consists of five auditors or other persons versed in accountancy or banking; they are responsible for auditing the accounts.

The MBL provides that the Governor of the CBI is appointed for a five-year term by "Royal Decree," upon recommendation of the Minister of Finance and Economic Affairs subject to approval by the cabinet (now composed of the President of Iran and the ministers). The Deputy Governor is also appointed for a five-year term by "Royal Decree," upon the recommendation of the Governor, the agreement of the Minister of Finance and Economic Affairs, and the approval of the cabinet. The Governor is the CBI's highest executive and administrative authority and is liable for the proper conduct of the affairs of the CBI and implementation of the MBL. He appoints a Secretary General and three Vice Governors, subject to approval by the General Meeting; those five plus the Governor make up the Executive Board.

Under the MBL, an important role is to be played by the Currency and Credit Council (CCC), which is composed of the CBI Governor, various government officials such as the Prosecutor General and one of the undersecretaries of the Economics and Finance Minister, businessmen (the president of the Chamber of Commerce and the managing director of the Banking Association), and experts appointed by economics ministers. Under the MBL, the CCC "shall: 1. Examine and approve the organization, budget, employment code, and internal regulations of the CBI; ... 3. Review and approve the regulations drawn up under the provisions of this Act; 4. Comment upon the banking, monetary and credit issues of the country," among other things.

**CBI in Practice**

In practice, the MBL has been stretched in several ways, presumably governed by regulations, though I have not in all cases found the relevant regulations. The General Meetings appear to be often attended by other economic ministers, especially the Minister of Commerce, the

Housing Minister, the Agriculture Minister, the Industry Minister, the Cooperatives Minister, the Housing and Construction Minister, the Mines Minister, and until its abolition the Head of the Plan and Budget Organization. The composition of the CCC appears in practice to vary from that specified by the MBL, for instance, by the inclusion of two non-voting legislative deputies chosen by the Majlis (Parliament). Though not mentioned in the MBL, there is in practice a "High Banking Council" made up of the CBI Governor, the CBI General Secretary, the managing director of Bank Melli (the largest bank, completely state owned), and representatives of various ministers – typically the same ministers who are at the General Meeting.

More importantly, the CBI in practice is much more directly controlled by the government than it is in theory. That was particularly true under the 2005-13 government headed by President Mahmoud Ahmadinejad, but it continues to be true under the current government headed by President Hassan Rouhani.

First, the CBI governor in practice serves at the pleasure of the President. One could argue that in the absence of the monarch referenced in the MBL, the President in his capacity as head of state appoints the Governor. However, the MBL still specifies a specific five-year term of office for the Governor, with no mention made about procedures by which the Governor may be dismissed before the end of his term of office. That provision has been ignored. In August 2007, Ebrahim Sheybani resigned as CBI Governor under strong pressure from Ahmadinejad – an action which seems consistent with the letter of the MBL if not with its spirit. But in 2008, his successor Tahmasb Mazaheri refused to resign. His last letter to Ahmadinejad was leaked to the press; excerpts are available in English at http:\\www.roozonline.com/english/news/newsitem/article/2008/september/29//central-bank-governors-goodbye-letter-revealed.html. In it, Mazaheri complained his recommendations "are not and will not be accepted," his suggestion about reforms "was not attended to," and "necessary measures were not taken" about problems he identified. He added that he knew "sending a report to the leader means the end of my cooperation at the central bank." And indeed, upon receiving the letter, Ahmadinejad signed a decree naming a new CBI Governor. None of this was consistent with the spirit or the letter of the MBL, which sets out a fixed five-year term for the CBI Governor.

Second, the government cabinet regularly votes at its meeting to order the CBI to extend loans for specific purposes. For instance, to take two examples at random, on March 15, 2007, the 26th cabinet session of the first Ahmadinejad government ordered the CBI to lend 50 billion rials for marriage, medical treatment, education and housing loans, while on April 20, 2007, the 27th cabinet session ordered the CBI to extend 150

3

billion rials for the same purposes. The MBL provides that the CBI "shall be vested with the following powers: (1) Granting of loans and credits to ministries and government organizations, subject to legal authorization..." That is quite a different procedure from the government ordering the CBI to extend loans for specific purposes.

Third, the CCC plays little of the role laid out for it in the MBL. Major decisions about monetary policy are made directly by the government. During the Ahmadinejad era, these decisions were often made personally by the President without consulting the CCC. For instance, in his speech of April 16, 2008, Ahmadinejad describes orders he had given the CBI about monetary policy. On July 14, 2009, the semi-official Mehr News Agency announced that the CCC had met for the first time in two years. Indeed, in August 2007, Ahmadinejad announced he had dissolved the CCC; press reports stated that this action was what precipitated Sheybani' resignation as CBI Governor. This seems inconsistent with the MBL's provision that the CCC approves monetary regulations and the CBI budget.

A telling illustration of the CBI's subservience to the government has been the issue of setting interest rates – that term being widely used in discussion of the issue in Iran, even though an elaborate ruse is used to present the interest rates as consistent with a strict interpretation of Islamic law which bans interest. While running for the presidency and since assuming office, Ahmadinejad insisted that interest rates be kept low, which he thought would reduce inflation – a viewpoint for which he has been harshly criticized by Iranian economists. His insistence on this point is what led him to force the resignation of one CBI Governor and to dismiss another, as well as to order that the CCC be dissolved. The interest rate on loans has been well below the inflation rate, with the result that demand for loans is extremely high. In practice, loans nearly always go to those with good political connections. The low interest rates have also led to an explosion of non-bank financial institutions, vaguely similar to U.S. credit unions, many of which are run by politically well-connected institutions such as the Islamic Republican Guard Corps. It would be fair to say that the chief beneficiaries of the low-interest-rate policy have been the political elite; to be less polite, the policies Ahmadinejad imposed on the banking system facilitate corruption.

Under Rouhani, the government's focus has been on reducing the inflation rate.  This has led to a restrictive monetary policy, an artificially fixed exchange rate to keep import prices low, and a contractionary fiscal stance (at first, running a budget surplus and then, when the collapsing oil price slashed government revenue, sharply curtailing government spending).  The CBI has been the principal implementer of the first two of these policies, which have pushed Iran into a recession.  The Rouhani stance has been highly controversial, to the point that four important

4

Cabinet Ministers sent him a letter criticizing his economic policy (the letter was subsequently leaked to the press). In the debates about the policy, it has been extremely clear that the CBI policies were being implemented at Rouhani's direction, rather than as a result of decisions by the CCC or the CBI General Meeting.

**The Economic Concept of Central Bank Independence from the Government**

Many central banks have a complicated governing structure with a large government role. In other cases, the central bank is essentially a government department, with its management under about the same degree of government control as that of a ministry like the Ministry of Finance. Economists have long been intensely interested in to what extent central banks are independent from the government. Several influential articles presented somewhat different ways to measure central bank independence:

Alesina, A. and L.H. Summers, Central Bank Independence and Macroeconomic Performance: Some Comparative Evidence, *Journal of Money, Credit and Banking*, 25(2), May 1993, pp. 151-62.

Grilli, V., D Masciandaro, G. Tabellini, "Political and Monetary Institutions and Public Financial Policies in the Industrial Countries," *Economic Policy*, Vol. 13, October 1991, pp. 341-92.

Cukierman, A., P. Kalaitzidakis, L.H. Summers and S.B. Web, "Central Bank Independence, Growth, Investment and Real Rates," in Meltzer A.H. and I.P. Charles (eds.), *Carnegie-Rochester Conference Series on Public Policy*, No. 39, December 1993, pp.95-140.

Eijffinger, S.C.W. and E. Schaling, "Central Bank Independence in Twelve Industrial Countries," *Banca Nazionale del Lavoro Quarterly Review*, No. 184, March 1993, pp. 49-70.

These articles are concerned with such factors as whether the central bank governor has a fixed term, whether the governor can be dismissed, and other legal provisions which strengthen the central bank's position in conflicts with the government. But the articles are also concerned with the bank's independence in economic policy formulation, such as setting interest rates and lending to the government, and in banking supervision.

Each of these indices to Iran has been applied to Iran in a 551-page 2000 Ph.D. dissertation at the Catholic University of Brabant (the Netherlands) by Abloghassem Jamshidi, *The Financial System and Monetary Policy in the Islamic Republic of Iran*; the thesis, written in the English language, was published by Tilburg University in 2000. Each of those indices used slightly different criteria, and they each had very different scoring systems (as an analogy: a baseball game has very different scores from a basketball game). He scores the CBI's

independence using the criteria developed in each of those four articles and then compares that score to those of eighteen developed countries analyzed by the authors of those four articles (Australia, Austria, Belgium, Canada, Denmark, France, Germany, Greece, Ireland, Italy, Japan, Netherlands, New Zealand, Portugal, Spain, Switzerland, U.K. and the U.S.). He presented the minimum independence score for those eighteen, the maximum independence score, and the average independence score. The results were:

|  | Iran's Score | Score of the 18 developed countries | | |
|---|---|---|---|---|
|  |  | Minimum | Average | Maximum |
| Alesina | 1 | 1 | 2.15 | 4 |
| Grill, Masciandaro, and Tabellini | 6 | 3 | 7.61 | 13 |
| Cukierman | .43 | .14 | .37 | .68 |
| Eijffinger and Schaling | 2 | 1 | 3.21 | 5 |

Using three of the four systems, CBI is less independent from the government than the average for the eighteen developed countries. The primary factors on which the CBI scored higher for independence were on economic policy formulation and in banking supervision. With regards to provisions which allow the central bank to act independently of the government, CBI is distinctly less independent than are most developed country central banks.

Within Iran, many complaints have been heard that the CBI lacks independence from the government. In a 2006 interview about the government's Fourth Development Plan (a document setting out government economic goals and policies for the next five years), former deputy minister of economic affairs and finance Mohsen Safa'i-Farahani praised the Plan because, "The Central Bank will be taken out of government control. In other words, this will put an end to the interference of the government's economic sectors, such as the Ministry of Finance and Economic Affairs, in the Central Bank" (the reforms envisaged in 2006 were not carried out). On June 10, 2006, CBI Governor Sheybani "once again called for more independence for the Central Bank," according to the newspaper *Siyasat-e Ruz*, arguing, "An independent central bank can wisely outline and execute monetary policies; otherwise it must be a mere follower of the government." After Sheybani resigned as Governor in August 2007, Iranian press reports stated that the CBI's loss of independence from the government, as evidenced by the dispute over interest rates, was the main factor in his resignation.

**Conclusion**

There is no doubt that Iran's laws state that the CBI is owned by the Iranian government and give the Iranian government great influence over the CBI. In practice, the Iranian government treats the CBI much the same way as it treats any government ministry, that is, with very little if any independence. On balance, the CBI is less independent from the government than do the central banks of most developed countries.

**Exhibit A**
**Curriculum Vita of Patrick L. Clawson**

Dr. Clawson is Director for Research at The Washington Institute for Near East Policy. His previous positions include five years as senior research professor at the Institute for National Strategic Studies of the National Defense University and senior economist for four years each at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund.

Dr. Clawson speaks often about Iran for U.S. government audiences, including for the Office of the Director of National Intelligence, the United States Central Command, the U.S. Army's Central Command, various offices at the State Department (including briefing U.S. ambassadors to Middle Eastern countries), and tours arranged by several U.S. embassies.  He has lectured about Iran and Middle East politics in more than twenty countries, including Saudi Arabia, the U.A.E., Kuwait, Bahrain, Israel, Russia, China, Britain, France, Germany, Italy, Spain, the Netherlands, Belgium, Austria, Poland, Portugal, the Czech Republic, Australia, and Canada.

Dr. Clawson has testified often about Iran before the House International Relations, National Security, and Banking and Financial Services Committees and the Senate Foreign Relations and Banking Committees. From 2009 through 2014, he served on the Distinguished Advisory Panel of the Department of Energy's Sandia National Laboratory, which is the lead actor on many nuclear security issues. From 1994 to 2012, Dr. Clawson was senior editor of *Middle East Quarterly*. From 1990 through 1994, he was editor of *Orbis*, a foreign policy quarterly.

Dr. Clawson has written extensively about Iran including for *The New Republic* as well as op-ed articles in *New York Times*, *Wall Street Journal*, and *Washington Post*, among other newspapers. He is the author of more than thirty scholarly articles in *Foreign Affairs*, *Survival, Washington Quarterly*, *International Journal of Middle East Studies*, *Middle East Journal*, *Les Cahiers de l'Orient*, and *Oxford Bulletin of Economics and Statistics*, among other journals.

Dr. Clawson most recent co-authored book, *The Monetary History of Iran From the Safavids to the Qajars* (I.B. Tauris, 2013), with Rudi Matthee and Willem Floor, won the Middle East Studies Association of North America's Pourshariati Award for best book about Iran. His 14 other books and monographs about Iran include: *Preventing an Iranian Nuclear Breakout: U.S.-Israel Coordination* (The Washington Institute for Near East Policy, 2012, with David Makovsky);  *An Iranian Nuclear Breakout Is Not Inevitable* (The Washington Institute for Near East Policy, 2011); *Engaging Iran: Lessons from the Past* (The Washington Institute for Near East Policy, 2009, edited); *The Last Resort: Consequences of Preventive Military Action Against Iran* (The Washington Institute for Near East Policy, 2008, with Michael Eisenstadt); and *Deterring the Ayatollahs: Complications in Applying Cold War Strategy to Iran* (The Washington Institute for Near East Policy, 2007, edited with Michael Eisenstadt); and *Eternal Iran: Continuity and Chaos* (Palgrave, 2005, with Michael Rubin).  He has also written or edited seven monographs and books on other issues about the Middle East, such as energy security.

1

Dr. Clawson has been an expert witness about Iran in thirty federal court cases, mostly about Iran's support for terrorism.  Those case include: including *Cicippio v. Islamic Republic of Iran*, 18 F. Supp.2d 62, 68 (D. D.C. 1998); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8-9 (D.D.C. 1998); *Cronin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02890 (1999); *Higgins v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-00377 (1999); *Stehem v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00159 (2000); *Hegna v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00716 (2000); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000);  *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000); *Elahi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02802 (1999); *Wagner v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-017999; *Polhill v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01798 (2000); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001); *Raffi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-850 (2001); *Kerr v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01994 (2001); *Surette v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-00570 (2001); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002); *Ungar v. Islamic Republic of Iran*, 271 F. Supp. 2d 91, 93 (D.D.C. 2002); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 (D.D.C. 2003); *Rieger v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 90 (D.D.C. 2003); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003); *Greenbaum v. Islamic Republic of Iran*, No. 02-2148, 2006 WL 2374221 at * 3 (D.D.C. Aug. 10, 2006); *Levin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 05-2494 (2007); *Owens v. Republic of Sudan*, et al., No. 01-2244, 2011 U.S. Dist. LEXIS 135961 (D.D.C. Nov. 28, 2011); *In Re Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570 (S.D.N.Y. Dec. 22, 2011), among others.

Dr. Clawson's Ph.D. in economics is from the New School for Social Research and his B.A. is from Oberlin College. He speaks fluently Persian and French , as well as some Hebrew, Spanish, and German.